IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| DONJON-SMIT, LLC<br><br>VS.<br><br>ADMIRAL KARL L. SCHULTZ, CAPTAIN JOHN W. REED, COMMANDER NORM C. WITT, and COMMANDER MATTHEW J. BAER, IN THEIR OFFICIAL CAPACITY AS OFFICERS OF THE UNITED STATES COAST GUARD | CIVIL ACTION NO. _____ |

**PLAINTIFF DONJON-SMIT, LLC'S
VERIFIED APPLICATION FOR INJUNCTIVE RELIEF AND
BRIEF IN SUPPORT THEREOF**

Plaintiff Donjon-SMIT, LLC ("Donjon-SMIT") files this Verified Application for Injunctive Relief and Brief in Support Thereof against Defendants Admiral Karl L. Schultz, Captain John W. Reed, Commander Norm C. Witt, and Commander Matthew J. Baer (collectively, the "Defendants"), in their official capacity as officers of the United States Coast Guard ("Coast Guard"), and in support thereof state as follows:

**INTRODUCTION**

1.   Plaintiff Donjon-SMIT, LLC ("Donjon-SMIT") files this Verified Application for Injunctive Relief and Brief in Support thereof along with an accompanying Verified Complaint in an effort to prevent an almost certain environmental disaster in St. Simons Sound.  The United States Coast Guard and the Federal On-Scene Coordinator, in direct violation of the Oil Pollution Act of 1990 ("OPA 90") and corresponding regulations, are permitting an extremely high-risk salvage plan to move forward that has failed on two prior occasions involving similar ship wrecks. The vessel owner/responsible party and the Coast Guard are directly subverting the statutory and

1

regulatory requirements of OPA 90. Despite Donjon-SMIT's efforts to warn the Coast Guard and Donjon-SMIT's multiple requests for information from the Coast Guard regarding its decision, the Coast Guard has refused to respond, leaving Donjon-SMIT no other option but to seek court intervention in the best interest of the proper enforcement of OPA and to avert an imminent environmental catastrophe.

## PARTIES

2. Donjon-SMIT is a maritime salvage, firefighting, and lightering company that is registered as a limited liability company in the State of Delaware.

3. Defendant Admiral Karl L. Schultz ("Admiral Schultz") is the Commandant of the United States Coast Guard ("Coast Guard"). The Coast Guard is a military branch and federal agency within DHS. Admiral Schultz may be served with process at the National Command Center of the Coast Guard, US Coast Guard Stop 7318, 2703 Martin Luther King Jr Ave SE, Washington, DC 20032. Pursuant to Federal Rule of Civil Procedure 4(i), a copy of the summons and of this complaint will also be sent by registered or certified mail to the United States Attorney's Office for the Southern District of Georgia at 22 Barnard Street, Suite 300 Savannah, Georgia 31401, and to the Attorney General's Office at 950 Pennsylvania Avenue, NW Washington, DC 20530-0001.

4. Defendant Captain John W. Reed ("Captain Reed") is a Coast Guard Captain and Commander of the Coast Guard Sector Charleston. Captain Reed may be served with process at 196 Tradd Street, Charleston, SC 29401. Pursuant to Federal Rule of Civil Procedure 4(i), a copy of the summons and of this complaint will also be sent by registered or certified mail to the United States Attorney's Office for the Southern District of Georgia at 22 Barnard Street, Suite 300 Savannah, Georgia 31401, and to the Attorney General's Office at 950 Pennsylvania Avenue, NW Washington, DC 20530-0001.

5. Commander Norm C. Witt ("Commander Witt") is a Coast Guard Commander, the Commander of the Coast Guard Marine Safety Unit Savannah, and the Federal On-Scene Coordinator ("FOSC") in the State of Georgia. Commander Witt may be served with process at 1297 N. Lightning Road, Savannah, GA 31408. Pursuant to Federal Rule of Civil Procedure 4(i), a copy of the summons and of this complaint will also be sent by registered or certified mail to the United States Attorney's Office for the Southern District of Georgia at 22 Barnard Street, Suite 300 Savannah, Georgia 31401, and to the United States Attorney General's Office at 950 Pennsylvania Avenue, NW Washington, DC 20530-0001.

