UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| DONJON-SMIT, LLC, | No. 2:20-cv-00011 LGW-BWC |
| Plaintiff, | |
| v. | |
| ADMIRAL KARL L. SCHULTZ, CAPTAIN JOHN W. REED, COMMANDER NORM C. WITT, and COMMANDER MATTHEW J. BAER, in their official capacity as officers of the UNITED STATES COAST GUARD, | |
| Defendants. | |

**UNITED STATES COAST GUARD'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendants, Admiral Karl L. Schultz, Captain John W. Reed, Commander Norm C. Witt, and Commander Matthew J. Baer (collectively, the "Coast Guard"), submit the following proposed findings of fact and conclusions of law in connection with Plaintiff's motion for a preliminary injunction, Dkt. No. 6.

## I.   FINDINGS OF FACT

**A.   THE MARINE CASUALTY**

1.   On September 8, 2019, the M/V GOLDEN RAY, a roll-on/roll-off foreign freight vessel with 20 crew members and approximately 4,200 cars aboard, capsized in St. Simons Sound. Plf's Ex. 16 at 1 (Decision Memo); Dkt. No. 20-1 at pdf page 29-30 (Invitation to Tender) at 4-5.

2.   Because the vessel represented a substantial threat of a discharge, a Unified Command ("UC"), which brings together the federal and state governments and the responsible private

parties, was formed.  The UC is comprised of the Federal On-Scene Coordinator ("FOSC"), a

State of Georgia On-Scene Coordinator ("SOSC"), and a Qualified Individual ("QI") who is a

representative of the vessel owner.  Hearing Tr. 151:17-23 (Hankins Testimony).

3.    The Coast Guard has used the national incident management system ("NIMS") during

the GOLDEN RAY response, including the use of Incident Command System ("ICS") and ICS-

209 forms, which are routinely used to provide incident summaries.  Plf's Ex. 24 (ICS-209

Incident Summary); Hearing Tr. 134:21-25; 135:1-6 (Williamson Testimony).

4.    At the time of the casualty, Plaintiff, Donjon-Smit, LLC, had already been designated as

a provider of salvage and marine firefighting services under the GOLDEN RAY's approved

nontank vessel response plan ("NTVRP") required under the Clean Water Act, 33 U.S.C. §

1321(j)(5), and the Oil Pollution Act of 1990; 33 C.F.R. § 155.5035.  Plf's Ex. 1 (Donjon-Smit

Contract).

**B.    THE NONTANK VESSEL RESPONSE PLAN, PLAINTIFF'S CONTRACT, AND
        INITIAL RESPONSE**

5.    The OPA was enacted in the wake of the *Exxon Valdez* tanker accident in Prince

William Sound, Alaska in 1989.  The OPA "provides a streamlined and comprehensive approach

to cleanup and liability for oil spills in navigable waters."  2 Admiralty & Mar. Law § 18:3 (6th

ed.).

6.    The National Oil and Hazardous Substances Spill Contingency Plan ("NCP") is the

centerpiece of U.S. preparation to deal with (1) spill prevention; (2) emergency situations; and

(3) spill response.  2 Admiralty & Mar. Law § 18:3 (6th ed.).  The NCP establishes a National

Response Team to provide technical assistance, resources and coordination, and thirteen regional

response teams, which include state and local personnel.  40 C.F.R. §§ 300.110-300.115.  The

Clean Water Act requires the President, acting through the Coast Guard, to remove an oil or hazardous substance spill and to direct and monitor all federal, state, and private removal efforts. 33 U.S.C. § 1321(c), (d).  The NCP specifies that the FOSC is the federal official with responsibility to direct the spill removal and clean-up efforts.  *Id.* at 1321(c)(1)(A).  The Clean Water Act requires owners and operators of vessels and facilities to create detailed contingency spill response plans covering "worst-case" scenarios.  *Id.* at 1321(j)(5)(D).

7.    NTVRPs are developed under the NCP's implementing regulations in order to prepare for a "nontank vessel's worst case discharge or substantial threat of such a discharge."  33 C.F.R. § 155.5010.

8.    General and specific content requirements to be included in a NTVRP are set forth in 33 C.F.R. §§ 155.5030, 155.5035.  In developing their NTVRPs, nontank vessel owners and operators must identify in the NTVRP and ensure "through contract or other means, the response resources necessary to respond to a discharge."  33 C.F.R. § 155.5050(d), (e), (f).  An NTVRP may list multiple resource providers for each service.  33 C.F.R. § 155.4030(a).

9.    The Coast Guard does not dictate how a vessel owner bills a contract for its NTVRP; the regulations only require that a contract be in place that meets the requirements of 33 C.F.R. Part 155.  33 C.F.R. § 155.5050(*l*).  Under the GOLDEN RAY's NTVRP, Plaintiff is a contracted salvage and marine firefighting ("SMFF") resource provider to the registered owner of the vessel (GL NV24 Shipping, Inc) ("Owner").  Plf's Ex. 1 (Donjon-Smit Contract); Hearing Tr. at 13:21-23, 14:18-20 (Martin Testimony).

10.   Plaintiff is a sophisticated business entity that serves as a NTVRP-listed resource provider on approximately 7,000 ships.  Hearing Tr. at 2:9-11, 16:2, and 62:20-22 (Martin testimony).

11.   The contract that Plaintiff and the Owner of the GOLDEN RAY entered into for SMFF services renews automatically, but may be terminated with two months' notice by either party. Plf's Ex.1 at 1 (Donjon-Smit Contract).

12.   The contract also includes a provision addressing disputes between the parties, under which Plaintiff and the Owner agree they will, "i) Always attempt to settle amicably;  ii) In the event that they fail to settle amicably, they will mediate; and iii) In the event attempts to mediate fail, then disputes shall be decided by arbitration in the manner set forth in Article 11 hereafter." Plf's Ex. 1 at 3 (Donjon-Smit Contract).  During the hearing, Douglas Martin, President and General Manager of Smit Salvage Americas, Inc., testified that Plaintiff has sought to settle its recent differences with the Owner amicably and has requested mediation with the Owner in connection with the salvage of the Golden Ray.  Hearing Tr. at 81:7-17.

13.   On September 15, 2019 the FOSC, Commander Norm C. Witt, issued an Administrative Order directing the Owner to remove all oil and hazardous materials.  Dkt. No. 20-1 at pdf pages 23-24.

14.   Pursuant to its contract, Plaintiff assisted in the initial response to the capsizing, during which the site was stabilized and approximately 300,000 gallons of fuel was removed from the vessel's fuel tanks.  Plf's Ex. 24 (ICS-209 Incident Summary); Hearing Tr. at 18:8-15, 20:20-25 (Martin Testimony).  Operations to remove the fuel lasted until December 19, 2019.  Hearing Tr. at 146:13-18 (Hankins Testimony).

15.   Approximately 4,200 vehicles remain inside the vessel.  Plf's Ex. 16 (Decision Memo); Hearing Tr. at 25:18-20 (Martin Testimony).

16.   The vessel was determined to be a constructive total loss on October 12, 2019. Plaintiff's Exhibit 16 at 2 (Decision Memo).

17.   Even with an overarching SMFF contract in place pursuant to the NTVRP, Plaintiff recognizes that a separate contract would have to be signed before Plaintiff would begin working on the removal because each removal operation is unique.  Hearing Tr. at 85:12-13 (Martin Testimony).

## C.  DEVELOPMENT OF VESSEL SALVAGE PLANS

18.   Plaintiff's SMFF contract with the Owner is a tiered agreement which consists of an umbrella agreement and different stages depending on the severity of the case.  Hearing Tr. at 26:8-18 (Martin Testimony).  At the end of the initial phase of the response, the agreement switched from the highest category of risk to the secondary category of risk.  *Id.*  About this same time, on October 26, 2019, Plaintiff entered into a Letter of Intent with the Owner and had a 21-day exclusive period in which to provide a salvage plan to the Owner.  Plf's Ex. 4 (Letter of Intent); Hearing Tr. at 28:2-4 (Martin Testimony).

19.   In an October 28, 2019 email, the Owner stated that "in order to manage expectations," it would "reiterate" certain points to be addressed in the presentation, including "[p]referably a minimum of three high level dismantling scenarios inclusive of pros, cons on feasibility or other issues you feel the need to address.  The scenario should be substantiated with a risk register and possible timelines and the ultimate focus to find the right solution."  Plf's Ex. 5; Hearing Tr. at 32:14-18 (Martin Testimony).

20.   Throughout October, Plaintiff had four formal meetings and other informal meetings with representatives from the Owner's Property and Indemnity ("P&I") Club and Owner's representative, Global Salvage Consultants.  Plf's Exhibit 3 (Meeting Minutes); Hearing Tr. at 112:6-8, 17-25 (Van der Jagt Testimony).

21.   At the meetings, the Owner's representatives and Plaintiff discussed various means to remove the wreck, including Large Section Demolition ("LSD").  Plf's Ex. 3; Hearing Tr. at 112:6-8, 17-25 (Van der Jagt Testimony).  Plaintiff was also told that if the Owner and Plaintiff could not come to an agreement, the Owner would issue a tender and solicit bids for the wreck removal.  Hearing Tr. at 49: 14-18 (Martin Testimony).

