**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF**
**GEORGIA BRUNSWICK DIVISION**

| | |
|---|---|
| **DONJON-SMIT, LLC** | |
| **VS.** | |
| **ADMIRAL KARL L. SCHULTZ, CAPTAIN JOHN W. REED, COMMANDER NORM C. WITT, and COMMANDER MATTHEW J. BAER, IN THEIR OFFICIAL CAPACITY AS OFFICERS OF THE UNITED STATES COAST GUARD** | **CIVIL ACTION NO. 2:20-cv-00011 L:GB-BWC** |

**DONJON-SMIT, LLC'S PROPOSED CONCLUSIONS OF LAW**

Plaintiff, Donjon-SMIT, LLC, submit the following proposed conclusions of law in connection with Plaintiff's motion for preliminary injunction.  Dkt. No. 6

**I.     CONCLUSIONS OF LAW**

Almost thirty (30) years after the horrific Exxon Valdez oil spill in Prince William Sound, Alaska, and some 3,640 miles away, the Court has before it a situation which The Oil Pollution Act of 1990 (OPA 90) and the Chafee Amendment were intended to prevent, arising from the September 8, 2019 capsizing of the MV GOLDEN RAY in St. Simons Sound.

The gravity of this case is extraordinary and the Court's decision will have implications for years to come, well after salvors leave coastal Georgia.   Moreover, given that this case is one of first impression and necessitates judicial analysis of  OPA 90, particularly the Chafee Amendment, the court's decision could affect how vessel owners, their insurers, and salvors handle, confront, and respond to similar tragic events in the future.

Given the foregoing facts, and as explained below, the Court GRANTS Plaintiff's Motion for a Preliminary Injunction.

A.     **DONJON-SMIT IS ENTITLED TO INJUNCTIVE RELIEF**

While there is no doubt the evidentiary burden for a Court to grant a preliminary injunction is high, Plaintiff has met this burden.

The purpose of preliminary injunctive relief is to preserve the status quo until the district court renders a decision on the merits. *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 (11th Cir.1999). The Court must balance "the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (*en banc*). Here, DJS has shown preliminarily that

(1)     there is a substantial likelihood of success on the merits;

(2)     irreparable injury will be suffered if the relief is not granted;

(3)     the threatened injury outweighs the harm the relief will inflict on the non-movant, and

(4)     entry of the relief will serve the public interest.

*Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir.2005); *see also Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034 (11th Cir. 2001).

B.     **BASED ON THE EVIDENCE BEFORE THE COURT, AS WELL AS THE LACK OF EVIDENCE PRESENTED BY DEFENDANTS, THERE IS A SUBSTANTIAL LIKELIHOOD DONJON-SMIT WILL PREVAIL ON THE MERITS.**

The Federal Water Pollution Control Act (FWCP, often called the Clean Water Act), Section 311 of the Clean Water Act Section, 33 U.S.C. § 1321, as amended by the Oil Pollution

Act of 1990 ("OPA"), 33 U.S.C. §§ 2701-2762, is focused on the prevention of and response to oil spills.  The OPA "provides a **framework for preventing and responding to potential oil spills" and "mandates oil spill contingency planning** at four levels:  the national, regional, and area level, and, lastly, at the level of individual owners and operators of offshore oil facilities." *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1215 (9th Cir. 2015)(citing 33 U.S.C. § 1321(b)); see also Walter Quality Ins. Syndicate v. United States, 225 F.Supp. 3d 41, 48 (D.D.C. 2016) ("The OPA was designed to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry.")

The Chafee Amendment to OPA 90 (33 U.S. Code § 1321 (3) (B))  provides: An owner or operator participating in efforts under this subsection shall act in accordance with the National Contingency Plan and the applicable response plan required under subsection (j), or as directed by the President, except that the owner or operator may deviate from the applicable response plan if the President or the Federal On-Scene Coordinator determines that deviation from the response plan would provide for a ***more expeditious or effective response*** to the spill or mitigation of its environmental effects. (Emphasis Added).

The related administrative law, found in 33 C.F.R. § 155.4032, provides, however, that:

Use of resource providers not listed in the VRP. If another resource provider, not listed in the approved plan for the specific service required, is to be contracted for a specific response, justification for the selection of that resource provider needs to be provided to, and approved by, the FOSC. ***Only under exceptional circumstances will the FOSC authorize deviation*** from the resource provider listed

3

in the approved vessel response plan in instances where that would best affect a more successful response." (Emphasis Added).

And the Federal Register:

"VRP approval is done according to certain criteria used by the Coast Guard in reviewing the submitted NTVRPs.  Should the review process uncover deficiencies, or if a historical pattern of deficiencies are found in the resources listed in NTVRPs, the Coast Guard will take administrative action in accordance with §§ 155.2015(d)(1) and 155.1070(e).  However, the responsibility of ensuring the adequacy of the response provider is on the planholder, based on the selection criteria found in § 155.4050."  See Federal Register, Vol. 73, No. 251, 80643.

While "exceptional circumstance"[1] are not more clearly defined in OPA 90 or the Chafee Amendment, the Salvage and Marine Firefighting Requirements; Vessel Response Plans for Oil, 73 FR 80618-01 gives examples of what constitutes "exceptional circumstances." Those circumstances exist when "a resource provider [is unable] to perform their required services. . . [or] if a resource provider is found to be non-responsive or deficient[,]"  Neither circumstance ever existed with respect to DJS. Therefore, the FOSC had no discretion to grant a deviation.

---

[1] Black's Law Dictionary states "exceptional circumstances" are "[c]onditions which are out of the ordinary course of events; the unusual or extraordinary circumstances."  Black Law Dictionary Edition ___.  Focusing merely on the word "exceptional," common use dictionaries define the word to mean "rare." *E.q.* Merriam Webster dictionary.  Synonyms for "exceptional" bear out the heightened degree to which  something must reach to be considered "exceptional" for such including: aberrant, aberrated, abnormal, anomalous, atypical, especial, exceeding, extraordinaire, extraordinary, freak, odd, peculiar, phenomenal, preternatural, rare, singular, uncommon, uncustomary, unique, unusual, unwonted. *Id.*  This illustrates that the circumstances existing in September 2019 were the same as those relied upon when the deviation was sought.

Additionally, these examples illustrate the stricture for there to be a finding of "exceptional circumstances"  Further, these examples are consistent with the high threshold courts gave when interpreting the phrase "exceptional circumstances" in other federal rules and regulations.[2] Moreover, the Chafee Amendment (33 C.F.R. § 155.4032) speaks of replacing a provider for **a** service, not all 19 SMFF duties.  Moreover, the uncontradicted testimony at trial was that there has not been a circumstance where a deviation from and NTVRP was granted when based upon exceptional circumstances, even more-so for all 19 SMFF services.

