**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| **DONJON-SMIT, LLC,** | |
| **Plaintiff,** | |
| **vs.** | **CIVIL ACTION NO:** |
| **ADMIRAL KARL L. SCHULTZ, CAPTAIN JOHN W. REED, COMMANDER NORM C. WITT, and COMMANDER MATTHEW J. BAER, in their official capacity as Officers of the UNITED STATES COAST GUARD,** | **2:20-CV-00011-LGW-BWC** |
| **Defendants.** | |

## DONJON-SMIT, LLC'S PROPOSED FINDINGS OF FACTS

COMES NOW the Plaintiff, **DonJon-SMIT, LLC**, in the above captioned matter and hereby proposed the following statements of facts and conclusions of law, as follows:

1. **COURT'S JURISDICTION:**  This Court finds that the allegations set forth in DJS's Complaint relate to events, circumstances, injury and alleged damages that occurred within this District and, therefore, this Court has jurisdiction and venue is proper.  33 U.S.C.S. § 2717(b).

2. **GENERAL OVERVIEW:**

   a. **KEY STAKEHOLDERS AND PARTIES:**

      i. Hyundai Glovis Co., Ltd., the parent company of G-Marine Service Co. Ltd. and G-Marine Service Co., Ltd. is the owner of GL NV24 Shipping,

1

Inc., the owner and responsible party (RP) of the Golden Ray ("Owner" or "RP"). Hearing Exh. 1 (Dkt. 22-5 at 2).

ii. **Donjon-SMIT (DJS)** is a joint venture between SMIT Salvage Americas, Inc. and Donjon Marine Co., Inc. with over 230 years of combined experience in the salvage and marine firefighting business. Hearing Exh. 1 (Dkt. 22-5, p. 53. This joint venture was formed specifically to provide SMFF services to vessel owners to satisfy OPA 90 and DJS meets all the criteria required under OPA-90 and its regulations. Hearing Exh. 1 (Dkt. 22-5, p. 53). DJS is the SMFF service provider under the Golden Ray NTVRP ("NTVRP") and entered into a contract with Owner for services required by OPA 90 (hereinafter "NTRVP Contract"). T.129:12-14; Hearing Exh. 1. DJS is the largest wreck and salvage company in the world. It is the designated SMFF service provider contracted to serve in that role for over 7000 vessels subject to OPA 90. SMIT, one of the joint venturers of DJS, is also the only company that has experience with large section demolition (LSD) of the type of plan that was selected and approved by Unified Command (UC).

iii. **The North of England Protecting & Indemnity Association Limited (P&I Club)** is the Protection and Indemnification insurer for Owner.

iv. **Global Salvage Consultancy (GSC)** is the salvage consultant retained by P&I Club to as a salvage consultant. T.32:183 (Martin); Dkt. 20-1. It was contracted to perform analysis of Golden Ray "and determine the safest, most economically conscious and efficient wreck removal").

v. **The Federal On-Scene Coordinator (FOSC)**

1.  The FOSC is the person designated to be in charge of this salvage and who has "principal authority for responding to oil and hazardous substance spills or releases, including substantial threats of discharges and releases." The FOSC is to "use legislative and regulatory authorities to ensure that pollution response is carried out expeditiously and aggressively." COMDTINST M3010.24, June 2016, Appendix C-4.

2.  For incidents such as this incident, the United States Coast Guard (USCG) is the lead agency and FOSC is responsible to "coordinate and direct responses to hazardous substances releases or potential releases." The FOCS's "primary objective is to protect public health and safety, and the environment…." The "USCG is the lead agency for federal pollution response in the coastal zone." Dkt. 28-6, pp 21-23.

3.  In order to qualify to serve as FOSC, however, the individual must be properly certified and qualified to perform a NIMS ICS position. However, if "the person is not *certified* in writing by a NIMS-compliant agency, then that person does not have the proper authorization granted to them to fill that position within established IMT standards. To align with federal NIMS ICS standards and for purposes of [COMDTINS], within the Coast Guard the term *certification* will be used to refer to all ICS PQS position

3

qualifications, and is considered equivalent to the achievement of a Coast Guard qualification." SEE COMDTINST M3010.24, 10-5, ¶ D.1 (Qualification versus Certification), Contingency Preparedness Planning Manual, Vol. 4, June 2016.

4. The biography attached to Defendants' submission shows there is no indication in that document or any other document confirming currently in the record that Commander Witt is certified by a NIMS-compliant agency. Dkt. 22-9, p. 2.

5. There is no evidence in the record that Commander Witt was certified in writing by a NIMS-compliant agency; therefore, he did not have authorization to fill the position of FOSC within established IMT standards.

vi. **Unified Command:**

1. The Unified Command (UC) consists of the following: FOSC, State of Georgia Department of Natural Resources and Gallagher Marine Systems (QI), the Owner's designated representative.

2. A key element of the federal government response is the creation of a UC that is designed to bring together the ICs (Incident Commanders) of all major organizations that have jurisdictional authority for the incident to coordinate an effective response while carrying out their own organization's jurisdictional responsibilities." Dkt. 28-6, p. 5-1. The UC "links responding organizations to the incident and provides them a forum to make

4

decisions together. The UC is designed to "blend together" organizations to "to create an integrated response team." *Id.,* pp. 5-1 thru 5-4.

3. A planning response requires the coordination of the UC and other stakeholders, including any "person, group, or organization affected by and having a vested interest in the incident and/or the response operation." Dkt. 28-6, pp. 25-26.

4. "To be a member of the UC, a participating organization must have underlying statutory authority or legal obligation to carry out proposed response action and have jurisdiction within the area affected by the incident. Members of the UC may also include agencies, organizations, private industries, or owners and operators of waterfront facilities *and vessels* bringing large amounts of tactical and support resources to the table." (Emphasis added.) *Id.* at 5-1.

5. UCs are needed in various situations, but specifically when, as here, a vessel is involved that creates a pollution threat. *Id.*

6. "The UC is responsible for overall management of an incident. The UC directs incident activities including the development and implementation of incident objectives, strategies, and approves ordering and releasing of resources." *Id.* at 5-2.

7. "While the UC structure is an excellent vehicle – and the only nationally recognized vehicle – for tactical-level incident

5

command, coordination, cooperation, and communication, the duly authorized UC members must make the system work successfully. The UC should develop synergy using the significant capabilities brought by its diverse members. While varied perspectives on UC and contentious issues arising from the incident may cause disagreement, resolution can be reached by using *the UC framework, which provides a forum and process to resolve problems and find solutions.* The UC is not a committee; in a situation *where consensus cannot be reached, the UC member representing the agency with the most legal/jurisdictional authority would normally be deferred to for the final decision….*" (Emphasis added.) *Id.*

8.  "UC members are expected to:

    a.  Agree on incident priorities, objectives, constraints/limitations, decisions, response organization, assignments, and procedures (e.g., logistical, ordering, cost accounting, and sensitive information).

    b.  Commit to speak with "one voice" through the PIO or JIC, if established.

    c.  Have the authority to commit organization resources and funds, assign agency resources, and authorize the release of public and inter/intra agency information to the incident.

    d.  Have the capability to sustain a 24/7 commitment to the incident.

    e.  Possess a cooperative attitude.

    f.  Have a thorough understanding of the incident and ICS Operational Planning Cycle." *Id.* at 5-4.

9.  An insurer is not and should not be a part of UC or have influence over the UC.  T. 120:6-14 (Williamson).

10.  "[N]ormally the salvor is being requested to provide information directly to the unified command sometimes through the operations section but always into that unified command through the ICS system."  T. 76:17-21 (Martin).  It is customary that salvor have direct contact with the UC but in this instance DJS was excluded. T. 77:12-20 (Martin)

**b.  GOLDEN RAY EVENT**

i.  On September 8, 2019, the carrier Golden Ray (IMO #9775816) experienced a casualty while departing the Port of Brunswick, Georgia via St. Simons Sound carrying approximately 4,200 new and used automobiles for export.   The vessel grounded and capsized on the north side of the harbor entrance, just outside the navigational channel.

ii.  DJS was notified within hours of the incident and arrived on scene <u>within 2 hours</u> and led a successful effort to cut through the hull of the capsized vessel and rescue the crew. Dkt. 26-1, ¶ 7(a).  DJS "arranged for a local rapid situational assessor to be there within the first hours" and they "flew

7

in with a charter plane with a team, and … brought in other folks."  T. 18:8-10. (Martin).

iii.   DJS showed up when called and performed and was commended for it. Dkt. 26-1, ¶ 7(b).

iv.   The Golden Ray had a crew of 23 and all were rescued, including four of whom were rescued when DJS led a successful effort to cut through the hull of the capsized vessel and rescue those persons.   The USCG addressed the issue of the four crew members who were still trapped in the vessel and asked DJS to "arrange for the last four, and [DJS] worked very closely and [was] able to get the last four guys out in that next 36-hour period or so."  T. 18:12-15 (Martin).

v.   On September 15, 2019, the FOSC issued Administrative Order 01-19, directed to the Owner. *See* First Administrative Order dated September 15, 2019.  The order noted that there may be imminent and substantial threat to the public health and welfare of the environment because of a substantial threat of a discharge of oil or hazardous substances from the Golden Ray.  The FOSC determined that there "may be a substantial threat to the public health and welfare or the environment because of a substantial threat of a discharge of oil or hazardous substances" invoked the authority under federal law for the USCG to take full control of the response effort, a control that cannot be abated until the threat is abated.

vi.   DJS removed approximately 300,000 gallons of bunker fuel from the 24 fuel tanks and removed all accessible fuel oil (complicated by the vessel

lying at an angle) from the wreck, stabilized the wreck so the situation would not worsen (rock replacement), developed a detailed plan for removal and proper disposal of the ship and its cargo, and commenced efforts to implement that plan. Further, DJS completed rock placement around the hull of the vessel to prevent erosion and stabilize the wreck. Dkt. 26-1, ¶7(c); T. 20:12-25 (Martin).

vii.   DJS fulfilled its obligations as SMFF primary service provider under the NTVRP, as acknowledged by the FOSC. Hearing Exh.16 (Dkt. 20-1, p. 51). ("worked effectively during the initial incident response and fulfilled the primary purpose of the NTVRP regulations." and "all safely accessible liquid pollutants have been removed from the vessel….". *Id*. Thus, in terms of the initial response and the other services provided by DJS regarding removal of fuel and securing the vessel, NTVRP fulfilled its primary purpose under 33 CFR 155.5015. *Id*.; *see also* Dkt. 1-3 at 4 (DJS "has met every aspect of our regulatory requirements" and "all safely accessible liquid pollutants have been removed from the vessel….").

viii.   On January 7, 2020, the Unified Command (UC) commended DJS for its hard work and commitment to the complicated initial response. Dkt. 26-1, ¶7(e).

ix.   At all times relevant from the date DJS arrived on scene to perform SMFF services under the NTVRP through today's date, the Golden Ray was in the same location (i.e., "very close proximity to a navigable channel which serves as the only access route to the Port of Brunswick, the second

9

busiest RORO port in the U.S. by tonnage" (Dkt. 20-1 at 52), the same ecological concerns (it is "grounded in an environmentally sensitive area which includes prime shrimping grounds and Bird Island" (*id*.), and it is in the same proximity to two tourist islands ("in close proximity to Saint Simons and Jekyll Islands, which are major tourist destinations" (*id*.).

x. DJS never received any communications of any sort, *i.e.*, telephone call, text message, email or otherwise raising a concern or criticism asserting that it failed to perform, was deficient in its performance or found unable to perform SMFF services called for under the NTVRP Contract (other than a complaint related to scouring, which was properly addressed). Dkt. 26-1, ¶7(f); T. 123:18-25; 124:3-8 (Williamson). DJS provided all resources that they were expected to provide. T. 124:1.

c. **CURRENT CONDITION OF THE GOLDEN RAY**

i. The port side of the exterior structure of the GOLDEN RAY has collapsed over 7-meters, the port side shell in the vessel's midbody has separated from the upper decks, and torque buckling is visible in the exposed decks and on the starboard side shell. The port bilge is crushed at the ends in the Engine Room and in the forward Fuel Tanks, making it reasonable to assume it is also crushed in the midbody where the ground reaction is higher. The vessel's ends are cantilevered over scour holes, so that more than 50% of the ship is unsupported. This increases the amount of exposure to the sea slightly, but more importantly is the increasing risk of collapse of the vessel (over months and years versus days) and the extreme

risk imposed by slicing into the intact hull components that are keeping the vessel relatively intact to this point.  Dkt. 26-1, ¶16(a).

ii.  Although approximately 300,000 gallons has been removed from the vessel by DJS, fuel remains in the vessel's fuel lines and other fluids are in the 4200 individual motor vehicles still aboard the vessel.  Dkt. 29-1 (fuel accounting spreadsheet; part of Williamson affidavit) but approximately 44,000 gallons of fuel on board the vessel.

iii.  The longer the GOLDEN RAY remains in the St. Simons Sound, the greater the environmental and navigational hazards become because of tidal action and weather conditions. Dkt. 26-1, ¶16(c).  The wreck has "been sitting since November with tides going up and down" and salvage could have been handled in a proactive way.  T. 96:13-16 (Martin).