6. Commander Matthew J. Baer ("Commander Baer") is a Coast Guard Commander who at certain relevant times acted as the FOSC. Commander Baer may be served with process at 196 Tradd Street, Charleston, SC 29401. Pursuant to Federal Rule of Civil Procedure 4(i), a copy of the summons and of this complaint will also be sent by registered or certified mail to the United States Attorney's Office for the Southern District of Georgia at 22 Barnard Street, Suite 300 Savannah, Georgia 31401, and to the Attorney General's Office at 950 Pennsylvania Avenue, NW Washington, DC 20530-0001.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States;

   b. 28 U.S.C. § 1346, which gives district courts original jurisdiction over any civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department;

   c. 33 U.S.C. § 1321(e)(2) of the Clean Water Act, which gives district courts jurisdiction to grant any relief under § 1321(e) that the public interest and the equities of the case may require.

8. Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B).

## BACKGROUND

**A.     The GOLDEN RAY Capsizes in St. Simons Sound.**

9. On September 8, 2019, the GOLDEN RAY, a 200-metre-long car carrier vessel, capsized in the Port of Brunswick, St. Simons Sound. The capsizing of the GOLDEN RAY is the largest cargo shipwreck in U.S. coastal waters since the Exxon Valdez. At the time of the accident, the GOLDEN RAY was carrying approximately 4,200 automobiles and over twenty crew members. Though all crew members have been rescued, the automobiles remain trapped within the cargo hold of the GOLDEN RAY posing a "***substantial threat of a discharge***" in the navigable waters of St. Simons Sound if not properly removed.[1] In short, the cars need to be safely removed to avoid environmental disaster.



Photograph of the capsized GOLDEN RAY vessel in St. Simons Sound

---

[1] A true and correct copy of Commander Witt's November 8, 2019 USCG Administrative Order 01-19 Amendment 1 is attached hereto as **Exhibit 1**.

### B.     Congress Requires Non-Tank Vessel Response Plans Under OPA 90.

10.     In response to the devastating impacts of the Exxon Valdez disaster, Congress passed OPA 90 amending the Clean Water Act.  OPA 90 was designed to address a wide-range of problems associated with preventing, responding to, and paying for oil pollution incidents in the navigable waters of the United States.  Importantly, OPA 90 greatly increased federal oversight of maritime oil transportation and significantly reduced the amount of discretion that responsible parties had in determining how to best respond to environmental emergencies of their own making.

11.     Before OPA 90, a vessel owner responsible for an oil spill ironically also wielded significant control over how the spill would be cleaned up. In order to shift decision-making authority regarding oil spill response efforts back into the hands of public officials, OPA 90 requires owners of non-tank vessels carrying oil to submit to the Coast Guard a Non-Tank Vessel Response Plan ("NTVRP") detailing how they will respond to large discharges. 33 C.F.R. § 155.5010.  Depending on the capacity of the vessel, the NTVRP must demonstrate that the vessel owner has contracted with resource providers to provide certain services in case of an emergency, including salvage, emergency lightering, and marine firefighting. 33 C.F.R. § 155.5035.  Once a plan is approved, a vessel owner *may not* deviate from the NTVRP without additional approval from the President or the FOSC.  33 U.S.C.A. § 1321(c)(3)(B) (emphasis added).  Moreover, the FOSC may only approve a deviation from the NTVRP under "*exceptional circumstances*."  33 C.F.R. § 155.4032 (emphasis added).  Section 155.4032 provides:

> Use of resource providers not listed in the VRP.  If another resource provider, not listed in the approved plan for the specific service required, is to be contracted for a specific response, justification for the selection of that resource provider needs to be provided to, and approved by, the FOSC.   Only under *exceptional circumstances* will the FOSC authorize deviation from the resource provider listed in the approved vessel response plan in instances where that would best affect a more successful response."