22.   The FOSC did not attend these meetings.  *See* Plf's Ex. 3 (Meeting Notes).

23.   Plaintiff provided its proposed salvage plan to the Owner's representatives on November 6, 2019 but did not discuss the proposal with the Owner's representatives at that time, as the planned meeting was cancelled.  Hearing Tr. at 35:16-19 (Martin Testimony).  The FOSC was not in attendance.

24.   Plaintiff's salvage plan proposed to use Small Section Demolition ("SSD").  Plf's Ex. 6 at 13.

25.   Plaintiff did not provide a Large Section Demolition methodology for consideration. Plf's Ex. 6.  Plaintiff's witness, Douglas Martin, testified that Plaintiff initially "wanted to do the ultralarge section removal," and sought to enter into an agreement for the use of a large asset, the Versabar 10,000, which will be used now under a plan to be carried out by T&T Salvage, using Large Section Demolition.  Hearing Tr. at 39:15-25.  Mr. Martin testified that there were issues with using the Versabar 10,000 with the environmental barrier, so Plaintiff shifted to a different

plan.  *Id.* at 40:6-25.  Plaintiff voluntarily released Versabar from an exclusive agreement prior to submitting its wreck removal plan to the Owner because it did not intend to use Versabar.  *Id.* at 41:1-10.  The Versabar 10,000 is not available to Plaintiff to conduct a Large Section Demolition today.  *Id.* at 88:4-8.  If Plaintiff were to attempt a Large Section Demolition today, the Versabar 10,000 remains a unique component to the Large Section Demolition plan; therefore, Plaintiff would likely have to bring T&T Salvage, the entity currently under contract to perform the salvage operation, in as a subcontractor.  *Id.* at 73:22-25, 74:1-12.  In fact, shortly before wreck removal proposals were due, Plaintiff discussed working with T&T Salvage.  T&T Salvage was willing to work together as joint venture partners for the Large Section Demolition, but Plaintiff was only willing to work with T&T Salvage as a subcontractor.  *Id.* at 74:17-25, 75:1-9.

26.  Plaintiff's proposed plan listed reasons why it "discarded" a Large Section Demolition methodology.  Plf's Ex. 6 at 7.  The listed reasons are: (1) "At least 60% of the wreck is above water and accessible by other means;" (2) "Cost and time of mobilization / demobilization of heavy list assets;" (3) "Scheduling risks;" (4) "Relative costs, compared to SSD for heavy lift assets;" (5) "Limited availability of heavy lift assets while on site including custom rigging;" (6) "Flag state issues (i.e. Jones Act) and subsequent operating restrictions;" (7) "Complications for the scrapper to handle large, possibly unstable, sections ashore;" and (8) "The structural integrity of the upper decks, or lack thereof, does not allow this part of the wreck's structure to be removed in large sections."  *Id.*; *see also* Hearing Tr. at 94, lines 6-10 (Martin Testimony) (acknowledging that most of the reasons listed did not relate to feasibility).  As Plaintiff's salvage master replied when asked about the feasibility of a Large Section Demolition he replied,

"We do it all the time."  Hearing Tr. at 91:4-6 (Martin Testimony); *see also id.* at 91:15-16

("Yes, we're not opposed to doing large section demolition.").

27.   Mr. Martin further testified that Plaintiff "knew [the Owner] wanted [Large Section

Demolition].  So [Plaintiff] wanted to be very clear and communicative about why [Plaintiff]

didn't think it was a good idea. And if [the Owner] then said, 'Go ahead and do it,' then, okay,

we could do it under our agreement but [Plaintiff] shut off."  Hearing Tr. at 47:2-8.

28.   The Owner rejected Plaintiff's plan on or about November 6, 2019.  Plf's Ex. 16 at 2

(Decision Memo).

29.   While considering wreck removal operations, the Owner consulted a salvage technical

advisor, Global Salvage Consultancy, for assistance determining the best plan for removal.

Hearing Tr. at 33:1-3 (Martin Testimony).

## D.   THE TRANSITIONAL AGREEMENT AND INITIAL DEVIATION DENIAL

30.   On November 8, 2019, Plaintiff, the Owner, and a different salvage provider, Donjon

Marine Co., Inc., entered into a Transitional Agreement under which Plaintiff's wreck removal

contract for the GOLDEN RAY, "Wreckhire 1," would be terminated and Donjon Marine Co.,

Inc.[1] would replace Plaintiff as the resource provider and assume Plaintiff's rights and

obligations with respect to future wreck removal services under a new contract, "Wreckhire 2."

Plf's Ex. 7 (Transitional Agreement).

---

[1] Though Donjon-Smit is a joint venture composed of Donjon Marine Co., Inc. and Smit
Internationale N.V., the entities are legally distinct.  Hearing Tr. at 11:24-12:6 (Martin
Testimony).

31.   Donjon Marine Co., Inc. was not a resource provider listed in the Owner's NTVRP for the GOLDEN RAY.  Before entering into the Transitional Agreement, the Owner did not submit a request to deviate from the GOLDEN RAY's NTVRP to the FOSC.

32.   Also on November 8, 2019, the FOSC issued Amendment 1 to Administrative Order 01-19, directing the Owner to submit a plan for pollution removal efforts, monitoring, and an engineering assessment of the vessel.  Pl's Ex. 11.

33.   On November 18, 2019, Owner's insurer sent out an Invitation to Tender ("ITT") for the wreck removal, inviting Plaintiff and other companies to submit proposals and bids for the wreck removal.  Dkt. No. 20-1 at pdf pages 26-41.

34.   The Owner expressly stated its preference for Large Section Demolition – emphasizing that its use would be "a high priority in selection of the contractor" – and for use of an Environmental Protection Barrier to be constructed before demolition.  Dkt. No. 20-1 at pdf page 34 (Invitation to Tender); Dkt. No. 20-1 at pdf page 44 (Dec. 19, 2019 Request for NTVRP Deviation).

35.   On November 22, 2019, the FOSC issued Amendment 2 to Administrative Order 01-19, in which the FOSC determined the Transitional Agreement was an unapproved deviation from the NTVRP regulations.  *See* Dkt. No. 20-1 at pdf page 14 (Owner's Response).  The FOSC also requested materials submitted to the Owner by Plaintiff.

36.   In response, on November 25, 2019, the Owner requested a deviation from the NTVRP to add Donjon Marine Co. as a SMFF resource provider, which would allow Donjon Marine Co. to carry out the salvage of the GOLDEN RAY.  *Id.* at pdf page 15.  In making the request, the Owner explained that since replacing Plaintiff with Donjon Marine Co., there had been improved

communication and "[n]o repeat of incidents that occurred during the course of the Wreckhire#1 contract." *Id.* at pdf page 16.

37.    The Owner also provided the FOSC with the Letter of Intent (Plfs' Ex. 4), Plaintiff's proposed plan (Plf's Ex. 6), an explanation for the Owner's finding that Plaintiff's plan was unacceptable, and additional information. *See* Dkt. No. 20-1 at pdf pages 16-18.

38.    The Owner summarized its rationale for rejecting Plaintiff's plan, stating that Plaintiff's plan to use Small Section Demolition would result in a longer period of work and was less preferable than Large Section Demolition; that Plaintiff's plan did not commit to an environmental barrier from the outset; and that Plaintiff did not provide clarity on its availability to work 24 hours per day, seven days per week.  Dkt. No. 20-1 at pdf page 17.

39.    On November 26, 2019, Plaintiff "submit[ed] [their plan] to Coast Guard."  Hearing Tr. at 59:5-9.  Plaintiff's representatives met with the FOSC and the State On-Scene Coordinator to present to Plaintiff's Small Section Demolition proposal for the wreck removal.  Plf's Exhibit 28; Hearing Tr. at 143:7-10, 141:24-25, 142:1-2 (Hankins Testimony).

40.    Plaintiff did not provide its internal timeline risk register to the FOSC for consideration. Plaintiff had created its own timeline risk register because it did not agree with the timeline risk register calculated by the Owner's consultant, which showed Plaintiff's plan would take four months longer to complete than Plaintiff's timeline risk register projected.  Hearing Tr. at 66:8-22 (Martin Testimony).   As a result, all of the information that the FOSC had concerning the timelines showed was that T&T's was four months faster.  *Id.* at 99:24-25, 100:1-3.

41.  "The Coast Guard only received the summary that [the Owner's consultant] CL Risks puts out, not [Plaintiffs'] parallel review."  Hearing Tr. at 66:19-21 (Martin Testimony).

42.   The FOSC disapproved the first deviation request on December 1, 2019, finding that "the justification noted the change in resource providers had little to no impact on the continuity of the operations," and thus would not "make the response more expeditious, effective, or environmentally safer."  Dkt. No. 20-1 at pdf page 23.  The FOSC did not reach the question of whether there were exceptional circumstances that would authorize a deviation from the NTVRP to provide for a more expeditious or effective response.  *Id.* at 23-24.

43.   After the first deviation request was denied, the Owner asked Plaintiff to reinstate the original wreckhire under Plaintiff (Wreckhire1), but Plaintiff refused.  Hearing Tr. at 57:5-58:25 (Martin Testimony).

44.   Regardless of the Transitional Agreement, the parties agree that Plaintiff remains a listed SMFF resource provider in the NTVRP.  Dkt. No. 20 at 18; Hearing Tr. at 60:20-22, 75:10-12, 83:7-11 and 16-20, 101:13-15 (Martin Testimony); Hearing Tr. at 129:1-14 (Williamson Testimony).