Further, the facts Defendants contend are "exceptional circumstances" are inconsistent with the principle of *ejusdem generis* when one examines the examples provided in the applicable Federal Register,  Salvage and Marine Firefighting Requirements; Vessel Response Plans for Oil, 73 FR 80618-01. *City of Delray Beach v. Agricultural Ins. Co.*, 85 F.3d 1527, 1534 (11th Cir.1996) (applying the doctrine of *ejusdem generis* that "when an enumeration of specific things

---

[2] The For example, under Supreme Court Rule 20, an "extraordinary writ" such as a writ of mandamus or habeas corpus may only be granted upon a showing of "exceptional circumstances [that] warrant the exercise of the Court's discretionary powers[.]" U.S. Sup. Ct. R. 20. Tellingly, though thousands of such petitions have been filed, the Court has not granted an extraordinary writ of habeas corpus since 1925, *see Ex parte Grossman*, 267 U.S. 87 (1925), or a writ of mandamus since 1962. *See Fong Foo v. United States*, 369 U.S. 141 (1962). Similarly, under Section 1229a of the Immigration and Nationality Act, a judge's removal order made in absentia may only be rescinded under "exceptional circumstances". 8 U.S.C. § 1229a(e)(1). This language has been interpreted to "set[] a high bar that 'will be met in only rare cases.'" *Jimenez-Castro v. Sessions*, 750 F. App'x 406, 408–09 (6th Cir. 2018) (quoting *Kaweesa v. Gonzales*, 450 F.3d 62, 68 (1st Cir. 2006)); *see also Herbert v. Ashcroft*, 325 F.3d 68, 72 (1st Cir. 2003). Likewise, pursuant to 18 U.S.C.A. § 3145(c), which governs the review of detention or release orders in criminal proceedings, a judicial officer may only order the release of a defendant held under a detention order if "it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C.A. § 3145. Here again, what qualifies as *exceptional* has been narrowly defined. *See United States v. McGillivray*, No. 2:11 CR 22-7, 2012 WL 137409, at *2 (quotations omitted) (W.D.N.C. Jan. 18, 2012) ("Courts generally have defined 'exceptional reasons' as circumstances which are clearly out of the ordinary, uncommon, or rare."); *United States v. Lea*, 360 F.3d 401, 403 (2d Cir.2004) (quoting *United States v. DiSomma*, 951 F.2d 494, 497 *2d Cir.1991) ("Exceptional circumstances exist where there is 'a unique combination of circumstances giving rise to situations that are out of the ordinary.'").

is followed by some more general word or phrase then the general word or phrase will usually be construed to refer to things of the same kind or species as those specifically enumerated).

Simply put, once a plan is approved, a vessel owner may not seek a deviation from the plan, and a FOSC cannot grant a deviation at the whim of an Owner particularly when the SMFF is doing what it was charged to do and doing it well.

Absent the existence of "exceptional circumstances," a FOSC is prohibited from granting a NTVRP deviation.  Based on the facts of this case, and guiding principles of law, the reasons for FOSC's deviation do not qualify as "exceptional circumstances" justifying the replacement of SMFF DJS.  Indeed, the claimed exception circumstances upon which Defendants seeks to rely, existed immediately upon the capsizing of the MV GOLDEN RAY.

Nothing close to the extremis of "exceptional" existed in this case when the deviation was sought and granted.  For instance, the boat remained capsized in its current location and relatively stable, with all accessible fuel removed such that the environmental crisis of the oil spill was largely abated.

DJS's representatives were on site within two (2) hours, and assisted in the successful rescue of four (4) trapped crewmen, stabilized the worksite by laying down a blanket of rock surrounding the ship, and  successfully removed most of the approximately 300,000 gallons of bunker fuel from the MV GOLDEN RAY's twenty-four (24) fuel tanks."[34]

---

[3] Plaintiff offered substantive documents and the testimony of Messrs.  Paul Hankins,  Doug Martin, Thijs van der Jagt, and Tim Williamson who were directly involved in DJS's immediate response to MV GOLDEN RAY's distress call, and who were actively engaged in fulfilling DJS's responsibilities under OPA-90 as the pre-approved SMFF under MV GOLDEN RAY's NTVRP.
[4] Plaintiff also presented the Affidavit of Tim Williamson as well as extensive records.  Defendants did not contest the content of Mr. Williamson's affidavit nor did they present any testimony, most surprisingly non from FOSC Commander Witt, not even by affidavit.

It is undisputed that DJS was ready to commence salvage operations of the MV GOLDEN RAY in November 6, 2019 – underline approximately four (4) months ago[5] and was diligently pursuing the development of a salvage plan consistent with the directives of Owner, the P&I Club and GCS. Even DJS's preferred removal methodology was deemed feasible by SERT on December 3, 2019. Dkt. 20-1, p. 2.  Significantly, DJS was even willing to utilize the riskier LSD plan.[6] These do not come close to being "exceptional circumstances."

The FOSC (in his Decision Memo)  states three (3) reasons for granting the deviation.  The Court considers the reasons disingenuous in the context of what are truly "exceptional circumstances." [7]  Therefore, the reasons stated in the FOSC Decision Memo fail to amount to "exceptional circumstances."

FOSC's Deviation Basis 1 – The vessel is large and close to a navigable channel

While the vessel is large, it was on day one and remains so today.  It was and still is close to a navigable channel; nothing has changed. Moreover,  the Court considers FOSC's deviation decision contrived because the alternate plan to DJSs intrudes to a greater degree into the navigable waters with its EPD than that proposed by DJS.  Indeed, DJS's plan included a much smaller barrier *outside* of the channel.

---

[5] Had the delays not taken place, DJS would have reasonably completed its operations within approximately six (6) months.

[6] The LSD plan is risker because of the higher likelihood that the midsections of the MV GOLDEN RAY will collapse when the ends are removed, crushing the cars inside, making their removal more complicated and damaging to the environment.  While DJS was willing to undertake the riskier plan, it was not willing to and accept the risks of that plan's failure through a fixed price agreement.

[7] The circumstances justifying the deviation must be "clearly out of the ordinary, uncommon, or rare." But none of the three reasons stated meet this "high bar." The reasons given are vague and do not actually support deviation. Further, none of Defendants' documentation reflects consultation with anyone regarding the environmental impacts of either plan to shrimping, migratory birds, the navigation channel, or the effects on tourism (or otherwise).

<u>FOSC's Deviation Basis 2 – The vessel is grounded in an environmentally sensitive area – does not constitute an "exceptional circumstance"</u>

The environmental sensitivity of the area has not change since November 2019. There is no evidence before this Court showing the FOSC consulted with any biologists and/or environmentalists to evaluate DJS plan and found it to be changed.

<u>FOSC's Deviation Basis 3 – the vessel is grounded in close proximity to tourist destinations – does not constitute an "exceptional circumstance"</u>

The proximity of the vessel between Jekyll Island and St. Simons Island remains as it did on September 8, 2019, adjacent to tourist areas. Defendants offer no facts which show a change in his condition. The documents presented by the Defendants demonstrate that DJS's plan was technically feasible.  Dkt. 20-1, p. 60 – 61.  As such, this offered explanation for the deviation is a false narrative. The reality is that DJS could already be well on its way in the removal process, to remove the vessel from tourist areas.