**d.  THE REMOVAL OF THE GOLDEN RAY HAS BEEN DELAYED BECAUSE OF THE FOLLOWING FACTORS:**

i.  The Owner and P&I Club injected competitive bidding into the process of review, consideration and determination of the methodology that would be utilized to remove the Golden Ray from its current location. Hearing Exh. 8 (Dkt. 20-1); Hearing Exh.1, p.6, ¶ 1; Dkt. 26-1, ¶ 8.

ii.  The Owner and P&I Club forced DJS into a letter of intent for a twenty-one day "Negotiation Period" and Owner failed to use their best endeavors to agree to Contract Principals. Dkt. 26-1, ¶ a - c.

iii.  The Owner and P&I Club issued an Invitation to Tender, opening up a competitive bidding situation that allowed other salvage companies to

submit proposals and bids for the very SMFF services for which DJS was contract.   Dkt. 20-1, pp. 26-41; Hearing Exh. 1, p.6, ¶ 1-2; Hearing Exh. 8.

iv.   The P&I Club attempted to use its influence to strong arm DJS into negotiating financial terms for the SMFF services.  Dkt. 20-1; Exhibit 2, p.2, ¶ 2.; Hearing Exhibit 8.

v.   The Owner and P&I Club failed and refused to give full review and consideration to the DJS plan and then misrepresented to Unified Command the extent to which DJS was willing to pursue methodologies preferred by Owner and P&I Club.  Hearing Exh. 12 (Dkt 20-1, pp. 43-47); Hearing Exh. 3, p.17, ¶ 3, p.8; Hearing Exh. 16 (Dkt 20-1, pp. 53-55).

vi.   The delay in the removal of the Golden Ray is not the result of any conduct on behalf of DJS, the NTVRP designated primary resource provider for all SMFF services.  DJS performed all SMFF services that it was allowed to perform, and Owner and P&I Club prevented DJS from performing the SMFF services that remain to be completed.

vii.   FOSC failed to direct that the DJS plan be refined and finalized in the normal planning process (Planning P).

viii.   FOSC failed to provide to DJS the NAVY SUPSALV comments in a timely basis (comments having been generated on or about December 3, 2019, but not provided to DJS) to enable DJS to address items set forth in the comments and continue working towards a final salvage plan.

e. **CREDIBILITY OF WITNESSES:**   DJS offered the testimony of Douglas Martin, Timothy Williamson, Thijs van der Jagt and Paul Hankins, as well as the unchallenged affidavit of Timothy Williamson (Dkt. 26-1). Each of DJS's witnesses have extensive experience in the salvage industry and testified about the facts and circumstances that caused or contributed to the delay of the removal of the Golden Ray, as well as explaining to the Court the various methodologies (including pros and cons) for such removal. Hearing Exhs. 29-32.   The Court found their testimony believable and notes that their testimony was not rebutted by Defendants. Defendants offered no testimony or additional documents into evidence but chose to rely exclusively on the Administrative Record.

3. **Oil Pollution Act of 1990 (OPA 90)**

a. When operating its vessel in or near United States waters, Golden Ray is required to satisfy the provisions of OPA 90; namely, having an approved NTVRP which requires it to have an approved SMFF contractor under contract, with proper funding agreements in place.   The NTVRP precontract requirement is the cornerstone of OPA 90.  T. 118:24 (Williamson).  "Salvage, as it's done in the rest of the world, is contracted after the incident" and that usually results in delays.  T. 118:24-119:1 (Williamson).  OPO 90, however, uses a precontracting requirement that is designed to ensure that there are no delays due to negotiating financial terms during the incident response.  T. 119:7-11 (Williamson).

b. Before non-tank vessels were required by law to have pre-prepared plans to respond to emergency spill situations under the OPA, when a spill occurred the vessel owner was allowed to select its own emergency resource providers, which

caused slower response times because of contract negotiations, etc., which placed federal officials in a passive role, without "control" over the clean-up. This situation also pitted the owner's desire to reduce its cleanup costs against significant environmental considerations. Dkt. 26-1, ¶18(k). 33 U.S.C. 2701, *et. seq.* The very purpose of the precontracting requirements under NTVRP is to avoid delays for contracting negotiations, since OPA 90 requires there to be a USCG approved contractor in place. T.119 (Williamson).

c. Under OPA 90, when a discharge occurs or may be imminent, a non-tank vessel owner or operator (RP) – in this case Owner of Golden Ray) must act in accordance with its NTVRP. 33 U.S.C. 2701 (32), 33 U.S.C. § 1321(c)(3)(B). Dkt. 26-1, ¶18(k).

d. "OPA 90 was designed specifically to  prevent the case where you would have a large salvage incident and you would have to put everything on hold because the salvors have to negotiate a contract with a responsible party…." T. 147:3-8 (Hankins).

e. Over two years ago the Owner selected DJS as its "resource provider" under the Owner's NTVRP for SMFF services and was and remains fully qualified to fill this role. Dkt. 26-1, ¶ 6(b)(c).  As such, DJS is "committed to be there within planning timeframes and [has] to keep equipment, personnel and resources always ready to respond" with SMFF services for the 7,000 vessels for which it is the designated and approved NTVRP SMFF service provider. T. 15, 6-10 (Martin).

f. DJS expended significant effort and investment to be prepared to fulfill its contractual obligations pursuant to the USCG approved NTVRP. The only return

14

DJS receives on that investment is responding to these types of incidents. Dkt. 26-1, ¶ 8(ii). An SMFF resource provider must have "a very large network of agreements with both people, organizations and companies that have specific types of equipment…."  T. 144:7-10 (Hankins).

g.  Under the OPA 90, a qualified NTVPR resource provider must provide nineteen itemized services as SMFF. DJS was ready, willing and able to provide all nineteen (19) services and contracted to do so. The ability to provide the 19 services formed the basis upon which to conclude that DJS could execute salvage operations in a variety of possible salvage situations. Dkt. 26-1, ¶ 6(d).

h.  The ability to perform the services required of the SMFF under OPA 90 is not merely the ability to provide a specific service for a particular type of wreck removal or for a 'grounding' or an 'engine room fire', or even a 'salvage,' alone. The SMFF services are designed as a system of potential services that, when taken together are meant, to achieve the all of the requirements in event of a vessel casualty. They are also utilized to develop and execute a plan to respond to a vessel casualty. *Id.*

i.  The 19-SMFF services which DJS agreed to perform for the Owner are found in Table 250.4030 of the Salvage and Marine Firefighting Services and Response Times SMFF Regulations. Of those 19 services, DJS has fully performed service numbers 1,2,7,8, 9, and 16.

j.  The SMFF service items that remain necessary for this salvage operation are numbers 3,4,5,6,12-15, and 17-19.  Dkt. 26-1, ¶ 6e; T. 120 (Williamson).

k.  DJS is ready, willing and able to fulfill all of its NTVRP Contract obligations as SMFF,  as set forth in the preceding paragraph.

l.  DJS was prevented from performing the remaining services, based upon the decision of FOSC to authorize Owner to deviate from the NTVRP and select another resource provider to perform the same services.

**4.  NTVRP and SMFF SERVICES CONTRACT:**

a.  DJS is and remains the primary resource provider for SMFF services for the Golden Ray, under the USCG approved NTVRP Contract.  Dkt. 22; Hearing Exh.1; Dkt. 22-5 at 4.

b.  Under the terms of the NTVRP Contract, DJS "agrees to and is capable of providing, and intends to commit to providing, the services that are listed in 33 Code of Federal Regulations (CFR) 155.4030(a) through 155.4030(h) to the Owner.  Further, these services will be provided to the best of [DJS's] capability, in according with planning timeframes..." Dkt. 22-5 at 4, Article 8.

c.  Under the NTVRP Contract, DJS expected to be paid under Category 2 stage terms, i.e., time and materials.  T. 28:14-15 (Martin).

d.  The Contract further provides that the parties "agree that the use of [DJS] as the Owner's named salvor and marine firefighter is required under the regulatory language of 33 CFR Part 155 within the jurisdictional limits in that Part." Dkt. 22-5 at 4, Article 10(b).  At all times relevant to this matter, DJS was and  remains the primary resource provider as set forth in the NTVRP Contract and at the time of the NTVRP Contract there were no other SMFF service providers listed in the NTRVP Contract.  *Id.*

16

e. "The primary resource provider will act as the primary point of contact when multiple resource providers are listed in the same service."  33 CFR 155.  "The primary resource provider means a resource provider listed in the vessel response plan as the principal entity contracted for providing specific salvage and/or marine firefighting services…."  *Id.*  "The primary resource provider will be the point of contact for the planholder, the [FOSC] and the [UC], in mattes related to specific resource and services as required in § 155.4030(a)."

f. FOSC was notified that Owner planned to deviate from two SMFF services (salvage plan and specialized salvage plan) by using an ITT.  Dkt. 20-1, Hearing Exh. 3, p.18, ¶ d; Hearing Exh. 8.

g. The Owner, through an unauthorized deviation, brought in a non-VRP SMFF provider, GCS, to perform on-site salvage assessments, assessment of structural stability, salvage planning and specialized salvage planning, all part of the nineteen (19) services pre-contracted in the NTVRP.   GCS, together with P&I Club, created delays in the salvage process when GCS and P&I Club interjected competitive bidding that interfered with securing final approval of the DJS salvage plan.

5. **DJS ATTEMPTS TO SECURE FINAL APPROVED SALVAGE PLAN (October through November 6, 2019) – LETTER OF INTENT PERIOD:**

a. The P&I Club insisted that DJS enter into a Letter of Intent  (LOI) for purposes of negotiating future SMFF work under the NTVRP Contract, despite the existence of the NTVRP.  Mr. Martin testified that he was perplexed that P&I Club would insist on a letter of intent, since DJS is the SMFF under the NTVRP.  T. 29:17-

17

30:3. However, the P&I Club was "asking [DJS] to give them lump sum offers for the work," already attempting to renegotiate the financial terms of the NTVRP contract.  T. 30:6-7.  Even in the face of the efforts by P&I Club to re-negotiate the financial terms, Mr. Martin was working diligently to work it out.  T.30:8-9.

b.  On October 16, 2019, DJS entered into the LOI with P&I Club.  Dkt 26-1, ¶ 8(a); Dkt. 20, p. 5. The LOI provides, among other terms, that the parties will have exclusive negotiations   for the twenty-one days (defined in the LOI as "Negotiation Period") related to SMFF services to "agree in general terms… to Contracting Principles" which included "rates for personnel and standard equipment" (even though rates were already specified in the NTVRP Contract). Hearing Exh. 4, ¶ 2 (Dkt. 20-1, p. 6).

c.  In an OPA 90 event, there should be no period of delay to negotiate financial terms. It is common, however, to have a time period for negotiating financial terms in events outside of U.S. waters, not subject to OPA 90.

d.  DJS believed it was being forced into the LOI for fear that the P&I Club would take steps to cause Owner to terminate their NTVRP contract for SMFF services, understanding however that even in the event of termination there is a two-month notice provision under the terms of the NTVRP Contract.  Hearing Exh. 1.

e.  The LOI expressly contemplated that P&I Club and DJS would "use their best endeavors to agree to the Contracting Principles within the Negotiation Period…."  Hearing Exh. 4, ¶ 3.

f.  P&I Club did not use its best endeavors to agree to the Contracting Principles as set forth in the LOI.

18

g.  During the Negotiation Period, DJS satisfied its obligation under the LOI by using its best endeavors to reach an agreement with P&I Club on the Contracting Principles, but DJS was unwilling to agree to financial terms that were in conflict with the NTVRP Contract terms, i.e., those approved by USCG in the NTVRP. Hearing Exh. 4, ¶ 3.

h.  P&I Club insisted on renegotiating the financial terms set forth in the NTVRP, and DJS would not agree to renegotiate the commercial elements of the NTVRP Contract, in violation of OPA 90. Dkt. 26-1, ¶ 8(b).

i.  Notwithstanding that the P&I Club was attempting to renegotiate financial terms of the NTVRP Contract, DJS continued using its best endeavors to finalize a salvage plan. Dkt. 26-1, ¶ 8c.

j.  Leading up to and during the Negotiation Period, DJS and representatives of Owner, including Global Salvage Consultants and P&I Club, met to discuss the various methodologies that could be used for salvage of the Golden Ray.  T. 113:3-13.  The meetings were designed to finalize "work method statement and the methodology" that would be used to finalize a salvage plan proposal. T.113:3-9.

k.  Minutes of meetings reflect that the Owner's and P&I Club (including a marine consultant for P&I Club, Hans van Rooij, or HVR) were pleased with the methodology options being proposed by DJS.  Hearing Exh. 3, p. 2.   P&I club communicated to DJS that the "Club wants an option with minimum risk, and the highest chance of success.  No experimental methods or risk to be taken in plan if this would lead to higher risk and failures in timely success."  *Id.*  As early as

19

October 10, 2019, the meeting minutes reflect that the P&I Club representative "[b]elieves everybody on the same page with regards to salvage methodology" and "happy SMIT ideas are similar to the club's studies and ideas" and the P&I Club representative advised "SMIT and Club to closely cooperate to streamline decision making." *Id.*

l.   DJS understood that LSD may be utilized to remove the salvage and, therefore, entered into an exclusive agreement with Versabar, a company that has one of the few types of cranes that is capable of a large or ultra large section lifting.  T. 41:1-5.