33 C.F.R. § 155.4032(a) (emphasis added).

According to the Coast Guard's own administrative guidance published in 2009, its NTVRP requirement was implemented "to ensure that an incident be responded to quickly and ***without the need for contract negotiations during an actual emergency***." Salvage and Marine Firefighting Requirements; *Vessel Response Plans for Oil*, 73 FR 80618-01. Clearly, the term "exceptional circumstances" was intended to rarely allow for deviations from an approved NTVRP.[2]

### C. The GOLDEN RAY's NTVRP Under OPA 90.

12. GL NV24 Shipping Inc. ("Owner") is the owner of the GOLDEN RAY. As the owner of a non-tank vessel carrying oil, Owner was required to prepare an NTVRP. Pursuant to an agreement signed on September 20, 2017, Donjon-SMIT was designated as the approved salvage and marine firefighter ("SMFF") provider under the GOLDEN RAY NTVRP for nineteen different salvage and marine firefighting services. Donjon-SMIT is a highly-experienced marine salvage and casualty response provider which currently holds active response agreements with

---

[2] Though 33 C.F.R. § 155.4032 has not yet been interpreted by a court of law, courts have interpreted use of the term ***exceptional circumstances*** in other federal rules and regulations as setting a high threshold that should rarely be met. For example, under Supreme Court Rule 20, an "extraordinary writ" such as a writ of mandamus or habeas corpus may only be granted upon a showing of "exceptional circumstances [that] warrant the exercise of the Court's discretionary powers[.]" U.S. Sup. Ct. R. 20. Tellingly, though thousands of such petitions have been filed, the Court has not granted an extraordinary writ of habeas corpus since 1925, *see Ex parte Grossman*, 267 U.S. 87 (1925), or a writ of mandamus since 1962. *See Fong Foo v. United States*, 369 U.S. 141 (1962). Similarly, under Section 1229a of the Immigration and Nationality Act, a judge's removal order made in absentia may only be rescinded under "exceptional circumstances". 8 U.S.C. § 1229a(e)(1). This language has been interpreted to "set[] a high bar that 'will be met in only rare cases.'" *Jimenez-Castro v. Sessions*, 750 F. App'x 406, 408–09 (6th Cir. 2018) (quoting *Kaweesa v. Gonzales*, 450 F.3d 62, 68 (1st Cir. 2006)); *see also Herbert v. Ashcroft*, 325 F.3d 68, 72 (1st Cir. 2003). Likewise, pursuant to 18 U.S.C.A. § 3145(c), which governs the review of detention or release orders in criminal proceedings, a judicial officer may only order the release of a defendant held under a detention order if "it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C.A. § 3145. Here again, what qualifies as ***exceptional*** has been narrowly defined. *See United States v. McGillivray*, No. 2:11 CR 22-7, 2012 WL 137409, at *2 (quotations omitted) (W.D.N.C. Jan. 18, 2012) ("Courts generally have defined 'exceptional reasons' as circumstances which are clearly out of the ordinary, uncommon, or rare."); *United States v. Lea*, 360 F.3d 401, 403 (2d Cir.2004) (quoting *United States v. DiSomma*, 951 F.2d 494, 497 *2d Cir.1991) ("Exceptional circumstances exist where there is 'a unique combination of circumstances giving rise to situations that are out of the ordinary.'").

approximately 7,000 vessels worldwide.  In fact, Donjon-SMIT is the largest OPA 90 provider in the world.

        **D.**        **Donjon-SMIT Provides Life Saving Emergency Services on the GOLDEN RAY and Limits Environmental Harm.**

        13.        Within hours of the GOLDEN RAY capsizing, Donjon-SMIT provided emergency salvage, firefighting, and damage stability services as the approved SMFF under the GOLDEN RAY NTVRP.  Donjon-SMIT assisted in the successful rescue of four trapped crewmen.  Donjon-SMIT further stabilized the worksite by laying down a blanket of rock surrounding the ship, and by late October, Donjon-SMIT successfully removed most of the approximately 300,000 gallons of bunker fuel from the GOLDEN RAY's twenty-four fuel tanks.  Donjon-SMIT performed everything it was asked to do.  By all accounts, Donjon-SMIT's emergency services not only saved lives, but significantly limited the environmental harm caused by the GOLDEN RAY's capsizing.  This is the exact type of response that envisioned under OPA 90 and its NTVRPs.