45.   At this time, for the purposes of the removal of the wreck, there is no contract for Plaintiff to continue work on the GOLDEN RAY salvage.  Hearing Tr. at 86:15-18 (Martin Testimony).

**E.    THE FOSC'S REVIEW OF THE PROPOSED SALVAGE PLANS**

46.   On December 2, 2019, one week after the FOSC received Plaintiff's plan, salvage experts from the U.S. Navy Supervisor of Salvage and Diving ("SUPSALV") and U.S. Coast Guard Salvage Engineering Response Team ("SERT") conducted a technical review of Plaintiff's plan.  Dkt. No. 20-1 at pdf page 60.

47.   On December 3, 2019, SERT, in consultation with SUPSALV, provided the FOSC with a report of its technical review of Plaintiff's plan.  Dkt. No. 20-1 at pdf pages 60-61.  Overall, SERT found Plaintiff's plan to be "conceptually feasible."  *Id.* at 61.  SERT determined that "limited technical detail was provided and significant additional analysis would be expected before moving forward."  *Id.*  SERT specifically noted that installing a cofferdam was optional and that no discussion of debris containment was included if the cofferdam was not installed.  *Id.*  SERT further noted the structural analysis "has several technical flaws and lacks accuracy when compared to actual observations of the wreck" and noted five major concerns.  *Id.*

**F.    RESPONSE TO THE INVITATION TO TENDER**

48.   Six companies responded to the Owner's Invitation to Tender, including Plaintiff.  Plf's Ex. 16 at 2 (Decision Memo).

49.   Despite the Owner's explicitly stated preference for a Large Section Demolition methodology in the Invitation to Tender, Plaintiff again submitted a Small Section Demolition plan for consideration by the Owner.  Dkt. No. 20-1 at pdf page 45.

50.   T&T Salvage ("T&T") submitted a Large Section Demolition proposal to the Owner.  The Owner accepted T&T's bid and provided the plan to the FOSC for consideration on December 19, 2019.  Plf's Ex. 18.

51.   On December 19, 2019, SUPSALV and SERT conducted a technical review of T&T's plan.  Dkt. No. 20-1 at pdf page 57.  SERT in consultation with SUPSALV, provided the FOSC with a report of its technical review of T&T's plan.  SERT found T&T's plan to be "technically feasible."  *Id.*  As with Plaintiff's plan, SERT noted with respect to T&T's plan that "limited

12

technical detail is provided, the plan indicates further analysis will be conducted prior to operations." *Id.*

## G.    THE FOSC'S APPROVAL OF THE SECOND DEVIATION REQUEST

52.    On December 20, 2019, the Owner requested a deviation from the NTVRP in order to add T&T as a designated service provider to conduct salvage operations on the GOLDEN RAY. Dkt. No. 20-1 at pdf page 43-47.

53.    The FOSC reviewed the Owner's NTVRP deviation request in consultation with Commander Matthew J. Baer, the Coast Guard Sector Charleston Chief of Response, and Captain John W. Reed, the Coast Guard Charleston Sector Commander.  The FOSC also considered the analysis of SERT and SUPSALV and all the facts and circumstances of the response known to him.  Plf's Ex. 16 (Decision Memo).

54.    The FOSC first determined that based on the scope of the incident – the vessel's size, location, complexity of the wreck removal, environmental threat and public interest factors – exceptional circumstances exist to consider a deviation under 33 C.F.R. § 155.4032.  Plf's Ex. 16 at 3-4 (Decision Memo).  *Cf.* Hearing Tr. at 63:16-18 ("The Golden Ray [casualty] is one that people will speak about for time. You know, there's a number of marine casualties that come up, and Golden Ray will be one of them.") (Martin Testimony); 63:20-25 ("Well, this one is in the US and it's high profile.  There's cars.  There's a pollution event, and it's a big job and it will be -- and it's in front of everyone.  So, yeah.  You know, these kind of cases occur occasionally around the world, you know, I mean, so to have it in one location is -- is unique as mentioned.") (Martin Testimony).

13

55.   The GOLDEN RAY is a 656 foot, roll-on/roll-off foreign freight vessel.  Plf's Ex. 16 at 3-4 (Decision Memo).  Since the vessel ran aground on 8 September 2019, it has come to rest on its port side with a list of approximately 100 degrees.  *Id*; Plf's Ex. 2.  The vessel is in very close proximity to a navigable channel that serves as the only access route to the Port of Brunswick.  Plf's Ex. 16 at 4 (Decision Memo).  The vessel is grounded in an environmentally sensitive area that includes prime shrimping grounds and Bird Island – a significant roosting area for migratory birds.  *Id*.  The vessel is also aground in close proximity to Saint Simons and Jekyll Islands, which are major tourist destinations for coastal Georgia.  *Id*.

56.   The longer a vessel remains in a grounded position such as this, the more time that the environment (including marine aquatic specified) is exposed to the risks, for example from release of oil or other harmful substances.  Declaration of Capt. Ricardo Alonso, Dkt. No. 20-2 at 2-4; Hearing Tr. at 79:19-22 (Martin Testimony).

57.   Having found exceptional circumstances, and being advised that both Plaintiff's plan and T&T's plan were feasible, the FOSC then analyzed whether a deviation from the NTVRP to add a SMFF provider for the wreck removal would result in a more expeditious removal.  Plf's Ex. 16 at 4-5 (Decision Memo).

58.   The Owner's Risk Register calculated (with 90% certainty) that Plaintiff would complete wreck removal on or around October 7, 2020 using its proposed Small Section Demolition methodology.  Dkt. No. 22-6 at pdf page 3 (Risk Register).

59.   The Owner's Risk Register calculated (with 90% certainty) that T&T would complete wreck removal on or around June 6, 2020 using its proposed Large Section Demolition methodology.  Dkt. No. 22-7 at pdf page 7 (Risk Register).

60.   SUPSALV and SERT reviewed T&T's timeline and confirmed it was reasonable given the proposed plan.  Dkt No. 20-1 at pdf page 57.

61.   Based on the information provided, the FOSC determined T&T's plan would be faster than Plaintiff's plan by approximately four months.  Plf's Ex. 16 at 4 (Decision Memo).  The faster timeline associated with T&T's plan will reduce the likelihood of salvage operations being conducted throughout the 2020 hurricane season or winter storm months.  *Id.* at 5.  The faster timeline will also avoid a prolonged impact on the unrestricted use of the navigation channel.  *Id.*

62.  Finally, the FOSC considered whether the requested NTVRP deviation would allow for a more effective response.  Plf's Ex. 16 at 5-7 (Decision Memo).

63.   The FOSC stated that he was aware of the Owner's preference of the Large Section Demolition being performed within an Environmental Protection Barrier, and that the Barrier be placed prior to demolition in order to maximize containment and minimize any adverse environmental impact.  *Id.* at 5; *See also* Plf's Ex. 18 at 10 (T&T Plan).

64.   T&T's proposed plan included the placement of an Environmental Protection Barrier prior to commencing cutting operations, which would provide containment for remaining pollutants and mitigate the effects of a potential discharge.  Plf's Ex. 16 at 5 (Decision Memo); Plf's Ex. 18 at 10 (T&T Plan).

65.   Plaintiff understood that the use of an Environmental Protection Barrier was "mandated" by the Owner.  Hearing Tr. 52:15-19 (Martin Testimony).

66.   Plaintiff's plan proposed an optional Environmental Protection Barrier, and also proposed the possibility of commencing cutting work at the same time it constructed the barrier.  Plf's Ex. 6 at 19, 22.

67.   The FOSC further stated that he was "compelled by other environmental safety and mitigation concerns."  Plf's Ex. 16 at 5 (Decision Memo).  Indeed, the longer the vessel is exposed to tidal influences the more oil and other contaminants could be released from the vessel.  Hearing Tr. at 79:19-22 (Martin Testimony); Plf's Ex. 16 at 5 (Decision Memo).  The FOSC concluded that the faster time period in T&T's plan would reduce the time the environment, including marine aquatic species, would be exposed to the risks and impacts of operations.  A faster timeline would also reduce the duration of noise and light pollution in the marine environment, something T&T's plan addressed.  Plf's Ex. 16 at 5 (Decision Memo).

68.   In reviewing the Owner's NTVRP Deviation Request, the FOSC made sure he had all relevant information for consideration by, *inter alia*, ensuring the Owner had fully complied with his requests for information in Amendment 2 and reviewing the 165 pages of information provided by Plaintiff on November 26, 2019.  Plf's Ex. 28 (Plaintiff's Submission to the FOSC).

69.   On December 21, 2019, the FOSC approved the Owner's request for deviation from NTVRP.  Plf's Ex. 16.

70.   Plaintiff became aware of the FOSC's decision on December 22, 2019.  Hearing Tr. at 61:21-25 (Martin Testimony).  Plaintiff filed its Complaint and motion for preliminary relief on January 13, 2020.  Dkt. Nos. 1, 6.

71.   The Court denied Plaintiff's motion for a Temporary Restraining Order, Dkt. No. 12 at 1, and allowed further briefing before holding a hearing on Plaintiff's motion for preliminary injunction on February 25, 2020.