Notwithstanding these realities, Defendants seeks to expand and recast the identified "exceptional circumstances" as set forth in the FOSC's December 21, 2019 "Decision Memo." Despite Defendants' attempts to cast the FOSC's reasoning as an acceptable bases for approving the deviation, the Decision Memo, itself, does not "adequately explain" any legitimate rationale given.  Rather, it merely mimics the demands and commentary of the Owner and fails to reflect any independent analysis. Compare Ex. 12, Dkt. 20-1, p. 43-47 (Owner's December 12, 2019 deviation request) and Dkt. Ex. 16, Dkt. 20-1, p. 49 – 55). *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

If Defendants' arguments relative to 33 C.F.R. § 155.4032 are accepted, that would indeed give Owner's and their insurers an end around the Chaffee Amendment and the Coast Guard's

stated purpose for NTVRPs and allow responsible parties to re-open contract negotiations any time during precious response times, slowing down and frustrating the stated purpose of the NTVRP requirement. 33 U.S.C. § 1321(c)(3)(B).  This the Court will not do, for if it did, it would be ignoring codified law which would allow an Owner to can change a SMFF without any fault by the SMFF.

Indeed, by virtue of the realities, the FOSC applied, at best, an "any circumstance" standard in making his evaluation.   If an "exceptional circumstance" becomes "any circumstance," then a NTVRP, much like 33 C.F.R. § 155.4032, are meaningless, and the entire structure of OPA 90 tumbles like a house of cards.  This cannot have been the intent of the Congress.

By way of the record before the Court, there is a substantial likelihood DJS will prevail because the FOSC failed to follow established agency procedure.

By mid-October 2019, there was no longer any direct communications between FOSC Witt, the UC, over which Commander Witt had charge, and DJS.  The cessation of communication during this critical time period should have been a "red flag" to the UC, as a body, and to, FOSC Witt in particular, that something might be amiss given DJS's status as SMFF and a stakeholder. Everyone was waiting for a salvage plan to consider[8].

As prescribed by The United States Coast Guard Incident Management Handbook (IMH) COMDTPUB P3120.17B (May 2014) (hereinafter IMH),[9] a required function of UC, as led by the FOSC, is to engage in "Stakeholder outreach." Dkt. 28-6: IMH, p. 4-2. The management obligations include keeping stakeholders, among others, informed "of [incident] response activities." Dkt. 28-6:  IMH, p. 4-8, Management ¶ E. Most importantly, the UC is charged with

---

[9] The IMH's purpose is to assist Coast Guard personnel in the use of the National Incident Management System  (NIMS) and Incident Command System  (ICS) during response operations. Id at p. 1.1. The IMH is prepared and published by the United States Coast Guard.

9

"[e]stablish[ing] an information transfer process to facilitate communications with stakeholders and organizations." Dkt. 28-6: IMH, p. 4-9, Management, ¶ R.  Indeed, a UC must define and follow Critical Information Requirements (CIRs) which are "critical to facilitate timely decision making." Dkt. 28-6: IMH, p. 4-9; IMH p. 12-6.  CIRs are developed to "ensure the most accurate and appropriate data is gathered by both operational assets and other IMT members." Dkt. 28-6: IMH, pp. 12-2 to 12-3.  Stakeholder interest and concerns are one of those enumerated.  Dkt. 28-6: IMH, p. 4-10, CIR, ¶ V.

Given the critical nature of communication, the UC is to establish a Liaison Officer (LOFR), who under UC guidance, is to

A. <u>Develop an action plan to ensure communication and coordination with appropriate stakeholders</u> and submit draft of plan to IC/UC for review and approval.

B. Develop interagency/intra-agency information dissemination plan.

C. <u>Keep IC/UC informed of any adverse stakeholder concerns, feelings and/or relationships that may develop.</u>

D. Ensure external entities, such as EOCs, are informed of IC/UC direction.

E. Staff AREPs to deploy to external entities.

F. <u>Keep IC/UC appraised of</u> political and/or <u>stakeholder sensitivities</u>.

G. Coordinate with PIO on communication strategies and VIP visits.

Dkt. 28-6: IMH, pp. 4-10 – 4-11; See also IMH pp. 6-5.

With the goal of achieving a "Best Response," integral parts of the UC and Command response organizational duties, are to keep "stakeholders well informed" and to "efficiently use response resources." Dkt. 28-6:  IMH, pp. 4-13 – 14. The IMH even includes a checklist to assist the UC and the FOSC in assessing their own actions.  Dkt. 28-6:IMH, p. 4-15.  Of the twenty-two (22) items of assessment, examples are

Is progress being made toward achieving objectives and completing tasks?

Is the response organization working together effectively?

Is the response organization communicating effectively?

*Id.*

With regard to salvage, in particular, the IMH provides that "…Primary Resource Provider [in this case DJS] **will be the point of contact for the** plan holder, **FOSC, and IC/UC** in matters related to specific resources and services as required in 33 CFR §155.4030(a)." Dkt. 28-6: IMH, p. 22-10. (Emphasis Added). It is the expectation that "[a]ll services are planned to be performed by the Primary Resource Provider identified in the VRP within timeframes…." Dkt. 28-6: IMH, p. 22-10.

Given the limited evidence proffered by Defendants, the UC and FOSC Witt apparently did nothing to assess the status of a salvage plan for the removal of the MV GOLDEN RAY for over three (3) months. However, from the record before the Court, during that same period of time, Plaintiff developed and refined a feasible removal plan and delivered to the Owner and then to the FOSC. Under DJS's, plan, assuming commencement of the plan during November 2019, the MV GOLDEN RAY would be removed before hurricane season starts, even using the allegedly more conservative salvage method set out above. Given Defendants' failure to offer any testimony and, the limited documents from the Administrative Record, the Court can reach no other conclusion but that the FOSC failed to stay apprised of salvage development and planning. As the FOSC, it was incumbent upon him to do so, and his failure does not create an "exceptional circumstances" and illustrate a fundamental failure of the FOSC to follow the Coast Guards own rules, regulations and protocols. The Coast Guard interprets the Chafee amendment this amendment as applicable to the use of contracted resources, qualified individuals, and other "significant" deviations from the plan.

11

From the record before the Court, there is a substantial likelihood DJS will prevail on the merits because the FOSC failed to justify his decision.

While Defendants contend an FOSC is not required to provide "justification for his decision", that position renders 33 C.F.R. § 155.4032 meaningless, removing the lynchpin that holds OPA 90 together. Dkt. 20, p. 12. As referenced above, then any "circumstance" would be was "exceptional," making an NTVRP, much like 33 C.F.R. § 155.4032, meaningless,

While the FOSC alternatively claims he provided "reasonable justification" for the deviation, he did not do so timely given that he made his determination in on December 21, 2019 yet only made it available to DJS two (2) months later on February 21, 2020 and then only *after* DJS filed its lawsuit. Doc. 20, pp. 3, 12. Moreover, the FOSC's "justification" and decision bases were *not otherwise* made public. Notably, the decision memo was only directed to "File."

Moreover, the government continues to withhold relevant documents from the Court and DJS. Notably, and obviously missing, are (1) the Global Salvage Consultants' twenty-eight-page report advocating for Large Section Demolition (LSD), (2) other communications between the government and the Owner and its insurer, (3) documents evidencing "Planning P" meetings and decisions, (4) documents the FOSC relied on to determine that "exceptional circumstances" exist, and (5) T&T Salvage's fixed price contract.[10] For unexplained reasons, the FOSC is actively

---

[10] The "cost" question is significant because, as the government admits, the Owner is only responsible for approximately $78,000,000.00 of the recovery cost, and the difference is paid by U.S. taxpayers. While both proposals exceed this amount, T&T's proposal would cost the U.S. taxpayers over $120,000,000.00, taking funds from the Oil Spill Liability Trust Fund. Importantly, the limitation of liability does not apply if it is found that the incident was proximately caused by the responsible party's (1) gross negligence or willful misconduct, and/or (2) the violation of an applicable Federal safety, construction, or operating regulation by the responsible party or agent thereof, or a person acting pursuant to contractual relationship with the responsible party. 33 U.S.C. §2704 (c).

violating US laws by failing to respond to two (2) FOIA requests submitted by DJS, while he also was nonresponsive to a series of informal requests from DJS.