m.  On October 31, 2019, Jacob Hogendorp, a representative from GSC, sent a letter to DJS representatives identifying two critical dates:  confirmation of a November 6, 2019 meeting in New Jersey to allow DJS to present to "Owners, their P&I Club and their Consultants…various scenarios for the removal of the Wreck from its present location"; and a reference to a November 30, 2019 conference call and "working on providing us with your scenarios and philosophy behind these."  See Hearing Exh. 5, p. 1 (herein "Hogendorn Letter")

n.   The Hogendorn Letter shows that the Owner, the P&I Club and GCS are expecting "a minimum of three high level dismantling scenarios inclusive of pros and cons on feasibility or other issues you feel the need to address.  The scenarios should be substantiated with the risk register and possible timelines, with the ultimate focus to find the right solution." *Id.*  Even though the letter contemplated discussion and continued analysis of "three high level dismantling options", and contemplates a meeting on November 6th and conference call on November 30th,

the letter also reminded DJS that the time is ticking away on the Negotiation Period, the end of which was just days away.

o.  The Hogendorn Letter was copied to the Owner, GSC and the P&I Club representative.  T. 33:25-34:3.

p.  The minutes of meetings show that DJS continued to meet with and consult with representatives of Owner, P&I Club and GSC and as of October 31, 2019, the minutes confirm the parties were still discussing the various methodologies and the risks associated with each.  T. 115:1-4.  During that meeting the P&I Club's representative raised "[d]oubts whether large cut sections are liftable without collapsing" (Hearing Exh. 3, p. 5) and the parties discussed the SSD approach as well as an SSD/LSD combination approach.  Hearing Exh. 3, p.6.  Regarding the SSD approach, the minutes reflect that "[d]uration derived from Risk Register is better than shown" and that "[l]ocalized containment, pieces to be lifted can be picked separately, larger pieces might be possible than the planning currently accounts for."  *Id.*  With respect to the "SSD/LSD combination approach" they reference that the "Large SMIT grab to be mobilized".  *Id.* at 6.

q.  Even though P&I Club consultants were engaging with DJS, DJS was not able to secure a final agreed salvage plan with P&I Club on the Contracting Principles as that term was defined in the LOI.

r.  At no time during the month of October when DJS was preparing the salvage plan did P&I Club or its salvage consultant instruct DJS that it was "large scale demolition or nothing" and, in fact, required that the plan outline multiple methodologies.  T. 115:8-12.

21

s.   The LOI provided that "the Club shall be under no obligation to arrange a meeting and/or joint presentation with the Authorities or continue further discussions" and also included a nondisclosure provision that applied to the parties "and their respective advisors" that prevented the parties from disclosing to others "the subject matter of, the commercial terms of and all other provisions of this [LOI]…." Hearing Exh. 4, ¶ 5.

t.   Prior to submitting its plan on November 5th, DJS made clear that it considered the SSD safer, more environmentally friendly, and less risky. *Id.* However, at the same time, understanding that Owner and UC may select a LSD or hybrid LSD/SSD, it entered into an exclusive agreement with VERSA BAR, Inc., to use its VERSA 10,000 (the only U.S. based crane capable of performing the "lifts" of the gigantic ship parts weighing upwards of 6000 tons each). This crane would be necessary if the LSD had been approved by the Unified Command and DJS had an exclusive contract to use that very crane.  T.41:1-5.

u.   At all times during the LOI negotiation period, DJS willingly discussed salvage plan options with the Owner and P&I Club. While there were discussions concerning various methodologies, at no time did DJS refuse to perform the LSD, although DJS advised P&I Club that the LSD had more disadvantages than advantages. T. 124-125; Dkt 26-1,¶ 8(a)-(f).

v.   Owner and P&I Club did not make it clear until after the ITT that Owner and P&I Club insisted on the LSD approach, and would not consider the SSD approach. Hearing Exhibit 3, Meeting Minutes dated October 18, 2019 and October 31, 2019.  Exh. 2, Section 2 of the Verified Complaint.

w. On or about November 5, 2019, within the timeframe specified by Owner and P&I Club, DJS provided to the Owner and P&I Club a detailed salvage plan ("DJS Plan") containing wreck removal options with estimated timelines for each. Hearing Exh 6; Dkt. 26-1, ¶ 8(d).   The plan presented to the Owner included timelines, detailed technical explanations, costing analyses, and other recommendations.  It included a structural analysis report, demonstrating the weakening hull. The plan recommended that salvage begin immediately by removing selected portions of the wreck above the water line and removing weight from the ends of the vessel to relieve stress on the center of the hull. *Id.* at 7, ¶ 4.  While the SSD was the preferred method in the DJS plan, the LSD option was included in the plan.

x. The DJS plan emphasizes the priorities of protecting the environment, safety of personnel, certainty of success, efficiency, provided a start date and a timeline and the cost.   Hearing Exh. 6, Dkt 1-2, at 8.

y. DJS plan was consistent with what was discussed with representatives of P&I Club and GSC during the meetings in October and consistent with the objective expressed early on:  A plan "with minimum risk, and the highest chance of success.  No experimental methods or risk to be taken in plan if this would lead to higher risk and failures in timely success."  Hearing Exh. 3, p. 2.

z. DJS used its best endeavors to provide to Owner a salvage plan that identified three methodologies for removal of the vessel:  parbuckling and re-floating, large section demolition (LSD) and small section demolition (SSD). Hearing Exh. 6, p.8. The parbuckling and re-floating was "deemed not feasible" due to the "lack

23

of structural integrity and the stability of the wreck." *Id.*   The DJS plan then proceeded to describe the LSD and SSD methodologies.

aa. The DJS plan, which was the result of the DJS working "closely with CL Risk Solutions" Hearing Exh. 6 (Dkt. 1-2 at 9) then proceeded to set forth the SSD methodology as follows: "Removing the wreck in smaller sections using available assets and proven wreck removal techniques (e.g., chisels, grabs, shears, etc.), which is the Contractor's preferred option.   Using this methodology, the upper decks are removed in a piecemeal fashion after which the lower decks are removed in sections up to 600MT.   This solution is cost-effective and has the lowest risk profile.   This solution can begin almost immediately with the U S-flagged assets already on site….the SSD option will accommodate the introduction of heavy lift assets to lift larger sections of the lower hull if the need/opportunity arises (LSD for wreck section D)." *Id*. at 8.

bb. Thus, the DJS plan recommended the SSD option, but also contemplated some sections being removed with the LSD method.[1]   *Id.* at 8, 14.   The DJS plan was developed contemplating that a "cofferdam will be constructed close around the wreck to contain surface pollutants and to prevent escape of vehicles[2] into the

---

[1] In considering the T&T Plan, the Owner recognized the issue of whether the "wreck's hull is structurally sound enough to support Large Section Demolition" and that Small Section Demolition may be necessary.  Hearing Exh.12 (Dkt. 20-1 at 45).

[2] DJS's plan was to expose the cars by "surgically removing" sideshell/bulkheads, then removing the accessible cars and using the hull as primary containment to "hold" the cars as they are removed via cranebarge.  Once cars in a certain section were removed, DJS would remove the "cleaned" section of hull which would expose more cars.  Dkt. 26-1, ¶ 8(b)(ii).  This process would be continued until the cars were completely removed.  If small section demolition method is used work methods can easily be made or adjusted to clear/remove cars either deck by deck or

navigation channel or surrounding area" and that "Phases 1 and 2 of the wreck removal plan can be executed in parallel with the installation of the cofferdam." *Id.* at 9; *see also id.* at 23.

cc. DJS continued, in good faith, to propose salvage methodologies consistent with its obligations under the SMFF, and pursuant to the terms of the NTVRP Contract.   Hearing Exh. 6.

dd. DJS was supposed to meet with representatives of Owner and P&I Club on November 6, 2019, in New Jersey.   DJS representatives, including Mr. Martin, along with other DJS representatives, traveled to New Jersey and expected to have a full meeting and make a full presentation to the Owner, P&I Club and the GSC.   T. 35:5-6.   They arrived with "hundreds of papers, and within about … 30 minutes, the meeting for the 6th of November was cancelled…." T. 35:9-10.

ee. On November 8, 2019, FOSC issued Administrative Order: 01:19 Amendment 1 affirming that there remains "an imminent and substantial threat to public health, welfare, or the environment because of an actual or substantial discharge/release of oil or designated hazardous substance from the vessel."   Hearing Exh. 11 (Dkt. 1-1 at 2).

ff. DJS could have started the salvage work in or about November 6, 2019, if Owner and the P&I had allowed it to pursue the recommended methodology set forth in the DJS plan. T.   119:17-19.   DJS would have completed the salvage before

---

per section.  Sections where wreck section and cars could be securely lifted together would be undertaken when safe and efficient to do so.  *Id.*

hurricane season, but for the delays occasioned by the competitive bidding process forced by the Owner and P&I Club.  T. 47:9-14.

gg. If DJS had started its salvage work in November, it would have taken DJS had "63 days to go down to the center line of the vessel" and "another 90-something days to the sea bed."  T. 47:16-21.

hh. While all of its vessels and portable equipment have been demobilized, remobilization of those assets could occur within two weeks. T. 72:3-4

ii. Since DJS's plan would work within the bounds of the barrier currently under construction, there would be no need to stop that construction (albeit it's a much larger, more time intensive barrier to build).  If DJS were to start February 26, with a month to complete the EPB, 64 days to remove to centerline, and 92 days to remove to seabed, the approx. finish date would be August 29, 2020.

jj. If DJS had started in November when it first presented the plan, DJS had a good chance of finishing before hurricane season.  Given the time it has taken to get the T&T plan and contract in place, that plan cannot be completed prior to the hurricane season.  Moreover, the risk to the environment by having a ship that has been cut in sections using LSD is far greater than the risk of a hurricane passing over the ship with the hull still intact and cars much more safely protected inside that hull.

kk. DJS does not know T&T's current anticipated estimate of completion but understands T&T plan costs substantially more than the DJS's plan and the T&T is currently two months behind schedule.

26

6.   **DELAY CAUSED BY FAILURE TO USE PLANNING P**

   a.   DJS salvage plan contemplated that the Golden Ray salvage operation is "subject to the input of the [UC] and the Incident Management System (IMS)…"  Owner and P&I Club, however, did not timely submit the DJS plan to UC; instead they pursued the ITT which caused delay in the salvage operation.

   b.   Owner and P&I Club did not submit the DJS plan to UC and, instead, proceeded with an Invitation to Tender.

   c.   UC is required to use the Planning P process.  T.43:5-10 (Martin)   The DJS plan did not make it into the planning process to ensure that the DJS Plan received proper review and consideration.  *Id.*

   d.   The Planning P consists of various phases, and at each step all stakeholders, including  the resource providers, are to be involved.   It involves a "series of meetings so everything is evolving, because things in salvage and emergency responses are always changing, so you have a continuous evaluation  process and it refines it and you get a better solution until you execute."  T. 43:5-10.

   e.   "NIMS, national incident management system … is a system [to] organize emergency response into very specific sections, so it basically took a civilian construct and put it on top of the military organization so you have planning, operations, logistics and finance."  T. 132:13-18 (Hankins).   "The planning section piece was the most important piece [related to this case] because it put organization around developing these plans to execute these emergency responses specifically designed to be very – very --  nimble, so as plans needed to change, the Planning P, all the stakeholders get involved and adjust the plan for the next

27

day to make sure the plan is the best plan you have to offer."  T. 132:19-133:1

(Hankins).

f.   Under the Operational Planning Cycle protocol, there should have been, among

other features, an Initial UC meeting, a UC objective meeting, a Command and

General Staff meeting, a Tactics Meeting, and Planning meeting, and then

approval of the Plan, followed by an Operations Briefing, after which the Plan

was executed.  The protocol for each step – including even suggested agenda for

each meeting is spelled out in detail in ICS Section Chief, Section 6.0 "Manage

the Planning Process".   Once a Plan starts through the process, the USCG

protocols envision that the Plan may need adjusting, in which case the Planning P

begins again as necessary.    The DJS plan never made it into the Planning P

process.    T.125:20-126:5. It was unusual that DJS was not afforded that

opportunity to allow its plan to even start through the Planning P process.  T.

126:6-11 (Williamson).

g.   In this case, UC and FOSC failed to utilize Planning P to enable the DJS plan

proper consideration.  T. 125:21 (Williamson).  DJS is the primary resource

provider for SMFF and they are "very much a part of the resource plan system."

T. 125:15-17.  Even as late as November, the Planning P was not being utilized

with respect to the DJS salvage plan; there "was no dialog whatsoever between

what [DJS was] doing to put forward as a plan and whatever the Coast Guard or

the Unified Command was thinking as going to be implemented."  T. 134:16-20

(Hankins).

h.  Further, this Court finds that FOSC and UC did not engage the Planning P with respect to DJS plan and the failure to do so prevented DJS plan from considering an appropriate review, revisions and securing final approval by UC.

i.  DJS assumed, per usual protocol, that the Owner in early November had forwarded its proposal to the FOSC for consideration and that the UC would respond in the usual and timely fashion.

j.  When DJS learned that it had not in the third week of November, in response to Administrative Order 2, DJS hand-delivered its proposal to FOSC and his representatives and emailed it to the FOSC on November 26, 2019.  Hearing Exh. 28, p. 8, ¶ 6.  Within one week of DJS providing the DJS Plan to UC, SERT confirmed the DJS plan is conceptually feasible.  Hearing Exh. 14 (Dkt. 20-1 at 61).  SERT comments were not seen by DJS until these court proceedings.

k.  "[R]ather than hold discussions with Donjon-SMIT LLC to overcome differences" with DJS, the Owner's, the P&I Club's and GSC's "preferable course of action was to issue an Expression of Interest document followed by an Invitation to Tender…."  Hearing Exh. 9 (Dkt. 20-1 at 18).

l.  The express terms of the ITT make it clear that Owner, P&I Club and GCS were unwilling to engage in meaningful and constructive discussion with DJS after they received DJS's plan on November 5, 2019, making it impossible for DJS to continue to perform services as SMFF.