Donjon-SMIT laying down rocks to stabilize the GOLDEN RAY

**E.     Donjon-SMIT Submits a Proven Salvage Plan Focused on Mitigating the Environmental Risks and Avoiding the Main Navigation Channel to the Port of Brunswick.**

14.     After securing the GOLDEN RAY, Donjon-SMIT was ready to move forward with removing the wreck under the GOLDEN RAY's NTVRP.  On November 5, 2019, Donjon-SMIT submitted a salvage plan proposal to Owner and its representatives.[3]  Under Donjon-SMIT's plan, the GOLDEN RAY would be cut and removed in small sections weighing approximately 600 tons each, allowing for a controlled removal of the over 4,000 automobiles still inside the vessel while minimizing stress on the damaged hull and reducing the significant risk of inadvertent discharges into St. Simons Sound.

15.     This approach had been successfully employed in a similar shipwreck salvage operation for the REIJIN that also involved the safe removal of automobiles that had posed a significant environmental risk.  Additionally, Donjon-SMIT proposed establishing a small 4.6-acre protective perimeter around the GOLDEN RAY that not only mitigates environmental risks but also avoids the main navigation channel to the Port of Brunswick.  Donjon-SMIT was prepared to move forward with its plan in November of 2019 and remains ready willing and able to implement its plan today.

**F.     The Owner subverts OPA 90 and Requests that Donjon-SMIT be replaced by Another Salvage Company.**

16.     Owner and its representatives rejected Donjon-SMIT's proposal out of hand, citing their unproven preference that the vessel be removed in much larger sections of approximately 4,000 tons.  Rather than affording Donjon-SMIT an opportunity to advocate for its safer small section removal plan, Commander Witt instead allowed Owner to place the wreck removal project out for tender to third-party contractors who were not part of the NTVRP in violation of OPA 90

---

[3] A true and correct copy of Donjon-SMIT's November 5, 2020 salvage plan is attached hereto as **Exhibit 2.**

and its regulations. Further, Commander Witt permitted Owner to solicit proposals based on a "fixed-price" rate rather than on the "cost-plus" terms used in the GOLDEN RAY'S NTVRP. The change to a "fixed price" structure is alarming it that it appears that the Owner may be attempting to limit its exposure. Simply put, Commander Witt allowed Owner to conduct the very bidding process that OPA 90 was designed to prevent, wasting valuable time that Donjon-SMIT could have used to begin work on the GOLDEN RAY while at the same time allowing the Owner to potentially limit it exposure.

17. Soon thereafter, Donjon-SMIT learned that a third-party company named T&T Salvage ("T&T") had submitted its own proposal to Owner and was permitted to present its plan to the entire Unified Command, including Commander Witt and other Coast Guard officials. Donjon-SMIT, which again was the pre-contracted SMFF resource provider, was never afforded a similar meeting with Unified Command to discuss its own proposal and its serious concerns with T&T's unproven, high risk plan.

      **G.    T&T's High-Risk Plan Will Likely Result in an Environmental Disaster in the Waters of St. Simons Sound.**

18. T&T proposed a high risk, "large section" removal whereby eight sections of the ship, weighing approximately 4,000 tons each, would be removed and transported by barge to the Gulf of Mexico. Similar large section removal processes have been used on capsized car carrier vessels twice before without success--once on the TRICOLOR in 2003, and again on the BALTIC ACE in 2014. In both instances, after removal of several large sections, the remaining sections collapsed, releasing additional pollutants into the surrounding waters. Additionally, T&T's proposed plan would require the construction of a thirty-one acre environmental protection barrier in St. Simons Sound that would interfere with the navigation channel, increasing the potential for another accident. Further, because each removed section would be even larger than the barge itself,

there would be significant risk of the sections falling off the barge during transport to the Gulf. T&T's proposal is also significantly more expensive than Donjon-SMIT's.

    **H.    The Coast Guard Permitted an Unlawful Deviation from GOLDEN RAY's NTVRP in Violation of OPA 90 and Its Regulations.**

19.    On December 19, 2019, Owner, without reference to any "exceptional circumstances," submitted a request to Commander Witt to deviate from the GOLDEN RAY's NTVRP and replace Donjon-SMIT with T&T as the salvage and marine fighting (SMFF) provider going forward. Again, and for undisclosed reasons, Donjon-SMIT was shut out of any discussions with Owner, Commander Witt, and the Coast Guard regarding the selection process. Two days later, on December 21, 2019 Commander Witt, in direct violation of OPA 90 and its corresponding regulation approved Owner's request to deviate from the GOLDEN RAY NTVRP without any justification or reference to any "exceptional circumstances" as required by 33 C.F.R. § 155.4032. This is the exact conduct that OPA 90 was designed to prohibit.