## II.   CONCLUSIONS OF LAW

**A.   THE COURT'S JURISDICTION TO HEAR PLAINTIFF'S CLAIMS AND WHETHER PLAINTIFF HAS STATED COGNIZABLE CLAIMS**

1.   Before deciding whether Plaintiff is likely to succeed on the merits of its claims, the Court must ensure that it has jurisdiction to hear Plaintiff's claims, and that those claims are cognizable.  *Steel Co. v. Citizens for a Better Env't,* 532 U.S. 83, 94 (1998)) (noting that subject matter jurisdiction is a threshold concern).

2.   Federal courts are courts of limited jurisdiction and may only hear cases or controversies authorized by the Constitution and by statute.  *Exxon Mobil Corp. v. Allapattah Servs. Inc.*, 545 U.S. 546, 552 (2005).  Where the Constitution does not waive the government's sovereign immunity, waiver, if it exists at all, "must be unequivocally expressed in statutory text . . . in favor of the sovereign."  *FPL Food, LLC v. U.S. Dep't of Agric.*, 671 F. Supp. 2d 1339, 1345 (S.D. Ga. 2009) (Wood, J.) (quoting *Gomez–Perez v. Potter*, 553 U.S. 474, (2008) (internal quotations omitted)).  *See also Sierra Club v. Tenn. Valley Auth.*, 430 F.3d. 1337, 1355 (11th Cir. 2005).  "Because Congress decides whether federal courts can hear cases at all, it can also determine when, and under what conditions, federal courts can hear them."  *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007).

3.   In the portion of the Complaint setting forth the Court's jurisdiction, Dkt. No. 1 at ¶¶ 7 and 9, Plaintiff cites 28 U.S.C. § 1331, 28 U.S.C. § 1345, 33 U.S.C. § 1321(c)(2), and 28 U.S.C. §§ 2201 and 2202.  None of these provisions contain a waiver of sovereign immunity.

4.   Plaintiff's citation to the federal question statute, Dkt. No. 1 at ¶ 7(a), does not provide the requisite waiver of sovereign immunity.  The federal question statute provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This provision merely establishes subject matters that are within the jurisdiction of federal courts to entertain. Where the United States is the defendant, federal subject matter jurisdiction is not enough; there must also be a statutory cause of action through which Congress has waived sovereign immunity. *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34 (1992); *Harbert v. United States*, 206 F. App'x 903, 907 (11th Cir. 2006).

5.      Plaintiff's citation to 28 U.S.C. § 1346, Dkt. No. 1 at ¶ 7(b), also fails to demonstrate a waiver of sovereign immunity. Section 1346 does contain a limited waiver of sovereign immunity – for civil actions seeking tax refunds and other monetary damages against the United States. 28 U.S.C. § 1346. However, the limited waiver does not extend to claims for equitable relief. *Richardson v. Morris*, 409 U.S. 464, 465 (1973); *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997). Section 1346, therefore, does not constitute a waiver of sovereign immunity with respect to Plaintiff's claims, which specifically seek declaratory or injunctive relief. *Cermak v. Babbitt*, 234 F.3d 1356, 1361 (Fed. Cir. 2000).

6.      Section 311(e)(2) of the Clean Water Act, 33 U.S.C. § 1321(e)(2), cited by Plaintiff at Dkt. No. 1 at ¶ 7(c), also does not waive sovereign immunity. Subsection (e) authorizes the President to react to imminent and substantial threats to the public health or welfare; "its purpose is to give the President the power to remove oil and hazardous substances from the water and shorelines of the United States." *Evergreen Power, LLC v. United States*, No. 3:14-CV-01537-WWE, 2015 WL 4603440, at *3 (D. Conn. July 30, 2015). Subsection (e)(2)'s provision that district courts have jurisdiction to "grant any relief under this subsection that the public interest and the equities of the case may require" applies to enforcement claims

brought by the United States.  33 U.S.C. § 1321(c)(2).  Subsection (e)(2) does not grant the Court subject matter jurisdiction over Plaintiff's claims, as it does not unequivocally waive the government's sovereign immunity.  *Evergreen Power*, 2015 WL 4603440, at *5.

7.      The Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, is also not a waiver of sovereign immunity.  Rather, Section 2201(a) authorizes district courts to enter declaratory judgment as a remedy, but "also requires that the plaintiff allege facts showing that the controversy is within the court's original jurisdiction."  *Household Bank v. JFS Grp.*, 320 F.3d 1249, 1253 (11th Cir. 2003) (noting that Section 2201 expressly states that it is "procedural only"). That a court may grant declaratory relief against any type of defendant in a case otherwise within the court's jurisdiction does not suggest, let alone expressly state, that the United States has waived its immunity for all declaratory relief claims.

8.      With respect to the Causes of Action listed in the Complaint, Plaintiff lists four counts.  The Court addresses each in turn.

9.      Count One of the Complaint is entitled "Request for Injunctive Relief."  Dkt. No. 1 at 12-13.  Requests for relief are not freestanding legal "claims" within the meaning of Rule 8(a)(2).  *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1310 (11th Cir. 2008).

10.      Count Two of the Complaint is entitled "Violation of OPA 90 and Request for Judicial Review Under the Administrative Procedure Act."  Dkt. No. 1 at 13.  The OPA does not waive sovereign immunity to bring a private right of action to enforce the Act.  *Int'l Marine Carriers v. Oil Spill Liab. Trust Fund*, 903 F. Supp. 1097, 1102 (S.D. Tex. 1994) (finding that nothing in several sections of the OPA can be construed as a waiver of sovereign immunity, or imply a private right of action to sue the government under the OPA); *Rick Franklin Corp. v.*

*United States Dep't of Homeland Sec.,* No. 06-1647, 2008 WL 337978, at *3 (D. Or. Feb. 4, 2008) ("The OPA does not contain a waiver of the government's sovereign immunity from suit.").

11.     Although Plaintiff does not cite the Administrative Procedure Act ("APA") as a waiver of sovereign immunity or basis for the Court's jurisdiction, the APA "waives the government's sovereign immunity, 5 U.S.C. § 702, and provides subject matter jurisdiction in conjunction with 28 U.S.C. § 1331 over 'final agency action.' 5 U.S.C. § 704." *Media General Operations, Inc. v. Herman*, 152 F. Supp. 2d 1368, 1371 (S.D. Ga. 2001) (citing *Stockman v. Fed. Election Comm'n,* 138 F.3d 144, 152 (5th Cir. 1998)).  Thus, there is a waiver of sovereign immunity, and jurisdiction, for judicial review of the FOSC's December 22, 2019 approval of a deviation from the GOLDEN RAY's NTVRP.  Dkt. No. 1 at 13-14 (requesting review under the APA).

12.     Count Three is entitled "Violation of Procedural and Substantive Due Process," and alleges claims under 42 U.S.C. § 1983 and the Fifth Amendment of the Constitution.  Dkt. No. 1 at 14-15.  Because a claim under 42 U.S.C. § 1983 requires state action, the federal government and its employees are not subject to suit under 42 U.S.C. § 1983.  *Alba v. Montford*, 517 F.3d 1249, 1251 (11th Cir. 2008); *see also Glover v. Haynes*, No. CV211-114, 2011 WL 3877001, at *1 n.1 (S.D. Ga. Aug. 2, 2011), *report and recommendation adopted*, No. CV211-114, 2011 WL 3876994 (S.D. Ga. Sept. 2, 2011) (recognizing same).

13.     With respect to the due process claim under the Fifth Amendment, Plaintiff alleges deprivation of its "contractual agreement with the Owner to provide SMFF services" and damaging its reputation "that will directly harm its ability to contract in the future."  Although

20

Plaintiff has asserted in its motion for preliminary injunction that it is entitled to a contract that is "secured by statute absent exceptional circumstances," Dkt. No. 6 at ¶ 30, Plaintiff cites no statute or other authority to support this assertion.

14. The mere fact that a resource provider is listed on a NTVRP does not give rise to a property interest protected under the Fifth Amendment. It simply means that the provider agrees to perform services if needed. The Coast Guard requires that an NTVRP contain a list of resource providers available by contract or other approved means. The regulations do not address exclusivity in this list, as the NTVRP may list multiple resource providers for each service. 33 C.F.R. § 155.4030(a). In any event, the testimony at the hearing confirms that Plaintiff remains a listed resource provider of SMFF services under the GOLDEN RAY'S NTVRP. *See* FOF ¶ 44.

15. Moreover, Plaintiff cannot state a claim that the Coast Guard is the source of any loss of the contract for the salvage of the GOLDEN RAY. As noted above, on November 8, 2019, Plaintiff, in agreement with the Owner and another business entity, transferred its responsibility for "providing future services to the [GOLDEN RAY] to the Replacement Contractor." FOF ¶ 30; Plf's Ex. 7 (Transitional Agreement). Thus, any property interest Plaintiff may have had in the contract for the salvage of the GOLDEN RAY was transferred by Plaintiff to another entity not a party to this litigation.

16. With respect to Plaintiff's allegation of damage to its reputation, courts have recognized that harm to reputation alone does not implicate a protected liberty or property interest. *See Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1106 (D.C. Cir. 1985) (citing *Paul v. Davis*, 424 U.S. 693, 694 (1976)). Rather, there must be a "tangible alteration of a 'status'—in

21

addition to an injury to reputation—before a liberty interest will be recognized." *Doe*, 753 F.2d at 1105 (citing *Paul*, 424 U.S. at 694).