Defendants argue that T&T's plan would provide for a more expeditious or effective response and, therefore, was not arbitrary and capricious. 33 C.F.R. § 155.4032 (Chafee Amendment).   However, this Court finds that in this instance, FOCS "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1217 (9th Cir. 2015).   The facts set forth herein evidence the FOSC's failure to comply with the law.

As evidence of the FOSC's dereliction of his responsibilities, and the arbitrariness and capriciousness of the decision at issue here, DJS offers the following:

In October 2019, at the first signs of disagreement, FOSC should have noted that there was a difference of opinions between the Owner and DJS, the primary resource provider for SMFF, as to the best methodology for removal of the MV GOLDEN RAY.   The FOSC should then, in an expeditious manner, have conducted his own investigation – keeping in mind all the criteria to consider.   Then any disagreement regarding methodology would have been resolved in a timely fashion.   Had the FOSC gotten involved when he should have, DJS would have started operations in November, either using the SSD methodology (with a removal completion within approximately 6 months) or LSD methodology (with a removal completion with approximately 5 months).

The FOSC knew DJS was ready, willing, and able to implement either plan, however, his unwillingness to adequately perform his responsibilities under the Act and make a decision based on facts, led to the development of contrived and unsupportable explanations for approving a deviation.   The effect of this is that, because of the FOSC's decision, the Owner and its insurer are

improperly employing a fix-price contract with T&T, to control "owner's" costs and illegally obtain indemnity in contravention of the NTVRP.  As such, by the FOSC's deference to the Owner, the government has acted at the expense of the public, the environment and the law.

"Some" explanation by the FOSC does not constitute "Exceptional Circumstances" to justify a NTVRP deviation.

Defendants argue that because the FOSC has shown *some* exceptional circumstance to justify his deviation decision, the Court must give deference to the FOSC's definition of "exceptional."  However, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decision making.  Simply put, the agency must explain why it decided to act as it did, and the reason for the agency's decision must be both rational and consistent with the authority delegated to it by Congress." *Water Quality Ins. Syndicate v. United States,* 225 F. Supp. 3d 41, 63 (D.C. Cir. 2016) (internal citations omitted).

It is striking that the FOSC apparently only needed two (2) days to investigate, analyze, and prepare a memorandum to justify granting the Owner's deviation request.  The deviation request was made December 19, 2019 and the FOSC Decision Memo is dated December 21, 2019. The evidence in the record shows that the USCG actually directed the Owner to submit a deviation request.  Curiously, the FOSC had zero substantive interaction with DJS during the interim time and refused all efforts by DJS to engage on the subject.  This is illogical and is indicative arbitrary and capricious action.

Despite being responsible for ensuring that any plan to remove the MV GOLDEN RAY is the best one to protect the environment and do no harm to coastal waters, by his actions, the FOSC abdicated  his responsibilities and merely adopted the Owner's demands *carte blanche*.  The OPA 90 is designed to protect the public health and welfare of navigable waters, with the Coast Guard's

oversight. By the FOSC's abdication, the FOSC did not act reasonably. Instead, he made an arbitrary and capricious decision when he unsoundly found that the previously and existing conditions on the vessel and in the St. Simons Sound were "exceptional," and approved the Owner's unwarranted request for deviation.  This decision ignored the December 19, 2019 SERT report stating, with respect to T&T's plan, that its  "…structural analysis does not include an analysis of the structure in the current condition, nor does it include an analysis of remaining sections throughout cutting and removal." (Dkt. 20-1).

In this case, the FOSC's actions were tantamount to informal rule outside of proper procedures and should therefore be set aside. Judicial review of informal rulemaking proceeding is governed by 5 USCS § 706(2)(A)-(D), and court must decide (1) whether agency *has observed procedure required by law* (5 USCS § 706(2)(D), (2) scope of agency's authority and whether, on facts presented, agency's decision lies within that range (5 USCS § 706(2)(C)), and (3) *if proper procedures have been followed* and matter lies within agency's delegated powers. Environmental Defense Fund, Inc. v. Blum, 458 F. Supp. 650 (D.D.C. 1978).  Here, the FOSC's conduct amounts to rulemaking because he defined "exceptional circumstances" – previously never done – which undoubtedly will create precedent. Further, he permitted the Owner to force a lump-sum financial arrangement with the SMFF provider; again, this will undoubtedly create precedent. It is undisputed that the FOSC did not follow the "rulemaking process" in creating these new rules, and that violated procedure. "Any changes in the requirements in this section will occur through the rulemaking process."  See 155.5050(o). Therefore, the FOSC's decision to deviate should be set aside.

### There Is A Substantial Likelihood DJS Will Succeed On its Section 1983 claim because the FOSC Improperly Divested DJS of its Rights

It is a distinction without a difference for the government to state that "FOSC did not remove DJS as a response provider under the NTVRP." Moreover, this statement casts confusion on what is an otherwise simple narrative. Prior to the December 21, 2019, DJS was the sole and primary resource provider for all nineteen (19) SMFF services related to the MV GOLDEN RAY salvage and cleanup effort, including this recovery job. After December 21, 2019, solely because of the FOSC's improper approval of the Owner's unsupported request for a deviation, DJS was removed as the resource provider for each of the nineteen (19) SMFF services. Perhaps the FOSC did not remove DJS from a provider list, but the FOSC, for all practical purposes, permitted the Owner to completely eliminate DJS from this job.

**There Is A Substantial Likelihood DJS Will Succeed On its Section 1983 claim because the FOSC Violated DJS's Due Process Rights**

The FOSC's deviation approval effectively gutted DJS's contract with the Owner, a contract on which DJS expended significant time, money, and resources to procure. Because the government, itself, has improperly interfered with DJS's contract, its Fifth Amendment rights to due process of law have been violated. Under the Fifth Amendment of the U.S. Constitution, no person shall "be deprived of life, liberty, or property, without due process of law[.]" Indeed, the "root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *see also Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971).

Protected property interests include valid contracts. *See Lynch v. United States*, 292 U. S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a

municipality, a State or the United States."). Se*e also Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1003 (1984) (the range of "intangible interests" include contracts, that are "property for purposes of the Fifth Amendment's Takings Clause"); *Long Island Water-Supply Co. v. City of Brooklyn*, 166 U.S. 685, 690, 17 S. Ct. 718, 720, 41 L. Ed. 1165 (1897) ("A contract is property, and like any other property, may be taken...subject to rule of just compensation[.]"); *United States v. Petty Motor Co*., 327 U.S. 372, 381, 66 S.Ct. 596, 90 L.Ed. 729 (1946) (holding that plaintiff was entitled to just compensation for the *government's taking* of an option to renew a lease); *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").