29

7. **TRANSITIONAL AGREEMENT PERIOD**

   a. Owner, DJS and Donjon Marine, Inc. executed a Transitional Agreement whereby the parties thereto attempted to transfer control of the salvage to Donjon Marine, Inc. Hearing Exh. 7.

   b. However, the Owner did not seek approval from FOSC for a deviation from NTVRP and no additional funding agreements or other documents were forwarded to USCG or FOSC for approval of such a transition.

   c. FOSC issued Administrative Order, Amendment 2, notifying Owner that the attempted shift to another resource provider was improper.  Owner attempted to justify the shift from DJS to Donjon Marine, Inc. by indicating it was a "simple transition from a joint venture (DJS) to one of its partners (Donjon)", but in this instance, the FOSC rightfully concluded[3] that there was not a factual basis articulated to warrant a deviation, i.e., there were no exceptional circumstances to warrant a deviation.    Hearing Exh. 9 (Dkt. 20-1 at 14).   In the same letter attempting to justify the deviation, the Owner emphasized that "[w]e should add that the change was not made for financial reasons…." *Id.* at 15.

   d. On December 1, 2019 in considering Owner's request for a deviation from DJS to Donjon Marine, FOSC concluded that the "justifications [RP] provided do not meet the standards for approval detailed in Title 33 CFR § 155.4032 or § 155.5012 and hereby disapprove that deviation."  Hearing Exh. 9 (Dkt 20-1 at 23); Hearing Exh. 25( Dkt 20-1 at 66).   Essentially, without using the words

---

[3] Assuming Commander Witt does, in fact, have the authority and certifications in writing to serve in the role of FOSC.

"exceptional circumstances", FOSC determined that there were no exceptional circumstances.

    e.   This denial effectively rescinded the Transition Agreement, leaving DJS as the approved resource provider under the NTVRP for the GOLDEN RAY.[4]

    f.   On FOCS's subsequent approval of T&T as an additional resource provider, FOSC then declared his original findings in Administrative Order 1 Amendment 2 "moot".  Hearing Exh. 8, p.55, ¶ 5.

**8.  COMPETITIVE BIDDING PERIOD:**

    a.   The LOI terminated on November 6, 2019 and shortly thereafter DJS received notice that GSC proceeded with an Invitation to Tender (ITT), dated November 17, 2019.  The ITT was made "in behalf of … the Owner … together with their P&I Club…."  Hearing Exh. 8 at 4 (¶1.1).  Prior to termination of the LOI, DJS was threatened that if it was not able to get to an agreement with the P&I Club on the financial terms,  then the P&I Club would take it out to tender, i.e., invite other salvors to bid on the project.  T. 49:17.  An invitation to tender is common in international markets and is not uncommon in the United States for events that are not OPA 90 events (i.e., if the vessel is determined "no longer … a threat to the environment" in which case the "OPA 90 would stand down….."), but it is not authorized in OPA 90 events.  T. 50:4-7.

    b.   This Court finds that during the same time period that P&I Club was sending out the ITT, it was also trying to persuade the USCG that Golden Ray is no longer

---

[4] Indeed, this position is borne out by the Government's argument that DJS is still a resource provider under its NTVSP.  It can only be a resource provider if the contract it has for the GOLDEN RAY is still in effect.

was an imminent threat, despite knowing full well that the Golden Ray was in the

same location, still with 44,000 gallons of fuel and 42,000 cars on board.

c.  The Administrative Order Amendments cited the continuing substantial risk of a

pollution event.   Instead of moving forward with refining the DJS salvage

methodology proposal after Amendment 2 was released, the entire focus of the

RP shifted to the ITT process.

d.  The financial terms of the ITT were in direct conflict with the financial terms set

forth in the NTVRP Contract with DJS ("bidder shall provide lump sum

budgets…") Hearing Exh. 8; T.125:7-8.

e.  The ITT also contemplated "[c]ontract negotiations" and that such negotiations

would be "governed by a risk based contracting process to allow shortlisted

bidders to refine their work method on the basis of an open risk dialogue and to

determine how the parties effectively mitigate, transfer or share the risks."

Hearing Exh. 8; (Dkt. 202-1, p. 32, ¶ 1.4).

f.  Owner, P&I Club and the GSC invited salvage companies to bid on SMFF

services that are already a part of the USCG approved NTVRP contract, and the

bidding process expressly contemplated that the bidder would be expected to

continue to negotiate  financial terms, expressly prohibited by OPA 90.  *Id.*   In

OPA 90 events, this should not occur.  T. 96:24-25.   Under the express terms of

the ITT, the Owner, P&I Club and GCS advised potential bidders that they were

expected to continue negotiations even though Golden Ray continues to sit in the

St. Simons Sound.

g.  The express terms of the ITT show that the Owner, the P&I Club and the Owner's salvage contractor are demanding financial terms that are directly in conflict with the financial terms outlined in the USCG approved NTVRP Contract (with the ITT calling for a lump sum contract and the NTVRP Contract setting for the cost plus financial terms). *Id.*; T.125.  (The NTVRP Contract allows for "add or subtract assets, resources, personnel, change the plans and things like that and adjust the pricing because everything is a price list and it just either comes on or off with whatever scope of work is needed, and in the invitation to tender, you might have blocks of work that would be X amount, another block would be --- so your're compiling scopes of work into one price." T.  51:9-15.

h.  DJS was surprised that USCG did not intervene and prevent the ITT. Martin 50:17-18.  DJS made USCG aware of the ITT process.  T. 96:5-8.  "We brought it to their attention…they came back and allowed the process to go through…." T. 96:5-10.

i.  DJS re-submitted its proposal to Owner and P&I Club, following the ITT.

j.  Later in November, Mr. Hankins was working on another job for the Navy and he learned that UC still had not received the DJS Plan.  T. 142:15-25.  On or about November 26, 2019, Mr. Hankins, to meet the requirements of the FOSC Administrative Order Amendment 2 and frustrated at the lack of response from UC, delivered a letter and attachments to FOSC.  Hearing Exh. 28.   The documents were designed to make sure that FOSC had the benefit of the salvage plan methodologies (Hearing Exh. 12) and why DJS believed that it had satisfied

33

the requirements by presenting an appropriate salvage plan.    T.143:15-25

(Hankins).

k.  The NTVRP Contract between DJS and Owner contains a dispute resolutions

provision and requires DJS and Owner first, to "[a]lways attempt to settle

amicably"; second, "… always mediate"; and third, if the first two steps fail "then

disputes shall be decided by arbitration in the manner set forth in Article 11

hereafter."  Hearing Exh. 1, Dkt 22-5, Article 7).

l.  This Court finds that DJS attempted to resolve its dispute with owner amicably.

m.  This Court finds that Owner did not use best endeavors to amicably resolve

whatever dispute existed between the parties.

n.  DJS was willing to mediate its dispute with Owner, but that Owner was not

willing to mediate the dispute.

o.  On December 3, 2019, SERT informed FOSC that their evaluation of the DJS

plan deemed it technically feasible (Dkt. 20-1, Hearing Exh. 9; Hearing Exh. 13,

14), but that information was not provided to DJS until it the document were filed

in court by Defendants.

p.  On December 8, 2019, DJS once again submitted its plan to Owner, in response to

the ITT, and made it clear that it was committed to a full planning review and was

prepared to assess progress with the UC and adjust tactics and assets as UC

objectives change, but using financial terms outlined in the NTVRP.

q.  On December 16, 2019, DJS presented its salvage plan for wreck removal to the

Owner's GCS.  Although DJS made repeated requests for a meeting with UC, that

did not occur, in spite of the fact that DJS was still a stakeholder and a primary SMFF provider in the UC. Hearing Exh. 26-1, ¶ 8(w).

r.  On December 17, 2019, DJS informally met with the FOSC and the QI informing them that DJS would undertake whatever wreck removal option the UC/FOSC decided upon, but only under the terms of the NTVRP, not under the lump sum financial arrangement demanded by P&I Club and Owner, as set forth in the ITT. *Id.* at ¶ 8(x).

s.  On December 19, 2019, DJS learned that T&T Salvage, LLC (T&T) was presenting its salvage plan directly to the entire UC.  DJS, as a stakeholder and SMFF primary resource provider under NTVRP,  requested to have an opportunity to present its plan to the UC, but was refused, in violation of Operational Planning Cycle and the Planning P.  Instead, the FOSC instructed DJS that it should communicate its concerns to the Owner.  *Id.* at ¶8(bb).

t.  The T&T Plan was allowed to go through Planning P, the DJS plan was not.  DJS reasonably expected for UC to ensure that its plan, as the approved SMFF, would properly go through the Planning P process.  T.125-126.

u.  Representatives of DJS inquired why the DJS plan was not processed through proper planning procedures and they never received a straight answer.   T.125.

v.  DJS continued to try to provide its proposed plan and other information to the UC via email and hand delivery in Washington, D.C.   Dkt. 26-1, ¶8(ee).   DJS representatives tried to meet with UC between November 5, 2019 and December 22, 2019, but the UC refused to meet with them.  T.15 62:1-8.

35

w.  FOSC refused to allow DJS access to the UC or to personally discuss with DJS the salvage (or any alternatives).  Moreover, at no time during the process did the Coast Guard ever solicit any technical data from DJS concerning the vessel, in spite of the fact that it was the only salvor that had worked on the GOLDEN RAY for months and had acquired significant knowledge about the vessel's condition. *Id.* at ¶8(ff).

x.  The Owner accepted T&T's bid and then sought a deviation, allowing it to add T&T as a resource provider for all 19 SMFF services for this particular salvage.

y.  From the time the SERT advised the DJS plan was "technically feasible" on December 3, 2019 (Dkt. 20-1; Hearing Exh. 10; Hearing Exh. 13, 14) until the SERT advised the T&T plan was "technically feasible" (Dkt. 20-1, Exhibit 9) on December 19, 2019, sixteen days elapsed.  The time delay is not consistent with FOSC's concern of timely removal.

9. **DEVIATION REQUESTS A PRETEXT FOR NEGOTIATING FINANCIAL TERMS**

a.  In the administration of the Golden Ray salvage, the FOSC was presented with two separate requests from Owner to deviate from NTVRP:  First, a deviation request to allow for a transition from DJS to Donjon Marine, Inc. as SMFF under the NTVRP; and, second, a deviation request to allow T&T to be added as an additional SMFF service provider under the NTVRP.   The FOSC issued a decision letter on the first deviation request on December 1, 2019 (denying the request, T.121) and issued a decision letter on the second deviation request on December 21, 2019 (granting the request).  Dkt. 20-1, pp. 23,67.

b.  Under the DJS plan, DJS could have begun salvage operations and removal of the Golden Ray wreck as early as the first week of November, if only the Owner and UC had approved the DJS proposed plan of SSD.

c.  The delay of the Owner and P&I Club in presenting the DJS plan to the UC for consideration, discussion and approval or modification through the  Planning P process exacerbated the continuing threat from pollution, and further collapse of the vessel, which in turn would exacerbate the pollution threat.

d.  The UC and FOSC should have been concerned when it received no salvage plan from the sole SMFF resource provider and should have inquired before the FOSC finally did on November 22, 2019, while pollution and other risks continued unabated during the delay.

e.  In October the P&I Club began interacting directly with UC.  At that time DJS was forbidden by the P&I Club from communicating directly with the UC/FOSC. However, as a stakeholder and necessary component of the UC, DJS should not have been prevented from communicating with the UC/FOSC, as it had been doing until that point in time.  Hearing Exh. 28, p. 3, ¶ 4.

f.  The P&I Club insisted that DJS have no interaction with UC and specifically prohibited DJS from attempting "to arrange a meeting and/or joint presentation with the Authorities or continue further discussions…."  Hearing Exh. 4 (Dkt. 20-1 at 7 (¶ 5).  The provision preventing DJS from interacting with UC violated of the text and spirit of OPA-90.

g.  DJS is unaware of any reasonable basis upon which UC would agree to meet with T&T and allow T&T to make a full presentation, but did not allow DJS the same

opportunity, as DJS was the designated SMFF resource service provider.  *Id*. at 7(d).

h.  The FOSC failed to recognize this oddity created by DJS's sudden failure to discontinue interacting with the UC/FOSC. This failure prevented the FOSC from receiving any input from DJS regarding any aspect of pollution control, or any aspect of its well-known salvage expertise. The failure to recognize the lack of communication from DJS should have been even more striking, particularly in view of the fact FOCS was receiving communications from the P&I Club and only from the P&I Club.   Hearing Exh. 28, p. 4, ¶ 4.[5]   The FOSC should have taken charge of the process, as is customary, by allowing the proposed methodologies to go through the proper planning process and not allowing financial terms to delay or prevent salvage operations.  T. 120:6-22.

i.  Because DJS had heard nothing from the FOSC, on November 22, 2019, the General Manager of DJS (Tim Williamson) emailed the FOSC expressing his concern because DJS had received no comments or correspondence from the UC about its plan that was provided to Owner weeks earlier. The substance of this email was never properly addressed.  Dkt. 26-1, ¶ 8(r).

j.  During the critical period while DJS was preparing a salvage removal plan (October through November 5th, and then continuing until November 22nd), FOSC had no formal communication with DJS.