20.    Astonishingly, Donjon-SMIT was removed as the SMFF services provider on the GOLDEN RAY for *each of the nineteen different services* for which Donjon-SMIT was pre-contracted under the GOLDEN RAY NTVRP. Despite multiple inquiries from Donjon-SMIT, Commander Witt refused to articulate his reasoning for approving Owner's deviation request and has never explained why Donjon-SMIT was removed for all nineteen services.

    **I.    The Coast Guard Unlawfully Delegated Its Sole Decision-Making Authority to the GOLDEN RAY'S Owner.**

21.    On December 22nd, Paul Hankins, Donjon's Vice President for Salvage Operations, emailed Commander Witt to explain Donjon-SMIT's concerns with the T&T plan and to request a meeting to discuss the Commander's unlawful deviation approval.[4] In response,

---

[4] As outlined in the detailed email, the T&T Plan is a high risk plan that costs substantially more than the Donjon-SMIT plan and employs a removal method that has previously failed on two other occasions resulting in more environmental harm. Moreover, T&T's approach appears to be that if its plan does not work, there is plenty of money

10

Commander Witt, who as the designated FOSC is supposed to be sole decision-maker regarding any deviations from the NTVRP, tellingly "defer[red] to the Owner's representatives" regarding any meetings to discuss the deviation.[5]  This is an unlawful delegation of the decision-making authority that Congress sought to prevent under OPA 90.

22. By (1) permitting Owner to circumvent use of its pre-contracted NTVRP service provider in favor of an open bidding process, (2) not affording Donjon-SMIT any opportunity to explain its salvage removal plan or address any potential concerns, and (3) never providing any justification for their approval of Owner's deviation request, much less a finding of "exceptional circumstances," Defendants have subverted the very purpose of OPA 90 and effectively delegated their decision-making authority back to those responsible for the disaster at issue.  Moreover, Defendants have deprived Donjon-SMIT of its contractual agreement with Owner to provide SMFF services in addition to causing damage to Donjon-SMIT's reputation that will directly harm its ability to contract in the future.

23. Implementation of T&T's large section removal plan is now imminent.  On February 5, 2020, the Unified Command announced that construction of the environmental protection barrier will begin approximately one week from the date of this motion.[6]  Soon thereafter, T&T will commence cutting and removing sections of the GOLDEN RAY.  Time is of

---

to then try the Donjon-SMIT's approach.  The Coast Guard's rejection of the safer, proven, and less expensive approach outlined in the Donjon-SMIT plan is arbitrary, at best, and increases the likelihood of greater environmental harm.

[5] A true and correct copy of the email exchange between Donjon-SMIT and the Coast Guard is attached hereto as **Exhibit 3**.

[6] A true and correct copy of the Unified Command Press Release is attached hereto as **Exhibit 4**.

11

the essence if Defendants' blatant violations of Donjon-SMIT's statutory and constitutional rights are to be remedied.[7]

## ARGUMENT AND AUTHORITIES

24. Donjon-SMIT re-alleges and incorporates the above allegations as if fully set forth herein.

25. Pursuant to Federal Rule of Civil Procedure 65, Donjon-SMIT seeks entry of a temporary restraining order, preliminary injunction, and permanent injunction, as set forth below, to avoid immediate and irreparably loss, injury, and damage.

26. The purpose of temporary injunctive relief is to preserve the status quo until the district court renders a decision on the merits. *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 (11th Cir.1999). The Court must balance "the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir.2000) (en banc).

### A. Elements for Injunctive Relief.

27. A temporary restraining order or preliminary injunction may be granted upon a showing of the following:

    (1)    A substantial likelihood of success on the merits;

    (2)    That irreparable injury will be suffered if the relief is not granted;

    (3)    That the threatened injury outweighs the harm the relief would inflict on the non-movant; and

    (4)    That entry of the relief would serve the public interest.

---

[7] *See* Donjon-SMIT's Motion for Injunctive Relief and Brief in Support Thereof filed simultaneously with this Complaint.

*Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir.2005); *see also Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034 (11th Cir. 2001).

      **B.**      **There is a Substantial Likelihood Donjon-SMIT Will Prevail on the Merits.**

28.      As set forth in Donjon-SMIT's Verified Complaint filed with this Motion and as set out in facts above, Donjon-SMIT is substantially likely to prevail on the merits of its claims, and at the very least has a substantial case against Defendants.  When the balance of the equities weighs so heavily in favor of granting injunctive relief, a movant need only show that it has a "substantial case on the merits."  *See Gonzalez ex rel. Gonzalez v. Reno*, No. 00-11424-D, 2000 WL 381901, at *1 (11th Cir. Apr. 19, 2000) (citing *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir.1981).

29.      Donjon-SMIT has pled causes of action for violation of OPA 90 and judicial review under the Administrative Procedure Act, violation of both procedural and substantive due process under the Fifth Amendment, and request for declaratory judgment.  Donjon-SMIT has also requested a writ of mandamus regarding the Defendants' violations and abuses of OPA 90 and its regulations.  Defendants, by not providing any justification for its approval of Owner's deviation request removing Donjon-SMIT as the SMFF provider have violated OPA 90.  Even more problematic for Defendants is their complete failure to show any "exceptional circumstances," as required by 33 C.F.R. § 155.4032.  Defendants likewise violated 33 U.S.C.A. § 1321(c)(3)(B) because they have never articulated why or how the T&T plan would "provide for a more expeditious or effective response to the spill or mitigation of its environmental effects."  Finally, Defendants have never explained why Donjon-SMIT was removed as the SMFF services provider not only for wreck removal, but also for each of the nineteen different services for which Donjon-SMIT was pre-contracted under the GOLDEN RAY NTVRP.  Donjon-SMIT has at the very least a substantial claim against Defendants for each of its causes of action.

### C. Donjon-SMIT Will Suffer Irreparable Injury if the Relief is Not Granted.

30. As a direct and proximate cause of Defendants' conduct as described above, Donjon-SMIT has and will continue to suffer significant and irreparable harm. Donjon-SMIT will lose its contract to provide SMFF services under Owner's NTVRP, a contract that was supposed to be secured by statute absent exceptional circumstances. Several courts, including this Court, have found that loss of a contract award is sufficient to show irreparable injury. *See Georgia by & through Georgia Vocational Rehab. Agency v. United States by & through Shanahan*, 398 F. Supp. 3d 1330, 1344 (S.D. Ga. 2019) (finding that the plaintiffs would experience irreparable harm in the loss of a dining services contract that it was potentially entitled to); *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004) (stating that a party suffers irreparable injury "when it loses the opportunity to compete on a level playing field with other bidders. Irreparable injury includes, but is not limited to, lost profits which would flow from the contract."); *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 741 (2004) (stating that "[i]rreparable injury can be shown in the form of lost opportunity to fairly compete for and per-form work under the contract, including but not limited to lost profits that would generate therefrom.").

31. Donjon-SMIT will also lose the significant resources it expended both in negotiating to become the SMFF provider and in preparing its wreck removal proposal. Additionally, Donjon-SMIT's reputation in the industry will be damaged by its highly-publicized removal as the SMFF provider, impacting all future negotiations with other vessel owners. Perhaps most importantly, Defendants' actions have established the dangerous precedent that SMFF provider contracts can easily be terminated without justification. This not only undermines the very purpose of OPA 90, but also devastatingly impacts the hundreds of SMFF contracts that Donjon-SMIT currently has with other vessel owners.

32.     Yet in a matter of days this Court will lose any opportunity it has to provide adequate relief to Donjon-SMIT for the above injuries. Unified Command recently stated that construction on the thirty-one-acre barrier around the GOLDEN RAY will begin next week. Once started, it will become nearly impossible to restore Donjon-SMIT as the SMFF provider. Plus, even if Donjon-SMIT's injury could somehow be readily reduced to dollar damages, the federal government is not answerable in monetary damages for Donjon-SMIT's constitutional harms.[8]

33.     Because Donjon-SMIT continues to suffer considerable harm for which it cannot be monetarily compensated, and because construction on the GOLDEN RAY is imminent, a temporary restraining order is the only means of preserving any opportunity that this Court has to provide adequate relief in this matter.