17.     Further, it is well-established that federal courts will not decide a constitutional question if another ground adequately disposes of the controversy. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (stating that "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter"); *see also Jean v. Nelson*, 472 U.S. 846, 854 (1985); *Georgia v. Wheeler*, No. 2:15-cv-00079, 2019 WL 3949922, at *31 (S.D. Ga. Aug. 21, 2019) (Wood, J.).  Here, because resolution of Plaintiff's APA claim will resolve Plaintiff's allegations in its due process claim that the FOSC's approval of the NTVRP deviation was inconsistent with 33 C.F.R. § 155.4032, the Court need not reach the constitutional claims.

18.     Count Four is entitled "Declaratory Judgment."  Dkt. No. 1 at 15-16.  As noted above, the Declaratory Judgment Act does not contain a waiver of sovereign immunity, and merely authorizes declaratory relief where there is jurisdiction.

19.     In addition to the listed counts, Plaintiff's Complaint alleges entitlement to a writ of mandamus to "compel[] Defendants to reverse" the FOSC's approval of the NTVRP deviation.  Dkt. No. 1 at ¶¶ 48-55.   In order state a claim for a writ of mandamus, the plaintiff must demonstrate, *inter alia*, that it has a "clear and indisputable" right to issuance of the writ. *In re Wellcare Health Plans, Inc.*, 754 F.3d 1234, 1238 (11th Cir. 2014) (citing *Cheney v. U.S. Dist. Court. for the Dist. of Columbia,* 542 U.S. 367, 381 (2004)).  In other words, there must be a clear duty to act, and the action sought to be compelled must be nondiscretionary in nature.

*Cash v. Barnhart*, 327 F.3d 1252, 1258 (11th Cir. 2003) (citing *Heckler v. Ringer*, 466 U.S. 602, 616 (1984)).

20.     Plaintiff points to the OPA's implementing regulations, 33 C.F.R. § 155.4032, which provide that:

> If another resource provider, not listed in the approved plan for the specific service required, is to be contracted for a specific response, justification for the selection of that resource provider needs to be provided to, and approved by, the FOSC. Only under exceptional circumstances will the FOSC authorize deviation from the resource provider listed in the approved vessel response plan in instances where that would best affect a more successful response.

33 C.F.R. § 155.4032(a).  As the text of the regulation makes clear, the FOSC has discretion to determine whether there are exceptional circumstances, and whether a deviation would best affect a more successful response.  Thus, Section 155.4032 cannot be the source of any nondiscretionary duty for purposes of a petition for a writ of mandamus.

21.     Plaintiff also cites a provision of the Clean Water Act, 33 U.S.C. § 1321(c)(3)(B), which states that "the owner or operator may deviate from the applicable response plan if the President or the Federal On-Scene Coordinator determines that deviation from the response plan would provide for a more expeditious or effective response to the spill or mitigation of its environmental effects."  As with the regulation, the statutory provision authorizes a FOSC to use discretion in determining whether a deviation is warranted.  For this reason, Section 1321(c)(3)(B) also fails to support a petition for a writ of mandamus.

22.     In sum, Plaintiff has asserted only one cognizable claim, seeking judicial review under the APA of the FOSC's December 22, 2019 approval of the NTVRP deviation.

## B.      PLAINTIFF'S STANDING

23.      Having found jurisdiction to hear Plaintiff's APA claim, the Court must also determine whether Plaintiff has standing to bring its claim.  Under Article III of the United States Constitution, federal-court jurisdiction extends only to actual "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1.  Rooted in Article III's case or controversy requirement is the doctrine of standing.  *McGee v. Solicitor Gen. of Richmond Cty.*, 727 F.3d 1322, 1326 (11th Cir. 2013) (citing *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005)).  In order to invoke federal jurisdiction, the plaintiff bears the burden of establishing standing.  *Bischoff v. Osceola Cty.*, 222 F.3d 874, 878 (11th Cir. 2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  To do so, the plaintiff must demonstrate that "(1) [the plaintiff] has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable ruling."  *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1038 (11th Cir. 2008) (quoting *Harris v. Evans,* 20 F.3d 1118, 1121 (11th Cir.1994)).  The Court cannot proceed unless these requirements are satisfied.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

24.      The injury-in-fact requirement is "somewhat modified when a plaintiff seeks an injunction."  *FPL Food, LLC*, 671 F. Supp. 2d at 1347–48.  There, an injunction can only issue after the plaintiff either shows a threat of irreparable injury or a likelihood of future injury.  *Lujan v. Defs. of Wildlife*, 504 U.S. at 560 (holding that that the alleged injury must be "actual or imminent, not conjectural or hypothetical") (internal quotation marks omitted).

24

25.     Plaintiff claims injuries of loss of its contractual agreement with the Owner to provide SMFF services under the NTVRP, damage to Plaintiff's reputation, and lost resources spent negotiating to be the SMFF provider and preparing its wreck removal proposal.  Dkt. No. 1 at ¶¶ 23, 27, 42; Dkt. No. 6 at ¶¶ 30.  As noted above, Plaintiff remains listed on the GOLDEN RAY's NTVRP as a SMFF services provider, and thus retains its ability to enter into a contract for specific services as a SMFF provider on the NTVRP for the GOLDEN RAY.  FOF ¶ 44. Plaintiff has demonstrated no injury.

26.     In addition, Plaintiff entered into a contract to be replaced as a provider of wreck removal services for the GOLDEN RAY in November 2019, well before the FOSC approved the NTVRP deviation.  *See* FOF ¶ 30.  Plaintiff further refused to undo the agreement when the Owner's first deviation request was disapproved.  *See* FOF ¶ 43.  Thus, to the extent it can claim any injury regarding the loss of the specific contract for the removal of the GOLDEN RAY, such injury was caused not by any action of the FOSC.

27.     For similar reasons. Plaintiff cannot show that the requested relief of setting aside the FOSC's approval of the NTVRP deviation would redress any of its claimed injuries.  At this point, the FOSC's decision does not prevent Plaintiff from seeking to enter into a contract for some or all future services related to the GOLDEN RAY.  FOF ¶¶ 44, 45.  Plaintiff is still a listed SMFF resource provider on the NTVRP, and nothing about the approval of the deviation request prohibits Plaintiff from entering into a contract for salvage work on the Golden Ray. Indeed, when asked how a decision by the Court to set aside the deviation approval would make any difference to Plaintiff's ability to enter into a contract related to the salvage of the GOLDEN

RAY, Plaintiff's witness Douglas Martin stated that "…the crux of the problem is the owner doesn't want to do that."   Hearing Tr. at 102:1-8 (Martin Testimony).

28.     Thus, Plaintiff has failed to demonstrate each of the necessary elements of standing in order to show that there is a case or controversy for the Court to decide.

## C.     STANDARD OF REVIEW FOR MOTIONS FOR PRELIMINARY INJUNCTION

29.     "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The grant of a motion for preliminary injunction "is the exception rather than the rule . . . ." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam) (internal citation omitted).  Plaintiff is entitled to preliminary relief only if it demonstrates (1) likelihood of success on the merits, (2) likelihood of irreparable harm in the absence of an injunction, (3) the balance of hardships tips in its favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20; *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005).  Plaintiff must "clearly establish[] the burden of persuasion" on each factor.  *McDonald's Corp v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (internal quotation marks and citation omitted).

## D.     STANDARD AND SCOPE OF REVIEW OF FINAL AGENCY ACTION UNDER THE ADMINISTRATIVE PROCEDURE ACT

30.     The approval of the request to deviate from the NTVRP is a final agency action subject to judicial review under the APA, 5 U.S.C. §§ 701-706.

31.     The approval action must be upheld unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Review under the APA standard is narrow and "exceedingly deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996).  "The court's role is to ensure that the agency came to a rational

conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (internal quotation marks omitted).  The party challenging the agency action must set forth specific facts to show that it is entitled to relief.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 884-85 (1990).

32.     The scope of judicial review under the APA is limited to the administrative record before the agency at the time the decision was made.  5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).

33.     In the context of a motion for preliminary injunction in an APA matter, the reviewing court may consider *de novo* evidence submitted by a party to support its allegations regarding irreparable harm, the balance of equities, and the public interest, but such evidence should not be considered by the court in determining a party's likelihood of success on the merits.[2]  *See Nat'l Pork Producers Council v. Bergland*, 631 F.2d 1353, 1359 (8th Cir. 1980) (stating that district court should limit its inquiry to administrative record).

## E.   PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS APA CLAIM.

34.     Even if the Court were to disregard Plaintiff's lack of standing, Plaintiff has not shown a likelihood of success in it challenge to the FOSC's approval of the deviation request.

---

[2] Although the Court has made factual findings in this Order, "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions."  *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (emphasis added).  This is because the documents in the administrative record do not contain factual "disputes."  *Florida Power & Light Co.*, 470 U.S. at 744 ("The factfinding capacity of the district court is thus typically unnecessary to judicial review of agency decisionmaking."); *Loggerhead Turtle v. County Council of Volusia County*, 120 F. Supp. 2d 1005, 1013 (M.D. Fla. 2000) (finding same).