Here, because the FOSC's deviation approval deprived DJS of "a significant property interest" worth millions of dollars, DJS was entitled to "an opportunity for a hearing" before the taking. *See Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L. Ed. 2d 113 (1971). Since no "extraordinary situation" existed to justify Defendants' refusal to afford DJS even a single meeting to defend its property right before the government's "taking," Defendants violated DJS's Fifth Amendment right to due process of law.

## C. BASED ON THE EVIDENCE BEFORE THE COURT, AS WELL AS THE LACK OF EVIDENCE PRESENTED BY DEFENDANTS, DJS HAS BEEN HARMED AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY WILL BE SUFFERED IF RELIEF IS NOT GRANTED.

As a direct and proximate cause of Defendants' conduct as described above, DJS has and will continue to suffer significant and irreparable harm.

### Defendant's Actions Have Resulted in DJS's Loss of MV GOLDEN RAY Work Causing Irreparable Injury

DJS has lost the value of its NTVRP Contract, under which it was the sole and primary provider of SMFF services, a contract that was supposed to be secured by statute absent

17

exceptional circumstances.  Several courts, including this Court, have found that loss of a contract award is sufficient to show irreparable injury. *See Georgia by & through Georgia Vocational Rehab. Agency v. United States by & through Shanahan*, 398 F. Supp. 3d 1330, 1344 (S.D. Ga. 2019); *Cardinal Maint. Serv., Inc. v. United States,* 63 Fed. Cl. 98, 110 (2004); *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 741 (2004) (stating that "[i]rreparable injury can be shown in the form of lost opportunity to fairly compete for and per-form work under the contract, including but not limited to lost profits that would generate therefrom.").

This Court in *Georgia v. United States* found irreparable injury where a government vendor was improperly cut out of a bidding process at the Kings Bay Naval Base. 398 F. Supp. 3d  at 1340. Therein, the U.S. Navy put its dining services out for bid and the incumbent dining services vendor notified the Navy that it intended to bid for a renewal. However, the Navy informed the incumbent bidder that it would not be considered for a variety of reasons. That vendor considered those reasons improper and illegal, and sued for a temporary injunction to prevent the Navy from contracting with another vendor. This Court agreed with the vendor and granted an injunction.

In finding irreparable harm, this Court stated, "Plaintiff will experience irreparable harm in the loss of the contract (if they were supposed to be awarded it as they allege), the loss of employees, the economic loss involved in bidding for another contract, and the loss of not being able to bid for the contract ." *Id*. at 1344. The Court went on to favorably cite *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders. Irreparable injury includes, but is not limited to, lost profits which would flow from the contract."), and *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 741 (2004) ("Irreparable injury can be shown in the 'form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.'").

Here, Defendants argue that DJS's reliance on *Georgia* is "wholly misplaced" for two reasons, (1) DJS can still compete for MV GOLDEN RAY contracts, and (2) DJS can seek damages from the Owners. As already discussed, the first argument is a distinction without a difference.  While DJS may technically still be on the Owner's "provider list," it has been shut out of the recovery process.  Without the Court's intervention, this will continue. In DJS's Non-Tank Vessel Response Plan for the MV GOLDEN RAY, it was the contractor selected and pre-approved for all nineteen salvage services relevant to the MV GOLDEN RAY. But by the FOSC's unsubstantiated December 21, 2019 deviation approval, the FOSC effectively removed DJS from *all nineteen* services. Much like the Navy in *Georgia*, the FOSC created an unequal playing field when it came to MV GOLDEN RAY. On many occasions, the FOSC and other members of the U.S. Government refused to meet with DJS, all the while granting T&T Salvage meetings. DJS was prohibited from presenting its plan to Unified Command.  T&T Salvage did.  If the FOSC's deviation is allowed to stand, DJS will continue to experience irreparable harm in the loss of the contract, the loss of employees, the economic loss of its expected profit, the economic cost involved in bidding for another contract, and the inability to competitively bid for *this* contract.

DJS will also lose the significant resources it expended both in negotiating to become the SMFF provider and in preparing its wreck removal proposal.

**Defendants' actions have and will continue to damage DJS's reputation causing Irreparable Injury.**

Additionally, DJS's reputation in the industry will be damaged by its highly-publicized removal as the SMFF provider, impacting all future negotiations with other vessel owners. Perhaps most importantly, Defendants' actions have established the dangerous precedent that SMFF provider contracts can easily be terminated without justification. This not only undermines the very purpose of OPA 90, but also devastatingly impacts the hundreds of SMFF contracts that DJS

19

currently has with other vessel owners. An injury is irreparable if it cannot be undone through monetary remedies. *Hanna v. Plumer*, 380 U.S 460, 85 S.Ct. 1189 (1965). The loss of customers and goodwill is an "irreparable" injury. *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir., 1981); *McDonalds Corp. v. Robertson,* 147 F.3d 1301, 13010 (11th Cir. 1998).  "[G]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. Appx. 180, 190 (11th Cir. 2005). "Irreparable injury can also be based upon the possibility of confusion." *Ferrellgas,* 143 Fed. Appx. at 190.

Here, the federal government is effectively destroying DJS's reputation in this industry through its unreasoned approval of a deviation from the NTVRP and through its public relations. As an example, in its recent public forum, the federal government published a history of the MV GOLDEN RAY disaster response to date – a disaster response that until recently was indisputably handled entirely by DJS.  However, nowhere in the government's published history of this event is DJS mentioned.  Instead, T&T Salvage is given implicit credit for DJS's work. *See* Dkt. 28-5. Photographs from Public Forum.  A quick review of recent news articles makes it clear that DJS's important, early work on the project has already been forgotten. *See* Dkt. 28-1 – 28.5.

In addition to actively damaging DJS's reputation, the federal government is indirectly damaging DJS's reputation, as well. DJS is currently the largest OPA-90 salvor provider in the world, with thousands and thousands of contracts. Obviously, DJS's very strong reputation helped it achieve this position, and it relies on that reputation to sustain its business. MV GOLDEN RAY is currently the second largest marine casualty event in recorded history. This is precisely the type of work DJS should be involved in because it is the most experienced. But the federal government tarnished DJS's reputation when it improperly veered from the statutorily required course of action without justification and given the absence of evidence to support the claimed existence of "exceptional circumstances."  The reasons stated in the "Decision Memo" do not support a finding

of "exceptional circumstances" justifying the Owner's requested deviation (which coincidentally will relieve the Owner of its obligations as the "responsible party," contrary to statute). Allowing this deviation to stand until a full hearing on the merits of the underlying claim will forever tarnish DJS's heretofore pristine record and reputation. By its indifference, the federal government has essentially blackballed DJS from this project,  which will effectively damage DJS's reputation amongst its core business, cause a loss of its well-justified reputation, and, will undoubtedly cause a loss of goodwill amongst its current and prospective clients.

Finally, if the Court finds that there is not a substantial likelihood that DJS will succeed on the merits of its 42 USC § 1983 claim, this further buttresses its irreparable harm argument if this deviation is allowed to stand.  Even though DJS is not seeking monetary damages as they would be impossible to calculate, 42 USC § 1983 is the only avenue available where monetary damages of any significance could be sought.