---

[5]  The references cited on those pages refer to documents provided to the FOSC that should be part of the Administrative Record not produced.

k.  On November 22, 2019, the FOSC finally communicated directly with DJS and finally requested a copy of DJS' salvage plan that had been presented to the Owner weeks earlier.  *Id.* at 1, ¶ 1.

l.  On November 25th, the head of SERT (Andrew Lawrence) emailed Mr. Williamson to meet to discuss the GOLDEN RAY.  They agreed to meet in Washington D.C. that same day. Mr. Williamson arrived at the meeting with the DJS salvage plan and one of DJS's lead engineers (Jeff Stettler, former head of SERT).  However, upon arrival, Mr. Lawrence informed Mr. Williamson that he had just been advised by his superiors not to discuss either the GOLDEN RAY or the DJS plan.  Mr. Williamson found this highly unusual.  Dkt. 26-1, ¶ 8(s); T. 128.

m.  On November 26, 2019, DJS representatives met with the FOSC and the State On-Scene Coordinator (SOSC) to discuss the information it believed had been withheld from the FOSC and the UC, based on the correspondence received on November 22nd from the FOSC. After these documents (including the salvage plan) were provided to the FOSC, no further discussions occurred.  In fact, the FOSC merely allowed DJS's representative to hand him documents, while deferring discussion of the DJS plan.  Dkt. 26-1, ¶ 8(t).

n.  With its submittal to the FOSC on November 26, 2019, DJS included a reiteration of why its preferred plan was a better choice for the environment, reminded the FOSC that pollution mitigation included removal of the ship and its cargo, informed that in preparing its plan, it had consulted with salvage masters, naval architects, and project and risk controllers to investigate numerous wreck removal

39

options, assets and scenarios, and stated that its plan was the result of daily meetings with Owner representatives and maintained an open dialogue to consider all salvage possibilities.  Dkt. 28, pp. 4-10.

o. Even with the DJS salvage plan in hand the FOSC refused to allow DJS to participate in the Operational Planning Cycle or participate in any meeting to review other salvage plans, including its own. Dkt 26-1; ¶ 8(bb).

p. If the FOSC had allowed DJS to present its salvage plan to the UC, the plan would have been explained, and the pros and cons of various methodologies explored.  Had that occurred, a salvage plan could have been agreed upon by all and put in place months ago, regardless whether the selected method was the SSD, LSD or a combination of the two. T. 62; 1-8 ¶ 9(b).

q. As of November 26, 2019, in spite of the fact DJS was the designated resource provider, DJS had not been tasked with or asked to engage in any efforts to mitigate pollution from the vehicles remaining on board the vessel.  Hearing Exh. 28, p. 5.   There are still 44,000 gallons of fuel remaining on the vessel and DJS has not "been given permission to remove the cars."  T. 20:14-17.

r. Had DJS been allowed, as the sole SMFF provider, to present its salvage plan to the UC, the plan itself would have clearly demonstrated to all UC participants that DJS was completely ready, willing and able to perform either methodology outlined as options in the DJS Plan or, for that matter, any other option proposed by other salvage companies. Dkt 26-1, ¶ 9.

s. The FOSC should have recognized the conflicting financial terms between the NTVRP Contract, the LOI and those set forth in the ITT and that such financial

40

terms had caused and were causing a delay in the salvage effort.  T. 95; 12-15, 21-24.

t.  Between December 1, 2019 (the date of FOSC's first letter denying a deviation request) and December 21, 2019 (the date of FOSC's second letter granting a deviation request), there were no facts or circumstances that would warrant the FOSC conclusion that exceptional circumstances existed to warrant a deviation from the NTVRP.  T. 139; 2-4.

u.  "The only thing that changed was that the RP was allowed to send out an ITT", which resulted in a delay occasioned by a competitive bidding environment and the selection of another resource provider willing to agree to financial terms wherein it assumes greater risk.   T. 145:22-146:2 (Hankins).

v.  This court notes that the change of financial circumstances is not an "exceptional circumstance" and are delays occasioned by the Owner creating a competitive bidding process is not an "exceptional circumstance" that should be considered in determination whether a deviation is warranted.  Dkt 26-1, ¶ 10; Dkt 20-1, pp 49 – 55; T. 146 – 147.

w.  Owner and P&I Club were using the ITT process and competitive bidding to change the financial terms of the NTVRTP Contract, in violation of the express terms and spirit of OPA 90 and its regulations.  Dkt 26-1, ¶ 10; Dkt 20-1, pp 49 – 55; T. 146 – 147.

x.  The Court finds that FOSC allowed Owner to engage in a competitive bidding process, in violation of the express terms and spirit of OPA 90 and its regulations. Dkt 26-1, ¶ 10; Dkt 20-1, pp 49 – 55; T. 146 – 147.

41

y. Instead of exercising his authority to allow the DJS plan to proceed through planning protocol, FOSC showed preference for the T&T Plan and directed the Owner to submit a deviation request ("Owner submitted the Deviation Request at the direction of the U.S. Coast Guard…." See Hearing Exh. 27, Dkt. 22-1, ftn. 3).

z. The FOSC's allowing DJS to develop a salvage plan in parallel with GSC created confusion, as evidenced by the 28-page report prepared by GSC "explaining its analysis and concluding wreck removal should be performed using Large Section Demo techniques" (see Dkt. 20-1, Exhibit 7, p.43, para. 4). This document was never shared with DJS and it is unclear whether it is a part of the Administrative Record.

## 10. DEVIATION REQUEST

a. The Owner submitted to FOSC a letter requesting that FOSC authorize Owner to deviate from the NTVRP and add another SMFF service provider. See Hearing Exhibit 12, Dkt. 20-1. The first time DJS saw the Owner's letter to the FOSC was after this litigation was filed. T.56:1-6 (Martin)

b. Owner misrepresented facts in its request:

i. Owner misrepresented to UC that DJS was unwilling to utilize LSD. The Owner and the Owner's QI and Insurer were pressing for an LSD but using negotiations for costs and risk management as the basis for failing to agree to a final salvage plan with DJS. Dkt. 26-1, ¶ 3(g). The LOI shows that the P&I Club entered into "exclusive negotiations" with DJS "in order to conclude suitable contracting principles for recovery and removal of the Vessel and cargo…." See LOI, Dkt. 21-1, pp. 6-8. The Owner also

improperly engaged the services of GSC to develop salvage plan
procedures and an early communication with DJS made it clear that they
requested DJS analysis of "three high level dismantling scenarios
including of pro's and con's on feasibility...." Dkt. 20-1, pp.10-12; Dkt.
21-1, p.43.

ii.   Owner misrepresented to UC that "[b]oth times Donjon-SMIT submitted a
wreck removal plan that did not include complete large section
demolition." T. 65:7-14.

iii.   Owner misrepresented to UC that "DJS proposed to perform small section
demolition and for owners to separately contract for the erection of an
EPB with a third party.  T.65:19-23 (Martin).

iv.   Owner misrepresented to UC that "Under DJS's small section demolition
timeline, complete removal of the wreck would not be expected to occur
until P 90 date of 7 October 2020."  T. 66:4-8. In fact, DJS ran their own
quantified risk assessment and they "put in the record the differences how
they were combining risks on top of risks to make the dates run out."
T.66:8-17 (Martin)

v.   Owner misrepresented DJS's positions regarding LSD versus SSD, as well
as misstating DJS's concerning use of/need for an environmental
protection barrier (EPB). Dkt. 20-1, pp. 14-18.

vi.   Notably, the Owner also conveniently failed to mention in its missive to
the FOSC that it had tried but failed to get DJS to agree to new financial
terms outside the NTVRP Contract. Dkt. 20-1; Dkt. 26-1, ¶ 8(f).

vii.  At all times relevant, DJS knew that the "barrier was not an option not to do it" and that it would have to be part of the overall plan.  T. 40:14-16.

viii.  DJS was not given an opportunity to have input into the deviation request, was not aware when it was submitted and not provided an opportunity to respond, despite repeated requests to the FOSC.

**c.  FOSC LACK OF COMMUNICATION WITH DJS**

i.  The Coast Guard's stated policy is to have excellent communication with the public and stakeholders, from the start and throughout any project. The Coast Guard's policy recognizes the  importance to manage External Affairs, i.e., communication and transparency with the public and stakeholder groups, i.e.,  "hit it hard and hit it fast to set the correct tone at the onset of a response."  Hearing Exh. 33, Chpt.  9-1.

ii.  It is "Coast Guard policy is to make available to the public all information about, and imagery of, service activities except those specifically restricted by Reference (l), law, operational security, or policy.  This information shall be done in a forthright, expeditious manner.  It is critical to  manage  the  balance  of  timeliness,  completeness,  accuracy,  and synchronization to ensure that information is conveyed in a reasonable manner.   Information  can  be  made  public  electronically,  in  writing, through imagery, by live or taped broadcast, or person to person.  The rules  for  release  of  information  apply  equally  to  all  methods  of information sharing (official and unofficial) and across all mediums and audiences."  *Id.* at Chpt. 9-1A.

44

iii.   Further, the Coast Guard's guidance regarding compliance with OPA 90 and the Chafee Amendment states that "FOSCs should be mindful of the need for salvors during a response and ***ensure close coordination with contracted SMFFs*** to ensure successful salvage operations for saving life or property in danger and for preventing damage to the environment." *See* USCG Marine Environmental Response and Preparedness Manual, COMDTINST M16000.14A, Section 2.C.2.b (30 November 2016) (Emphasis added). Plainly, while the Coast Guard's own interpretation of OPA 90 requires FOSCs to closely coordinate with SMFF providers, Defendants instead chose to completely leave DJS in the dark and never afforded DJS with a single meeting to discuss its proposed plan.

iv.   The same administrative guidance provides that, "[b]efore the FOSC authorizes a deviation, the ***FOSC must clearly document why the deviation is necessary*** in the MISLE activity and/or other relevant incident response documentation, such as an Incident Action Plan (IAP)." *Id*. at Section 5.C.5.b.(4) (emphasis added); *see also id*. at Section 9.E.1.d.(3) (emphasis added) ("The FOSC may authorize deviations from the services and resources called for in its VRP/FRP under certain circumstances when a deviation from the plan provides a more expeditious or effective response. ***The FOSC shall document any authorized deviations***."). (Emphasis added.) Again, DJS was left in the dark regarding the FOSC's reasons for approving Owner's deviation request and did not discover

45

those reasons until filing receiving the Government's response to DJS motion for injunctive relief.

**d. FOSC DECISION AND DECISION LETTER**

   i. Owner (at the direction of the FOSC, see footnote above) requested the deviation from NTVRP, by letter dated December 19, 2019 and FOSC issued his decision letter, granting the deviation, on December 21, 2019, within twenty-four hours of the deviation request.

   ii. During that twenty-four-hour period, FOSC consulted with U.S. Navy Supervisor of Salvage and Diving and the U.S. Coast Guard Salvage Engineering Response Team. Dkt. 20-1 at 57-61.

   iii. On December 21, 2019, FOSC approved Owner's "request to deviate from your … NTVRP … for the purpose of using T&T Salvage as a salvage and marine firefighting resource provider" (herein "Decision Letter") . Hearing Exh. 13, Dkt 20-1 at 63.

   iv. At the time of the Decision Letter, DJS was still listed as the primary resource provider under the NTVRP. DJS was not provided a copy of the Decision Letter until Defendants filed it with the Court in connection with this matter.

   v. There were no exceptional circumstances that warranted a deviation from NTVRP and allowing another SMFF provider. Hankins 139:2-4. Further, DJS has never been the subject of a deviation request, other than those involved with the Golden Ray. T. 139:15-18.

46

vi.  On December 21, 2019, FOSC prepared a decision memorandum, setting forth the "ANALYSIS OF THE FOSC'S APPROVAL OF THE OWNER'S REQUEST TO USE ANOTHER RESOURCE PROVIDER". (Hearing Exh. 16, Dkt. 20-1 at 49-67).  The FOSC, either intentionally or unwittingly, in issuing the Decision Letter, relied upon assumptions that simply were untrue, as follows:

1.  Witt's memorandum sets forth wrote that the "T&T's plan using LSD is faster than DJS's plan using SSD by approximately four months," and that is not the accurate timetable.  T. 67:14-17. FOSC assumed that DJS's plan would push until 2021, which was not accurate.  DJS's plan would have completed approximately one month later than the plan proposed by T&T.

2.  FOSC wrongly assumed the failure of the P&I Club and DJS to finalize a salvage plan was due to P&I Club waiting for the plan to be developed by DJS.  This is not true as the DJS plan was provided to Owner and P&I Club in a timely manner, on November 5, 2019.  The Insurer failed and refused to use best endeavors to reach an agreement on the salvage plan, because it was insisting on renegotiating the pre-approved contract and pricing terms as set forth in the NTVRP Contract, in direct violation of OPA 90.  DJS provided to the P&I Club a detailed salvage plan that contemplated possible salvage and wreck removal options that could be utilized, but also made it clear to the

P&I Club that it was not renegotiating the terms of the NTVRP Contract.  Dkt. 26-1, ¶3(d).