### D.     The Threatened Injury Outweighs the Harm the Relief Would Inflict on the Non-Movant;

34.     The threatened injury to Donjon-SMIT outweighs any harm Defendants may suffer if injunctive relief if granted. Temporarily delaying the approval of Owner's deviation request would not harm the Defendant government officials in any perceptible way. *See S. Wine & Spirits of Am., Inc. v. Heineman*, No. 4:07CV3244, 2007 WL 3051405, at *1 (D. Neb. Oct. 16, 2007) (granting a temporary restraining order halting the implementation of a new Nebraska liquor license law inter alia because the defendant government officials "would not be harmed in any way by [the TRO]" when compared to the potential violation of the plaintiffs' Equal Protection and Commerce Clause rights); *Husteel Co. v. United States*, 34 F. Supp. 3d 1355, 1363 (Ct. Int'l

---

[8] It is well established that the United States and its agencies are immune from suit on constitutional claims for damages. *See, e.g., Pereira v. U.S. Postal Service*, 964 F.2d 873, 876-77 (9th Cir.1992) (emphasis added); *Daly-Murphy v. Winston*, 837 F.2d 348, 355-56 (9th Cir.1987); *see also FDIC v. Meyer,* 510 U.S. 471, 486-87,114 S.Ct. 996,127 L.Ed.2d 308 (1994). In addition, a suit against a federal employee in his/her official capacity is a suit against the United States, and the doctrine of sovereign immunity bars claims for monetary damages against federal actors sued in their official capacities. *See, e.g., Larson v. Domestic & Foreign Commerce Corp*., 337 U.S. 682, 688-89, 69 S.Ct. 1457,93 L.Ed. 1628 (1949); *Gilbert v. DaGrossa*, 756 F.2d 1455.1458 (9th Cir.1985) (barring suit against federal officials sued in their official capacities).

Trade 2014) (granting a preliminary injunction stopping the Department of Commerce from liquidating certain merchandise in part because "the government will not be harmed in any meaningful way" if made to wait for judicial review of the agency's determination).

35. In contrast, once T&T begins constructing its thirty-one-acre barrier around the GOLDEN RAY, Donjon-SMIT will have lost its status as SMFF provider that was secured by both contract and statute absent exceptional circumstances. Therefore, the balance of potential harms substantially favors enjoining Defendants until this Court can determine if Donjon-SMIT's rights were violated and if the violations of OPA 90 pose greater risk to the environment.

### E. That Entry of the Relief Would Serve the Public Interest.

36. Enjoining Defendants' approval of Owner's NTVRP deviation will best serve the public interest. If environmental harm is likely, the public interest favors the issuance of injunctive relief to protect the environment. *See Amoco Prod. Co. v. Vill. of Gambell*, AK, 480 U.S. 531, 545, 107 S. Ct. 1396, 1404, 94 L. Ed. 2d 542 (1987) (stating that environmental injury, if shown to be "sufficiently likely[,]" will usually favor the issuance of an injunction because "by its nature, [environmental injury] can seldom be adequately remedied by money damages[.]"). Indeed, citing public interest, courts have frequently granted injunctive relief halting behavior which could have caused irreparable damage to the environment. *See Wroncy v. Bureau of Land Mgmt.*, 777 F. Supp. 1546, 1549 (D. Or. 1991) (granting a temporary restraining order stopping the Bureau of Land Management from continuing to fertilize certain forest lands in part because of the potential environmental impact to public lands); *Sierra Club v. Lujan*, 716 F. Supp. 1289, 1293 (D. Ariz. 1989) (granting a preliminary injunction inter alia because it was "obvious" the public interest would be served by stopping construction which could irreparably damage a national park); *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) (quotations omitted) (granting a preliminary injunction halting the construction of a water diversion project partly

because "preserving nature and avoiding irreparable environmental injury is in the public interest.").