35.      In its motion for preliminary injunction, Plaintiff first contends that the Coast Guard violated the OPA "by not providing any justification for its approval of Owner's deviation request removing [Plaintiff] as the [salvage and marine firefighting] provider."  Dkt. No. 6 at ¶ 29; *see also* Dkt. No. 1 at 13-14 (Count Two, seeking APA review of the approval of the NTVRP deviation).  The provisions cited by Plaintiff in Count Two – 33 C.F.R. § 155.4032 and 33 U.S.C. § 1321(c)(3)(B) – do not contain any requirement that the FOSC provide a justification for his decision to approve a deviation of the NTVRP.

36.      In any event, the Coast Guard has "disclose[d] the basis" of its action.  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-169 (1962) (internal quotation marks omitted); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.").  Here, the FOSC prepared a contemporaneous decision memorandum setting forth the reasons for his decision.  *See* Plfs' Ex. 16 (Decision Memo); *see also* Dkt. No. 20-1 at pdf page 63 (Deviation Approval Letter).

37.      Plaintiff also alleges that the Coast Guard failed to show that there were "exceptional circumstances" that would allow for a deviation from the resource provider identified in the NTVRP.  Dkt. No. 6 at ¶ 29; *see also* Dkt. No. 1 at ¶¶ 29, 32-33 (Count Two), 41 (Count Three).

38.      The National Contingency Plan provision of the Clean Water Act, 33 U.S.C. § 1321(c)(3)(B), was amended in 1996 to add that "the owner or operator may deviate from the applicable response plan if the President or the Federal On-Scene Coordinator determines that deviation from the response plan would provide for a more expeditious or effective response to

28

the spill or mitigation of its environmental effects."  Coast Guard Authorization Act of 1996,

Pub. L. No. 104-324 § 1144.  The amendment thus provides the FOSC with the flexibility to

depart from the NTVRP where appropriate.

39.     The statute does not include the term "exceptional circumstances."  The term

originated in a 2008 rulemaking by the Coast Guard promulgating SMFF requirements in vessel

response plans.  There the agency stated that:

> [T]here is a need to ensure that an incident be responded to quickly and without
> the need for contract negotiations during an actual emergency.  In order to ensure
> this happens, contracts must be in place as part of the vessel's response plan.  *In
> regards to the ability of the unified command to select other than contracted
> resource providers . . . the U.S. Coast Guard agrees that there may be a need for
> flexibility to use other than contracted resources, under exceptional
> circumstances, during an incident if it is in the best interest of the response*.  We
> have added this authorization into § 155.4032(a) of the final rule.

73 Fed. Reg. 80,618, 08, 635 (Dec. 31, 2008), Salvage and Marine Firefighting Requirements;

Vessel Response Plans for Oil (emphasis added).

40.     As noted above, Section 155.4032(a) allows for another resource provider, not

listed in the approved plan for the specific service required, to be contracted for a specific

response.  33 C.F.R. § 155.4032(a).  Justification for the selection of that resource provider must

be provided to, and approved by, the FOSC.  *Id.*  "Only under exceptional circumstances will the

FOSC authorize deviation from the resource provider listed in the approved vessel response plan

in instances where that would best affect a more successful response."  *Id.*  Thus, while the

preferred means of obtaining response resources is by pre-approved contracts, the FOSC has

flexibility under exceptional circumstances to deviate from the service provider(s) listed in the

approved NTVRP.

29

41.     While the Coast Guard's regulations do not define "exceptional circumstances," the agency has explained in its "Guidance for Implementation and Enforcement of the Salvage and Marine Firefighting Regulations for Vessel Response Plans" that the FOSC "determines what exceptional circumstance will lead to deviation from the response plan in order to provide for a more expeditious or effective response to the spill or mitigation of its environmental effects. *It is up to the individual FOSC to make this determination from his understanding of the facts of the situation*."  Navigation and Vessel Inspection Circular No. 2-10, at 32-33 (Sept. 27, 2010) (emphasis added) (citing 33 U.S.C. § 1321(c)(3)(B); 33 C.F.R. § 153.103(n); 33 C.F.R. § 155.4032).

42.     Thus, the NCP provision of the Clean Water Act, 33 U.S.C. § 1321(c)(3)(B), makes clear that the FOSC has broad discretion in determining whether a deviation would provide for a more expeditious or effective response.  And the regulations recognize that, while such situations are the exception rather than the rule, deviations may be made in rare cases where the FOSC finds that the deviation to allow for another resource provider to be used would lead to a more successful (i.e., more expeditious or effective) response.  The structure of these provisions indicate that determining whether there are exceptional circumstances justifying a deviation from a NTVRP is a case-specific inquiry.

43.     The Court rejects Plaintiff's reading of the regulation, under which the FOSC could only find exceptional circumstances in the event a resource provider under the NTVRP is unwilling or incapable of providing services.  Dkt. No. 26 at 16.   Had the agency intended that the term "exceptional circumstances" be so limited, it would have used language along those lines.

30

44.     Whether there are "exceptional circumstances" is an inquiry based on the totality of the facts known to the FOSC, the federal official with the responsibility to direct the spill removal and clean-up efforts.  Such circumstances may relate to the ability or willingness of a resource provider listed in the NTVRP, to the circumstances regarding the nature of the release or imminent release of oil or hazardous materials, or other unforeseen circumstances.

45.     Here, the FOSC analyzed the facts on the ground, and articulated a rational basis for concluding that the circumstances here are "exceptional."  To determine whether the circumstances here warranted such a deviation, the FOSC considered the relevant facts, including:

(1) The vessel is very large (656 feet in length), and has come to list on its port side at approximately 100 degrees in very close proximity to a navigable channel that is the sole access route to the one of the busiest ports in United States - the Port of Brunswick;

(2) The vessel is grounded in an environmentally sensitive area that includes prime shrimping grounds and a significant roosting area for migratory birds; and

(3)  The vessel is aground in close proximity to the major tourist destinations of Saint Simons and Jekyll Islands.

Plf's Ex. 16 at 4 (Decision Memo).

46.     The Court finds that the FOSC reasonably determined that these were exceptional circumstances.  The facts at issue are not in dispute, and Plaintiff itself recognizes that "[t]he capsizing of the GOLDEN RAY is the largest cargo shipwreck in U.S. coastal waters since the Exxon Valdez," and acknowledges the significant environmental concerns regarding the removal

of the vessel and its contents.  Dkt. No. 1 at ¶ 10.  As noted above, Plaintiff's witnesses

described the casualty in similar terms.  *See* FOF ¶ 54.

47.     The Court further finds that the term "exceptional circumstances" is not

ambiguous when viewed in the context of the Clean Water Act's NCP provision and the history

and purpose of the regulations.  *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (finding that

deference may be afforded to an agency's interpretation of its own regulations, but only where

"the text, structure, history and purpose of a regulation" reveal true ambiguity).  Here, the text,

structure, history, and purpose of the regulation make clear that what encompasses "exceptional

circumstances" should be broadly defined and will depend on the nature of the incident and its

response constraints.

48.     Even if the Court were to find that there were ambiguity in the term "exceptional

circumstances," deference to the Coast Guard's view would be appropriate here.  The Coast

Guard's reading of its own regulation is plainly a reasonable interpretation given the text,

structure, history, and purpose of Section 155.4032.  And the Coast Guard's interpretation

satisfies all of the criteria that courts must assess in determining whether the "character and

context of the agency interpretation entitles it to controlling weight."  *See Kisor*, 139 S. Ct. at

2416.

First, there is no doubt that the Coast Guard's interpretation of "exceptional

circumstances" represents the agency's "official position."  *Kisor*, 139 S. Ct. at 2416.  The Coast

Guard has consistently explained that "exceptional circumstances" are "based on the facts of the

situation."  Navigation and Vessel Inspection Circular No. 2-10, at 32-33 (Sept. 27, 2010)

(emphasis added) (citing 33 U.S.C. § 1321(c)(3)(B); 33 C.F.R. § 153.103(n); 33 C.F.R. §

155.4032).  The guidance is posted on the Coast Guard's web site, which states that the guidance assists mariners, the marine industry, and the public as a means of determining how the Coast Guard will be implementing and enforcing its regulations.  *See* https://www.dco.uscg.mil/Our-Organization/NVIC/ (last visited February 28, 2020).  It is therefore beyond dispute that the document is not an "ad hoc statement not reflecting the agency's views."  *Kisor*, 139 S. Ct. at 2416.

Second, the Coast Guard's interpretation "implicate[s] its substantive expertise." *Kisor*, 139 S. Ct. at 2417. The *Kisor* Court noted that "technical" regulations are especially deserving of deference and gave as an example FDA's interpretation of regulations concerning which substances qualified as a "moiety."  *Id.*; *see id*. at 2410-11 (plurality op.).  The Coast Guard's interpretation of regulations concerning what instances may require a deviation from a NTVRP in order for there to be a more expeditious or effective response is equally technical and equally implicates the agency's substantive expertise regarding the a successful response action and is squarely within the competence of an agency charged to remove an oil spill or hazardous substance spill and to direct and monitor all federal, state, and private removal efforts.  33 U.S.C. § 1321(c), (d).  Finally, the interpretation reflects the agency's "fair and considered judgment." *Kisor*, 139 S. Ct. at 2417.  The interpretation at issue here is not a post hoc rationalization first announced in litigation.  Rather, the guidance document at issue here was published in 2010, years before the filing of this Complaint.  *See id.* at 2418.