### Based on the evidence before the court, as well as the lack of evidence presented by Defendants, the threatened injury to DJS outweighs the harm the relief would inflict on Defendants.

The threatened injury to DJS outweighs any harm Defendants may suffer if the preliminary injunction is granted. Temporarily delaying the approval of Owner's deviation request would not harm the Defendant government officials in any perceptible way.  *See S. Wine & Spirits of Am., Inc. v. Heineman*, No. 4:07CV3244, 2007 WL 3051405, at *1 (D. Neb. Oct. 16, 2007) (granting a temporary restraining order halting the implementation of a new Nebraska liquor license law inter alia because the defendant government officials "would not be harmed in any way by [the TRO]" when compared to the potential violation of the plaintiffs' Equal Protection and Commerce Clause rights); *Husteel Co. v. United States*, 34 F. Supp. 3d 1355, 1363 (Ct. Int'l

Trade 2014) (granting a preliminary injunction stopping the Department of Commerce from liquidating certain merchandise in part because "the government will not be harmed in any meaningful way" if made to wait for judicial review of the agency's determination).

The construction of the thirty-one acre barrier has already begun, but it will be months before the remaining salvage work will be performed.  Having been displaced as the sole SMFF service provider, DJS has already lost out on some of the work, but substantial work remains. DJS' status as SMFF provider was secured by both contract and statute absent exceptional circumstances. Therefore, the balance of potential harms substantially favors enjoining Defendants until this Court can determine if DJS's rights were violated and if the violations of OPA 90 pose greater risk to the environment.

### That Entry of the Relief Would Serve the Public Interest.

Enjoining Defendants' approval of Owner's NTVRP deviation will best serve the public interest.  If environmental harm is likely, the public interest favors the issuance of injunctive relief to protect the environment. *See Amoco Prod. Co. v. Vill. of Gambell*, AK, 480 U.S. 531, 545, 107 S. Ct. 1396, 1404, 94 L. Ed. 2d 542 (1987) (stating that environmental injury, if shown to be "sufficiently likely[,]" will usually favor the issuance of an injunction because "by its nature, [environmental injury] can seldom be adequately remedied by money damages[.]").  Indeed, citing public interest, courts have frequently granted injunctive relief halting behavior which could have caused irreparable damage to the environment.  *See Wroncy v. Bureau of Land Mgmt.*, 777 F. Supp. 1546, 1549 (D. Or. 1991) (granting a temporary restraining order stopping the Bureau of Land Management from continuing to fertilize certain forest lands in part because of the potential environmental impact to public lands); *Sierra Club v. Lujan*, 716 F. Supp. 1289, 1293 (D. Ariz. 1989) (granting a preliminary injunction inter alia because it was "obvious" the public interest would be served by stopping construction which could irreparably damage a national park);

*Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) (quotations omitted) (granting a preliminary injunction halting the construction of a water diversion project partly because "preserving nature and avoiding irreparable environmental injury is in the public interest.").

Here, Defendants' current course of action will likely cause significant environmental harm. If T&T's wreck removal plan fails, over 4,000 vehicles containing batteries, refrigerant, gasoline, antifreeze, engine oil, brake, transmission, and power steering fluid, mercury switches, and lead battery connectors may end up St. Simons Sound. When compared to DJS's proposal, the T&T plan undeniably poses a much greater risk to the environment:

| GOLDEN RAY Wreck Removal Plan Comparison | |
|---|---|
| **T&T Plan** | **Donjon-SMIT plan** |
| o Establish large, thirty-one-acre perimeter which would interfere with the navigation channel | o Establish small, 4.6-acre perimeter which avoids main navigation channel |
| o Cut vessel into eight large, 4,000-ton sections, increasing risk of hull collapse/discharge of vehicles into surrounding waters | o Cut vessel into small, 600-ton sections, minimizing risk of hull collapse/discharge of vehicles |
| o Sections would be too large to completely fit onto transport barge, posing additional discharge risk | o Smaller sections would fit securely on transport barge |
| o More expensive | o Less expensive |
| o  Approach led to further pollution when implemented on the TRICOLOR and BALTIC ACE wreck removals | o Approach successfully employed during REIJIN wreck removal |

While normally the government could correctly argue that its interests are merged with those of the public, the evidence shows that not to be the case here.  The facts are that the government has blatantly bent over backwards to accommodate the Owner, at the expense of the

public.  It is DJS's interests, not federal government's, which merge with the public's interest. This is clearly demonstrated through the evidence.

The government's entire argument regarding the "balance of the equities" can be summarized as a "time is of the essence" argument.  Such an argument is hypocritical.  Essentially, the government argues that the longer that work cannot commence, the greater the risk to all stakeholders, except DJS.  If time was truly of the essence, then the government would not have let four (4) months lapse to acquiesce to the Owner's demands when a feasible plan was presented by the contracted SMFF.  The FOSC has allowed  the situation to devolve, despite having a viable, feasible, executable plan available from DJS, a recognized expert in the field.  The FOSC allowed the Owner to commandeer the methodology of salvage and demand a fixed priced contract.  This decision to deviate, without appropriate rationale, failed to take into consideration the public's interest and is beyond extraordinary. Indeed, if timing were truly the FOSC's concern, DJS's work would have begun in November and would have been concluded within approximately six (6) months.

It is significant to note that the government has not produced any analytical comparison of the DJS and T&T's plans.  As such, by acquiescing to the Owner's demands, the FOSC has failed to provide any thoughtful reasoning supporting the efficacy of  LSD over  SSD.  This alone is definitive evidence that the FOSC failed in his duties to protect the public and assure compliance with U.S. laws.

While the harm to DJS has been thoroughly briefed above, and is similar to the harm alleged in *Georgia*, this Court must determine whether (1) "the harm to [DJS] of losing out on the contract and the sunk costs and profits involved in losing incumbent status without having any remedy to pursue damages against the United States," and (2) the harm to DJS's reputation outweighs the harm to the government. *Georgia*,  398 F. Supp. 3d at 1357. Considering that the

public's and DJS's interests are aligned and considering the irreparable harm DJS will suffer without an injunction, the Court should find that the equities tip in favor of DJS and grant a preliminary injunction.

Because of the potentially devastating environmental consequences at stake, the public interest would best be served by enjoining Defendants so that this Court can properly evaluate the plans at issue before T&T begins work on the GOLDEN RAY.

###    D.    DECLARATORY JUDGMENT ACTION

DJS seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and Fed R. Civ. P. 57, and as provided for by the Administrative Procedure Act under 5 U.S.C. § 704.  The Court finds that:  Defendants' actions with respect to their approval of the deviation from the NTVRP were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; Defendants' actions with respect to their approval of the deviation from the NTVRP were contrary to Donjon-SMIT's constitutional rights and Defendants' constitutional powers or privileges; Defendants' actions with respect to their approval of the deviation from the NTVRP were in excess of their statutory jurisdiction, authority, and/or limitations; and Defendants' actions with respect to their approval of the deviation from the NTVRP were without observation or procedure as required by law.