3.  FOSC's statement that "DJS's lack of adability in meeting the owner's demands" is not accurate.

    a.  DJS Plan shows the options available and merely shows the preferred option.  Further, DJS was willing to pursue other methodologies, but not willing to meet the P&I Club's demands to negotiate new financial terms. *Id.* at ¶ 3(e); T. 67:22-68:2; T.  68:3-6; T. 124:17-21.

    b.  DJS would have been willing[6] to utilize LSD if Unified Command would have approved that methodology, after full planning review, but DJS would not have been willing to do that with the lump sum pricing terms demanded by P&I Club and Owner and assuming the risk. T. 70:7-15; 19-24.

---

[6] The full plan presented to the UC, which should be a part of the full Administrative Record, included the following language:  "While this plan was developed to meet Unified Command (UC) objectives with the benefit of DJS's experience, we are committed to a full planning review at the onset and are open to changes in methodology and tactics as determined by the UC before plan execution and at any of the plan's various stages.  Additionally, we are prepared to assess progress with the UC and adjust tactics and assets as UC objectives possibly change from the initial salvage plan as the work progresses."  DJS does not have the complete Administrative Record, but this document should be a part of that record and confirms that UC was notified of DJS' openness and adaptability to changes in methodology, once finalized and approved by UC.   Dkt. 26-1, ¶8(y).  Thus, Commander Witt should have had direct knowledge that this assertion was not accurate.

c. DJS had their "recommended methodology, but [DJS] was fully prepared to work with the [UC] to execute whatever the[UC] decided to do." T. 125:1-3.

d. There was never a point when DJS refused to perform a large section demolition; however, DJS, in its capacity as SMFF, did recommend the SSD approach, over the LSD approach, believing it was less risky. T. 44:6-9.

4. Witt writes that "This approval of a deviation from your NTVRP fulfills the requirements of 33 CFR Part 155 and meets the demands of my order. Please provide me, no later than December 29, 2019, an executed Letter of Consent between you and T&T Salvage. Also, at your earliest convenience, please provide me an executed contract." See Hearing Exh. 15; Dkt. 20-1 at 63. This does not meet the requirements of 33 CFR Part 155. First, a letter of consent is not an acceptable contract or other approved means for a vessel of this size, and second, according to 155.4025 definitions, "(a) As part of the contract or other approved means you must develop and sign, with your resource provider, a written funding agreement. This funding agreement is to ensure that salvage and marine firefighting responses are not delayed due to funding negotiations. "Funding agreement is a written agreement between a resource provider and a planholder that identifies agreed upon rates for specific equipment and services to be made

49

available by the resource provider under the agreement. The funding agreement is to ensure that salvage and firefighting responses are not delayed due to funding negotiations. <u>This agreement must be part of the contract or other approved means and must be submitted for review along with the VRP.</u>" (Emphasis added) Witt abrogated the regulatory requirement, itself, along with the listed regulatory procedures by not requiring a contract to be submitted as part of his approval process.

5. FOSC chose to ignore SERT technical review comments on lack of procedures and based the decision on an unvetted, challenged timeline provided by GCS, a non-VRP third party.

vii. "If Commander Witt's definition of exceptional circumstances stands, then there is no reason for us to have VRP because every single salvage incident is an exceptional circumstance." T.148:23-149:1.

viii. DJS is not aware of any other request for deviation that has been approved by any other FOSC, in any event that is governed by OPA 90. T. 120:23 - 121:1; T. 139:7-11)

ix. FOSC delegated excessive authority to Owner, the P&I Club and the GSC and gave into their demands:

1. "T&T's salvage plan met the Owner's demands and proposed a Large Section Demolition and an Environmental Protection Barrier." Dkt. 20 at 6.

50

2. "T&T's plan met [the Owner's] preferred demolition methodology and preference for placement of an environmental barrier prior to cutting…"  Dkt. 20 at 6.

3. The Large Section Removal and Environmental Protection Barrier were "preferred by Owner." Dkt. 20 at 17.

4. "DJS simply failed to provide a plan that the Owner found satisfactory." Dkt. 20 at 21.

5. "DJS … plan that did not address the Owner's stated preference for Large Section Demolition and placement of a pre-demolition Environmental Protection Barrier." Dkt. 20 at 21.

6. The "Owner ultimately rejected DJS' plan." Dkt. 20-1 at 50.

7. "Owner asserts that they prefer the LSD be performed with the EPB to maximize containment and minimize any adverse environmental impact." Dkt. 20-1 at 53.

8. The FOSC, in his decision memorandum, cites conflict between the Owner and DJS, and sides with Owner without the benefit of any type of presentation or meeting with DJS.  Dkt. 20-1, at 53.

x. Insurers for the Owner have no role in the Incident Command System (ICS), and in particular the UC, utilized to respond to casualties such as the Golden Ray.  *See* Commandant Publication P310.17B, U.S. Coast Guard Incident Management Book, dated May 21, 2014; T. 120:10-14. Further, typically the insurer is involved "at the periphery as an interested party" but the process of finalizing a salvage plan is "always been left to

51

the owners".  T.120:18-19.  "We provide [the plan] to the owners and then unified command…with the FOSC taking obviously priority."  T. 120:18-22.

xi.   FOSC Decision Letter states that DJS lacked "adaptability in meeting the Owner's demands" (Hearing Exh.16, Dkt. 20-1 at 54); however, this Court finds that DJS satisfied its obligations to perform SMFF services as primary resource provider, was willing to utilize a variety of options, and diligently pursued a salvage plan that addressed all methodologies requested by Owner, P&I Club and GSC.

xii.  FOSC Decision Letter makes no reference to the differing financial terms between the DJS plan and the T&T plan.  FOSC should have taken into consideration the degree to which the financial considerations were impacting the SMFF services by DJS, the primary resource provider for SMFF under the NTVRP, and the extent to which the delay in removing the wreck was impacted by the ITT process.

xiii. DJS learned about the FOCS's decision to allow a deviation from the NTVRP on December 22, 2019. T. 61:21-25.  DJS had no idea why it was being replaced by T&T.  T. at 123.  As the primary SMFF resource provide under the NTVRP, DJS should have been contacted before any deviation was granted.  T.123.

xiv. The FOSC's approval of a wholesale substitution of T & T as the sole resource provider on this salvage conflicts with 33 C.F.R. 155.4032, which states that changes can be made only for a "specific service

52

required." The regulations do not allow for the wholesale addition of another resource provider for all 19 SMFF tasks.

xv.  This deviation was allowed despite the fact that DJS was never notified that it had failed to perform or was unable to perform its required services or that it was non-responsive, or its responses were deficient. Dkt. 26-1, ¶ 8(gg); T.123-124; T.54:21-24, 55:9-11.  DJS performance satisfied the purposes of OPA 90, by being immediately responsive and available to provide the services contracted for under NTVRP.  *Id.* at ¶ 8(hh).

xvi.  DJS did not receive a copy of the FOSC decision letter or Decision Memo until this litigation when Defendants provided it as an exhibit to their responsive submission (February 21, 2019).

xvii.  DJS, the resource provider for SMFF as set forth in NTVRP, objected to any suggestion of a deviation request by Owner and repeatedly attempted to provide input into the FOSC decision to select a resource provider another than DJS, but was denied the opportunity. *Id.* at ¶ 8(m).

xviii.  On December 22, 2019, Paul Hankins sent a letter to FOSC and others, challenging FOSC's decision to authorize a deviation from the NTVRP and, also, challenging the assumptions upon which FOSC made the decision. Hearing Exh. 17, Dkt. 1-3 at 3-7.  Mr. Hankins queried why there was a deviation approval "without ever having sought a salvor meeting on our plan or our position on the removal of the Golden Ray." *Id.*  Mr. Hankins pointed out that DJS had "never been asked to present our plan directly to" QI and FOSC staff and that it seemed odd that T&T

was given an opportunity to prevent their plan directly to FOSC.  *Id*.  He then wrote:  "The fact that the SMFF provider can't get 30 minutes in front of our [UC] in deference to English underwriters and Dutch consultants with zero assets or responsibility (and no formal role in the UC) is an extreme disappointment."  *Id*. at 4.  Within two days of Mr. Hankins letter to FOSC, he received a scathing letter from an attorney for the Owner.  Dkt. 22-1, which is part of the Administrative Record (as we understand).

xix.  DJS made repeated requests for meetings and information from UC and FOSC but was not provided information sufficient to even begin to understand the rationale or reasoning behind FOSC decision to grant Owner's deviation request.

xx.  Additionally, DJS sent FOIA requests to USCG requesting information pertaining to FOSC decisions regarding the deviation request.  T.121:18-25; Hearing Exh. 26.  The USCG received FOIA requests, dated December 26, 2019; however, USCG has failed and refused to provided documents properly requested under FOIA.  *Id*.

## 11. COMPARISON OF DJS PLAN AND T&T PLANS

a.  DJS Plan

i.  With specific regard to the SSD method, when considering a car carrier such as the GOLDEN RAY where much of it remains above the water line, the SSD methodology is safer, less risky and less environmentally dangerous than the LSD.  And using the SSD method on large vessels has

always been successful. Dkt. 26-1, ¶13(b)(i).  The SSD method allows greater control over certain environment issues. *Id.*; Hearing Exh. 6; T.36-45, 52-53.

ii.  While all salvage methods have risks, SSD has fewer risks should a cut fail or a piece be dropped. Even though a few cars may fall into the water at a time when using the SSD, in contrast, hundreds of cars will enter the ocean at a time if a failure occurs  using the LSD. *Id.,* ¶ 14(cc, q).

iii.  In contrast to the dangers created by using the LSD method which leaves the interior of the ship constantly exposed to the elements, if the SSD method is used, three sides of the hull remain intact at all times, and everything below the water line remains protected from tidal action until the interior of the ship is cleaned out.  The hull, itself, acts as a primary containment barrier. Dkt. 26-1, ¶ 13a(vi); T-367-45, 52-53.

iv.  DJS proposed using an EPB sitting just a few feet off the hull and occupying no more than 5 acres. Dkt. 26-1, ¶13(a)(xiii), (xiv); T. 53.

v.  If the SSD is used, by removing the deck of the ship that is now perpendicular to the water, cars can be removed deck by deck after surgically removing sideshell/bulkheads and decks themselves. This method uses the hull as primary containment barrier, keeping the cars on the vessel until they are safely removed. This system would be used until all cars are removed. That would leave the remainder of the hull at water level to remove, minimizing the debris field to clean.   Dkt. 26-1, ¶13(b)(ii).

vi.  Using the SSD would prevent severing the fuel lines thought to be holding upwards of 44,000 gallons of the ship's fuel, because with the method described above, these structures can be accessed from a deck, without exposing the environment to that trapped fuel. Dkt. 26-1, ¶13(a)(x).

vii.  Because the SSD method would remove the cars and all else above the water line before cutting into the hull below the water line, the possible release of debris or cars into the ocean substantially minimized. *Id.* at ¶13(b)(iii).

viii.  In its salvage plan, DJS suggested it would do some of the removal above the water line while the EPB required was being constructed. *Id.* at ¶13(b)(iv).

ix.  When the SSD method is used, the sections cut from the ship are considerably smaller than those cut using the LSD method.  The SSD sections are of a size well-suited for the material barges available and can be transported more securely and are thereby more stable. *Id.* at ¶13(a)(viii); 13(b)(v).

x.  A failure using the SSD would just lengthen the time to complete the salvage by requiring smaller pieces and sections be removed at a time. *Id.* at ¶13(b)(v).

xi.  Car carriers are unique vessels. Only SMIT, a partner in DJS, has attempted wreck removals of these difficult car carrier projects. T. 126-127; Dkt. 26-1, ¶ 14(d). On the occasions when the LSD removal has been attempted on vessels similar to this one, the LSD has failed. *Id.* The only

56

car carrier salvage that successfully removed cars without spilling them into the ocean was performed by SMIT using DJS's proposed SSD methodology. *Id.* A repeat of the structural failures of the types experienced by the BALTIC ACE or the TRICOLOR would be catastrophic in the St. Simons Sound. *Id.*

xii. The interior of a car carrier is virtually wide-open, essentially a car garage, with decks.  Because the vessel is in its side, if a car drops from its lashings, it falls to the portside bottom.  T. 22-24.

xiii. The environmental impact during both TRICOLOR and BALTIC ACE wreck removals was significant due to the failure of the large mid-sections that are weakened once the hull structure is compromised.  Once cut there was a large area where cars where falling from the cut sections once lifted.  This is due to the fact that the sideshell breaks away remaining on the sea floor, which leaves the car decks literally open, so cars easily fall out of the collapsed or partly intact sections.   The same risk is present at the GOLDEN RAY wreck removal.