37. Here, Defendants' current course of action will likely cause significant environmental harm. If T&T's wreck removal plan fails, over 4,000 vehicles containing batteries, refrigerant, gasoline, antifreeze, engine oil, brake, transmission, and power steering fluid, mercury switches, and lead battery connectors may end up St. Simons Sound. When compared to Donjon-SMIT's proposal, the T&T plan undeniably poses a much greater risk to the environment:

| GOLDEN RAY Wreck Removal Plan Comparison ||
|---|---|
| **T&T Plan** | **Donjon-SMIT plan** |
| o Establish large, thirty-one-acre perimeter which would interfere with the navigation channel | o Establish small, 4.6-acre perimeter which avoids main navigation channel |
| o Cut vessel into eight large, 4,000-ton sections, increasing risk of hull collapse/discharge of vehicles into surrounding waters | o Cut vessel into small, 600-ton sections, minimizing risk of hull collapse/discharge of vehicles |
| o Sections would be too large to completely fit onto transport barge, posing additional discharge risk | o Smaller sections would fit securely on transport barge |
| o More expensive | o Less expensive |
| o Approach led to further pollution when implemented on the TRICOLOR and BALTIC ACE wreck removals | o Approach successfully employed during REIJIN wreck removal |

38. Because of the potentially devastating environmental consequences at stake, the public interest would best be served by enjoining Defendants so that this Court can properly evaluate the plans at issue before T&T begins work on the GOLDEN RAY.

F. **Bond Requirement.**

39. Donjon-SMIT is willing to post a bond to secure temporary injunctive relief and asks the Court to determine a fair and reasonable amount of security given by Donjon-SMIT for

17

the protection of Defendants in the event such relief is wrongfully issued and results in harm to the Defendants. However, because the requested relief is the least restrictive means of providing appropriate relief and does not prevent Defendants from any behavior except refraining from improperly violating the applicable statutes and regulations for a brief period of time, Donjon-SMIT respectfully request that the bond sought be waived or set at a nominal amount.

### G. Request for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction.

40. Donjon-SMIT respectfully requests this Court, pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure, enter a Temporary Restraining Order revoking Defendants' approval of Owner's NTVRP deviation request until such time that a hearing can be held on Donjon-SMIT's application for temporary injunction.

41. Donjon-SMIT further requests this Court set for hearing Donjon-SMIT's application for preliminary injunction within the time provided for in Rule 65(b)(2) of the Federal Rules of Civil Procedure, and that, upon such hearing this Court, pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure, enter a preliminary injunction revoking Defendants' approval of Owner's NTVRP deviation request until trial of this matter.

42. Donjon-SMIT further requests that, upon final trial hereof, this Court enter an order permanently enjoining and restraining Defendants from participating in the above conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Donjon-SMIT, LLC respectfully requests that this Court:

a. Enter a temporary restraining order, preliminary injunction, and permanent injunction against the Coast Guard as requested herein.

b. Hold unlawful and set aside Defendants' actions under the Administrative Procedure Act as requested herein;

c. Enter judgment against Defendants for violating Donjon-SMIT's procedural and substantive due process rights;

    d.    Enter a declaratory judgment against Defendants as requested herein;

    e.    Enter a writ of mandamus against Defendants as requested herein;

    f.    All such other relief at law or in equity as this Court deems appropriate.

Dated February 20, 2020.

Respectfully submitted,

**TAYLOR, ODACHOWSKI, SCHMIDT & CROSSLAND, LLC**

/s/ Joseph R. Odachowski
**Joseph R. Odachowski**
Georgia State Bar No. 549470
300 Oak Street, Suite 200
St. Simons Island, GA 31522
(912) 634-0955 – Telephone
(912) 638-9739 – Facsimile
jodachowski@tosclaw.com

**ATTORNEYS FOR PLAINTIFF DONJON-SMIT, LLC**

**OF COUNSEL:**
**CLARK HILL PLC**

/s/ Garney Griggs
**Garney Griggs**
Texas State Bar No. 08491000
**Clifford Bowie Husted**
Texas State Bar No. 00796803
**Gregorio Flores**
Texas State Bar No. 24116367
909 Fannin, Suite 2300
Houston, TX  77010
(713) 951-5600 – Telephone
(713) 951-5660 – Facsimile
ggriggs@clarkhill.com
hustedc@clarkhill.com
gflores@clarkhill.com

**ATTORNEYS FOR PLAINTIFF DONJON-SMIT, LLC**