49.     Plaintiff next argues that the Coast Guard violated 33 U.S.C. § 1321(c)(3)(B) by failing to articulate "why or how the T&T plan 'would provide for a more expeditious or effective response to the spill or mitigation of its environmental effects.'"  Dkt. No. 6 at ¶ 29.

Plaintiff is simply incorrect.  In the FOSC's Decision Memo, he specifically determined that the use of "*another* resource provider would provide for a more successful response" since it would be more expeditious or effective and would mitigate the environmental effects of the removal of the vessel.  Plf's Ex.16 at 4 (Decision Memo) (emphasis added).  The Owner's request to use another response provider (T&T) was made for the purpose of conducting Large Section Demolition on the GOLDEN RAY.  *See id.*  Plaintiff repeatedly proposed only using Small Section Demolition instead.  *See id.*; Plf's Ex. 6; Dkt. No. 20-1 at pdf page 45.  After reviewing the Owner's request and the report of the Owner's engineering and salvage experts – who stated that Large Section Demolition would be the more expeditious, effective, and environmentally safe means of removing the GOLDEN RAY – the FOSC directed SUPSALV and SERT to perform a separate technical review.  Plf's Ex. 16 at 4 (Decision Memo).  That review determined that T&T's plan would be feasible and confirmed the risk analysis that – with 90% certainty – T&T's plan was more expedient than Plaintiff's plan by four months.  *See id.*; Dkt. No. 20-1 at pdf pages 57-61.  Importantly, this expedited schedule would reduce the likelihood that salvage operations would extend into the 2020 hurricane season.  *See* Plf's Ex. 16 at 5 (Decision Memo).  The faster timeline would also avoid a prolonged impact on the navigation channel.  *See id.*  The Coast Guard's and Navy's technical experts' conclusions regarding the demolition proposals "require[] a high level of technical expertise" warranting deference.  *Marsh v. Oregon Nat'l Res. Council*, 490 U.S. 360, 377 (1989).

50.     The FOSC also considered the positive environmental outcomes from T&T's expedited schedule.  Large Section Demolition requires fewer cuts to the vessel compared to Small Section Demolition, thereby reducing the threat of potential discharge.  *See* Plf's Ex. 16 at

5 (Decision Memo).  Noise pollution and acoustic disturbance of the marine environment will also be reduced under T&T's expedited schedule.  *See id.*

51.    The Court concludes that the FOSC reasonably determined that T&T's timeline would be more expeditious and decrease the likelihood of salvage operations being conducted throughout the 2020 hurricane season, and that T&T's proposed placement of an environmental protective barrier prior to cutting would reduce risk to the environment.

52.    Although Plaintiff's witnesses contend that their own internal analysis disagreed with that of the Owner's risk reviewers and third party reviewers, Hearing Tr. at 66:8-22 (Martin Testimony), Plaintiff admits that it did not submit its internal findings to the FOSC and thus they are not part of the record on review.  FOF ¶¶ 40-41.

53.    In reaching his decision to approve the deviation, the FOSC also reasonably considered the deteriorating working relationship between Plaintiff and the Owner that may impede progress to remove the GOLDEN RAY.  *See* Plf's Ex. 16 at 5-6 (Decision Memo). Neither of Plaintiff's proposed plans included Large Section Demolition or the certainty of the construction of an Environmental Protection Barrier around the removal activity area prior to demolition of the vessel, both of which had been articulated as preferred by the Owner.[3]  *See id.* at 6.  In addition, there were other incidents that demonstrated problems in the working relationship between the owner and Plaintiff that threatened to delay the response.  *See id.* at 6; Dkt. No. 20-1 at pdf page 16.

---

[3] Plaintiff's proposal provided for the possibility of a 4.6 acre "protective perimeter" comprised of a cofferdam built close to the vessel.  Plf's Ex. 6 at 13, 22.  But Plaintiff proposed building the protective perimeter at the same time it would be undertaking cutting of the vessel.  *Id.* at 22.

54.     Based on his assessment of the facts, the technical review of the Large Section

Demolition proposal, the mitigation of environmental impacts, the working relationship between

Plaintiff and the owner, and the unique challenges posed by a casualty of this magnitude situated

in Saint Simons Sound, it was reasonable that the FOSC concluded exceptional circumstances

were present under 33 C.F.R. § 155.4032, and that a deviation from the NTVRP would provide

for a more effective response, pursuant to 33 U.S.C. § 1321(c)(2)(B).

55.     Finally, Plaintiff contends that the Coast Guard has failed to explain why Plaintiff

"was removed as the salvage and marine firefighter services provider not only for wreck

removal, but also for each of the nineteen different services for which Plaintiff was pre-

contracted under the GOLDEN RAY NTVRP."  Dkt. No. 6 at ¶ 29.  Plaintiff does not cite any

language in the OPA or its implementing regulations as the basis for any requirement that the

Coast Guard explain to a response provider why it approved changes to a NTVRP.  And even if

there were a requirement to do so, the FOSC did not remove Plaintiff as a response provider

under the NTVRP.[4]  As made clear in the FOSC's December 21, 2019 Decision Memo and

---

[4] The Court notes that, in a nontank vessel response plan rulemaking in 2013, the Coast Guard
responded to a comment that under the proposed rule, NTVRPs would only have one salvor who
would require immediate activation, which would lead to only one salvage solution and inhibit
the ability for any competition in salvage operations in developing other wreck removal
solutions.  78 Fed. Reg. at 60,110.  The Coast Guard specifically responded to the commenter's
concern, stating:

> VRPs may list more than one salvor. A VRP GSA must list primary resource
> providers who are responsible for all, or a subset of, the services that are listed in
> Table 155.4030(b). VRPs may list additional resource providers for each service,
> but VRPs must indicate the primary resource provider for the COTP zone. … 33
> CFR 155.5012 describes the means to respond using alternate strategies based on
> FOSC approval of a salvage plan that the attending salvage master develops,
> which may provide for a more expeditious or effective response.

*Id.*

Reply to Request for Approval for Deviation from NTVRP, the FOSC only approved adding T&T as "another resource provider" for the purpose of salvage and marine firefighter services. *See* Plf's Ex. 16 at 1, 7 (Decision Memo); Dkt. 20-1 at pdf page 63 (FOSC Letter to Owner Approving NTVRP Deviation Request).  The decision does not purport to remove Plaintiff as a response provider, and has no effect on Plaintiff's status as such.  Plaintiff's witnesses did not dispute that Plaintiff remains a resource provider under the NTVRP.  Hearing Tr. at 83:12-13 (Martin Testimony).  For this reason, Plaintiff is unable to succeed on the merits and is not entitled to its requested relief.

56.     Applying the APA standard of review, 5 U.S.C. § 706(2), the Court concludes that the FOSC's approval decision was reasonable and consistent with the applicable law.  Thus, Plaintiff is not likely to succeed in showing that the FOSC's decision was arbitrary, capricious, or contrary to law.

### F.   PLAINTIFF HAS NOT SHOWN ANY INJURY, MUCH LESS AN IRREPARABLE INJURY.

57.     "A showing of irreparable harm is 'the *sine qua non* of injunctive relief'" and must be "neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citations omitted).  Indeed, establishing imminent and irreparable harm is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction."  11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Fed. Prac. & Proc.* § 2948.1 (3d ed. 2018).  In addition, before a preliminary injunction may issue, imminent and irreparable harm must be "not merely possible, but likely." *United States v. Jenkins*, 714 F. Supp. 2d 1213, 1221 (S.D. Ga. 2008)

(citing *Winter*, 555 U.S. at 22).  Absent such a showing, no preliminary injunction may issue. *Jenkins*, 714 F. Supp. 2d at 1220.

58.     Plaintiff's delay in seeking relief from this Court is alone a sufficient basis for concluding that an urgent need for the speedy relief of a preliminary injunction is not warranted. *See generally Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten week delay in seeking injunction undercut claim of irreparable harm); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming denial of temporary injunctive relief where movant, among other things, delayed three months in making its request).  This is especially true in the context of a vessel response operation where there is the imminent threat of a discharge in an environmentally significant area just months before hurricane season.

59.     Plaintiff asserts that it has already suffered and will continue to suffer significant and irreparable harm because it will "lose its contract to provide salvage and marine firefighting services" under the NTVRP, which Plaintiff incorrectly describes as "a contract that was supposed to be secured by statute absent exceptional circumstances."  Dkt. No. 6 at ¶ 30. Plaintiff also asserts that it will lose the "significant resources it expended" in negotiating to be a salvage and marine firefighting service provider for the GOLDEN RAY and in preparing its wreck removal proposal.  *Id.* at ¶ 31.  As discussed above, even though Plaintiff has terminated its contract with the Owner, *see* Anglin Decl., Exhibit 4 (Transitional Agreement), Plaintiff remains a services provider under the NTVRP, as the FOSC's approval of the Owner's deviation request did not change Plaintiff's status as a listed resource provider on the Owner's NTVRP. FOF ¶ 44.

60.     If Plaintiff has lost its contract rights with respect to the salvage of the GOLDEN RAY, it is due to the exercise of the Plaintiff's freedom to contract in consenting to being replaced by Donjon Marine for the purposes of providing the very services the Plaintiff now seeks to reclaim.  *See* FOF ¶¶ 30, 43.  The FOSC's action did not cause the Plaintiff to lose its contract with the Owner.