In that the Court has the authority to grant declaratory relief under Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, the Court declares that exceptional circumstances did not exist to warrant a deviation from the NTVRO and, therefore Defendants' actions exceeded the scope of their authority

###    E.    OTHER MATTERS

####        1.    <u>JURISDICTION</u>

This Court has jurisdiction pursuant to (1) 28 U.S.C. § 1331, given that this matter involves matters related to the Constitution, and the laws, or treaties of the United States; (2) 28 U.S.C. § 1346, given that DJS's claims against the United States are founded upon the Constitution, Act(s) of Congress and the regulations of an executive department, including but not limited to OPA 90 *et. seq*.; and (3) 33 U.S.C. § 1321(e)(2) of the Clean Water Act given that the relief sought is in the public interest and is required by the balance of the equities.

### 2.    DJS HAS STANDING

#### a)    To Seek Injunctive Relief

By way of the Administrative Procedure Act (APA),[11] DJS has standing to pursue injunctive relief. 5 U.S.C. §704.  The APA directs reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action, findings, and conclusions" that

violate the law or are otherwise "arbitrary and capricious." 33 U.S.C. ch. 40 § 2701; 33 C.F.R. § 155.5010.  The NTVRP requirement and SMFF designations exist "to ensure that an incident be responded to quickly and without the need for contract negotiations during an actual emergency." Salvage and Marine Firefighting Requirements; Vessel Response Plans for Oil, 73 FR 80618-01 .

#### b)    To Pursue Claims Procedural and Substantive Due Process Claims

42 U.S.C  § 1983 provides a cause of action against any person "who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of

---

[11] 5 U.S.C. §§551 et seq.

Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]"  Under the Fifth Amendment of the U.S. Constitution, no person shall "be deprived of life, liberty, or property, without due process of law[.]" Defendants, acting in their official capacity, intentionally violated DJS's procedural and substantive due process rights under § 1983 and the Constitution by approving Owner's deviation from the NTVRP without any justification, much less a finding of "*exceptional circumstances*", and without providing Donjon-SMIT any opportunity to be heard. Defendants thereby violated Donjon-SMIT's procedural and substantive due process rights and deprived Donjon-SMIT of its contractual agreement with Owner to provide SMFF services in addition to causing damage to Donjon-SMIT's reputation that will directly harm its ability to contract in the future.

**B.   DJS DELAY IN SEEKING INJUNCTIVE RELIEF IS NOT UNREASONABLE**

Any alleged delay by DJS in filing its Motion for Injunctive relief was not unreasonable given the circumstances confronted because of the FOSC's failure to engage DJS as the designated SMFF under a NTVRP regarding salvage matters with a stakeholder, in contravention of The United States Coast Guard Incident Management Handbook (IMH) COMDTPUB P3120.17B (May 2014) (hereinafter IMH),

Moreover, given DJS's repeated, although rebuffed, efforts to communicate with the FOSC, and the UC in hopes of avoiding the need to seek Court intervention, it cannot be said DJS's filing was untimely.  The law is clear that a party's reasonable delay in filing for injunctive relief caused by its efforts to investigate or resolve the matter does not prejudice whether relief should be granted. *See Georgia by & through Georgia Vocational Rehab. Agency v. United States by & through Shanahan*, 398 F. Supp. 3d 1330, 1347 (S.D. Ga. 2019) (granting preliminary injunction

and stating that the plaintiff's two-and-a-half month delay in filing was "a reasonable time for [the plaintiffs] to consider their options . . . and decide to prepare for and pursue injunctive relief while their arbitration was pending."); *Cybermedia, Inc. v. Symantec Corp*., 19 F.Supp.2d 1070, 1078 (N.D.Cal.1998) ("[A] reasonable delay caused by a plaintiff's good faith efforts to investigate an infringement claim will not rebut the presumption [of irreparable harm] in a copyright infringement case."); *Fid. Brokerage Servs. LLC v. McNamara*, No. 11 CV 1092 MMA RBB, 2011 WL 2117546, at *5 (S.D. Cal. May 27, 2011) (granting a temporary restraining order despite a three-month delay in seeking injunctive relief because, during that time, the plaintiffs were endeavoring to informally resolve its concerns with defendants); *Steinway & Sons v. Demars & Friends*, No 80–04404, 1981 U.S. Dist. LEXIS 15169, at *39 (C.D.Cal. Jan. 28, 1981) ("Plaintiff cannot be charged with delay attributable to efforts, such as those here, to resolve the dispute without the court's intervention.").

### C.   ENTRY OF TRANSITIONAL AGREEMENT IS IRRELEVANT TO COURT'S CONSIDERATION

Defendants contend that Don-Jon-SMIT's entry into a Transitional Agreement with the Owner (Dkt. 20-1, p. 20) prevents Don-Jon-SMIT from now asserting rights as the designated and certified SMFF under the NTVRP.  The Court finds this contention unsupported by the facts and law, and irrelevant to the controversy before the Court particularly to any analysis of the FOSC's failure to comply and act in accordance with the APA.

As an initial matter, any deviation from NTVRP required approval of the FOSC. 33 U.S.C.A. § 1321(c)(3)(B), 33 C.F.R. § 155.4032.  As such, the Transitional Agreement was merely anticipatory given that it was ineffective without FOSC approval. When the FOSC rejected the Owner's request for a deviation, the Transitional Agreement became void.

Indeed, the Owner's recognition that Don-Jon-SMIT remained the registered and approved SMFF and , when it applied for a second deviation on December 19, 2019.  Hearing Exh. 12.

In fact, the FOSC recognized DJS as the SMFF under MV GOLDEN RAY's NTVRP when (1) it rejected the Owner's first Deviation (Dkt. 20-1, p. 23), and (2) accepted Owner's second deviation request.  Dkt. 20-1, p. 63.  Further, the FOSC makes no reference to DonJon-Marine in his December 21, 2019 "Decision Memo." Dkt. 20-1, p. 49 – 55.

### D.      THE COURT IS ENTITLED TO REVIEW THE FOSC'S DECISION

Under 5 U.S.C.A. § 706, a district court may "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] (D) without observance of procedure required by law[.]" 5 U.S.C.A. § 706(2).

In reviewing an agency's decision under the Administrative Procedure Act (APA), it is the Court's duty "to determine whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *McElmurray v. USDA*, 535 F. Supp. 2d 1318, 1324 (S.D. Ga 2008). A "clear error of judgment" can be defined as a decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "unless it is unsupported by substantial evidence." *Alabama-Tombigbee Rivers Coal v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007).

While the scope of the Court's review of an agency's actions must be deferential, "deference does not mean acquiescence." *Water Quality Ins. Syndicate v. United States*, 225 F. 3d 41, 52 (D.C. Cir. 2015), citing *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 508 (1992).  *Nat'l Customs Brokers & Forwarders Assn. of Am., Inc. v. United States*, 883 F.2d 93, 96 (D.C. Cir.

1989).   Given that an agency is duty bound to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," a court can overturn an agency decisions which is unsupported by substantial evidence. *McElmurrary, at* 1324.   *See Assoc. of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Res. Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984).

As to the scope of a court's deference, "deference has its limits," particularly when the agency has not provided the record upon which it relies which is tantamount to presenting unreliable evidence.   *McElmurray*, 535 F. Supp. 2d at 1325 (internal citations omitted). "Substantial evidence is more than a scintilla and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion..." (Citations omitted)." *Id.*

### E.   THE COURT IS ENTITLED TO CONSIDER EVIDENCE BEYOND THE ADMINISTRATIVE RECORD

While typically the Court should only consider evidence within the Administrative Record, the Court can consider outside evidence where there is a "strong showing of bad faith or improper behavior by the agency." *Alabama -Tombigbee Rivers Coal v. Kempthorne,* 477 F.3d 1250, 1262 (11th Cir. 2007).