**b.  T&T PLAN**

i. The approved T&T salvage plan (LSD) calls for cutting the GOLDEN RAY into eight, ultra large sections and the potential and known difficulties encountered in this plan are discussed in DJS's salvage plan. Dkt. 1-2; Hearing Exh.18.

ii. To perform the LSD, the hull is sliced by cutting through the hull and the interior, as if cutting a loaf of bread, starting at both ends and progressing

57

toward the center.   As the cut-away ends are lifted away to a waiting barge, they and the ship's contents will spread (including cars) into the ocean, some of which may end up on the seabed.  Dkt. 26-1, ¶ 13(a).

iii.   Moreover, as the ends of the vessel are removed, the remaining hull loses strength and stability and collapses in on itself, creating a more complex and larger debris field on the seabed.  T.37-38  All of the interior contents are exposed to the elements from both open ends, including the constant 5 knot twice daily tides and the strong currents running through the St. Simons Sound. T. 36, 41.

iv.   Another concern with LSD is that there is presently a crushed fuel pipe tunnel and the fuel piping which is thought to contain some/all of the missing 44,000 gallons of fuel. These will be severed if the LSD is used, uncontrollably releasing this fuel into the water. Dkt. 26-1, para. 13a(x).

v.   In order to properly utilize the LSD, the Versabar VB 10000 must be used. T-41.  It need not be used the SSD is the chosen method. *Id.*

vi.   When there is a hull collapse, a rigging failure or if a significant number of cars were to fall from the vessel while the VB 10000 is over it, the VB 10000 could, itself, be seriously damaged, creating a shipwreck within a ship wreck. Dkt. 26-1, para. 13a(x).

vii.   If, as anticipated, the hull collapses after the bow and aft ends are removed, a large number of cars and debris will enter the St. Simons Sound and it is unlikely that the EPB that is being erected can contain the debris and the dropped cars, given the high velocity swirling currents. In

58

that event, there is a significant likelihood that the cars and debris will migrate into the navigation channel, and elsewhere, while simultaneously spreading fuel and other pollutants now trapped in the cars into the St. Simons Sound, the beaches and estuary. *Id.* at ¶13a(xi).

viii. A representative of T&T stated publicly in Glynn County recently that T&T expects to lose 100 cars overboard with each cut (and its Plan envisions seven cuts). *Id.* at ¶14(b).

ix. The sizeable impact of such an occurrence on the St. Simons Sound, the estuary and the beach  would include more than merely the spread of debris and cars because each vehicle contains about 5 gallons of fuel, lubricating oils, steering and transmission fluids, antifreeze, refrigerants, and synthetic, several of which are water soluble. According, any vehicle allowed to enter the St. Simons Sound can release multiple waste streams that neither the net nor the boom can contain. *Id.*  at ¶13(a)(xii).

x. The size of T & T's approved EPB – 31 acres – being erected now - is a risk to navigation in the channel. This enormous size of this EPB is necessary because the LSD was selected, which in turn required the use of VB 10000. *Id.*  at ¶ 13a(xiv), T. 41. Even at this size, if cars and debris fall into the ocean, it is unlikely that the EPB will be able to contain them all. *Id.* at ¶ 13.

xi. After the LSD cutting process starts, the vessel is completely open to the elements and the twice-daily 5 knot average tidal action.  Indeed, the day-to-day risk during salvage using the LSD method is greater than that from

59

a potential hurricane. *Id.* at ¶ 13(a)(vi), 13(a)(ix).  The certainty that the remaining hull will collapse after the ends are removed is a greater risk than that of a potential hurricane. *Id.* In contrast, if the SSD method is used, three sides of the hull remain intact at all times until all the contents are removed. *Id.* Another significant concern relating to the use of LSD concerns the actual movement of the severed large sections of the ship to the material barges, and then their safety and security during transport to their final location in Louisiana.  Given the huge size and weight of the sections moved in this fashion, there is the risk that the section itself will be lost at sea or further break apart in transit, affecting an even greater area of the environment. *Id.* The sizes to the sections that will be removed in this manner are actually larger than the barges they will be loaded on, creating separate risk that more debris, cars and pollutants will be accidentally dropped into the ocean while in transit. This methodology is also dangerous for the people involved. *Id.*; T. 45-46.

xii.   There is also the danger under the LSD that the EPB and/or the removal flotilla will have impacts in the channel.  In fact, the greatest risk is after the large sections are loaded on the material barges and are maneuvering out of the EPB. The relative height and weight of the removed sections in contrast to the barge sizes exacerbate the risk.  *Id.* at ¶13(a)(ix); T. 45-46.

xiii.   The  impact  to  the  St.  Simons  Sound,  its  estuary  and  near  shore environments is greater than just debris and chunks of steel. Each vehicle has at least one battery, contains about 5-gallons of gasoline, lubricating

oils, steering/transmission fluids, antifreeze, refrigerants, and a host of synthetics, and some are water soluble. Any vehicle entering the St. Simons Sound has the potential of releasing multiple waste streams that would not be contained by either a net or a boom.  Dkt. 26-1, ¶ 13(a)(xii).

xiv.  T&T has no experience with wreck removal at this scale.  *Id.* at para. 13.iii.  SMIT, a DJS partner, is the only organization that has performed LSD of a car carrier. T. 126:2-3. No LSD of a similarly sized ship, much less a car carrier, has been successful because the ship collapses on itself after end slices are made through the hull.  T.115-116; Dkt. 26-1, ¶18(b). The collapse drops the remainder of the ship and its contents to the seabed, which further complicates salvage time, and requires adjusting to an SSD method.  *Id.* at ¶18(d). When SMIT salvaged the TRICOLOR, and the LSD was attempted (the same methodology T&T is using), this collapse is exactly what occurred.  The resulting debris field on the seabed was larger than the ship and a an SSD was used. *Id*.; T. 115-116.

xv.  No LSD salvage operations of large vessels like the GOLDEN RAY have prevented the collapse of the hull after the ends of the vessel are removed. T.36; 37:9-25.  It was with this experience that DJS recommended that the SSD be used in with the GOLDREN RAY and advised against the LSD method in its Plan and discussions. T. 38:1-5.

xvi.  T&T is currently two months behind the schedule outlined in T&T's plan. T.124:12-56.

xvii. The cost associated with the T&T plan is nearly double the cost of the DJS plan. Dkt. 26-1, ¶14(a).

xviii. T&T has never accomplished a wreck removal of this size or complexity, and certainly has no history with car carriers like the GOLDEN RAY. Dkt. 20, p.66.

c. Large Section Demolition Not "more expeditious or effective response to the spill or mitigation of its environmental effects" than a Small Section Demolition:

i. The plan put forth by T&T Salvage does *not* provide for a more expeditious or effective response to the spill or mitigation of its environmental effects.  Dkt. 20, p.1.  In fact, the T&T plan increases the risk of environmental damages,  moves the completion date forward by only one month under a very questionable schedule, and costs significantly more than DJS's plan.  Dkt. 26-1, ¶ 14.a.

ii. The T&T recommended approach, LSD, compared to the DJS's preferred methodology (SSD), is determinedly not more expeditious or effective for the following reasons:

1. The T&T LSD has failed to remove all the large sections on two previous occasions, when tried on similar casualties. Dkt. 20, p.2. The T&T plan calls for cutting the Golden Ray into eight, ultra large sections.  Dkt. 26-1, ¶13(a.1).  The discussion of why ultra large sections will not work was addressed in DJS's salvage plan. *Id.*, ¶8(i).   The only car carrier (of three similar casualties) successfully removed without spilling cargo used DJS's proposed

methodology (i.e., SDS).  *Id.*, ¶ 18.  No explanation has been given as to why large section cuts would possibly work this time, in the middle of the St. Simons Sound.  Dkt. 20, p.2.  DJS fully expects the wreck and her sections to break up and spill cargo should this method be utilized.   Dkt. 26-1, ¶ 14(b).

2.  Further, the T&T plan made sweeping inaccurate generalizations on the wreck condition and they are, essentially, planning for failure.  In fact, technical deficiencies of T&T's plan were noted in an email exchange between FOSC and SERT.  *Id.* at ¶13.a.ii.

3.  A repeat of the structural failures of the types that were experienced by the Baltic Ace or the Tricolor would be catastrophic in the St. Simons Sound, especially when it is a known likely outcome.    *Id.*, at ¶ 18.c.

4.  It is unclear whether T&T's timeline contemplates the additional time it will take to recover the roughly 700 cars that will end up in the St. Simons Sound, as a result of the LSD proposed by T&T. *Id.* ¶ 14(a).

5.  The DJS recommended plan proposed removing the cars prior to cutting the hull structure so release of debris and cargo into the Sound substantially minimized.  The risk of large -scale collapse of the hull structure is significantly less than the large section removal due to the controlled removal of structure commensurate with reduction in hull strength. Id., ¶ 13b.

63

iii. Hurricane Season:

1. There is no dispute that the hurricane season is one factor but by no means the only factor.   Dkt. 20, p.49.   Seemingly the risk to the environment posed by a potential collapse of the vessel into the St. Simons Sound is an equal or greater risk.   Dkt. 26-1, ¶ 13.a.vi. The hurricane season risk is also mitigated by a small section removal by keeping the hull intact (acting as a primary containment barrier). *Id.* When DJS offered that it could compress the timeline by cutting above water line steel that would not put cargo at risk as the barrier was built, we were criticized for minimizing concern for the environment, which was the complete opposite of the intent of the suggestion.  *Id.*, ¶ 13(b)(vi).

iv. But given the time it has taken to get the T&T plan and contract in place, it is unlikely T&T's would be able to complete their plan prior to the hurricane season either.   Moreover, the risk to the environment by having a ship that has been opened up to the elements experience during a hurricane is far greater that the risk of a hurricane passing over the ship with the hull still intact and cars much more safely protected inside that hull.  Id., ¶ 15

v. Greatest Risk to the Environment:

1. LSD has a greater risk to the environment.  *Id.*, ¶ 13(a)vii).   The significant additional risk is collapse or loss of an unstable section after lifting onto a material barge after commencement of transit

64

potentially spilling cars and / or wreck sections outside the environmental barrier into presently unaffected areas.   The small section demolition does not have the risk of transporting unstable sections that may collapse or lost overboard.  *Id.*, ¶13(a)(viii).

2.   During the TRICOLOR salvage some sections required the heavy lift sheerlegs to remain connected holding the wreck section during transit to the scrapping location.    During the TRICOLOR and BALTIC ACE cases only the fore and aft sections could be lifted. *Id.* ¶18(d).

3.   The remaining sections--similar to those proposed in GOLDEN RAY LSD--structurally collapsed and had to be recovered by grabbing and wrecking.   The resultant wrecking is messy, more difficult, and more time consuming than the proposed SSD.   The only times LSD in a car carrier was attempted was by SMIT, and both times resulted in the majority of the mid-sections of the Wreck collapsing. *Id.*, ¶18(f).

vi.   Greatest Risk to Navigation:    The large section removal presents the greatest danger to the navigation channel for two reasons.    *Id.*, ¶ 13(a). The first is the high risk for debris, vehicles and/or hull structure falling into the channel.  While the nets are supposed to catch that debris, with 5 kts of current that net is not infallible.  *Id.*   Secondly, with such a large barrier and removal flotilla there will be equipment impacts on the channel. *Id.*   The largest risk to the navigation channel exists after a

complete large section is lifted and landed onto a material barge. *Id.* The sections can be unstable and subject to collapse after maneuvering out of the environmental barrier. *Id.* The relative height and width of the sections compared to the barge sizes available further exasperate the risk. *Id.* In the case of the TRICOLOR and BALTIC ACE, "Giant Barges" not available in the USA were utilized. Even with the Giant Barges the sheerlegs heavy lift asset(s) were required after some lifts to secure the sections during transit.

vii. Risk Assessment:

1. In developing its salvage plan, DJS used SMIT's internal risk analysis software that uses common algorithms to assess risks associated with a variety of tasks in a given methodology. That analysis in part was what convinced DJS not to recommend the Large Section Removal. A third-party company CL Risk was engaged to develop Risk Registries on plans submitted through the ITT. Although the algorithms used in the risk assessment are similar to what SMIT used in their internal risk process, the results were wildly different (nearly 3-month risk penalty in schedule alone). When these differences were questioned, DJS was not allowed to ask for reconsideration or provided explanation. *Id.*, ¶. 14.e.

66

2.  An after the fact analysis of the results found additional discrepancies as outlined in the Golden Ray Comments to Risk Analysis of CL Risk.  Dkt. 26-2, pp. 2-8.

3.  DJS informed the P&I Club at several instances that the P&I Club was using the wrong planning and wrong risk register for the risk delay calculation. Please note that DJSs software did not use the uncertainties as introduced by P&I Club's CL Risk software, only the risks were applied.  DJS did not see the need for adding uncertainties as this safety factor was already applied directly to the tons/hr production,  meaning, the duration of the removal tasks is already conservative, including the uncertainties. It should also be noted that the planning as originally introduced by CL Risk prior to 5/Nov/19 suggested using this conservative production of 7.5mt per hour, while DJS foresaw a production of 15mt/hr based on prior experience and which was shown to the Defendants.  Dkt. 26-1, ¶14.m.

viii.  Chances of Success

1.  DJS's plan has a very high chance of success as planned and there is 100% certainly that DJS will complete the operation, having successfully used this methodology multiple times over the last 40 years.  The plan is to remove in sections that will not compromise hull integrity, maximizing chances of success.  *Id.*, ¶ 14(p).

67

2. For the LSD, if the Hull holds together long enough there is moderate chance of lifting the bow and stern sections intact. But once these rigid pieces are removed, DJS estimates a low chance of getting anything else in large pieces. There is an extremely low chance that all of the sections can be lifted intact and if so the risk of collapse or loss from the transport barge outside of the environmental barrier is high. *Id.*, ¶14.q.