61.     Plaintiff's reliance on *Georgia by & through Georgia Vocational Rehab. Agency v. United States by & through Shanahan*, 398 F. Supp. 3d 1330, 1344 (S.D. Ga. 2019), is wholly misplaced.  There, this Court found that, absent a preliminary injunction, the defendants would have been allowed to award the contract to another party and the plaintiffs would have been unable to compete for the contract since they had been eliminated from consideration.  *Id.* Plaintiff remains a services provider for the GOLDEN RAY, and can compete (and has competed) for contracts under the NTVRP.  Because Plaintiff has not been removed as a services provider under the NTVRP, it will not be "nearly impossible" to restore Plaintiff as a services provider.  Dkt. No. 6 at ¶ 15.  Moreover, while the plaintiff in *Georgia Vocational Rehabilitation Agency* had no ability to recoup its lost profits if the government contracted with another vendor, Plaintiff here has not shown it has no cause of action to recover such losses from the Owner. Indeed, Plaintiff has indicated it has sought to mediate its disputes under the contract, Hearing Tr. at 81, lines 7-21 (Martin Testimony), and may seek legal redress from the Owner.  Dkt. 20-1 at pdf page 65 (Dec. 23, 2019 Demand Letter from Plaintiff to Owner).

62.     Plaintiff also cites *Cardinal Maintenance Service, Inc. v. United States* for the proposition that a party suffers irreparable injury "when it loses the opportunity to compete on a level playing field with other bidders."  63 Fed. Cl. 98, 110 (2004).  But Plaintiff has had a more

than level playing field in which to compete.  Plaintiff had an exclusive 21-day bidding period, during which it competed with no one, to provide a wreck removal plan to the Owner.  Plaintiff simply failed to provide a plan that the Owner found satisfactory.  Plaintiff then had another opportunity to compete for the bid during the Owner's Invitation to Tender process.  Plaintiff squandered both opportunities by repeatedly proposing a plan that did not address the Owner's stated preference for Large Section Demolition and placement of a pre-demolition Environmental Protection Barrier.  The FOSC had no involvement in these transactions and did not interfere with the Plaintiff's ability to compete for the wreck removal contract.  For this reason, Plaintiff has failed to show how the Coast Guard is responsible for any harm that has been, or will be, suffered by the Plaintiff's abdication of its contractual rights.

## G.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST DISFAVOR AN INJUNCTION.

63.     Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief [and] [i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences." *Winter*, 555 U.S. at 24 (citations omitted).  Where the federal government is a party, the third and fourth injunction factors—the balance of equities and the public interest—"merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

64.     "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated."  *Ne. Florida Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1284.  Relief that goes beyond simply maintaining the status quo is "particularly disfavored."  *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) (internal quotations and citation omitted).  Plaintiff appears to ask the Court

to revoke the FOSC's approval of the deviation, Dkt. No. 6 at ¶ 40, and to "delay[] the approval" of the Owner's deviation request.  In this context, the only temporary or preliminary relief Plaintiff could possibly seek is an order staying the Coast Guard's decision to approve the deviation to the vessel response plan until this action can be fully litigated.

65.     Plaintiff claims that "[t]emporarily delaying the approval of [the] Owner's deviation request" would not harm the Coast Guard.  Dkt. No. 6 at ¶ 34.  The deviation has already been approved, however, so the Court understands that Plaintiff seeks to enjoin the effectiveness of the FOSC's decision.

66.     The Court concludes that further delay in moving forward with the removal of the vessel would harm the Coast Guard's interests in protecting the marine environment and integrity of the waterway, as well as safety of life at sea.  As set forth in the Declaration of Captain Ricardo Alonso, Dkt. No. 20-2, it is in both the Coast Guard's interest and public interest that the Owner proceed promptly with containment and removal at the site of the GOLDEN RAY.  Time is of the essence in a response and salvage operations such as this, involving a very large vessel containing thousands of cars and resting on its side with a list of approximately 100 degrees.  *Id.* at ¶ 4; Plf's Ex. 16 at 3 (Decision Memo); *see also* Alonso Decl. at ¶ 4 ("The ocean is a harsh environment—it rusts and deteriorates materials, leading to the breakdown of a vessel's integrity and structure.").

67.     Granting Plaintiff's request to halt the salvage operations will not do anything to lessen the Coast Guard's continuing obligations in this area.  Alonso Decl. at ¶ 9.  On the contrary, to put a stop to the Owner's response activities will prolong (and likely also increase) the ongoing burden on Coast Guard (and State of Georgia) personnel and resources to maintain

security and safety in the area and continue to monitor the status and risk presented by the grounded vessel. *Id.* Further, if resources are taken away from the removal now, more state and federal resources will have to be expended during hurricane season in order to mitigate the harms of the delay. *Id.* Since hurricane season already stretches the resource availability of the Coast Guard, prolonging the GOLDEN RAY salvage has the potential to deprive impacted communities of these much-needed resources. *Id.*

68.     An injunction would also be harmful to the public interest because the current phase of the response, in which the Environmental Protection Barrier is being installed, is a critical one. The barrier plays an important role in the containment of oil, debris, and other pollutants that may emanate from the vessel (including during the next planned phase where the vessel is cut apart and the pieces are removed). Alonso Decl. at ¶ 5. Such a containment method reduces the risk of these pollutants entering the water, washing up on nearby beaches or shores, or interfering with vessel (and craft) navigation on waterways. *Id.* Every day in which on-scene personnel are stopped from installing a protective barrier presents a significant risk to both the environment and to the safety of persons in the vicinity. *Id.*

69.     As the FOSC outlined in his Decision Memo, the particular location in which the vessel is grounded is an environmentally sensitive area which includes prime shrimping grounds and Bird Island—a significant roosting area for migratory birds. Plf's Ex. 16 at 3 (Decision Memo); *see also* Alonso Decl. at ¶ 5. The longer a vessel remains in a grounded position such as this, the more time that the environment (including marine aquatic species) are exposed to the risks, for example from release of oil and other harmful substances. Alonso Decl. at ¶ 5. In addition, the GOLDEN RAY is grounded in very close proximity to a navigable channel which

serves as the only access route to the Port of Brunswick and in close proximity to major tourist destinations for coastal Georgia. Plf's Ex. 16 at 3 (Decision Memo); *see also* Alonso Decl. at ¶ 5. Its continued presence there presents ongoing risk to vessel navigation and flow of commerce.

70.     The need for expediency in response situations such as this is further magnified by the approaching of the annual hurricane season for the Atlantic Ocean.  Alonso Decl. at ¶ 8. Conducting salvage operations during hurricane season (or winter storm months) presents additional safety risks and reduces ability to effect salvage and removal.  *Id.*  Hurricanes (even those that do not pass in close proximity) bring many dramatic changes to the marine environment – including high winds, storm surges, and shifting of the ocean floor – all of which increase chances of the vessel becoming destabilized or splitting apart.  *Id.*  A delay in salvage and removal operations puts the safety of individuals working on scene at risk and increases the chance of worsening the physical condition of the vessel.  *Id.*

71.     In his Decision Memo, the FOSC clearly documented the importance of T&T's faster timeline for removing the GOLDEN RAY wreck.  Plf's Ex. 16 at 4-5 (Decision Memo). Delays in the response will only serve to exacerbate the potential threat to the environment as the structural integrity of the vessel may decline as it is exposed to the elements and structural stresses for which it was not designed.  Alonso Decl. at ¶ 8.  The testimony presented by Plaintiff indicated that it would need approximately six months—late August—to complete its proposed removal. Hearing Tr. at 106:17-21 (Martin Testimony).  Even then, Plaintiff's witness could not promise it would be finished completely by that time.  Hearing Tr. at 107:22-108:1 (Martin). The FOSC relied on evidence indicating with 90% confidence that T&T could complete the removal by June 6, 2020.  Dkt. No. 22-6 at 7 (Risk Register).  Therefore, allowing Plaintiff to

proceed on a slower timeline would harm the public's interest in expediently removing the vessel.

72.    For these reasons, the Court finds that the balance of harms, and the public interest, do not favor a preliminary injunction.

73.    Plaintiff's motion for a preliminary injunction should be denied, as Plaintiff has not met its heavy burden to show entitlement to such extraordinary relief.


Date:   February 28, 2020              Respectfully submitted,

                                        /s/  Martha C. Mann
                                        MARTHA C. MANN
                                        SYDNEY A. MENEES
                                        U.S. Department of Justice
                                        Environment and Natural Resources Division
                                        Environmental Defense Section
                                        P.O. Box 7611
                                        Washington, D.C. 20044
                                        Telephone: (202) 514-2664 (Mann)
                                        Fax: (202) 514-8865
                                        martha.mann@usdoj.gov
                                        sydney.menees@usdoj.gov

                                        BOBBY L. CHRISTINE
                                        United States Attorney

                                        /s/ Bradford C. Patrick
                                        BRADFORD PATRICK
                                        Assistant United States Attorney
                                        South Carolina Bar No. 102092
                                        Post Office Box 8970
                                        Savannah, Georgia  31412
                                        Telephone:  (912) 652-4422
                                        Facsimile:  (912) 652-4227
                                        bradford.patrick@usdoj.gov

                                        *Counsel for Defendants*

44