Given Defendants failure to submit the entire "Administrative Record," or offer any testimony regarding the Administrative Record, the Court will consider evidence beyond the Administrative Record.  Moreover, in that, as discussed further below ¶  ____  §_____, given that there is at least a question of improper behavior by the FOSC in carrying out his duties of oversight and decision making, it is within the Court's discretion to consider any pro-offered evidence beyond the Administrative Record.

**F.**      **APPLICATION OF THE MISSING WITNESS AND DOCUMENT DOCTRINE TO THE COURT'S CONSIDERATION**

Plaintiff's lawsuit has been pending since February 13, 2020, and the Court noticed the injunctive hearing on February 18, 2020.  Dkt. 1 and 12.  Despite having notice of this hearing, and a pre-hearing opportunity to submit substantive records (Dkt. 19), Defendants choose not to produce all the records upon which they seek to rely and, then, failed  to present any testimony, including from the person who made the decision about which Plaintiff complains, FOSC Commander Witt.  Then, only during summation, despite asking to be afforded time to amend the record with the complete Administrative Record, Defendants only said they were in the process of compiling the Administrative Record.  Hearing Transcript, p. 172.

Therefore, given these circumstances, and the issues before the Court, the Court evaluates the evidence before it with the presumption that the remainder of the Administrative Record and any testimony by FOSC Witt (had he appeared) would have been unfavorable to Defendants. *Graves v. US*, 150 U.S. 118, 121, 14 S. Ct. 40, 37 L. Ed. 1021 (1893) (if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable); *Jones v. Otis Elevator Co.*, 861 F.2d 655 (11th Circ. 1988) (Georgia).

Here, FOSC's Witt's absence, as well as Defendants' failure to present the entire Administrative Record prevents this Court from assessing whether the FOSC's explanation for his decision was rationally connected to the facts found and the choice made. The Court finds FOSC Witt's December 21, 2019 Deviation Approval should be overturned, in part because it is unsupported by substantial evidence. Based on the evidence before it, the Court finds FOSC Witt's December 21, 2019 Deviation Approval should still be overturned.

### G.    The FOSC's Actions have allowed for the Entry of an Improper Fixed Price Contract in Derogation of OPA 90.

Defendants ignore the fact that the FOSC's deviation approval materially altered costs, liabilities, and indemnities, which the Owner and its insurer used to insulate themselves from liability and to control their costs.  By the FOSC's erroneous decision, the Owner has been allowed to shift liability and circumvented OPA 90, by transferring indemnity.

In the context of  OPA 90, 33 USC §2710 (b), states:

Liability Not Transferred: No indemnification agreement, hold harmless, or similar agreement or conveyance shall be effective to transfer liability imposed under this Act from a responsible party or from any person who may be liability for an incident under this Act to any other person.

The FOSC's deviation has allowed the Owner to transfer its liabilities to T&T, precipitating a possible violation of the law, in spite of the fact that under OPA 90 the Owner is the "Responsible Party."  DJS submits that the acceptance of a fixed price contract, because it shifts the risk to the salvor, is itself, a violation of the OPA susceptible to judicial review under the APA.

DJS is likely to succeed on the merits of its claims because it has shown the FOSC acted arbitrarily and capriciously when he approved the Owner's request for a deviation under the MV GOLDEN RAY's NTVRP because he did not demonstrate that the deviation was more expeditious or effective response to this event. (Defendants' ¶ B - Dkt. 20, p. 18).

Defendants argue that this litigation is nothing more than a contract dispute between DJS and the Owner and should be settled accordingly.  DJS does not dispute that this controversy involves a breach of contract element.  However, the action at bar is unrelated to the breach of contract issues between DJS and the Owner. Rather, DJS's lawsuit is based on the abdication of the duties and responsibilities the federal government owes not only to DJS, but also to U.S. Citizens under the OPA, as well as under the United States Constitution.

The presence of a contract dispute does not vitiate DJS's claims against the federal government. Both actions can be pursued independently of one another. With respect to this action, DJS can and will demonstrate that it will suffer irreparable harm if a preliminary injunction is not entered. The irreparable injury is twofold: (1) the approved deviation this will destroy DJS's business reputation and (2) it will cause DJS to lose the benefits of the contract it has with the Owner.

## **CONCLUSION**

Based on the foregoing, DJS asks the Court to enter the preliminary injunction.

*SIGNATURES ON FOLLOWING PAGE*

This 28th day of February 2020.

Respectfully submitted,

**TAYLOR, ODACHOWSKI, SCHMIDT & CROSSLAND, LLC**

/s/ Joseph R. Odachowski
**Joseph R. Odachowski**
Georgia State Bar No. 549470
**Peter H. Schmidt, II**
Georgia State Bar No. 629512
300 Oak Street, Suite 200
St. Simons Island, GA 31522
(912) 634-0955 – Telephone
(912) 638-9739 – Facsimile
jodachowski@tosclaw.com

**ATTORNEYS FOR PLAINTIFF**

**DJS, LLC**

**OF COUNSEL:**
**CLARK HILL PLC**

  /s/ Garney Griggs
**Garney Griggs**
Texas State Bar No. 08491000
**Clifford Bowie Husted**
Texas State Bar No. 00796803
**Gregorio Flores**
Texas State Bar No. 24116367
909 Fannin, Suite 2300
Houston, TX  77010
(713) 951-5600 – Telephone
(713) 951-5660 – Facsimile
ggriggs@clarkhill.com
hustedc@clarkhill.com
gflores@clarkhill.com

**ATTORNEYS FOR PLAINTIFF**
**DJS, LLC**

## <u>CERTIFICATE OF SERVICE</u>

This hereby certifies that on this day, I electronically filed the ***Plaintiff DJS, LLC'S***

***Conclusions of Law*** with the Clerk of Court using the CM/ECF system, which will automatically

send email notification of such filing to the following attorneys of record:

| | |
|---|---|
| Martha C. Mann, Esq.<br>Sydney A. Menees, Esq.<br>UNITED STATES DEPARTMENT OF JUSTICE<br>Environmental & Natural Resources Division<br>Post Office Box 7611<br>Washington, DC  20044<br>Martha.mann@usdoj.gov<br>Sydney.menees@usdoj.gov | Bradford C. Patrick, Esq<br>ASSISTANT UNITED STATES ATTORNEY<br>Post Office Box 8970<br>Savannah, Georgia   31412<br>Bradford.patrick@usdoj.gov |

This   28ʰ   day of   February   2020.

**TAYLOR, ODACHOWSKI, SCHMIDT &**
**CROSSLAND, LLC**

 /s/ Joseph R. Odachowski
**Joseph R. Odachowski**
Georgia State Bar No:          549470
**Peter H. Schmidt, II**
Georgia State Bar No. 629512

300 Oak Street, Suite 200
St. Simons Island, GA 31522
(912) 634-0955 – Telephone
(912) 638-9739 – Facsimile
jodachowski@tosclaw.com

35