3. SSD method on large vessels has a high probability of success completion. There is much more control on possible environmental issues. While all salvage methodologies impart risk, the key to selecting the best option is a robust risk analysis of all methods. The reasons an SSD is preferred is that the risks imparted should a cut fail or a piece dropped is much less than that risk imparted on a large section failure or drop. Most importantly is the relative environmental risk. The SSD removal might risk as many as a few cars at a time as compared to a large section removal failure risk of hundreds of cars. It is clearly a different magnitude of risk. SSD that have failed are generally due to environmental conditions not allowing for crane work. Saint Simon Sound is well protected and crane work has been successfully ongoing. Inability to use cranes on location would be the reason for an SSD from not working. That is not a significant risk at this location. *Id*.

68

ix.   If LSD fails, what is the worst-case scenario.

1.   A significant quantity of ship's fuel is thought to be entrapped within the crushed Pipe Tunnel (Pipe Duct) and Fuel Piping on the portside of the GOLDEN RAY.  The Large Section cutting will open the Pipe Tunnel and Piping to the St. Simons Sound.  *Id*., ¶. 13(a)(x).

2.   If there is a rigging failure, hull section collapse, or release of a significant number of vehicles, through either the known damage to the hull or at a cut line, while the VB 10000 is in position over the GOLDEN RAY; any such failure could result in the VB 10000 being severely damaged.    Basically, resulting in a ship wreck within a ship wreck.  *Id.*, ¶ 8.

3.   Even if the VB 10000 is not directly affected, a GOLDEN RAY hull collapse will spill large quantities of vehicles and debris into the St. Simons Sound.  Even with the net barrier, with the high velocity swirling currents, there is significant chance the debris will migrate into the channel and spread the waste pollution streams about the St. Simons Sound and Estuary.  *Id,* ¶13(a)(x)(i).

4.   The impact to the St. Simons Sound, estuary and near shore environments is not just debris and chunks of steel.  Each vehicle has at least one battery, about 5-gallons of gasoline, lubricating oils, steering/transmission fluids, antifreeze, refrigerants, and a host of synthetics; several of these fluids/items are water soluble.

Many vehicles have already been damaged by the energy of the vessel capsizing as well as the fires that occurred onboard.  Any vehicle allowed to enter the St. Simons Sound has the potent to release multiple waste streams that would not be contained by either a net or a boom.  These streams would enter one of the most productive environments on the East Coast.  *Id.*

5.  The number of vehicles unaccounted for will not be ascertained until the completion of section disposal months after a section is harvested.

x.  If SSD fails, what is the worst-case scenario:

1.  A failure would essentially be limited to an increased time to complete the removal and sections may need to be lifted in smaller than planned sections.   Securing and movement of the wreck from site will be much safer than that of the large section removal.  Dkt. 26-1, ¶13(b).

2.  While all salvage methodologies impart risk, the key to selecting the best option is a robust risk analysis of all methods.  The reasons a small section methodology is preferred is that the risks imparted should a cut fail or a piece dropped is much less than that risk imparted on a large section failure or drop.  Most importantly is the relative environmental risk.  The small section removal might risk as many as a few cars at a time as compared to a large section removal failure risk of hundreds of cars.  It is clearly a different

magnitude of risk.  Small section demolitions that have failed are generally due to environmental conditions not allowing for crane work.  Saint Simon Sound is well protected and crane work has been successfully ongoing.   Inability to use cranes on location would be the reason for a small section demolition from not working.   That is not a significant risk at this location.  *Id.*, ¶ 13(b)(i).

3.  Major hurricanes and storm risks still exist.  Under any approved salvage plan, the salvor would have to give that consideration.

xi.  Environmental Protection Barrier

1.  In late October, at the demand of Owner, its consultants, and Insurer, DJS was told to start design on a sheet pile cofferdam, which is essentially an enclosed environment so that if there is a small discharge of pollutants, they are contained within the cofferdam and able to be cleaned up.  DJS argued such a structure was not practicable but nevertheless proceeded on preparing a design.  In December, it proposed an alternative design that could be built using widely spaced piles, floating boom, and vertical nets in the water column.  It would have encircled the wreck tightly, approximately 5 acres.  Dkt. 26-1, ¶13(a)(xiii).

2.  Because of the size of the large section removal equipment, the alternative barrier concept was taken and expanded to over 31 acres.  It is made up of floating "pollution" boom with a "mesh"

underwater skirt extending to the ocean bottom.  The problem with the T&T design is that under the Sound conditions with up to 5 kts of current, if large debris, cars and pieces of the hull and structure, fall into the water, the net is unlikely to stop that debris being moved by those currents.  *Id.*

## 12. T&T SELECTED AS ADDITIONAL RESOURCE PROVIDER

a. DJS was not consulted and is not aware of the persons or entities who were consulted prior to the decision to select T&T.  Id., para. 7.a.  But the record shows that at least the Owner, the Owner's QI, the P&I Club and GSC each were involved in the process of review of methodology and in pursuing the ITT, which resulted in the selection of T&T.  The FOSC personally met with representatives of T&T on or about December 19, 2019.  *Id.*, ¶ 7c.

b. The Invitation to Tender, prepared and submitted by GSC shows that Owner and P&I Club successfully managed to delay a salvage plan in order to secure a competitive bidding scenario.  See Dkt. 20-1, pp. 26-41.  Further, the ITT shows terms economically different from the terms set forth in the NTVRP.  Under the terms of the contract between DJS and Owner, Owner was required to compensate DJS "for its services in accordance with the terms of applicable contract form for the category of the response."  Dkt. 22-5, p.3.  The contract expressly provides that if there is any dispute regarding which category and compensate rate would apply, such a dispute would be "handled in accordance with Article 7 below, but in no case will a response be delayed or altered pending such agreement."  Dkt. 22-5, p.3.  The NTVRP Contract then directs DJS to

"undertake() and use its best endeavors promptly to commence and execute the salvage, firefighting, and/or lightering services and have the category decided, during or after completion of the services in the manner appearing hereafter. *Id.*, p.4.   The parties' contract further directs them to "attempt to settle amicably", "mediate" and if mediation fails then proceed to arbitration. *Id.*

c.   The Owner's letter requesting deviation from the NTVRP shows that Owner used the so-called "philosophical differences" in methodology to attempt to justify a deviation from the NTVRP.  Hearing Exh. 12 (Dkt. 20-1, at 43 – 47).  The Owner then provides the FOSC with its own comparison of methodologies and suggests, in conclusion, that the "T&T methodology provides for a more expeditious and effective response and mitigates the environmental risks." Dkt. 20-1 at 46.

d.   The letter from David L. Reisman, attorney for Owner, to Paul Hankins, representative of DJS, in which he states that Owner "made the decision to utilize a contractor they believe gives them the best opportunity to successfully and expediently remove the wreck."  Dkt. 21-2,4 (Letter from Reisman to Hankins, dated December 24, 2019); T.139:19-25.  Mr. Reisman goes on to assert that the "Contract does not give DJS the right to determine the means or methodology to respond to a particular casualty.  Nor would it make sense for DJS to have such a right, because it's the Owners, not DJS, who may be responsible in the first instance to the United States government and third parties harmed by the casualty and response." Dkt. 21:2, at 4-5.

e.   Defendants' responsive pleadings to DJS's Injunction infers the USCG never engaged in a discussion of plan methodology with the USCG approved SMFF

provider named in the NTVRP. The FOSC seemingly expected the Owner/Responsible Party to select a plan and the FOSC perhaps saw his role merely to approve or reject that plan. The USCG's court filings repeatedly claim that the Owner/Responsible Party wanted a large section removal procedure, yet that USCG never explains why the two plans weren't compared given there was disagreement on methodologies. Further, DJS always maintained it was capable of doing either plan once those alternatives were fully vetted by the Unified Command (UC) Those actions indicate the UC and FOSC deferred the decision to others. Dkt. 26-1, ¶ 8(n).

f.  As cited in the Defendants' responses, the USCG repeatedly took the position that it was the RP's responsibility to select the plan and that the USCG was not going to interfere in that selection process. Dkt. 1-3, p.2; T. 137:16-20. They apparently did not care that the DJS (then current SMFF) was capable of completing any of the methodologies (see preamble to DJS proposal submitted December 8, 2019) nor that there was a significant disagreement between DJS and Owner on the inherent risks of the large section removal. *Id.*

g.  In reference to the Insurer, the record shows that the P&I Club was critical of the SSD approach, DJS's preferred methodology, and the Owner communicated that information to FOSC in its letter of November 25, 2019. Dkt. 20-1, pp. 14-18 (at page 8, reference to P&I Club); Dkt. 26-1, ¶8(f).

h.  In reference to GSC, the ITT was generated by and bears the watermark of GSC. Dkt. 20-1, pp. 27 – 41.

i. Just one day prior to approving RPs deviation request, the USCG Salvage Emergency Response Team (SERT) specifically charged with reviewing technical details of salvage plans, offered the following criticisms of the T&T plan: " limited technical detail is provided, the plan indicates further analysis will be conducted prior to operations…(2) The structural analysis does not include an analysis of the structure in the current condition, nor does it include an analysis of remaining sections throughout cutting and removal; this should be addressed in future revisions of the wreck removal plan."  According to USGC's own internal analysis, the T&T plan  provided "limited technical detail," the USCG decided a deviation to be granted.  (See SERT emails setting forth conclusions upon review of DJS's plan and T&T's plan).  Dkt. 20-1, pp. 57-58.

13. **DELAY IN FILING LAWSUIT**

a. DJS learned of the Decision Letter on December 22, 2019.  T.61:21-25.

b. DJS did not receive a copy of the FOSC decision letter or Decision Memo until this litigation (February 21, 2019) and, therefore, had no basis to understand the reasoning behind the decision made by FOSC.  Dkt. 20-1; T.140:11-16.

c. DJS sent FOIC requests to USCG requesting information pertaining to FOSC decisions regarding the deviation request.  T.121:18-25; Hearing Exh. 26.  USCG received FOIA requests, dated December 26, 2019.  Without justification, USCG has failed and refused to provided documents properly requested under FOIA.  *Id.*

d. DJS reasonably anticipated receipt of records from its FOIA request and that the USCG would have provided documents responsive to the requests within the time period required under law.  T.121.18-25; 140:11-16.

e.  Frustrated that it had not received the information showing justification for the decision to allow a deviation from NTVRP, and allow another SMFF resource provider, DJS filed this action.  *See* generally, Verified Complaint, Dkt. 1.

f.  It was not until filing this lawsuit that DJS received a copy of Decision Letter and the reasons set forth therein.

g.  Even as of this date DJS does not have a complete copy of the Administrative Record.

h.  DJS has attempted to mediate with Owner, but those efforts have failed leaving only the option of Arbitration under the NTVRP Contract.

Respectfully submitted,

**TAYLOR, ODACHOWSKI, SCHMIDT & CROSSLAND, LLC**

  /s/ Joseph R. Odachowski
**Joseph R. Odachowski**
Georgia State Bar No. 549470
**Peter H. Schmidt, II**
Georgia State Bar No.  629512
300 Oak Street, Suite 200
St. Simons Island, GA 31522
(912) 634-0955 – Telephone
(912) 638-9739 – Facsimile
jodachowski@tosclaw.com

**ATTORNEYS FOR PLAINTIFF DONJON-SMIT, LLC**

**OF COUNSEL:**
**CLARK HILL PLC**

/s/ Garney Griggs
**Garney Griggs**
Texas State Bar No. 08491000
**Clifford Bowie Husted**
Texas State Bar No. 00796803

909 Fannin, Suite 2300
Houston, TX  77010
(713) 951-5600 – Telephone
(713) 951-5660 – Facsimile
ggriggs@clarkhill.com
hustedc@clarkhill.com

**ATTORNEYS FOR PLAINTIFF**
**DONJON-SMIT, LLC**

## <u>CERTIFICATE OF SERVICE</u>

This hereby certifies that on this day, I electronically filed the ***Plaintiff DonJon-SMIT, LLC'S***

***Proposed Findings of Fact*** with the Clerk of Court using the CM/ECF system, which will automatically

send email notification of such filing to the following attorneys of record:

| | |
|---|---|
| Martha C. Mann, Esq.<br>Sydney A. Menees, Esq.<br>UNITED STATES DEPARTMENT OF JUSTICE<br>Environmental & Natural Resources Division<br>Post Office Box 7611<br>Washington, DC  20044<br>Martha.mann@usdoj.gov<br>Sydney.menees@usdoj.gov | Bradford C. Patrick, Esq<br>ASSISTANT UNITED STATES ATTORNEY<br>Post Office Box 8970<br>Savannah, Georgia   31412<br>Bradford.patrick@usdoj.gov |

This   28ʰ   day of   February   2020.

**TAYLOR, ODACHOWSKI, SCHMIDT & CROSSLAND, LLC**

 /s/ Joseph R. Odachowski
**Joseph R. Odachowski**
Georgia State Bar No:        549470
**Peter H. Schmidt, II**
Georgia State Bar No. 629512

300 Oak Street, Suite 200
St. Simons Island, GA 31522
(912) 634-0955 – Telephone
(912) 638-9739 – Facsimile
jodachowski@tosclaw.com