IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| DONJON-SMIT, LLC,<br><br>                    Plaintiff,<br><br>      vs.<br><br>ADMIRAL KARL L. SCHULTZ, CAPTAIN JOHN W. REED, COMMANDER NORM C. WITT, and COMMANDER MATTHEW J. BAER, in their official capacity as Officers of the UNITED STATES COAST GUARD,<br><br><br>                    Defendants. | CIVIL ACTION NO:<br><br>2:20-CV-00011-LGW-BWC |

## DONJON-SMIT, LLC'S REVISED PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

COMES NOW the Plaintiff, **DonJon-SMIT, LLC (DJS)**, in the above captioned matter and hereby proposes the following amended/revised statements of facts and conclusions of law, as follows:

## DJS – PRIMARY RESOURCE PROVIDER OF ALL SMFF SERVICES

1.  On September 20, 2017, Owner[1] and DJS[2] entered into an NTVRP agreement titled

    *Donjon-SMIT, LLC Oil Pollution Act of 1990 Salvage, Firefighting and Lightering*

---

[1] Hyundai Glovis Co., Ltd., the parent company of G-Marine Service Co. Ltd. and G-Marine Service Co., Ltd. are the owners of GL NV24 Shipping, Inc., and the owners and "responsible party" (RP) of the GOLDEN RAY ("Owner" or "RP").  Hearing Exh. 1; (Dkt. 22-5, p. 2.)

[2] **Donjon-SMIT (DJS)**, a joint venture between SMIT Salvage Americas, Inc. and Donjon Marine Co., Inc., was formed specifically to provide SMFF services to vessel owners to satisfy OPA 90,

*Contract and Funding Agreement* (herein "NTVRP Contract").   USCGREC000696, Hearing Exh. 1, Document 22-5; T.129:12-14 (Williamson); Hearing Exh. 1;

2. At all times relevant to this litigation, from the date of the original NTVRP Contract through December 21, 2019, DJS was the sole, primary resource provider for SMFF services for the GOLDEN RAY, under the NTVRP Contract.  Dkt. 22-5; Hearing Exh.1; Dkt. 22-5, p. 4, Article 8; T.WITT:267:14-25.

3. DJS expended significant effort and investment to be prepared to fulfill its contractual obligations pursuant to the USCG approved NTVRP. The only return DJS receives on that investment is responding to these types of incidents. Dkt. 26-1, ¶ 8(ii). An SMFF resource provider must have "a very large network of agreements with both people, organizations and companies that have specific types of equipment…." T. 144:7-10 (Hankins).

4. The financial terms related to the 19 SMFF contracted services are set forth in clear and express terms in Article 6 of the NTVRP Contract. Hearing Exh. 1.

5. Commander Witt understands that NTVRP agreements have to be approved by the USCG and that they require the salvor to be qualified and have proper funding agreements in place.  T.WITT:66:1-6, 36:16-25, 37:1-8.  If a funding agreement is not in place, the NTVRP will not be approved.  T.WITT:37:15-21.

6. The whole point of the NTVRP is to make sure that the right person shows up at the right time with the right equipment, the right resources, and the funding agreement is in place.

_____

is the SMFF for over 7000 vessels, and DJS meets all the criteria required under OPA 90 and its regulations. Hearing Exh. 1; (Dkt. 22-5, p. 53.)  DJS is a "well-respected company and obviously approved to be listed as a resource provider." T.WITT:280:4-5.  Commander Witt knew that DJS was the world's largest salvage company and fully capable of performing whatever methodology was selected by UC.  T.WITT:280:1-4.

T.WITT.239:22-240:4.  Commander Witt testified that the whole point of the NTVRP "is to make sure initial response is -- quick and effective" and in this instance Commander Witt believed "it was."  T.WITT:187:10-11.

7.  Under NTVRP, DJS is "committed to be there within planning timeframes and [has] to keep equipment, personnel and resources always ready to respond" with SMFF services for the 7,000 vessels for which it is the designated and approved NTVRP SMFF service provider.  T. 15, 6-10 (Martin).

8.  "In this particular VRP, [DJS] is the sole resource provider listed for SMFF.  Every VRP is not the same.  Some VRPs list multiple resource providers."  T.WITT:177:25-178:3. This NVRTP had just one listed SMFF provider.  T.WITT:178:7-9.

9.  Commander Witt agrees that "[t]he primary resource provider will be…the point of contact for the plan holder, FOSC and ICUS and the matters related to specific resource and services as required in 33 C.F.R. 155.4030(a)."  T.WITT:267:12-21; The United States Coast Guard Incident Management Handbook, COMDTPUB P3120.17B (May 2014) (hereinafter IMH), p. 22-10 (Dkt. 28-6).  There is no provision in the IMH that directs that P&I Club or GSC are primary points of contact for FOSC.

10.  It is the expectation that "[a]ll services are planned to be performed by the Primary Resource Provider identified in the VRP within timeframes…."  Dkt. 28-6, p. 323: IMH, p. 22-10.

11.  Under the terms of the NTVRP Contract, DJS "agrees to and is capable of providing, and intends to commit to providing, the services that are listed in 33 Code of Federal Regulations (CFR) 155.4030(a) through 155.4030(h) to the Owner.  Further, these services

will be provided to the best of [DJS's] capability, in accord with planning timeframes.  Dkt. 22-5, p. 4, Article 8.

12. Under the NTVRP Contract, DJS expected to be paid under Category 2 stage terms, i.e., time and materials.  T. 28:14-15 (Martin).

13. The NTVRP Contract further provides that the parties "agree that the use of [DJS] as the Owner's named salvor and marine firefighter is required under the regulatory language of 33 CFR Part 155 within the jurisdictional limits in that Part."  Dkt.22-5, p.4, Article 10(b).

14. FOSC was notified that the Owner planned to deviate from two SMFF services (salvage plan and specialized salvage plan) by using an ITT.  Dkt. 20-1, pp. 26-41; Hearing Exh. 8.

15. The Owner, through an unauthorized deviation, brought in a non-VRP SMFF provider, GSC, to perform on-site salvage assessments, assessment of structural stability, salvage planning and specialized salvage planning, all part of the nineteen (19) services pre-contracted in the NTVRP. Admin Rec Bates 000011.  GSC, together with P&I Club, created delays in the salvage process when GSC and P&I Club interjected competitive bidding that interfered with securing final approval of the DJS salvage plan.

16. DJS remained the sole, primary SMFF resource provider until December 21, 2019.  DJS is and has always been ready, willing and able to fulfill all of the 19 SMFF services under the NTVRP Contract, and Commander Witt knew that.  (T.WITT:107:12-18)

17. DJS was prevented from performing the remaining SMFF services, because of Commander Witt's authorization to allow the Owner to deviate from the NTVRP and select another resource provider to perform the same services.

## GOLDEN RAY INCIDENT AND INITIAL RESPONSE

18. On September 8, 2019, the carrier GOLDEN RAY (IMO #9775816) experienced a casualty while departing the Port of Brunswick, Georgia via the St. Simons Sound carrying approximately 4,200 new and used automobiles for export.   The vessel grounded and capsized on the north side of the harbor entrance, just outside the navigational channel.

19. DJS was notified within hours of the incident and arrived on scene **within 2 hours** and led a successful effort to cut through the hull of the capsized vessel and rescue the crew. Dkt. 26-1, ¶ 7(a).  DJS "arranged for a local rapid situational assessor to be there within the first hours" and they "flew in with a charter plane with a team, and … brought in other folks." T. 18:8-10. (Martin).

20. DJS showed up when called, with people, equipment and expertise, and performed and was commended for it. Dkt. 26-1, ¶ 7(b); T.WITT:22:24-25, 23:1-13, 38:7-18.   Commander Witt, after the date of grounding through the end of DJS's tenure on the GOLDEN RAY, never lost confidence in DJS's ability to perform all SMFF services.  T.WITT:52:2-10.

21. The GOLDEN RAY had a crew of 23 and all were rescued, including four who were trapped when DJS led a successful rescue effort by cutting through the hull of the capsized vessel.  The USCG addressed the issue of the four crew members who were still trapped in the vessel and asked DJS to "arrange for the last four, and [DJS] worked very closely and [was] able to get the last four guys out in that next 36-hour period or so."  T. 18:12-15 (Martin).

22. On September 15, 2019, the FOSC issued Administrative Order 01-19, directed to the Owner. Admin Rec Bates 000094-95.  The order noted that there may be imminent and

substantial threat to the public health and welfare of the environment because of a substantial threat of a discharge of oil or hazardous substances from the GOLDEN RAY. The FOSC determined that there "may be a substantial threat to the public health and welfare or the environment because of a substantial threat of a discharge of oil or hazardous substances" and invoked the authority under federal law for the USCG to take full control of the response effort, a control that cannot be abated until the threat is abated. *Id.*

23. DJS removed approximately 300,000 gallons of bunker fuel from the 24 fuel tanks and removed all accessible fuel oil (complicated by the vessel lying at an angle) from the wreck, stabilized the wreck so the situation would not worsen (rock replacement), developed a detailed plan for removal and proper disposal of the ship and its cargo, and commenced efforts to implement that plan.   Dkt. 26-1, ¶ 7(c); T. 20:12-25 (Martin).

24. DJS fulfilled its obligations as SMFF primary service provider under the NTVRP, as acknowledged by the FOSC. Hearing Exh.16 (Dkt. 20-1, p. 51.) ("worked effectively during the initial incident response and fulfilled the primary purpose of the NTVRP regulations." and "all safely accessible liquid pollutants have been removed from the vessel….".  *Id.*  Thus, in terms of the initial response and the other services provided by DJS regarding removal of fuel and securing the vessel, NTVRP fulfilled its primary purpose under 33 CFR 155.5015.  *Id.*, *See also* T.WITT:23:20-25, 24:1-5.

25. Commander Witt did not wait and ask the Owner to approve methodologies for removal of fuel and avoiding spillage.   T.WITT:181:2-7.   He did not wait on the Owner for permission to put out fires on the vessel or wait for the owner to provide a preference for how that should be completed.   T.WITT:181:8-15.

26. At all times relevant,  from the date DJS arrived on scene to perform SMFF services under the NTVRP through today's date, (i) the GOLDEN RAY is in the same location (i.e., "very close proximity to a navigable channel which serves as the only access route to the Port of Brunswick, the second busiest RORO port in the U.S. by tonnage"  (Dkt. 20-1, p. 52), (ii) the same ecological concerns exist (it is "grounded in an environmentally sensitive area which includes prime shrimping grounds and Bird Island" (*Id.*)), (iii) and the vessel is in the same proximity to two tourist islands ("in close proximity to Saint Simons and Jekyll Islands, which are major tourist destinations" (*Id.*)).

27. DJS never received any communications of any sort, *i.e.*, telephone call, text message, email or otherwise raising a concern or criticism asserting that it failed to perform, was deficient in its performance or found unable to perform SMFF services called for under the NTVRP Contract (other than a complaint related to scouring, which was properly addressed). Dkt. 26-1, ¶ 7(f); T. 123:18-25; 124:3-8 (Williamson).  DJS provided all resources that they were expected to provide.  T. 124:1 (Williamson); T.WITT:23:2-19.

28. The vessel was considered a total constructive loss as of October 12, 2019.
T.WITT:201:7-10.

29. Commander Witt's first interaction with P&I Club was within weeks of the grounding. T.WITT:24:6-13.  This is his first experience as FOSC interacting with a P&I Club. T.WITT:33:2-6.  He testified that he was not concerned that P&I Club was contacting him directly.  T.WITT:51:9-14.

**GENERAL OVERVIEW OF PROBLEMS**

30. DJS suffered injury as the result of Commander Witt's decision to allow Owner to deviate from the NTVRP, allowing the Owner to select another salvage resource provider.

31. With the stroke of his pen, Commander Witt issued a deviation order, effectively undercutting the very reasons for the existence of OPA 90 and the Chafee Amendment. Commander Witt's wholesale disregard for OPA 90 and the Chafee Amendment can be summed up in his own words: "I believe a central reasoning behind the VRP regulations and requirements is so that initial response … will not be delayed. And that's … the *primary reason* why resource providers, both for salvage, firefighting, but also oil response organizations, a qualified individual, why they're to be predesignated. That all happened. And I think the initial response to the GOLDEN RAY, again, a lot of – a lot of very successful work was completed. I think is as … the response moves on and it becomes … a wreck removal and the removal is actually central to mitigating the pollution threat, *I think it's entirely reasonable for the owner to explore other options*, especially if the plans that the … listed resource provider are not in line with what the owner is asking for." T.WITT:289:4-21 (emphasis added). Central to this litigation is Commander Witt's willingness to cede to the preference and desires of the Owner.

32. Commander Witt noted that the Owner "felt like they needed to request another … alternative resource provider … [and that] the regulations have a … provision for that and the owner followed that." T.WITT:290:3-7.

33. Even though the vessel, GOLDEN RAY, which still sits in the same place it did when it first grounded, and is still a pollution risk, Commander Witt thinks it is reasonable for an owner, while pollution risks exist, to consider switching to a salvage provider other than

the primary salvage provider listed in the NTVRP, in disregard of OPA 90 and the

Chafee Amendment.  T.WITT:305:16-23.

34. Exceptional circumstances did not exist to warrant a deviation from NTVRP.  Rather,

what is exceptional about this case is that Commander Witt allowed the Owner and its

P&I Club to circumvent the mandates of the NTVRP and interject competitive bidding

and related delays into the salvage and removal process. Hearing Exh. 8; Dkt. 26-1, ¶ 8.

35. The Owner and P&I Club forced DJS into a letter of intent (LOI) for a twenty-one day

"Negotiation Period," even though DJS was the sole and primary salvage provider under

the NTVRP Contract.   P&I Club failed to use  best endeavors to agree to Contract

Principles. Dkt. 26-1, ¶ 8(a-c).  This contributed to a delay of at least twenty-one days,

from October 16, 2019 through November 6, 2019.

36. The Owner and P&I Club issued an Invitation to Tender (ITT), opening up a competitive

bidding process which allowed other salvage companies to submit proposals and bids for

the very SMFF services for which DJS was contracted.   Hearing Exh. 8.   The ITT

contributed to a delay from November 6, 2019 until at least December 21, 2019, a period

of another 45 days.

37. As a result of the ITT, other salvors began interjecting their thoughts, proposals and ideas

directly to the FOSC, including emails from T&T directly to Commander Witt and Captain

Reed.  This undoubtedly delayed finalizing the approval of a final salvage plan and, as

Commander Witt testified, there could have been half a dozen different plans for the wreck

removal that could have been conceptually or technically feasible.  As long as the Owner

preferred any one of them, Commander Witt would have approved any of such plans.

T.WITT: 281:14-282:10.

9

38. In fact, the Owner and P&I never allowed DJS's plan to be finalized and Commander Witt did not intervene to require Owner to allow DJS's plan to receive thoughtful consideration through the UC planning process. The Owner and P&I Club failed and refused to give a full review and consideration to the DJS plan and then misrepresented to the UC the extent to which DJS was willing to pursue methodologies preferred by the Owner and P&I Club. Hearing Exh. 12 (Dkt. 20-1, pp. 43-47).

39. FOSC failed to provide DJS the NAVY SUPSALV's comments in a timely basis (comments having been generated on or about December 3, 2019, but not provided to DJS) to enable DJS to address items set forth in the comments, thereby preventing DJS from working towards finalizing a salvage plan. In fact, these comments are currently not in the Administrative Record, which is the subject of Plaintiff's motion to compel filed earlier today.

40. The P&I Club used its influence to strong arm DJS into negotiating financial terms for the SMFF services. Dkt. 26-1, ¶ 8; Hearing Exhibits 4, 8; T.WITT: 252:11-253:4.

41. The delay in the removal of the GOLDEN RAY is not the result of any conduct on behalf of DJS. DJS performed all SMFF services that it was allowed to perform, and Owner and P&I Club prevented DJS from performing the SMFF services that remain to be completed.

42. The Owner and the P&I Club refused to allow DJS access to the UC and refused DJS the opportunity to personally discuss its proposed salvage plan (or any alternatives). Hearing Exh. 28, Attachment 1, ¶ 4. Moreover, at no time during the process did the Coast Guard ever solicit any technical data from DJS concerning the vessel, in spite of the fact that it was the only salvor that had worked on the GOLDEN RAY for months and had acquired significant knowledge about the vessel's condition. Dkt. 26-1, p. 8, ¶ 8(ff).

10

43. DJS continued to try to provide its proposed plan and other information to the UC via email and hand delivered a copy of the plan to Andrew Lawrence, head of SERT in Washington, D.C.  Dkt. 26-1, ¶ 8(s), (ee).  DJS representatives tried to meet with UC between November 5, 2019 and December 22, 2019, but the UC refused to meet with them.  T. 62:1-8 (Martin).

44. In the middle of November, when DJS learned that the Owner had not provided a copy of DJS's proposed salvage plan to Unified Command (UC) in response to Administrative Order 2, DJS hand-delivered its proposal to the FOSC and his representatives and emailed it to the FOSC on November 26, 2019.  Hearing Exh. 28, p. 8, ¶ 6.  Within one week of DJS providing its plan to the FOSC, SERT confirmed the DJS plan is conceptually feasible.  Dkt. 20-1, pp. 60-61.  SERT comments were not seen by DJS until these court proceedings.

45. Commander Witt testified that he received a group of documents with a cover letter signed by DJS General Manager Tim Williamson (Hearing Exh. 28) from Messrs. Hankins and Martin on November 26, 2019 and that he met with them and that he reviewed the entire packet of materials.  T.WITT: 117:8-25, 118:1-12; 119:7-24;, 120:1-2, 250:25 - 253:1-11.

46. He testified that his take-away from the meeting with the DJS representatives was that DJS representatives were "focused primarily on contractual concerns."  *Id.* at 250:25 - 253:1-8; 263:9-25.   But he admitted that DJS representatives told him they were feeling pressure from the P&I Club to change the financial terms from those agreed-to under the NTVRP to ones DJS objected to.  *Id.* at 252:11-22.  Moreover, since Commander Witt had, in fact, read the materials contained in Hearing Exh. 28 (Depo. Exh. 9), he fully recognized that the issues concerning DJS went far beyond contract disputes.    In fact, the reference list shows that he was advising in writing of seven, single-spaced, well-organized concerns

describing the issues DJS was facing with regard to its NTVRP, and improper interference from the P&I Club.  *Id.*

47.  As part of the collection of documents, Commander Witt received a copy of the DJS salvage plan (dated November 5, 2019), one that the Owner had not provided to him in the three intervening weeks after DJS delivered it to the Owner, per protocol.

48. Williamson's letter also discussed 1) DJS's opinion that the Owner's requirement of the change from Wreckhire 1 to Wreckhire 2 would require a deviation (a position that the FOSC later agreed with; 2) DJS's opinion that, by allowing the Owner to use an ITT, the NTVRP was being improperly circumvented, and using the ITT would cause significant delay; and 3) using the ITT violated the goals of the UC and the VRP and was a deviation from the VRP. *Id.* at 1.

49. Williamson's Attachments 1 and 2 (Hearing Exh. 28, pp. 4-10) also discussed:

   a.  the history of the NTVRP and its binding significance in this incident;

   b.  the Owner's earlier attempt in September 2019 to sidestep the NTVRP with a side agreement that DJS rejected;

   c.  the P&I Club's refusal to allow DJS to communicate with the UC/FOSC during the LOI period (contrary to DJS's activities during this incident, prior to the LOI). Usually, primary resource providers communicate freely with the UC and FOSC.

   d.  P&I Club required DJS to sign an NDA (it did, but only so it could respond to the LOI, in an attempt to preserve its NTVRP status).  DJS found the NDA concerning and violative of the principle that the UC/FOSC be kept informed of progress being made on wreck sites;

e.  DJS's recognition that a pollution threat continued and would as long as the vehicles remained on the vessel but notified the FOSC that the Owner was not allowing any further progress in this regard;

f.  the Owner and its representatives refused to meet with DJS to discuss DJS's response to the LOI, even though meetings were planned by the Owner/Club to this end (and canceled by them after everyone had arrived);

g.  DJS's November 5th salvage plan (fully supported by a Risk Register and all required back-up documentation), identifying the work and substantial investigation that went into its planning and preparation, as well DJS's thoughts about a cofferdam, the pros and cons of SSD versus LSD, and, finally, its conclusion that SSD would be the safer, and more environmentally friendly;

h.  DJS's concern that pollution mitigation had ceased on about November 10th at the Owner's direction;

i.  DJS's concern about the imminent threat of the vessel's collapse, which, in turn, would greatly exacerbate the ongoing pollution threat;

j.  DJS's Daily Progress Reports that expressed concerns about and offered options to reduce stresses on the hull that were ignored; and

k.  DJS's opinion that the Owner's use of an ITT proposal was a violation of the NTVRP.

50. There is little question that as of November 26, 2019, after the LOI time period and ITT process, Commander Witt was aware of the pressures being placed on DJS by the Owner and the P&I Club -- pressures related to their attempt to change the economic terms of the NTVRP, but he did nothing to intervene.

13

51. However, notwithstanding the above, Commander Witt did nothing about it even though DJS, the primary resource provider is advising him that something is horribly wrong with the planning process to secure a final salvage plan.  T.WITT:164:6-10, 170:15-19.

52. As of March 9, 2020, Commander Witt testified there is still no final, approved salvage and wreck removal plan for the GOLDEN RAY.  T.WITT:127:14-18, 144:20-23.  Further, Commander Witt testified that there is not even a contract in place between T&T and the Owner for the yet-to-be-finalized salvage and wreck removal plan.  T.WITT:145:2-7, 146:21-147:1.

53. Further, Commander Witt failed to follow the incident management and planning protocols of the National Incident Management Systems (NIMS), by 1) his failure to properly communicate with DJS as a stakeholder and a part of the incident management structure; and 2) his failure to properly organize and coordinate the incident response and decision-making necessary to eliminate the imminent pollution risks that have existed from the first day of the grounding of the GOLDEN RAY.  T.WITT:178:10-14, 257:21-258:2.

**COMMANDER WITT, FOSC AND UNIFIED COMMAND:**

54. Commander Witt is the Commanding Officer of Marine Safety Unit.  T.WITT: 226:12-14.  This incident is only the second time he has been an FOSC on a large case, but he has served on Coast Guard oil responses on smaller spills.  T.WITT: 228:19-24.  This is his first large wreck removal as FOSC.  T.WITT: 18:4-6, 279:8-11.   As FOSC, his primary concern was and remains the pollution response.  T.WITT: 231:20-23.  He admits that as FOSC (assuming the Court determines  that he did, in fact, have that authority to act as FOSC, although he was not properly certified in writing by a NIMS compliant agency), he

14

is ultimately responsible for managing the response.  T.WITT:249:8-10.  However, he also suggests that the Owner is responsible for the response.  T.WITT: 249:2-4.

55. The Federal On-Scene Coordinator (FOSC)

    a.  The FOSC has "principal authority for responding to oil and hazardous substance spills or releases, including substantial threats of discharges and releases" and is required to "use legislative and regulatory authorities to ensure that pollution response is carried out expeditiously and aggressively." COMDTINST M3010.24, June 2016, Appendix C-4.

    b.  The FOSC is responsible to "coordinate and direct responses to hazardous substances releases or potential releases," with the "primary objective [ ] to protect public health and safety, and the environment …." Dkt. 28-6, Chpt. 21 at 21-3. The "USCG is the lead agency for federal pollution response in the coastal zone." *Id.*

    c.  In order to qualify to serve as FOSC, however, the individual must be properly certified and qualified to perform a NIMS ICS position.  However, if "the person is not *certified* in writing by a NIMS-compliant agency, then that person does not have the proper authorization granted to them to fill that position within established IMT standards.  To align with federal NIMS ICS standards and for purposes of [COMDTINS], within the Coast Guard the term *certification* will be used to refer to all ICS PQS position qualifications, and is considered equivalent to the achievement of a Coast Guard qualification."  SEE COMDTINST M3010.24, 10-5, ¶ D.1 (Qualification versus Certification), Contingency Preparedness Planning Manual, Vol. 4, June 2016.  (Hearing Exh. 33.)

15

d.   There is no evidence in the record that Commander Witt was certified in writing by a NIMS-compliant agency; therefore, he did <u>not</u> have authorization to fill the position of FOSC within established IMT standards.  Commander Witt admitted during his deposition that he does not have a written certification by a NIMS-compliant agency.  T:WITT: 8:7-15.  Commander Witt, during his deposition, tried to suggest that he was entitled to an "interim Type IC certification" and that such certification somehow replaced the mandate to be  "certified in writing by a NIMS-compliant agency," citing to Hearing Exh. 33, Section 10-5-10-6,  ¶ 4. *Id.* However, there is nothing in the record that confirms that any suggested "interim Type IC certification" qualifies Commander Witt to serve as FOSC one of the larges wreck in U.S. history.  Simply put, Commander Witt was not properly certified and, therefore, did not have authority to grant the deviation request authorizing Owner to add another resource provider for SMFF services.

56. Unified Command:

a.   The UC consists of the following:  FOSC, State of Georgia Department of Natural Resources and Gallagher Marine Systems (QI), the Owner's designated representative.  T.WITT: 42:23-24, 43:11.

b.   A key element of the federal government response is the creation of a UC that is designed to bring together the ICs (Incident Commanders) of all major organizations that have jurisdictional authority for the incident to coordinate an effective response while carrying out their own organization's jurisdictional responsibilities, and blend together the organizations to create an "integrated response team."  Dkt. 28-6, p. 58-61.

16

c.   "The UC is responsible for overall management of an incident. The UC directs incident activities including the development and implementation of incident objectives, strategies, and approves ordering and releasing of resources." *Id.* at 59.

d.   DJS, the primary resource provider under the NTVRP, is the "the point of contact for the plan holder, FOSC and ICUS and the matters related to specific resource and services as required in 33 C.F.R. 155.4030(a)."  T.WITT:267:12-21; The United States Coast Guard Incident Management Handbook, COMDTPUB P3120.17B (May 2014) (hereinafter IMH), p. 22-10 (Dkt. 28-6).

e.   An insurer is not and should not be a part of UC or have influence over the UC.  T. 120:6-14 (Williamson), T.WITT: 43:6-15.

f.   GSC[3] is not a part of the UC.  T.WITT: 43:16-18.

g.   "[N]ormally the salvor is being requested to provide information directly to the unified command sometimes through the operations section but always into that unified command through the ICS system."  T. 76:17-21 (Martin).  It is customary that a salvor have direct contact with the UC but in this instance DJS was excluded. T. 77:12-20 (Martin).

---

[3] **Global Salvage Consultancy (GSC)** is the salvage consultant by P&I Club and Owner as a salvage consultant. T.32:183 (Martin); Dkt. 20-1 at 43. It was contracted to perform analysis of GOLDEN RAY "and determine the safest, most economically conscious and efficient wreck removal").  GSC is not an approved salvage provider for SMFF services under the GOLDEN RAY NTVRP and is not a party to the NTVRP or a member of the UC.  T.WITT:32:13-15; 167:21-168:3; T.WITT:200:20-22.

## CURRENT CONDITION OF THE GOLDEN RAY

57. The port side of the exterior structure of the GOLDEN RAY has collapsed over 7-meters, the port side shell in the vessel's midbody has separated from the upper decks, and torque buckling is visible in the exposed decks and on the starboard side shell.  The port bilge is crushed at the ends in the Engine Room and in the forward Fuel Tanks, making it reasonable to assume it is also crushed in the midbody where the ground reaction is higher.  The vessel's ends are cantilevered over scour holes, so that more than 50% of the ship is unsupported.  This increases the amount of exposure to the sea slightly, but more importantly is the increasing risk of collapse of the vessel (over months and years versus days) and the extreme risk imposed by slicing into the intact hull components that are keeping the vessel relatively intact to this point.  Dkt. 26-1, ¶ 16(a).

58. Approximately 42,000 gallons of fuel remain on board the vessel.  T.WITT:56:24-2.

59. The longer the GOLDEN RAY remains in the St. Simons Sound, the greater the environmental and navigational hazards become because of tidal action and weather conditions. Dkt. 26-1, ¶ 16(c).  The wreck has "been sitting since November with tides going up and down" and salvage could have been handled in a proactive way.  T. 96:13-16 (Martin).

60. There is an ongoing pollution threat with the GOLDEN RAY.  T.WITT:184:23-185:2; T.WITT:56:6-9.  Commander Witt's "goal is to take care of the pollution threat." T.WITT:184:13-14.

**CREDIBILITY OF WITNESSES:**

61. DJS offered the testimony of Douglas Martin, Timothy Williamson, Thijs van der Jagt and
    Paul Hankins, as well as the unchallenged affidavit of Timothy Williamson (Dkt. 26-1).
    Each of DJS's witnesses have extensive experience in the salvage industry and testified
    about the facts and circumstances that caused or contributed to the delay of the removal of
    the GOLDEN RAY, as well as explaining to the Court the various methodologies
    (including pros and cons) for such removal. Hearing Exhs. 29-32.  The Court found their
    testimony believable and notes that their testimony was not rebutted by Defendants.
    Defendants offered no testimony or additional documents into evidence during the hearing,
    but chose to rely exclusively on the Administrative Record.

**OIL POLLUTION ACT OF 1990 (OPA 90)**

62. When operating its vessel in or near United States waters, GOLDEN RAY is required to
    satisfy the provisions of OPA 90; namely, having an approved NTVRP which requires it
    to have an approved SMFF resource provider under contract, with proper funding
    agreements in place.  The NTVRP precontract requirement is the cornerstone of OPA 90.
    T. 118:24 (Williamson).  "Salvage, as it's done in the rest of the world, is contracted after
    the incident" and that usually results in delays.  T. 118:24-119:1 (Williamson).  OPA 90,
    however, uses a precontracting requirement that is designed to ensure that there are no
    delays due to negotiating financial terms during the incident response.  T. 119:7-11
    (Williamson).

63. Before non-tank vessels were required by OPA 90 to have pre-approved plans to respond
    to emergency spill situations, when a spill occurred, a vessel owner was allowed to select

its own emergency resource providers, which caused slower response times because of contract negotiations, etc., which placed federal officials in a passive role, without "control" over the clean-up.   This situation also pitted the owner's desire to reduce its cleanup costs against significant environmental considerations.   Dkt. 26-1, ¶ 18(k). 33 U.S.C. 2701, *et. seq*.   The very purpose of the precontracting requirements under NTVRP is to avoid delays for contracting negotiations, since OPA 90 requires there to be a USCG approved contractor in place.  T.119 (Williamson).

64. Under OPA 90, when a discharge occurs or may be imminent, a non-tank vessel owner or operator (RP) – in this case the Owner of GOLDEN RAY) must act in accordance with its NTVRP.   33 U.S.C. 2701 (32), 33 U.S.C. § 1321(c)(3)(B). Dkt. 26-1, ¶ 18(k).

65. "OPA 90 was designed specifically to  prevent the case where you would have a large salvage incident and you would have to put everything on hold because the salvors have to negotiate a contract with a responsible party…."  T. 147:3-8 (Hankins).

66. Under the OPA 90, a qualified NTVRP resource provider must provide nineteen (19) itemized services as SMFF provider. DJS was ready, willing and able to provide all nineteen (19) services and contracted to do so. The ability to provide the  nineteen (19) services formed the basis upon which to conclude that DJS could execute salvage operations in a variety of possible salvage situations. Dkt. 26-1, ¶ 6(d).

67. The ability to perform the services required of the SMFF under OPA 90 is not merely the ability to provide a specific service for a particular type of wreck removal or for a 'grounding' or an 'engine room fire', or even a 'salvage,' alone.  The SMFF services are designed as a system of potential services that, when taken together are meant, to achieve

all of the requirements in the event of a vessel casualty. They are also utilized to develop and execute a plan to respond to a vessel casualty. *Id.*

68. The 19-SMFF services which DJS agreed to perform for the Owner are found in Table 250.4030 of the Salvage and Marine Firefighting Services and Response Times SMFF Regulations. Of those 19 services, DJS has fully performed service numbers 1,2,7,8, 9, and 16.

69. The SMFF service items that remain necessary for this salvage operation are numbers 3,4,5,6,12-15, and 17-19.  Dkt. 26-1, p. 2, ¶ 6e; T. 120 (Williamson).

**DJS ATTEMPTS TO SECURE FINAL APPROVED SALVAGE PLAN (OCTOBER THROUGH NOVEMBER 6, 2019) – LETTER OF INTENT PERIOD:**

70. The P&I Club insisted that DJS enter into a Letter of Intent (LOI) for purposes of negotiating future SMFF work under the NTVRP Contract, despite the existence of the NTVRP and even though the P&I Club knew DJS was the sole, primary salvor under the NTVRP.  Mr. Martin testified that he was perplexed that the P&I Club would insist on a letter of intent, since DJS is the sole SMFF under the NTVRP.  T. 29:17-30:3 (Martin).  However, the P&I Club was "asking [DJS] to give them lump sum offers for the work," already attempt to renegotiate the financial terms of the NTVRP contract.  T. 30:6-7 (Martin).  Even in the face of the efforts by the P&I Club to re-negotiate the financial terms, DJS continued to perform all of the SMFF services required and Mr. Martin was working diligently to come to an agreement with Owner and P&I Club.  T.30:8-9 (Martin).

71. On October 16, 2019, DJS entered into the LOI with P&I Club.  Dkt 26-1, ¶ 8(a); Dkt. 20-1, p. 6.   The LOI provides, among other terms, that the parties will have exclusive

negotiations for the twenty-one days (defined in the LOI as "Negotiation Period") related to SMFF services to "agree in general terms… to Contracting Principles" which included "rates for personnel and standard equipment" (even though rates were already specified in the NTVRP Contract). Hearing Exh. 4, ¶ 2; Dkt. 20-1, p. 7.  Commander Witt knew about the LOI on or about October 16, 2019.  T.WITT:60:18-25,l 61:21-25; 62:1-15; Hearing Exh. 28 (an executed copy of the LOI is attached as Reference 17).

72. Commander Witt was aware that DJS entered into a letter of intent with P&I Club, not with the Owner.   T.WITT:61:1-4, 14-23;  T.WITT:202:22-203:1.   But Commander Witt mistakenly believed that the P&I Club, in entering into the LOI was "representing the owner at that point." T.WITT:203:3-4.

73. As of the date of the LOI, and every other critical time period, DJS was doing everything they were required to do as the primary resource provider of SMFF services. T.WITT:63:2-9.

74. Commander Witt was not concerned with whether the letter of intent included negotiation of financial terms, but merely thought it related to producing a plan to remove the GOLDEN RAY that was "acceptable to the Owner."   T.WITT: 29:23-25, 30:1-9. Notwithstanding, Commander Witt testified that he knew it would not be acceptable if negotiations over financial terms delayed salvage and wreck removal.  T.WITT:31:24-32:4.

75. In an OPA 90 event, there should be no period of delay to negotiate financial terms. It is common, however, to have a time period for negotiating financial terms in events outside of U.S. waters, not subject to OPA 90. T. 147:1-25 – 148:1-20 (Hankins)

76. Despite the purpose and implications of the Chafee Amendment, Commander Witt testified that he was not concerned about the commercial terms of the LOI that were in conflict with the NTVRP contract.  T.WITT:30:10-17.  Although he did admit that it would be improper for there to be a delay in salvage and wreck removal as a result of negotiating financial terms.  T.WITT:30:24-25, 31:1-4.  But later in his testimony he countered that he really did not "have an opinion on it either way", referring to whether the P&I Club or the Owner, in this instance, may have utilized the LOI or ITT period to materially change the financial components of the salvage and wreck removal.  T.WITT:105:5-15.

77. DJS believed it was being forced into the LOI for fear that the P&I Club would take steps to cause the Owner to terminate its NTVRP contract for SMFF services, understanding, however, that even in the event of termination there is a two-month notice provision under the terms of the NTVRP Contract.  Hearing Exh. 1, Article 1(a).

78. Commander Witt testified that if the Owner tried to cancel the NTVRP contract during the salvage response using the two month notice period, he "certainly would have had big concerns about that" and that he would have "considered federalization more seriously at that point."  T.WITT:62:12-15.

79. In this instance, Commander Witt is not aware of the Owner attempting to terminate the NTVRP contract by using the two-month notice provision.  T.WITT:39:24-25, 40:1-13.

80. The LOI expressly contemplated that the P&I Club and DJS would "use their best endeavors to agree to the Contracting Principles within the Negotiation Period…." Hearing Exh. 4, ¶ 3 (Dkt 20-1, p. 7.)

81. The P&I Club did not use its best endeavors to agree to the Contracting Principles as set forth in the LOI.   Dkt 20-1, p. 6.)

82. Despite the contrived LOI, DJS satisfied its obligation by using its best endeavors to reach an agreement with the P&I Club on the Contracting Principles.  DJS, however, was unwilling to agree to financial terms that were in conflict with the NTVRP Contract terms, i.e., those approved by USCG in the NTVRP.  Hearing Exh. 4, ¶ 1.

83. The P&I Club insisted on renegotiating the financial terms set forth in the NTVRP, and DJS would not agree to renegotiate the commercial elements of the NTVRP Contract, in violation of OPA 90. Dkt. 26-1, ¶ 8(b).

84. Notwithstanding the P&I Club's improper attempts to renegotiate the financial terms of the NTVRP Contract, DJS continued using its best endeavors to finalize a salvage plan. Dkt. 26-1, ¶ 8c.

85. Leading up to and during the Negotiation Period, DJS and representatives of the Owner, including GSC and the P&I Club, met to discuss the various methodologies that could be used for salvage of the GOLDEN RAY.  T. 113:3-13 (Jagt).  The meetings were designed to finalize "work method statement and the methodology" that would be used to finalize a salvage plan proposal.  T.113:3-9 (Jagt).

86. Minutes of meetings reflect that the Owner's and P&I Club (including a marine consultant for the P&I Club, Hans van Rooij, or HVR) were pleased with the methodology options being proposed by DJS.  Hearing Exh. 3, p. 2.  The P&I Club never communicated to DJS that the "Club wants an option with minimum risk, and the highest chance of success.  No experimental methods or risk to be taken in plan if this would lead to higher risk and failures in timely success."  *Id.*  As early as October 10, 2019, the meeting minutes reflect that the P&I Club representative  "[b]elieves everybody on the same page with regards to salvage methodology" and "happy SMIT ideas are similar to the club's studies and ideas"

and the P&I Club representative advised "SMIT and Club to closely cooperate to streamline decision making." *Id.*

87. The Owner and its representatives even told Commander Witt at the end of October 2019 that salvage plan discussion with DJS were going "very well." T.WITT::67:18-19.

88. DJS understood that LSD may be utilized to remove the salvage and, therefore, entered into an exclusive agreement with Versabar, a company that has one of the few types of cranes that is capable of a large or ultra large section lifting. T. 41:1-5 (Martin).

89. On October 31, 2019, Jacob Hogendorp, a representative from GSC, sent a letter to DJS representatives identifying two critical dates: confirmation of a November 6, 2019 meeting in New Jersey to allow DJS to present to "Owners, their P&I Club and their Consultants…various scenarios for the removal of the Wreck from its present location"; and a reference to a November 30, 2019 conference call and "working on providing us with your scenarios and philosophy behind these." See Hearing Exh. 5, p. 1 (herein "Hogendorp Letter")

90. The Hogendorp Letter shows that the Owner, the P&I Club and GSC were expecting "a minimum of three high level dismantling scenarios inclusive of pros and cons on feasibility or other issues you feel the need to address. The scenarios should be substantiated with the risk register and possible timelines, with the ultimate focus to find the right solution." *Id.* Even though the letter contemplated discussion and continued analysis of "three high level dismantling options", a meeting on November 6th and a conference call on November 30th, the letter also reminded DJS that the time is ticking away on the Negotiation Period, the end of which was just days away.

91. The Hogendorp Letter was copied to the Owner, GSC and the P&I Club representative. Id., T. 33:25-34:3. (Martin)

92. The minutes of meetings show DJS continued to meet with and consult with representatives of the Owner, P&I Club and GSC and as of October 31, 2019, and confirm the parties were still discussing the various methodologies and the risks associated with each. T. 115:1-4 (Jagt). During that meeting, the P&I Club's representative even raised "[d]oubts whether large cut sections are liftable without collapsing" (Hearing Exh. 3, p. 5) and the parties discussed the SSD approach as well as an SSD/LSD combination approach. (Hearing Exh. 3, p. 6). Regarding the SSD approach, the minutes reflect that "[d]uration derived from Risk Register is better than shown" and that "[l]ocalized containment, pieces to be lifted can be picked separately, larger pieces might be possible than the planning currently accounts for." Id. With respect to the "SSD/LSD combination approach", the minutes reference that the "Large SMIT grab to be mobilized". Id. at 6.

93. Even though P&I Club consultants were engaging with DJS, DJS was not able to secure a final agreed salvage plan with the P&I Club on the Contracting Principles as that term was defined in the LOI. Dkt. 20-1, p. 6; T.36:5-25 – 37:1-8 (Martin).

94. Commander Witt knew that DJS was working on a salvage plan during the month of October 2019. T.WITT:29:16-22, 66:7-12. He also knew that DJS was working with representatives of the Owner and P&I Club and considering a variety of methodologies, including large section and small section demolition. T.WITT:63:15-25, 64:1-4, 73:25, 74:1-6.

95. At no time during the month of October when DJS was preparing the salvage plan did P&I Club or its salvage consultant instruct DJS that it was "large scale demolition or nothing" and, in fact, required that the plan outline multiple methodologies.  T. 115:8-12 (Jagt).

96. The LOI prepared by the P&I Club provided that "the Club shall be under no obligation to arrange a meeting and/or joint presentation with the Authorities or continue further discussions" and also included a nondisclosure provision that applied to the parties "and their respective advisors" that prevented the parties from disclosing to others "the subject matter of, the commercial terms of and all other provisions of this [LOI]…." Hearing Exh. 4, ¶ 5.

97. Prior to submitting its plan on November 5th, DJS made clear that it considered the SSD safer, more environmentally friendly, and less risky. *Id.* However, at the same time, understanding that the Owner and UC may select a LSD or hybrid LSD/SSD, it entered into an exclusive agreement with Versabar, Inc., to use its VERSA 10,000 (the only U.S. based crane capable of performing the "lifts" of the gigantic ship parts weighing upwards of 6000 tons each). This crane would be necessary if the LSD had been approved by the UC and DJS had an exclusive contract to use that very crane.  T.41:1-5 (Martin).

98. Commander Witt received a letter from the P&I Club wherein it wrongly states that DJS asked for a nondisclosure in order to protect commercial sensitive information. T.WITT:111:16-25.  If he learned of misrepresentations in the November 20, 2019 letter from the Owner, that would concern him.  T.WITT:112:13-23.  Despite knowing that commercial terms were already spelled out in the NTVRP, Commander Witt did not research what was meant by "commercially sensitive information" P.  T.WITT:113:4-12.

27

99. At all times during the LOI negotiation period, DJS willingly discussed all salvage plan options with the Owner and P&I Club. While there were discussions concerning various methodologies, at no time did DJS refuse to perform the LSD, although DJS advised the P&I Club that the LSD had more disadvantages than advantages. T. 124-125 (Williamson); Dkt 26-1,¶ 8(a)-(f).

100.    The Owner and P&I Club did not make it clear until after the ITT that Owner and P&I Club insisted on the LSD approach, and would not consider the SSD approach. Hearing Exh. 3, Meeting Minutes dated October 18, 2019 and October 31, 2019.  Exh. 2, Section 2 of the Verified Complaint.

101.    Commander Witt was advised multiple times by Owner's representatives (P&I Club and GSC), including a week before November 5th, that plan development with DJS was going very well and things were positive.  T.WITT:66:21-25, 67:1-22, 68:22-25, 69:1-15.

102.    On or about November 5, 2019, within the timeframe specified by the Owner and P&I Club, DJS provided to the Owner and P&I Club a detailed salvage plan containing wreck removal options with estimated timelines for each.  Hearing Exh 6; Dkt. 26-1, ¶ 8(d). The DJS plan presented to the Owner included timelines, detailed technical explanations, costing analyses, and other recommendations.  It included a structural analysis report, demonstrating the weakening hull. The plan recommended that salvage begin immediately by removing selected portions of the wreck above the water line and removing weight from the ends of the vessel to relieve stress on the center of the hull. *Id.* at 7, ¶ 4.  While the SSD was the preferred method in the DJS plan, the LSD option was included in the plan.

103.    Commander Witt knew that DJS submitted its proposed plan to Owner and P&I Club in a timely manner.  T.WITT:74:15-17.

104.    Commander Witt expected DJS, as the sole and primary salvage resource provider, to make a recommendation for the best methodology to use for the salvage and wreck removal of the GOLDEN RAY.  T.WITT:71:5-14.

105.    The DJS plan emphasizes the priorities of protecting the environment, safety of personnel, certainty of success, efficiency, provided a start date, timeline and the cost. Hearing Exh. 6, Dkt 1-2, p. 8.

106.    Despite knowing that DJS had submitted a proposed salvage plan to Owner, Commander Witt did not ask for a copy of the plan.  T.WITT:94-18-25.  He didn't feel like he needed to see a copy of the plan until the Owner decided on its preferred plan. T.WITT:95:19-22.

107.    The DJS plan was consistent with what was discussed with representatives of the P&I Club and GSC during the meetings in October and consistent with the objective expressed early on:  A plan "with minimum risk, and the highest chance of success.  No experimental methods or risk to be taken in plan if this would lead to higher risk and failures in timely success."  Hearing Exh. 3, p. 2.

108.    DJS used its best endeavors and provided to the Owner a salvage plan that identified three methodologies for removal of the vessel:  parbuckling and re-floating, large section demolition (LSD) and small section demolition (SSD). Hearing Exh. 6, p. 8. The parbuckling and re-floating was "deemed not feasible" due to the "lack of structural integrity and the stability of the wreck."  *Id.*   The DJS plan then proceeded to describe the LSD and SSD methodologies.

29

109.     The DJS plan, which was the result of the DJS working "closely with CL Risk Solutions" (Hearing Exh. 6; Dkt. 1-2, p. 9), set forth the SSD methodology as the recommended methodology, but also referenced the possibility of some lifting of larger sections, if the need/opportunity arises.  *Id*. at 8.

110.     Thus, the salvage plan proposed by DJS included its recommendation of using the SSD option, but also contemplated some sections being removed with the LSD method.[4] *Id.* at 8, 14.   The DJS plan was developed contemplating that a "cofferdam will be constructed close around the wreck to contain surface pollutants and to prevent escape of vehicles[5] into the navigation channel or surrounding area" and that "Phases 1 and 2 of the wreck removal plan can be executed in parallel with the installation of the cofferdam." *Id.* at 9; *see also id.* at 23.

111.     Commander Witt always knew that the DJS plan included an environmental protection component, including the coffer dam.  T.WITT:88:4-16.

112.     DJS continued, in good faith, to propose salvage methodologies consistent with its obligations under the SMFF, and pursuant to the terms of the NTVRP Contract.   Hearing Exh. 6.

---

[4] In considering the T&T Plan, the Owner recognized the issue of whether the "wreck's hull is structurally sound enough to support Large Section Demolition" and that Small Section Demolition may be necessary.  Hearing Exh.12 (Dkt. 20-1 p. 45).

[5] DJS's plan was to expose the cars by "surgically removing" sideshell/bulkheads, then removing the accessible cars and using the hull as primary containment to "hold" the cars as they are removed via cranebarge.  Once cars in a certain section were removed, DJS would remove the "cleaned" section of hull which would expose more cars.  Dkt. 26-1, ¶ 8(b)(ii).  This process would be continued until the cars were completely removed.  If small section demolition method is used work methods can easily be made or adjusted to clear/remove cars either deck by deck or per section.   Sections where wreck section and cars could be securely lifted together would be undertaken when safe and efficient to do so.  *Id.*

113.     Commander Witt testified that prior to the November 6th meeting, the Owner had stated its preference to Commander Witt of the large section demolition methodology. T.WITT:77:15-25.

114.     DJS was supposed to meet with representatives of Owner and P&I Club on November 6, 2019, in New Jersey.  DJS representatives, including Mr. Martin, along with other DJS representatives, traveled to New Jersey and expected to have a full meeting and make a full presentation to the Owner, P&I Club and the GSC.  T. 35:5-6 (Martin).  They arrived with "hundreds of papers, and within about … 30 minutes, the meeting for the 6th of November was cancelled [by the Owner]…." T. 35:9-10 (Martin).  Commander Witt was aware that the DJS met with representatives of P&I Club and Owner on November 6, 2019, and that the meeting lasted less than thirty minutes.  T.WITT:174:11-20.

115.     Commander Witt did not receive a copy of the DJS proposed salvage plan until approximately November 25, 2019, or within a few days of that date.  T.WITT:163:22-164:3.  But even after receiving the DJS proposed salvage plan, Commander Witt did not give it much consideration because the owner had not proposed to use the DJS plan. T.WITT:164:3-5.

116.     Commander Witt knew that the Owner rejected the DJS plan on November 5th or 6th.  T.WITT:66:21-25, 67:1-23.  The Owner did not provide a copy of the DJS plan to Commander Witt at that time and Commander Witt did not ask the Owner to provide him a copy of the plan.  T.WITT:75:2-4, 70:8-10, 114:4-8.

117.     On November 8, 2019, Commander Witt issued Administrative Order: 01:19 Amendment 1 affirming that there remains "an imminent and substantial threat to public

31

health, welfare, or the environment because of an actual or substantial discharge/release of oil or designated hazardous substance from the vessel." Hearing Exh. 11 (Dkt. 1-1 at 2).

118.    DJS could have started the salvage work in or about November 6, 2019, if the Owner and the P&I had allowed it to pursue the recommended methodology set forth in the DJS plan. T. 119:17-19. And, DJS would have completed the salvage before hurricane season, but for the delays occasioned by the competitive bidding process forced by the Owner and P&I Club. T. 47:9-14 (Martin).

119.    If DJS had started its salvage work in November, it would have taken DJS "63 days to go down to the center line of the vessel" and "another 90-something days to the sea bed." T. 47:16-21 (Martin).

120.    While all of its vessels and portable equipment have been demobilized, remobilization of those assets could occur within two weeks. T. 72:3-4 (Martin).

121.    Since the DJS plan would work within the bounds of the barrier currently under construction, there would be no need to stop that construction (albeit it's a much larger, more time intensive barrier to build). If DJS were to start February 26, with a month to complete the EPB, 64 days to remove to centerline, and 92 days to remove to seabed, the approx. finish date would be August 29, 2020.

122.    If DJS had started in November when it first presented the plan, DJS had a good chance of finishing before hurricane season. Given the time it has taken to get the T&T plan and contract in place, that plan cannot be completed prior to the hurricane season. Moreover, the risk to the environment by having a ship that has been cut in sections using LSD is far greater than the risk of a hurricane passing over the ship with the hull still intact and cars much more safely protected inside that hull.

32

123.     DJS does not know T&T's current anticipated estimate of completion but understands the T&T plan costs substantially more than the DJS plan and T&T is currently two months behind schedule.

124.     Commander Witt, however, acknowledged that T&T's work will not be completed in June 2020 and, thus, they are already behind schedule.  T.WITT:131:2-4.

125.     Despite submitting the DJS plan to SUPSALV, and receiving questions from SUPSALV for DJS to answer, Commander Witt did not request additional technical data from DJS or take the DJS proposed salvage plan to the next level.  T.WITT:185:3-11.   He did not request the additional technical data from DJS "because the owner did not want to go with that plan."  T.WITT:185:8-15.  He was aware, however, that upon SUPSALV and SERT review of both the DJS plan and T&T plan, SUPSALV requested additional information from both DJS and T&T.  T.WITT:126:19-23.  Commander Witt was aware that the initial SUPSALV and SERT technical review of the DJS plan was preliminary and part of the typical process towards coming to a final plan.  T.WITT:126:19-25, 127:1-3.

126.     Commander Witt did not intervene to force the Owner to present the DJS plan to FOSC or UC.  T.WITT:164:17-23.  He relied entirely on the Owner to provide him with a salvage plan that the Owner was comfortable with.  T.WITT:164:14-16.  Commander Witt considered it the USCG's "normal practice…[to wait] on the owner's proposed plan."  T.WITT:227:2-8.   In this instance, Commander Witt continued to wait on the Owner to provide a preferred plan because "we had indications that that was - - they were moving forward.  T.WITT:164:22-23.

127.     Commander Witt forwarded the DJS proposed salvage plan to SERT and SUPSALV as quickly as he could.  T.WITT:166:1-4.   He included the Owner's risk

registers when he asked them for technical analysis.   T.WITT:219:3-7.   Commander Witt

claims that he did not receive any other emails from SERT or SUPSALV with any

analytical information relating to either the DJS proposed salvage plan or T&T proposed

salvage plan. T.WITT:227:10-16.  So, there was only one technical review of the T&T plan

and he received from SERT and SUPSALV their technical analysis of the T&T plan within

four hours.  T.WITT:227:17-20.

128.     At least one week prior to DJS submitting its proposed plan to the Owner,

Commander Witt was under the impression that the Owner and DJS were "moving in the

correct direction, i.e., the Owners and the reps were expecting a plan that -- would meet

their – meet their concerns."  T.WITT:173:5-9.   He was aware that DJS spent the month

of October meeting with P&I Club and GSC and other Owner representatives coming up

with a proposed salvage plan.  T.WITT:174:1-9.  It was his understanding that the parties

were "working on that the entire time."  T.WITT:174:6-10

129.     Commander Witt testified that the DJS proposed plan never made it into any type

of planning process with FOSC or UC, solely because it was not preferred by the Owner.

T.WITT:91:4-25, 93:8-18, 283:25-283:4.    The plan never advanced forward in the

planning process because of the Owner.  T.WITT:90:9-17.

130.     Instead, Commander Witt allowed the Owner's consultant, GSC, to submit its own

report and he accepted the report of GSC.  T.WITT:99:10-25.  He knew that GSC was a

consultant to the Owner and that GSC was not an approved salvor under the NTVRP.

T.WITT:32:2-16.  He further has no understanding whether or not GSC was ever vetted by

the USCG (T.WITT:35:24-25) and did not consider what impact GSC was having on the

salvage and wreck removal process.  T.WITT:36:6-13.

131.    Commander Witt testified that if he had a concern that the letter of intent or any
other document would cause a delay he would have intervened.   T.WITT:59:17-22.
However, notwithstanding his testimony, he knew that the LOI included provisions for
negotiations of contract and pricing terms and he knew that the document included
nondisclosure terms that the P&I Club used to justify not providing documents to
Commander Witt or UC.   T.WITT:111:16-25   He added, however, that it would concern
him if Owner and the P&I Club misrepresented to him, as FOSC, that the nondisclosure
provision was designed to protect DJS and its commercially sensitive information.
T.WITT:112:17-24.

132.    DJS had not asked for the LOI or the nondisclosure provisions in that document.

## TRANSITIONAL AGREEMENT PERIOD

133.    Owner, DJS and Donjon Marine, Inc. executed a Transitional Agreement whereby
the parties thereto attempted to transfer control of the salvage to Donjon Marine, Inc.
Hearing Exh. 7.

134.    However, the Owner did not seek approval from FOSC for a deviation from
NTVRP and no additional funding agreements or other documents were forwarded to
USCG or FOSC for approval of such a transition.

135.    Commander Witt learned of the so-called transitional agreement within a day or so
after the November 6th meeting, and once he learned of the transitional agreement he
determined that it was not appropriate and he, ultimately, denied the request for deviation
to allow Donjon Marine, Inc. as substitute SMFF resource provider.  T.WITT:159:13-23.

From the time of the original NTVRP through December 21, 2019, DJS was the sole salvage provider under the NTVRP contract.  T.WITT:159:24-160:4.

136.     FOSC issued Administrative Order, Amendment 2, notifying Owner that the attempted shift to another resource provider was improper.  The Owner attempted to justify the shift from DJS to Donjon Marine, Inc. by indicating it was a "simple transition from a joint venture (DJS) to one of its partners (Donjon)", but in this instance, the FOSC rightfully concluded[6] that there was not a factual basis articulated to warrant a deviation, i.e., there were no exceptional circumstances to warrant a deviation.  Hearing Exh. 9 (Dkt. 20-1 p. 14).  In the same letter attempting to justify the deviation, the Owner emphasized that "[w]e should add that the change was not made for financial reasons…."  *Id.* at 15.

137.     On December 1, 2019, in considering Owner's request for a deviation from DJS to Donjon Marine, FOSC concluded that the "justifications [RP] provided do not meet the standards for approval detailed in Title 33 CFR § 155.4032 or § 155.5012 and hereby disapprove that deviation."  Hearing Exh. 9 (Dkt 20-1 p. 23); Hearing Exh. 25 (Dkt 20-1 p. 66).  Essentially, without using the words "exceptional circumstances", FOSC determined that there were no exceptional circumstances.

138.     This denial effectively rescinded the Transition Agreement, leaving DJS as the approved resource provider under the NTVRP for the GOLDEN RAY.[7]

---

[6] Assuming Commander Witt does, in fact, have the authority and certifications in writing to serve in the role of FOSC.

[7] Indeed, this position is borne out by the Government's argument that DJS is still a resource provider under its NTVSP.  It can only be a resource provider if the contract it has for the GOLDEN RAY is still in effect.

139.     On FOSC's subsequent approval of T&T as an additional resource provider, FOSC then declared his original findings in Administrative Order 1 Amendment 2 "moot". Hearing Exh. 17, p. 7 ¶ 7; (Dkt 20-1 p. 55 ¶ 7).

140.     At the time of the Administrative Order Amendment 2, Commander Witt was becoming concerned with the delays.  T.WITT:87:21-25, 88:1.

141.     Commander Witt agreed that there was an approximate one-month delay by not having SERT review the DJS plan that was submitted to the Owner on November 5, 2019. T.WITT:86:2-5.

**COMPETITIVE BIDDING PERIOD:**

142.     The LOI terminated on November 6, 2019 and shortly thereafter DJS received notice that the Owner and P&I Club was proceeding with an Invitation to Tender (ITT), dated November 17, 2019, and drafted by GSC.  Hearing Exh. 8, p. 4 (¶1.1).  Prior to termination of the LOI, DJS was threatened that if it was not able to get to an agreement with the P&I Club on the financial terms,  then the P&I Club would take it out to tender, i.e., invite other salvors to bid on the project.  T. 49:17 (Martin).  An invitation to tender is common in international markets and may also be used in the United States for events that are not OPA 90 events (i.e., if the vessel is determined "no longer … a threat to the environment" in which case the "OPA 90 would stand down….."); however, an invitation to tender is not authorized or permissible in OPA 90 events.  T. 50:4-7 (Martin).

143.     Commander Witt knew about and reviewed the Invitation to Tender on or about November 25, 2019.  T.WITT:84:11-23; 169:1-7.  Even though the ITT showed financial terms different from the NTVRP financial terms, he did not pay attention to those

differences, and "[c]ost was not a driver in the operation."   T.WITT:169:16-19. Commander Witt indicated he was not concerned that the financial terms of the ITT, demanding a lump sum contract, although were dramatically different from the financial terms in the NTVRP contract.  T.WITT:170:2-7.  He was not aware that ITT called for a lump sum contract (T.WITT:104:16-25) and he was not aware that T&T agreed to a lump sum contract (T.WITT:104:15-58) which is nearly twice the amount of the DJS proposal. T.WITT:104:11-14.

144.    Commander Witt acknowledges knowing that during the ITT period there would be negotiation of financial terms.  T.WITT:85:6-8.

145.    Commander Witt was aware that the GSC, the salvage consultant retained by the P&I Club, drafted the invitation to tender and submitted the ITT under the GSC watermark. T.WITT:203:11-17.  In fact, he "asked SUPSALV and SERT folks at the conclusion of the tender process to actually be on site to as much as possible expedite that review process." T.WITT:227:21-228:7.

146.    Commander Witt understood that the Chafee Amendment was designed to ensure that there are no delays in salvage efforts as a result of parties negotiating financial term. T.WITT:169:20-170:1.  However, he was not concerned at all with the terms of the ITT with a lump-sum compensation arrangement that was substantially different from the financial terms set forth in the NTVRP.  T.WITT:170:2-7.

147.    Nevertheless, Commander Witt did not intervene to prevent the Owner from utilizing the ITT process because he did not necessarily know that the ITT process would result in the Owner selecting an alternative resource provider, because he was aware that

DJS was one of the salvage providers that provided a proposal during the ITT process. T.WITT:170:15-22.

148.     At the time of the ITT, DJS was the sole SMFF Provider under the NTVRP contract. T.WITT:170:23-171:1.  DJS was in first position and was waiting for a final, approved salvage plan so it could begin performing the salvage and wreck removal.  T.WITT:171:2-6.

149.     Commander Witt was aware that under the ITT the Owner and P&I Club were pursuing a lump sum contract with potential salvage providers.  T.WITT:185:16-19.  He did not recognize or believe that "the rejection of [the DJS] plan on the 5th of November was a pretext to change the contractual terms."  T.WITT:192:1-4.  However, Commander Witt is aware that it is possible that an owner could use the pretext of not agreeing with a salvage methodology or proposed plan as a pretext to change resource providers. T.WITT:276:5-25.  He understands that an Owner could attempt to do that to avoid its obligations under the NTVRP and the Chafee Amendment.  T.WITT:277:8-16. Commander Witt agrees that if the basis for a deviation request is "strictly because of financial concerns" or "strictly contractual concerns" then there would be no basis for a deviation.  T.WITT:277:8-21.  Commander Witt testified that he reached his conclusions without meeting or considering the motivations of the parties, including the motivations related to the LOI or ITT time periods.  T.WITT:107:19-25.

150.     Commander Witt testified that if DJS had "been the preferred solution, that would have – that would have negated the need for a deviation."  T.WITT:187:1-6.  Commander Witt ignored the fact that at the very time period of the ITT, DJS was, in fact the primary

and preferred resource provider for all SMFF services under the NTVRP.  That is to say, DJS was the "preferred solution" by virtue of the NTVRP.

151.     This Court finds that during the same time period that P&I Club was sending out the ITT to solicit bids, it was also trying to persuade the USCG that GOLDEN RAY is no longer an imminent pollution threat, despite knowing full well that the GOLDEN RAY was in the same location, still with 44,000 gallons of fuel and 4,200 cars on board.

152.     To the contrary, the Administrative Order Amendments cited the continuing substantial risk of a pollution event.  Instead of moving forward with refining the DJS salvage methodology proposal after Amendment 2 was released, the entire focus of the RP shifted to the ITT process.

153.     Commander Witt issued this order because he was trying to get information from the Owner concerning the status of a salvage plan and why there were delays. T.WITT:163:4-19.  The intent of the order was to prevent delays.  T.WITT:163:9-19. Commander Witt testified that he specifically asked for the DJS proposed salvage plan in this order (see Condition 2 from Amendment 2).  T.WITT:165:4-12.  Ultimately, Commander Witt received the DJS proposed salvage plan both from DJS and from the Owner.  T.WITT:167:14-16.

154.     The financial terms of the ITT were in direct conflict with the financial terms set forth in the NTVRP Contract with DJS ("bidder shall provide lump sum budgets…") Hearing Exh. 8 (Dkt. 20-1, p. 37 ¶ 3.5); T.125:7-8 (Williamson).

155.     The ITT also contemplated "[c]ontract negotiations" and that such negotiations would be "governed by a risk based contracting process to allow shortlisted bidders to refine their work method on the basis of an open risk dialogue and to determine how the

parties effectively mitigate, transfer or share the risks."  Hearing Exh. 8 (Dkt. 20-1, p. 32,

¶ 1.4).

156.     The Owner, P&I Club and the GSC invited salvage companies to bid on SMFF

services that are already a part of the USCG approved NTVRP contract, and the bidding

process expressly contemplated that the bidder would be expected to continue to negotiate

financial terms, expressly prohibited by OPA 90.  *Id.*   In OPA 90 events, this should not

occur.  T. 96:24-25 (Martin).   Under the express terms of the ITT, the Owner, P&I Club

and GSC advised potential bidders that they were expected to continue negotiations even

though GOLDEN RAY remained grounded in the St. Simons Sound.

157.     The express terms of the ITT show that the Owner, the P&I Club and the Owner's

salvage contractor are demanding financial terms that are directly in conflict with the

financial terms outlined in the USCG approved NTVRP Contract (with the ITT calling for

a lump sum contract and the NTVRP Contract setting for the cost plus financial terms). *Id.*;

T.125 (Williamson).  (The NTVRP Contract allows for "add or subtract assets, resources,

personnel, change the plans and things like that and adjust the pricing because everything

is a price list and it just either comes on or off with whatever scope of work is needed, and

in the invitation to tender, you might have blocks of work that would be X amount, another

block would be --- so you're compiling scopes of work into one price.")  T.  51:9-15

(Martin).

158.     DJS was surprised that USCG did not intervene and prevent the ITT. T. 50:17-18

(Martin).  DJS made USCG aware of the ITT process.  T. 96:5-8 (Martin).  "We brought it

to their attention…they came back and allowed the process to go through…."  T. 96:5-10

(Martin).

159.     Commander Witt knew that the ITT process could delay the response efforts. T.WITT:115:22-25, 116:1-6, Administrative Record  00002562.

160.     DJS re-submitted its proposal to Owner and P&I Club, following the ITT.  Dkt. 26-1, pp. 6, 15 – Williamson Affidavit  Dkt. 26-1, ¶ 8(u), 13(xiii).

161.     Later in November, Mr. Hankins of DJS was working on another job for the Navy and he learned that UC still had not received the DJS Plan.  T. 142:15-25 (Hankins).  On or about November 26, 2019, Mr. Hankins, to meet the requirements of the FOSC Administrative Order Amendment 2 and frustrated at the lack of response from UC, delivered a letter and attachments to FOSC.  Hearing Exh. 28.   The documents were designed to make sure that FOSC had the benefit of the salvage plan methodologies (Hearing Exh. 12) and why DJS believed that it had satisfied the requirements by presenting an appropriate salvage plan.  T.143:15-25 (Hankins).  Mr. Hankins asked Commander Witt to intervene and assist with getting the salvage plan reviewed and in the planning process.  T.WITT:119:18-24.

162.     As of November 26th, the vessel is still grounded in the same place, with the same risk to the navigational and environmental risks.  T.WITT:121:6-20.

163.     The NTVRP Contract between DJS and the Owner contains a dispute resolutions provision and requires DJS and Owner first, to "[a]lways attempt to settle amicably"; second, "… always mediate"; and third, if the first two steps fail "then disputes shall be decided by arbitration in the manner set forth in Article 11 hereafter."  Hearing Exh. 1, Dkt 22-5, Article 7

164.     DJS was willing to mediate its dispute with Owner, but that Owner was not willing to mediate the dispute.

165.     On December 3, 2019, SERT informed FOSC that they analyzed and evaluated the

DJS plan and confirmed that it is conceptually feasible (Dkt. 20-1, pp. 57-58; 60-61).  DJS

was not aware of the SERT analysis until DJS received that information after filing this

litigation and Defendants entered the SERT documents into the record of the Court.

166.     Even though SERT determined that DJS plan was conceptually feasible,

Commander Witt did not submit the plan to UC.  T.WITT:76:11-25.

167.     On December 4, 2019, Jim Elliott, from T&T, sent an email to Capitan Reed and

in that email he wrote:  "We  look forward to having an opportunity to present this proposal

to the Unified Command at your convenience" and both Captain Reed and Commander

Witt received the email. T.WITT:216:19-24; Exhibit 19 to Witt Deposition, Admin. Record

002565.

168.     Commander Witt knew Mr. Elliott because Mr. Elliott was a commanding officer

at the Marine Safety Unit in Texas City, when Commander Witt was an assignment officer

or officer of personnel management.  T.WITT:137:17-21.

169.     On December 4, 2019, Captain Reed responded:  "Jim, thanks for the update and

we will certainly make all aware of that capability.  The RP is working now through

options, some of which look for that capacity."  T.WITT:217:1-10.  Captain Reed then

thanks Mr. Elliot for the "T&T team in the immediate deployment and rescue of those four

engineers" even though Commander Witt knew that DJS was the sole salvage provider of

SMFF services at the time of rescue of the crew members.  T.WITT:217:4-15.

170.     At the time of the December 4th emails between Mr. Elliott and Captain Reed and

Commander Witt, Commander Witt knew that DJS provided the initial SMFF response

and was responsible as sole, primary SMFF provider for saving lives and other matters pertaining to the initial response.  T.WITT:217:4-15.

171.    On December 8, 2019, DJS once again submitted its plan to Owner, in response to the ITT, and made it clear that it was committed to a full planning review and was prepared to assess progress with the UC and adjust tactics and assets as UC objectives change, but using financial terms outlined in the NTVRP.

172.    On December 16, 2019, DJS presented its salvage plan for wreck removal to the Owner's GSC.  Although DJS made repeated requests for a meeting with UC, that did not occur, in spite of the fact that DJS was still a stakeholder and a primary SMFF provider in the UC. Dkt. 26-1, ¶ 8(w).

173.    On December 16, 2019, Jim Elliott sent another email to Captain Reed and Commander Witt advising that T&T had the opportunity to present its proposed salvage plan to the Owner's representative and that "it was agreed our methodology provides the most expeditious and effective wreck removal process to meet the owner's and Unified Command's objectives."  T.WITT:217:23-218:1.

174.    Jim Elliott's December 16th letter also suggests to Captain Reed and Commander Witt that "[b]ased on our understanding of the regulations the salvage response was successfully completed with the rescue operations and removal of all accessible oil" and "now that the regulatory intent has been addressed and the vessel has been deemed a constructive loss, the GOLDEN RAY was no longer an operating vessel requiring a VRP but rather an object to be removed from the waterway under other regulatory authorities." T.WITT:218:8 – 219:1.  Commander Witt did not agree with Mr. Elliott's assessment that the GOLDEN RAY is no longer an operating vessel requiring a VRP.  T.WITT:54:9-20,

219:2-5.  At that point, Commander Witt still believed there was an imminent threat of pollution and that he still had overall responsibility for the salvage and wreck removal as FOSC. T.WITT:219:6-12.

175.      Commander Witt believed it was inappropriate for Mr. Elliott to contact Captain Reed and Commander Witt to attempt to solicit work on the GOLDEN RAY, nevertheless, he still allowed T&T to intervene and become an SMFF provider by virtue of his deviation order.  T.WITT:51:15-20, 139:24-140:2.  There is no written record that Commander Witt told Mr. Elliott or T&T that it was inappropriate for T&T to have contacted Commander Witt or Captain Reed directly, at a time when DJS was the sole, primary salvage provider for SMFF services.  T.WITT:51:24-25.

176.      On December 17, 2019, DJS informally met with the FOSC and the QI informing them that DJS would undertake whatever wreck removal option the UC/FOSC decided upon, but only under the terms of the NTVRP, not under the lump sum financial arrangement demanded by the P&I Club and the Owner, as set forth in the ITT.  *Id.* at ¶ 8(x).

177.      On December 19, 2019, DJS learned that the FOSC granted T&T Salvage, LLC (T&T) the opportunity to present its salvage plan directly to the entire UC.  DJS, as a stakeholder and SMFF primary resource provider under NTVRP,  requested the opportunity to present its plan to the UC, but was refused, in violation of Operational Planning Cycle and the Planning P and in violation of FOSC's obligation to communicate with DJS as the primary resource provider.  Instead, the FOSC instructed DJS that it should communicate its concerns to the Owner.  *Id.* at ¶ 8(bb).

178.     Commander Witt was aware that DJS and T&T were discussing working together in a joint venture to perform the salvage and wreck removal under the T&T plan. T.WITT:210:12-22; T.WITT:211:11-19.   As of December 19th, Commander Witt knew that either T&T was going to do its plan or T&T and DJS were going to joint venture and do the plan."   T.WITT:259:21-260:3.   He received a string of emails discussing the negotiations between T&T and DJS.   T.WITT:260:22-261:16; see also Admin. Rec Bates 002435-0002444.

179.     Commander Witt received the Owner's preferred plan on December 19, 2019 and within twenty-four hours of receiving the plan he learned that it was technically feasible, and he was ready to move forward with the Owner's preferred plan.   T.WITT:126:4-8, 212:20-25.

180.     The Owner first proposed its preferred plan on December 19, 2019.  T.WITT:258:6-12, 17.   The Owner requested an opportunity for T&T to present the proposed plan to UC on December 19th or 20th.   T.WITT:208:18-209:1.

181.     The first point at which Commander Witt considered the options for methodology was when he was considering the request for deviation, which was when he "had a proposal that the owner was putting forward large section demolition."   T.WITT:175:11-13.   That is when he looked at the DJS plan and compared it to the plan that the Owner submitted (i.e., the T&T proposed plan).   T.WITT:175:13-15.

182.     The T&T proposed plan contemplates the very same failure that the DJS plan contemplates, i.e., that large section demolition will not work.  T.WITT:196:4-9.

183.     The nature of a salvage plan is that there are adjustments that are made based upon events that occur.  T.WITT:199:2-5.   The adjustments contemplated by the T&T plan are

46

the same adjustments, between large section and small section demolition.  T.WITT:199:7-11.

184.        Commander Witt received responses back from the agencies who performed technical analysis of both the DJS proposed salvage plan and the T&T plan, and both were determined feasible.  T.WITT:215:1-5.

185.        But Commander Witt relied upon the Owner's decision that it preferred a plan other than the DJS plan.  T.WITT:270:17-24.  Commander Witt recognized that "the Owner did not want to move forward with the plan [DJS] submitted" and that he "did not force the Owner to move forward with a plan they did not agree with."  T.WITT:270:24-271:1.

186.        As of December 20th, Commander Witt was comfortable with the Owner's preferred plan, the T&T plan, and within twenty-four hours of first reviewing it he was in agreement to allow the Owner's preferred plan to go through the planning cycle process to end up with a final salvage plan.  T.WITT:213:17-24.  He did not contact DJS to get its feedback or analysis of the Owner's preferred plan, even though he knew at that time that DJS was the sole, primary, pre-approved and pre-contracted SMFF provider under the NTVRP.  T.WITT:214:2-10.  Not only did he not contact DJS, it did not even occur to him to contact DJS to give DJS an opportunity to pursue the methodologies set forth in the Owner's preferred plan. T.WITT:214:15-20.  Commander Witt concluded that DJS had lost its opportunity to provide the SMFF services as of that date, since the DJS plan was rejected by the Owner, it had gone through the ITT process, it was not selected by Owner, and it "had an opportunity to work things out in a joint venture."  T.WITT:214:20-24.

187.        Commander Witt allowed the T&T Plan to go through the planning process, but did not allow the DJS plan to go through the planning process.  DJS reasonably expected

47

for UC to ensure that its plan, as the approved SMFF, would properly go through the Planning P process. T.125-126 (Williamson).

188.    Representatives of DJS inquired why the DJS plan was not processed through proper planning procedures and they never received a straight answer.    T.125 (Williamson).

189.    DJS continued to try to provide its proposed plan and other information to the UC via email and hand delivered a copy of the plan to Andrew Lawrence in Washington, D.C. Dkt. 26-1, ¶8(ee).  DJS representatives tried to meet with UC between November 5, 2019 and December 22, 2019, but the UC refused to meet with them.  T. 62:1-8 (Martin).

190.    FOSC, deferring to the Owner and P&I Club, refused to allow DJS access to the UC and also refused DJS the opportunity to personally discuss its proposed salvage plan (or any alternatives). Hearing Exh. 28, Attachment 1, ¶ 4.  Moreover, at no time during the process did the Coast Guard ever solicit any technical data from DJS concerning the vessel, in spite of the fact that it was the only salvor that had worked on the GOLDEN RAY for months and had acquired significant knowledge about the vessel's condition.  Dkt. 26-1, p. 8, ¶ 8(ff).

191.    The Owner accepted T&T's bid and then sought a deviation, allowing it to add T&T as a resource provider for all 19 SMFF services for this particular salvage.

192.    From the time the SERT advised the DJS plan was "technically feasible" on December 3, 2019 (Dkt. 20-1, pp. 60-61) until SERT advised the T&T plan was "technically feasible" (Dkt. 20-1, pp. 57-58) on December 19, 2019, sixteen days elapsed. The time delay is not consistent with FOSC's concern of timely removal.

48

193.     Prior to accepting T&T as an additional resource provider, Commander Witt did not "direct any additional research other than the technical review of the proposal." T.WITT:278:23-24.  He was not aware that this is the first large wreck removal for T&T. T.WITT:279:2-5.

194.     Commander  Witt testified that the current T&T Plan is to "start at one end and progress to the other for the reason that the – that the structural strength predominantly lies in the bow and stern.  So you would leave one of those in position as the last section to remove.  That's the plan."   T.WITT:307:16-21.   The plan is to start at the bow. T.WITT:308:1-2.

195.     Plaintiff only learned of this "new" plan proposed by T&T during the deposition of Commander Witt.  However, as mentioned in the GSC "Position Report", see Admin. Rec., Part 2, page 413, appendix 1:  "As mentioned in section 4.4 the deflection of the bow section continues to increase.  Without a proper planning and hull assessment during all stages of demolition there is a significant risk that the construction fails at unwanted locations.  During demolition of the hull structure extreme care should be taken that the construction frame between frame 55 and 130 (the area of ground support) is not compromised before the overall bending moment of the hull is significant reduced....  It shall be noted that failing to do so might lead to a significant increase in the efforts needed to remove the vessel from its current location.  It is therefore stressed that a proper assessment of the hull strength in its current state, as well as in every intermediate demolition stages is needed to be able to assess the safest and cleanest removal.  This also means that proper planning of the demolition phase is of utmost importance…."   This is

the analysis of the P&I Club's retained salvage expert and is a warning sign that there is not a good consensus that this is the correct way to move forward.

196.    In fact, on December 19th, SERT sent Commander Witt an email citing three (3) potential failure modes in the T&T salvage wreck and removal plan related to these concerns.

## DEVIATION REQUESTS A PRETEXT FOR NEGOTIATING FINANCIAL TERMS

197.    In the administration of the GOLDEN RAY salvage, the FOSC was presented with two separate requests from Owner to deviate from NTVRP:  First, a deviation request to allow for a transition from DJS to Donjon Marine, Inc. as SMFF under the NTVRP; and, second, a deviation request to allow T&T to be added as an additional SMFF service provider under the NTVRP.   The FOSC denied the first deviation request on December 1, 2019 (T.121 (Williamson) and issued a decision letter on the second deviation request on December 21, 2019 (granting the request).  Dkt. 20-1, p. 23 (denial); Admin. Rec. 126-132 (grant).

198.    On December 1, 2019, when Commander Witt denied Owner's first request for a deviation under the NTVRP, he concluded that the reasons provided by the Owner did not meet the standards for approval detailed in 33 C.F.R. Section 155.4032 or Section 155.5012.  T.WITT:161:24-162:3, 162:4-10.  He understood that the Owner believed that it did not need a deviation request for the proposed switch from DJS to Donjon Marine, Inc.  T.WITT:117:21-23.

199.     Under the DJS plan, DJS could have begun salvage operations and removal of the GOLDEN RAY wreck as early as the first week of November, if only the Owner and UC had approved the DJS proposed plan of SSD.  Dkt.26-1, Para. 15(d).

200.     The delay of the Owner and P&I Club in presenting the DJS plan to the UC for consideration, discussion and approval or modification through the  Planning P process exacerbated the continuing threat from pollution, and further collapse of the vessel, which in turn would further exacerbate the pollution threat.   T. 24:22-25 - 25:1-7; 28:16-25 – 29:1-4 (Williamson).

201.     The UC and FOSC should have been concerned when they did not receive a salvage plan from the sole SMFF resource provider and should have made inquiry before the FOSC finally did on November 22, 2019, given that pollution and other risks continued unabated during the delay.  T. 142:12-25 – 143:1 – 6 (Hankins).

202.     In October, the P&I Club began interacting directly with UC.  At that time,  DJS was forbidden by the P&I Club from communicating directly with the UC/FOSC. However, as a stakeholder and necessary component of the UC, DJS should not have been prevented from communicating with the UC/FOSC, as it had been doing until that point in time.  Hearing Exh. 28, p. 3, ¶ 4.

203.     The P&I Club insisted that DJS have no interaction with UC and specifically prohibited DJS from attempting "to arrange a meeting and/or joint presentation with the Authorities or continue further discussions…."  Dkt. 20-1, p. 7 ¶ 5; Dkt 20-1 p. 8 ¶ 12.  The Owner directive prevented DJS from interacting with UC and violated the express text and spirit of OPA-90.

204.     DJS is unaware of any reasonable basis upon which UC would agree to meet with T&T and allow it to make a full presentation, but not allow DJS the same opportunity, as DJS was the designated SMFF resource service provider.

205.     The FOSC failed to recognize the oddity created of DJS's sudden discontinued interaction with the UC/FOSC. The Owner's prohibition of direct contact with UC prevented the FOSC from receiving any input from DJS regarding any aspect of pollution control, or any aspect of its well-known salvage expertise. The FOSC's failure to recognize the lack of communication from DJS should have been even more striking, particularly in view of the fact that the FOSC was receiving direct communications from the P&I Club and only from the P&I Club, to the exclusion of DJS.   Hearing Exh. 28, p. 4, ¶ 4.[8]   The FOSC should have taken charge of the process, as is customary, by allowing the proposed methodologies to go through the proper planning process and not allowing financial terms to delay or prevent salvage operations.  T. 120:6-22 (Williamson).

206.     Because DJS heard nothing from the FOSC, on November 22, 2019, the General Manager of DJS (Tim Williamson) emailed the FOSC expressing his concern because DJS had not received any comments or correspondence from the UC about its plan that was provided to the Owner weeks earlier. The substance of this email was never properly addressed.  Dkt. 26-1, ¶ 8(r).

207.     During the critical period while DJS was preparing a salvage removal plan (October through November 5th, and then continuing until November 22nd), FOSC had no formal communication with DJS.  Other than unrelated meetings regarding initial response and

---

[8]  The references cited on those pages refer to documents provided to the FOSC that should be part of the Administrative Record not produced.

normal lightering services that had been ongoing since the initial response,  Commander Witt did not communicate with DJS regarding its proposed vessel salvage and wreck removal plan.  T.WITT:27:3-25, 26:1-14.  Commander Witt knew that DJS was a party to the LOI, insisted on by the P&I Club, but he did not ask "a whole bunch of pointed questions" regarding the DJS plan prior to November 26, 2019.  T.WITT:28:1-25.

208.    On November 22, 2019, the FOSC finally communicated directly with DJS and finally requested a copy of DJS' salvage plan that had been presented to the Owner weeks earlier.  Hearing Exh. 28, p. 1 ¶ 1; T.WITT:69:16-25, 70:1-3, 72:14-23

209.    On November 25th, the head of SERT (Andrew Lawrence) emailed Mr. Williamson about meeting to discuss the GOLDEN RAY.  They agreed to meet in Washington D.C. that same day. Mr. Williamson arrived at the meeting with the DJS salvage plan and one of DJS's lead engineers (Jeff Stettler, former head of SERT). However, upon arrival, Mr. Lawrence informed Mr. Williamson that he had just been advised by his superiors not to discuss either the GOLDEN RAY or the DJS plan.  Mr. Williamson found this highly unusual.  Dkt. 26-1, ¶ 8(s); T. 128 (Williamson).

210.    On November 26, 2019, DJS representatives met with the FOSC and the State On-Scene Coordinator (SOSC) to discuss the information it believed had been withheld from the FOSC and the UC, based on the correspondence received on November 22nd from the FOSC. After these documents (including the salvage plan) were provided to the FOSC, no further discussions occurred.  In fact, the FOSC merely allowed DJS's representative to hand him documents, while deferring discussion of the DJS plan.  Dkt. 26-1, p. 6, ¶ 8(t).

211.    With its submittal to the FOSC on November 26, 2019, DJS included a reiteration of why its preferred plan was a better choice for the environment, reminded the FOSC that

pollution mitigation included removal of the ship and its cargo, informed that in preparing its plan, it had consulted with salvage masters, naval architects, and project and risk controllers to investigate numerous wreck removal options, assets and scenarios, and stated that its plan was the result of daily meetings with Owner representatives and maintained an open dialogue to consider all salvage possibilities.  Hearing Exh. 28, pp. 4-10.

212.     Even with the DJS salvage plan in hand the FOSC refused to allow DJS to participate in the Operational Planning Cycle or participate in any meeting to review other salvage plans, including its own. Dkt 26-1; p. 8, ¶ 8(bb).

213.     If the FOSC had allowed DJS to present its salvage plan to the UC, the plan would have been explained, and the pros and cons of various methodologies explored.  Had that occurred, a salvage plan could have been agreed upon by all and put in place months ago, regardless whether the selected method was the SSD, LSD or a combination of the two. T. 62 (Martin); Dkt 26-1, pp.1-9; Hearing Exh. 28, pp. 1-10.

214.     As of November 26, 2019, despite the fact that DJS was the designated resource provider, DJS had not been tasked with or asked to engage in any efforts to mitigate pollution from the vehicles remaining on board the vessel.  Hearing Exh. 28, p. 5.   There are still 44,000 gallons of fuel remaining on the vessel and DJS has not "been given permission to remove the cars."  T. 20:14-17 (Martin).

215.     Had DJS been allowed, as the sole SMFF provider, to present its salvage plan to the UC, the plan itself would have clearly demonstrated to all UC participants that DJS was completely ready, willing and able to perform either methodology outlined as options in the DJS Plan or, for that matter, any other option proposed by other salvage companies. Dkt 26-1, ¶ 9; Hearing Exh. 18, pp.1-10.

216.     The FOSC should have recognized the conflicting financial terms between the NTVRP Contract, the LOI and those set forth in the ITT and that such financial terms had caused and were causing a delay in the salvage effort.  T. 95; 12-15, 21-24 (Martin).

217.     Between December 1, 2019 (the date of FOSC's first letter denying a deviation request) and December 21, 2019 (the date of FOSC's second letter granting a deviation request), there were no facts or circumstances that would warrant the FOSC conclusion that exceptional circumstances existed to warrant a deviation from the NTVRP.  T. 139; 2-4 (Hankins).

218.     "The only thing that changed was that the RP was allowed to send out an ITT", which resulted in a delay occasioned by a competitive bidding environment and the selection of another resource provider willing to agree to financial terms wherein it assumes greater risk.   T. 145:22-146:2 (Hankins).

219.     This court finds that the change of financial circumstances is not an "exceptional circumstance" and that delays occasioned by the Owner creating a competitive bidding process is not an "exceptional circumstance" that should be considered in determination whether a deviation is warranted.

220.     The Owner and P&I Club were using the ITT process and competitive bidding to change the financial terms of the NTVRP Contract, in violation of the express terms and spirit of OPA 90 and its regulations.  T. 146-47 (Hankins).

221.     The Court finds that FOSC allowed the Owner to engage in a competitive bidding process, in violation of the express terms and spirit of OPA 90 and its regulations.  T. 146-147 (Hankins).

55

222.     Instead of exercising his authority to allow the DJS plan to proceed through planning protocol, FOSC showed preference for the T&T Plan and directed the Owner to submit a deviation request ("Owner submitted the Deviation Request at the direction of the U.S. Coast Guard…." See Dkt. 22-1, p.3, ftn. 3).

223.     The FOSC's allowing DJS to develop a salvage plan in parallel with GSC created confusion, as evidenced by the 28-page report prepared by GSC "explaining its analysis and concluding wreck removal should be performed using Large Section Demo techniques" (see Dkt. 20-1, p.44, ¶ 1). This document was never shared with DJS, but it is in the Administrative Record. See GSC Position Report, dated November 26, 2019, Admin. Rec. 0000416-000443.

**DEVIATION REQUEST**

224.     The Owner submitted to FOSC a letter requesting that FOSC authorize Owner to deviate from the NTVRP and add another SMFF service provider. See Hearing Exh. 12, Dkt. 20-1, pp. 43-47. DJS did not receive a copy of the Owner's deviation request letter until after this litigation was filed. T.56:1-6 (Martin).

225.     Commander Witt received the Owner's request for deviation on December 19, 2019 but did not provide to DJS a copy of the letter when he received it and did not provide DJS an opportunity to discuss with him the contents of the Owner's letter. T.WITT:195:8-13.

226.     In analyzing whether to grant the Owner's deviation request, Commander Witt concluded that exceptional circumstances existed based upon the following "aforementioned circumstances" (T.WITT:205:22-206:3): he identified that the GOLDEN RAY as a 656 foot roll-on roll-off foreign freight vessel and sitting on its portside listing

at approximately a hundred degrees (T.WITT:204:4-15); he determined that the vessel is in the navigational channel in the busiest RORO port in the U.S. by tonnage (T.WITT:204:16-205:3, 205:4-8); he determined that the vessel is grounded in an environmentally sensitive area which includes prime shrimping grounds and Bird Island (T.WITT:205:9-14); and he determined that the vessel is grounded between two tourist islands, St. Simons Island and Jekyll Island (T.WITT:205:15-20).

227.      The size of the vessel did not change from the date is grounded through the date of his testimony and it remains sitting in the same position, on its portside listing at approximately a hundred degrees.  T.WITT:204:11-24.  The vessel remains next to the same navigational channel in the busiest Ro-Ro port in the U.S.  T.WITT:204:25-205:8.  Finally, the vessel remains grounded in the very same environmentally sensitive area which includes prime shrimping grounds and Bird Island.  T.WITT:205:9-14.  And the vessel is currently in the same proximity to St. Simons Island and Jekyll Island, both tourist destinations, as it did when it capsized.  T.WITT:205:15-20.

228.      The Owner's requested for deviation did not specify which of the 19 services T&T would be selected to perform.  T.WITT:192:20-24.

229.      Commander Witt understands that the effect of granting the deviation authorized Owner to select T&T as the provider for all SMFF services.  T.WITT:41:12-22; 193:17-21; T.WITT:237:1-6 (Commander Witt understands that T&T is basically taking over all remaining SMFF services).   Further, as a result of the deviation order, Commander Witt is aware that DJS was displaced as SMFF provider and is not performing any SMFF services under the NVTVRP.  T.WITT:41:12-25

230.     Commander Witt knew at the time he received and reviewed the Owner's letter requesting deviation that DJS was the sole resource provider for SMFF services under the NTVRP.  T.WITT:198:7-12.

231.     Owner misrepresented facts in its request:

   a.  Owner misrepresented to UC that DJS was unwilling to utilize LSD.  The Owner and the Owner's QI and Insurer were pressing for an LSD but using negotiations for costs and risk management as the basis for failing to agree to a final salvage plan with DJS.  Dkt. 26-1, ¶ 8(g).  The LOI shows that the P&I Club entered into "exclusive negotiations" with DJS "in order to conclude suitable contracting principles for recovery and removal of the Vessel and cargo…."  See LOI, Dkt. 20-1, pp. 6-8.  The Owner also improperly engaged the services of GSC to develop salvage plan procedures and an early communication with DJS made it clear that they requested DJS analysis of "three high level dismantling scenarios including of pro's and con's on feasibility…." Dkt. 20-1, pp.10-12.

   b.  Owner misrepresented to UC that "[b]oth times Donjon-SMIT submitted a wreck removal plan that did not include complete large section demolition." T. 65:7-14 (Martin).

   c.  Owner misrepresented to UC that "DJS proposed to perform small section demolition and for owners to separately contract for the erection of an EPB with a third party.  T.65:19-23 (Martin).

   d.  Owner misrepresented to UC that "Under DJS's small section demolition timeline, complete removal of the wreck would not be expected to occur until P 90 date of 7 October 2020." T. 66:4-8 (Martin).   In fact, DJS ran its own quantified risk

assessment and they "put in the record the differences how they were combining

risks on top of risks to make the dates run out." T.66:8-17 (Martin)

    e.  Owner misrepresented DJS's positions regarding LSD versus SSD, as well as

misstating DJS's concerns about the use of/need for an environmental protection

barrier (EPB). Dkt. 20-1, pp. 14-18.

    f.  Notably, the Owner also conveniently failed to mention in its missive to the FOSC

that it had tried but failed to get DJS to agree to new financial terms outside the

NTVRP Contract. Dkt. 26-1, p. 3 ¶ 8(b).

    g.  At all times relevant, DJS knew that the "barrier was not an option not to do it" and

that it would have to be part of the overall plan. T. 40:14-16 (Martin).

    h.  DJS was not given an opportunity to have input into the deviation request, was not

aware when it was submitted and not provided an opportunity to respond, despite

repeated requests to the FOSC.

232.    Commander Witt relied upon the facts represented by Owner in basing his deviation

decision. T.WITT:26:15-19. However, Commander Witt testified that he would be

concerned if the facts represented by the P&I Club and GSC were not accurate.

T.WITT:26:20-23. Commander Witt simply based his deviation decision on what the

owner had requested. T.WITT:27:5-7.

## FOSC LACK OF COMMUNICATION WITH DJS

233.    The Coast Guard's stated policy is to have excellent communication with the public

and stakeholders, from the start and throughout any project. The Coast Guard's policy

recognizes the importance to manage External Affairs, i.e., communication and

transparency with the public and stakeholder groups, i.e., "hit it hard and hit it fast to set the correct tone at the onset of a response." (Hearing Exh. 33, Chpt. 9-1)

234.      In this instance, even though DJS was a part of the Incident Management Team in the operation section (T.WITT:44:22-25, 45:1-2) Commander Witt testified that he was "reluctant to meet with [DJS] independent of the owners." T.WITT:177:3-4. With respect to the salvage plan, Commander Witt decided to wait until the owner submitted its preferred salvage plan before he would meet with DJS. T.WITT:178:10-14.

235.      As a member of the Incident Management Team, Commander Witt agreed that there should be good and healthy, consistent communication between UC and DJS, yet he still refused to meet with DJS. T.WITT:41:3-21.

236.      DJS is consistently shown as part of Commander Witt's organizational management structure, the purpose of which was to make sure that every person and entity listed and engaged in the work or which they were contracted or required to perform. T.WITT:33:24-25, 34:1-4 (USCGRE002417-002421 is just one example of the many organizational charts showing Commander Witt as FOSC and representatives of DJS, as well as other stakeholders, part of the overall organizational management structure. *Id.*

237.      Commander Witt violated the Coast Guard's own guidance regarding compliance with OPA 90 and the Chafee Amendment, in that he failed to be "mindful of the need for salvors during a response and ***ensure close coordination with contracted SMFFs*** to ensure successful salvage operations for saving life or property in danger and for preventing damage to the environment." *See* USCG Marine Environmental Response and Preparedness Manual, COMDTINST M16000.14A, Section 2.C.2.b (30 November 2016) (Emphasis added). Plainly, while the Coast Guard's own interpretation of OPA 90

requires FOSCs to closely coordinate with SMFF providers, Defendants instead chose to completely leave DJS in the dark and never afforded DJS with a single meeting to discuss its proposed plan.

238.     DJS was not even aware of Commander Witt's reasons for approving Owner's deviation request until receiving the Government's response to DJS motion for injunctive relief.  T.61:10-14 (Martin).

239.     Even though Commander Witt knew that DJS submitted a plan to the Owner and P&I Club on November 5, 2019, and even thought DJS is part of Commander Witt's organizational management structure, Commander Witt did not ask to meet with DJS during the period November 5, 2019 through November 26, 2019.  T.WITT:114:24-25, 115:1, 33:24-25, 34:1-4

240.     Commander Witt received the letter from Mr. Williamson and the attachments (T.WITT:255:4-6), and he testified that he reviewed the materials, but he testified that his recollection of the November 26th meeting focused primarily on contractual issues. T.WITT:251:9

241.     However, during the November 26th meeting, Commander Witt knew that DJS was under duress and that DJS was getting pressure from the P&I Club regarding financial terms.  T.WITT:251:22 – 252:22.  Even though Commander Witt knew that DJS was under duress because of the pressure from the P&I Club, he did not issue any orders or make it clear that commercial terms or negotiations were not going to impede or delay the salvage and wreck removal efforts.  T.WITT:252:23-253:4.  At the time, his focus was that the DJS proposed plan did not address the Owner's concerns.   T.WITT:253:8-11.

242.     Commander Witt, knew full well the implications of the LOI and the ITT, and also
knew that DJS was under duress from the pressure from the P&I Club over commercial
terms and negotiations, but incredulously Commander Witt suggested during his testimony
that he was not aware that P&I Club was trying to renegotiate contract terms with DJS.
T.WITT:59:1-16.

243.     Even though Commander Witt knew that DJS was under duress with P&I Club
regarding financial considerations, Commander Witt did not intervene.  T.WITT:253:5-8.
Commander Witt was "focused on the fact that the plan they had submitted on -- in the
beginning of November did not, at least the way [he]read it, clearly addressed [sic] the
owner's concerns."  T.WITT:253:5-11.

244.     Commander Witt received an email from Mr. Hankins, dated December 22, 2019,
requesting a meeting, but he was unwilling to meet with Mr. Hankins or other
representatives of DJS.  T.WITT:256:6-13.

245.     Commander Witt never consulted with DJS about whether T&T should be selected
as an additional resource provider.  T.WITT:256:24-257:5.

246.     On December 18, 2019, Kevin Perry emailed Commander Witt wherein he
references a "previous email" and that there were "some questions directed to [DJS] that
were outstanding" but that they had "received from [DJS] answers to those questions."
T.WITT:258:20-24.   See Admin. Rec. Bates 0002435 to 00002444.

247.     In response to Mr. Hankin's meeting request, as set forth in his December 22nd
email, Commander Witt responded that he will "defer to the owner's representatives,
copied to schedule any desired meetings with the UC."  T.WITT:257:21-23.  Instead of

granting a meeting with DJS, Commander Witt deferred to the owner about whether or not the owner wanted or was willing to let DJS meet with UC.  T.WITT:257:24-2; 109:15-20.

248.      Commander Witt also knew that Mr. Hankins raised some serious charges of misstatements of facts as represented by Owner to Witt and UC, but simply deferred to the Owner whether a meeting would take place.  T.WITT:255:7-25.

## FOSC DECISION AND DECISION LETTER

249.      Owner (at the direction of the FOSC) requested the deviation from NTVRP, by letter dated December 19, 2019 and FOSC issued his decision letter, granting the deviation, on December 21, 2019.  Hearing Exh. 15; Dkt.20-1, pp. 40-48.  Commander Witt approved Owner's "request to deviate from your … NTVRP … for the purpose of using T&T Salvage as a salvage and marine firefighting resource provider" ("Decision Letter") Dkt 20-1, p. 63.

250.      During that short period of time, FOSC consulted with U.S. Navy Supervisor of Salvage and Diving and the U.S. Coast Guard Salvage Engineering Response Team. Dkt. 20-1, pp. 57-61.

251.      Just one day prior to approving RPs deviation request, the USCG Salvage Emergency Response Team (SERT) specifically charged with reviewing technical details of salvage plans, offered the following criticisms of the T&T plan:  " limited technical detail is provided, the plan indicates further analysis will be conducted prior to operations…(2) The structural analysis does not include an analysis of the structure in the current condition, nor does it include an analysis of remaining sections throughout cutting and removal; this should be addressed in future revisions of the wreck removal plan."

According to USGC's own internal analysis, the T&T plan provided "limited technical detail," the USCG decided a deviation to be granted.  (See SERT emails setting forth conclusions upon review of DJS's plan and T&T's plan).  Dkt. 20-1, pp. 57-58.

252.     At the time of the Decision Letter, DJS was still listed as the primary resource provider under the NTVRP.  T.WITT:40:14-22.  DJS was not provided a copy of the Decision Letter until Defendants filed it with the Court in connection with this matter.

253.     DJS was not consulted and is not aware of the persons or entities who were consulted prior to the decision to select T&T.  Dkt. 26-1, ¶ 12.a.  But the record shows that at least the Owner, the Owner's QI, the P&I Club and GSC each were involved in the process of review of methodology and in pursuing the ITT, which resulted in the selection of T&T.  The FOSC personally met with representatives of T&T on or about December 19, 2019.  *Id*., ¶ 12.c.

254.     Commander Witt directed the Owner to provide a letter of consent between Owner and T&T by no later than December 29, 2019.  T.WITT:235:1-5, T.WITT:237:7-12.

255.     Commander Witt approved the deviation request and T&T as an additional resource provider but did not require the Owner to secure from T&T an approved contract, consistent with NTVRP requirements, with T&T and, in fact, didn't even require a contract.  T.WITT:237:13-15.   Further, Commander Witt approved the deviation request without requiring T&T or the Owner to produce a funding agreement.  T.WITT:237:19-20.

256.     Commander Witt testified that he reviewed the DJS plan prior to his decision on the deviation request, but clearly he was unaware that the DJS plan also contemplated some version of large section demolition depending on the success of the small section demolition. T.WITT:308:22-25.

64

257.     Commander Witt approved the deviation request and T&T as an additional resource provider but did not require the Owner or T&T to submit a contract or funding agreement, as a condition to the deviation order, consistent with NTVRP requirements. T.WITT:145:14-25, 145:1-13, 237:19-20.   There is nothing in his approval letter that conditions the approval of T&T as an additional resource provider, not preconditioned on a contract or funding agreements.  T.WITT:240:22-241:1.  As of the date of his deviation approval letter, Commander Witt knew that there were no funding agreements in place for T&T.   WITT:241:17-23.   As of the date of his deposition, Commander Witt had not received or reviewed a funding agreement to determine compliance with NTVRP. T.WITT:146:1-25, 147:1.

258.     As of the date of Commander Witt's deposition, T&T still does not have a final approved salvage and wreck removal plan.  T.WITT:144:20-23.  And, as of that same date, Commander Witt has no knowledge whether there is a USCG approved contract between T&T and Owner.  T.WITT:145:4-7.

259.     Instead, Commander Witt merely requested a "letter of consent" expecting them (referring to Owner and T&T) to "demonstrate that they were moving towards finalizing the contract."  T.WITT:237:21-25.  Commander Witt recognizes that there is nowhere in the regulations that contemplate a "letter of consent".  T.WITT:238:11-19.  However, Commander Witt fully recognizes the mechanics of becoming a precontracted, preapproved, USCG certified SMFF provider under an NTVRP contract with funding agreements in place.  T.WITT:238:20-239:5.  Commander Witt is aware of the thirteen (13) criteria that a salvage provider must meet before the salvor is approved and accepted by USCG to serve in that role.  T.WITT:239:6-13.  Further, he is aware that it is a rigorous

process of becoming an approved SMFF provider.  T.WITT:239:14-17.  The whole point

of the NTVRP process is to make sure that the right person shows up at the right time with

the right equipment, the right resources, and the funding agreements in place to make sure

that we are not talking about whether someone is ready, willing and able to perform the job

when an event occurs.  T.WITT:239:22-4.

260.     When Commander Witt approved T&T as a resource provider he was "pretty sure"

that T&T is one of the four resource providers approved for listing and contracting NTVRP.

T.WITT:240:5-13.

261.     Commander Witt was not concerned about the "specifics of the financial

contracting" at the time that he approved T&T, under his directive allowing a deviation.

T.WITT:238:2-6.

262.     As of the date of his deposition, Commander Witt had not seen the specifics of any

type of funding agreement.  T.WITT:242:12-16.  He is aware that the Owner and T&T

have signed a "Wreckhire" agreement.  T.WITT:242:16-17.  He has been provided a copy

of the "Wreckhire", but that document does not include any of the commercial terms.

T.WITT:234:17-18.  The Wreckhire agreement that he was provided by Owner shows that

the financial or commercial terms have been redacted out.  T.WITT:235:3-5.

263.     Commander Witt emphasized that even though the financial terms were redacted

out of the Wreckhire agreement, he was not focused on the financial aspects.

T.WITT:235:22-23.

264.     Regardless, Commander Witt has not seen a final executed contract between the

Owner and T&T, and he does not know the status of the contract.  T.WITT:242:18-243:8.

He has only seen the Wreckhire contract, but the commercial information has been redacted out.  T.WITT:243:7-13; T.WITT:243:18-20.

265.     There were no exceptional circumstances that warranted a deviation from NTVRP and allowing another SMFF provider.  T. 139:2-4 (Hankins).  Further, DJS has never been the subject of a deviation request, other than those involved with the GOLDEN RAY.  T. 139:15-18 (Hankins).

266.     On December 21, 2019, FOSC prepared a decision memorandum, setting forth the "ANALYSIS OF THE FOSC'S APPROVAL OF THE OWNER'S REQUEST TO USE ANOTHER RESOURCE PROVIDER".  Hearing Exh. 16, Dkt. 20-1, pp. 49-61.

267.     Commander Witt agrees that DJS was always responsive in fulfilling its obligations as an SMFF under the NTVRP.  T.WITT:266:4-15.

268.     Commander Witt agrees that DJS was not deficient in performing its SMFF services under the NTRVP ("I think the owner had some issues with the way they provided certain services, but overall, I would agree with that").  T.WITT:266:16-267:1.

269.     He drafted the decision memorandum around the date listed in the memorandum, December 21, 2019.  T.WITT:200:8-16.

270.     Commander Witt's decision memorandum does not mention the following:

    a.  That the financial or commercial terms of the ITT or the T&T proposal are different from the financial terms set forth in the DJS NTVRP contract.  T.WITT:206:4-9; T.WITT:207:16-22.

    b.  That DJS submitted its proposed salvage plan to Owner on November 5, 2019 and that between that date and November 26, 2019 there was no communication between DJS and FOSC or UC.  T.WITT:207:23-208:6.

c.   That Jim Elliott, a T&T representative and friend of Captain Reed, contacted Commander Witt by email on December 4th and 16th, trying to secure the remaining SMFF services for T&T.  T.WITT:208:7-11.

d.   That on either December 19th or 20th, he allowed T&T to make a presentation of its salvage plan directly to FOSC and UC but did not allow DJS to make a similar presentation.  T.WITT:208:13-21; T.WITT:209:12-13.  In fact, Commander Witt allowed the Owner to present its salvage plan because the Owner requested the opportunity to do so, and then the Owner asked T&T to present it.  T.WITT:208:18-21.  When T&T presented its plan to UC, it was at a time when Commander Witt knew that DJS was still the sole salvager provider under the NTVRP.  T.WITT:208:22-209:1.

e.   That he had "no major doubts" that under either plan, i.e., the DJS proposed plan and the T&T plan, the vessel will be successfully removed.  T.WITT:269:24-270:7.  In fact, Commander Witt believes that "there could probably be a half dozen plans that could be successful or more…" as there are "multiple ways to approach this."  T.WITT:270:5-7.

f.   The automobiles are going to end up in the St. Simons Sound.  T.WITT:278:7-9.  Commander Witt expects that when that occurs, "T&T will be recovering those vehicles."  T.WITT:280:14-15.  As of the date of his deposition, Commander Witt is aware that T&T is providing any and all remaining SMFF services under the NTVRP.  T.WITT:280:16-23.

271.   The FOSC, either intentionally or unwittingly, in issuing the Decision Letter, relied upon assumptions that simply were untrue, as follows:

a. Witt's memorandum sets forth wrote that "T&T's plan using LSD is faster than DJS's plan using SSD by approximately four months," and that is not the accurate timetable.  T. 67:14-17 (Martin).  FOSC assumed that DJS's plan would push until 2021, which was not accurate.  DJS's plan would have completed approximately one month later than the plan proposed by T&T.

b. FOSC wrongly assumed the failure of the P&I Club and DJS to finalize a salvage plan was due to the P&I Club waiting for the plan to be developed by DJS.  This is not true as the DJS plan was provided to the Owner and P&I Club in a timely manner, on November 5, 2019.  The Insurer failed and refused to use best endeavors to reach an agreement on the salvage plan, because it was insisting on renegotiating the pre-approved contract and pricing terms as set forth in the NTVRP Contract, in direct violation of OPA 90.  DJS provided to the P&I Club a detailed salvage plan that contemplated possible salvage and wreck removal options that could be utilized, but also made it clear to the P&I Club that it was not renegotiating the terms of the NTVRP Contract.  Dkt. 26-1, pp. 3-4 ¶ 8(d); Hearing Exh. 6 (Admin Rec. has zip file of DJS' entire plan).

c. FOSC's statement that "DJS's lack of adaptability in meeting the owner's demands" is not accurate.

d. DJS's December 2019 Plan shows the options available and does identify the approach recommended by DJS.  However, the DJS plan does address whether large section demolition may be an option during the course of the salvage and wreck removal.  T:175:16-18.  Further, DJS was willing to pursue other methodologies, but not willing to meet the P&I Club's demands, contrary to OPA

90 law, to negotiate new financial terms. *Id.* at ¶ 3(e); T. 67:22-68:2 (Martin); T. 68:3-6 (Martin); T. 124:17-21 (Williamson).  DJS would have been willing[9] to utilize LSD if UC would approve that methodology, after a full planning review, but DJS would not have been willing to do that with the lump sum pricing terms demanded by P&I Club and Owner and assuming the risk. T. 70:7-15; 19-24 (Martin).

e.   DJS had its "recommended methodology, but [DJS] was fully prepared to work with the [UC] to execute whatever the [UC] decided to do."  T. 125:1-3 (Williamson).

f.   There was never a point when DJS refused to perform a large section demolition; however, DJS, in its capacity as SMFF, did recommend the SSD approach, over the LSD approach, believing it was less risky.  T. 44:6-9 (Martin).

g.   Witt writes that "This approval of a deviation from your NTVRP fulfills the requirements of 33 CFR Part 155 and meets the demands of my order.  Please provide me, no later than December 29, 2019, an executed Letter of Consent between you and T&T Salvage.  Also, at your earliest convenience, please provide me an executed contract."  See Hearing Exh. 15; Dkt. 20-1, p. 63.  This does not

---

[9] The full plan provided to the UC, which should be a part of the full Administrative Record, included the following language:  "While this plan was developed to meet Unified Command (UC) objectives with the benefit of DJS's experience, we are committed to a full planning review at the onset and are open to changes in methodology and tactics as determined by the UC before plan execution and at any of the plan's various stages.  Additionally, we are prepared to assess progress with the UC and adjust tactics and assets as UC objectives possibly change from the initial salvage plan as the work progresses."  DJS does not have the complete Administrative Record, but this document should be a part of that record and confirms that UC was notified of DJS' openness and adaptability to changes in methodology, once finalized and approved by UC.  Dkt. 26-1, p. 7 ¶8(y).  Thus, Commander Witt should have had direct knowledge that this assertion was not accurate.

meet the requirements of 33 CFR Part 155.  First, a letter of consent is not an acceptable contract or other approved means for a vessel of this size, and second, according to 155.4025 definitions, "(a) As part of the contract or  other approved means you must develop and sign, with your resource  provider, a written funding agreement.   This funding agreement is to ensure that salvage and marine firefighting responses are not delayed due to funding negotiations.   "Funding agreement is a written agreement between a resource provider and a planholder that identifies agreed upon rates for specific equipment and services to be made available by the resource provider under the agreement.  <u>This agreement must be part of the contract or other approved means and must be submitted for review along with the VRP."</u>  (Emphasis added) Witt abrogated the regulatory requirement, itself, along with the listed regulatory procedures by not requiring a contract to be submitted as part of his approval process.

    h.  FOSC chose to ignore SERT technical review comments and based his decision on an unvetted, challenged timeline provided by GSC, a non-VRP third party

272.    "If Commander Witt's definition of exceptional circumstances stands, then there is no reason for us to have VRP because every single salvage incident is an exceptional circumstance." T. 148:23-149:1 (Hankins).

273.    DJS is not aware of any other request for deviation that has been approved by any other FOSC, in any event that is governed by OPA 90. T. 120:23 -121:1 (Williamson); T. 139:7-11 (Hankins); T:WITT.232:22-25.  Commander Witt has never issued a deviation for any other NTVRP and is not aware of it having been done in any other OPA 90 incidents.  T:WITT:152:11-23.

274.    FOSC delegated excessive authority to the Owner, the P&I Club and the GSC and gave into their demands:

    a.   Owner asserts that they prefer the LSD be performed with the EPB to maximize containment and minimize any adverse environmental impact.  *See* Dkt. 20-1, p.1, ¶ 1,6(c).

    b.   T&T's salvage plan met the Owner's demands and proposed a Large Section Demolition and an Environmental Protection Barrier.  *See* Dkt. 20-1, ¶ 6.

    c.   Neither of DJS' plans satisfy the concerns of the Owner.  *Id.*

    d.   T&T's plan met [the Owner's] preferred demolition methodology and preference for placement of an environmental barrier prior to cutting… *Id. at* ¶ 7.

    e.   DJS simply failed to provide a plan that the Owner found satisfactory. *See* Dkt. 20-1.

    f.   The "Owner ultimately rejected DJS' plan."  Dkt. 20-1, p. 50.

    g.   The FOSC, in his decision memorandum, cites conflict between the Owner and DJS, and sides with Owner without the benefit of any type of presentation or meeting with DJS (Dkt. 20-1, pp. 53-43).

275.    The P&I Club has no role in the Incident Command System (ICS), and in particular the UC, utilized to respond to casualties such as the GOLDEN RAY.  T. 120:10-14 (Williamson).  Further, typically the insurer is involved "at the periphery as an interested party" but the process of finalizing a salvage plan is "always been left to the owners".  T.120:18-19 (Williamson).   "We provide [the plan] to the owners and then unified command…with the FOSC taking obviously priority."  T. 120:18-22 (Williamson).

276.     FOSC Decision Letter states that DJS lacked "adaptability in meeting the Owner's demands" (Hearing Exh.16, Dkt. 20-1, p. 54, ¶ 2); however, this Court finds that DJS satisfied its obligations to perform SMFF services as primary resource provider, was willing to utilize a variety of options, and diligently pursued a salvage plan that addressed all methodologies requested by Owner, P&I Club and GSC.

277.     FOSC Decision Letter makes no reference to the differing financial terms between the DJS plan and the T&T plan.  Dkt. 20-1, pp. 49-55.  FOSC should have taken into consideration the degree to which the financial considerations were impacting the SMFF services by DJS, the primary resource provider for SMFF under the NTVRP, and the extent to which the delay in removing the wreck was impacted by the ITT process.

278.     DJS learned about the FOSC's decision to allow a deviation from the NTVRP on December 22, 2019. T. 61:21-25 (Martin).  DJS had no idea why it was being replaced by T&T.  T. at 123 (Williamson).  As the primary SMFF resource provide under the NTVRP, DJS should have been contacted before any deviation was granted.  T.123 (Williamson).

279.     The FOSC's approval of a wholesale substitution of T & T as the sole resource provider on this salvage conflicts with 33 C.F.R. 155.4032, which states that changes can be made only for a "specific service required." The regulations do not allow for the wholesale addition of another resource provider for all 19 SMFF tasks.

280.     This deviation was allowed despite the fact that DJS was never notified that it had failed to perform or was unable to perform its required services or that it was non-responsive, or its responses were deficient. Dkt. 26-1, p. 9 ¶ 8(gg); T.123-124 (Williamson); T.54:21-24, 55:9-11 (Martin).  DJS performance satisfied the purposes of

73

OPA 90, by being immediately responsive and available to provide the services contracted for under NTVRP. *Id.* at ¶ 8(hh).

281.     DJS did not receive a copy of the FOSC decision letter or Decision Memo until this litigation when Defendants provided it as an exhibit to their responsive submission (February 21, 2019).

282.     DJS, the primary and sole resource provider for SMFF as set forth in NTVRP, objected to any suggestion of a deviation request by Owner and repeatedly attempted to provide input into the FOSC decision to select a resource provider another than DJS, but was denied the opportunity. *Id.* at ¶ 8(m).

283.     On December 22, 2019, Paul Hankins sent a letter to FOSC and others, challenging FOSC's decision to authorize a deviation from the NTVRP and, also, challenging the assumptions upon which FOSC made the decision. Hearing Exh. 17 (Dkt. 1-3, pp. 3-7). Mr. Hankins queried why there was a deviation approval "without ever having sought a salvor meeting on our plan or our position on the removal of the GOLDEN RAY." *Id.* Mr. Hankins pointed out that DJS had "never been asked to present our plan directly to" QI and FOSC staff and that it seemed odd that T&T was given an opportunity to prevent its plan directly to FOSC. *Id.* He then wrote: "The fact that the SMFF provider can't get 30 minutes in front of our [UC] in deference to English underwriters and Dutch consultants with zero assets or responsibility (and no formal role in the UC) is an extreme disappointment." *Id.* at 4. Within two days of Mr. Hankins letter to FOSC, he received a scathing letter from an attorney for the Owner. Dkt. 22-1 (not part of the Administrative Record produced as of this date).

284.     DJS made repeated requests for meetings and information from UC and FOSC but was not provided information sufficient to even begin to understand the rationale or reasoning behind FOSC decision to grant Owner's deviation request.

285.     Additionally, DJS sent FOIA requests to USCG requesting information pertaining to FOSC decisions regarding the deviation request.  T.121:18-25 (Williamson); Hearing Exh. 26.  The USCG received FOIA requests, dated December 26, 2019; however, USCG has failed and refused to provided documents properly requested under FOIA.  *Id.*

## DELAY CAUSED BY FAILURE TO FOLLOW AND USE NIMS AND THE PLANNING AND ORGANIZATIONAL STRUCTURE OF NIMS

286.     The DJS salvage plan contemplated that the GOLDEN RAY salvage operation is "subject to the input of the [UC] and the Incident Management System (IMS)…"  The Owner and P&I Club, however, never submitted November 5, 2019 DJS plan to UC; instead they pursued the Invitation to Tender ("ITT") which caused delay in the salvage operation.  T:76:24-77:1

287.     The USCG AND FOSC are required to use the National Incident Management System (NIMS)[10] for incident management. This includes the use of Incident Command System ("ICS") and ICS-209 forms, which are routinely used to provide incident summaries. *See e.g.,* Hearing Exh. 24 (ICS-209 Incident Summary); T. 134:21-25; 135:1-6 (Williamson).

___

[10] NIMS is a comprehensive, national approach to incident management that is applicable at all jurisdictional levels and across functional disciplines. *See* Natl' Incident Management System, 3rd Ed, October 2017, p. 78 (hereinafter NIMS).

288.     The primary role of ICS is to establish planning and management functions for responding partners to work in a coordinated and systematic approach. These functions can include: using common terminology, integrating communication media, creating a unified command structure, coordinating resource management and allocation, and planning.  The **incident commander**,  manage[s] response activities by assigning personnel, deploy[s] equipment, obtain[s] additional resources, and coordinat[es] with participating partners as needed. The incident commander delegates emergency management responsibilities as needed, and thereby maintains necessary focus on the overall picture of the disaster situation.  NIMS, pp.3, 25-31

289.     The Incident Action Planning Process (IAP) is designed to provide clear direction and includes a comprehensive listing of the tactics, resources, and support needed to accomplish the objectives. The various steps in the process, executed in sequence, help ensure a comprehensive IAP. These steps support the accomplishment of objectives within a specified time.  NIMS, pp. 105-110.

290.     UC is required to use the Planning P process.  T.43:5-10 (Martin); see Plaintiff's Exhibit 33, COMDTINST M3010l.24, Section 3-9.   The DJS plan did not make it into the planning process to ensure that the DJS Plan received proper review and consideration. *Id*.

291.     The Planning P consists of various phases, and at each step all stakeholders, including  the resource providers, are to be involved.   It involves a "series of meetings so everything is evolving, because things in salvage and emergency responses are always changing, so you have a continuous evaluation  process and it refines it and you get a better solution until you execute."  T. 43:5-10 (Martin).

292.     "The planning section piece was the most important piece [related to this case] because it put organization around developing these plans to execute these emergency responses specifically designed to be very – very --  nimble, so as plans needed to change, the Planning P, all the stakeholders get involved and adjust the plan for the next day to make sure the plan is the best plan you have to offer."  T. 132:19-133:1 (Hankins).

293.     Under the Operational Planning Cycle protocol, there should have been, among other features, an Initial UC meeting, a UC objective meeting, a Command and General Staff meeting, a Tactics Meeting, and Planning meeting, and then approval of the Plan, followed by an Operations Briefing, after which the Plan was executed.  The protocol for each step – including even suggested agenda for each meeting is spelled out in detail in ICS Section Chief, Section 6.0 "Manage the Planning Process".  Once a Plan starts through the process, the USCG protocols envision that the Plan may need adjusting, in which case the Planning P begins again as necessary.   The DJS plan never made it into the Planning P process.  T.125:20-126:5 (Williamson).  It was unusual that the DJS was not put through the Planning P process.  T. 126:6-11 (Williamson).

294.     In this case, UC and FOSC failed to utilize Planning P to enable the DJS plan proper consideration.  T. 125:21 (Williamson).  DJS is the primary resource provider for SMFF and they are "very much a part of the resource plan system."  T. 125:15-17 (Williamson). Even after the FOSC received the DJS plan in late November, the Planning P was not being utilized with respect to the DJS salvage plan; there "was no dialog whatsoever between what [DJS was] doing to put forward as a plan and whatever the Coast Guard or the Unified Command was thinking as going to be implemented."  T. 134:16-20 (Hankins).

295.    This Court finds that FOSC and UC did not engage the Planning P  or any other effective planning system with respect to DJS plan and the failure to do so prevented DJS plan from considering an appropriate review, revisions and securing final approval by UC.

296.    DJS assumed, per usual protocol, that the Owner in early November had forwarded its proposal to the FOSC for consideration and that the UC would respond in the usual and timely fashion.

297.    Commander Witt told the Owner and DJS that his "goal was not to get the Coast Guard involved in – in the contractual matters." T.WITT:190:23-24. He did not want to get involved in any conflict over financial or commercial terms between the Owner and the primary salvage provider ("I don't want the – costs to drive the response"). T.WITT:191:11-16. Contradicting himself, Commander Witt then testified that he would intervene if he recognized that costs were driving the response. T.WITT:191:19-21. In this instance, however, he "never recognized or believed that the rejection of [the DJS] plan on the 5th of November was a pretext to change the contractual terms…." T.WITT:192:1-4.

298.    Commander Witt did not concern himself with the motivation of the P&I Club and GSC or Owner in making his deviation decision. T.WITT:26:3-14. In fact, Commander Witt did not consider the motivations of the Owner or P&I Club for the LOI or the ITT. T.WITT:19-25.

299.    "[R]ather than hold discussions with Donjon-SMIT LLC to overcome differences" with DJS, the Owner's, the P&I Club's and GSC's "preferable course of action was to issue an Expression of Interest document followed by an Invitation to Tender…." Hearing Exh. 9 (Dkt. 20-1, p. 18).

300.     The express terms of the ITT, however, make it clear that the Owner, P&I Club and

GSC were  unwilling to engage in meaningful and constructive discussion with DJS after

they received DJS's plan on November 5, 2019, making it impossible for DJS to continue

to perform services as SMFF.   Dkt. 20-1, p.6.

301.     Commander Witt testified that the DJS proposed plan never made it into any type

of planning process with FOSC or UC, because it was not preferred by the Owner.

T.WITT:283:25-283:4.

302.     The FOSC and UC:

a.   Failed to properly communicate to DJS, as prescribed by The United States Coast

Guard Incident Management Handbook (IMH) COMDTPUB P3120.17B (May

2014) (hereinafter IMH), the UC, led by FOSC, is required to engage in

"Stakeholder outreach." Dkt. 28-6, p. 4-14.

b.   Failed to keep stakeholders, among others, informed "of [incident] response

activities." Dkt. 28-6, p. 50:  IMH, p. 4-8, Management ¶ E.

c.   Failed to "[e]stablish an information transfer process to facilitate communications

with stakeholders and organizations."  Dkt. 28-6, p. 51: IMH, p. 4-9, Management,

¶ R.

d.   Failed to define and follow Critical Information Requirements (CIRs) which are

"critical to facilitate timely decision making."  Dkt. 28-6, p. 51 & p.171: IMH, p.

4-9; IMH p. 12-6.  CIRs are developed to "ensure the most accurate and appropriate

data is gathered by both operational assets and other IMT members." Dkt. 28-6, at

167-168; IMH, pp. 12-2 to 12-3.  Stakeholder interest and concerns are one of those

enumerated.  Dkt. 28-6, p. 52: IMH, p. 4-10, CIR, ¶ V.

79

e.  Failed to make sure that UC developed "an action plan to ensure communication and coordination with appropriate stakeholders," like DJS, and to keep UC informed of any adverse stakeholder concerns, feelings and/or relationships that may develop.  Dkt. 28-6, pp. 52-53 & 66: IMH, pp. 4-10 – 4-11; *see also* IMH pp. 6-5.

f.  With the goal of achieving a "Best Response," integral parts of the UC and Command response organizational duties, are to keep "stakeholders well informed" and to "efficiently use response resources."  Dkt. 28-6, pp. 55-56:  IMH, pp. 4-13 – 14. The IMH even includes a checklist to assist the UC and the FOSC in assessing their own actions.  Dkt. 28-6, p. 57: IMH, p. 4-15.  Of the twenty-two (22) items of assessment, examples are:  Is progress being made toward achieving objectives and completing tasks?; Is the response organization working together effectively?; Is the response organization communicating effectively?

303.  DJS Plan

a.  With specific regard to the SSD method, when considering a car carrier such as the GOLDEN RAY where much of it remains above the water line, the SSD methodology is safer, less risky and less environmentally dangerous than the LSD. And using the SSD method on large vessels has always been successful. Dkt. 26-1, p. 18, ¶13(b)(i).  The SSD method allows greater control over certain environment issues. *Id.*; Hearing Exh. 6; T.36-45, 52-53 (Martin).

b.  While all salvage methods have risks, SSD has fewer risks should a cut fail or a piece be dropped. Even though a few cars may fall into the water at a time when

using the SSD, in contrast, hundreds of cars will enter the ocean at a time if a failure occurs using the LSD. *Id.,* ¶ 13(b)(i),(vi); 14(c).

c.  In contrast to the dangers created by using the LSD method which leaves the interior of the ship constantly exposed to the elements, if the SSD method is used, three sides of the hull remain intact at all times, and everything below the water line remains protected from tidal action until the interior of the ship is cleaned out.  The hull, itself, acts as a primary containment barrier. Dkt. 26-1, p. 13, ¶ 13(a)(vi).

d.  DJS proposed using an EPB sitting just a few feet off the hull and occupying no more than 5 acres. Dkt. 26-1, ¶13(a)(xiii), (xiv); T. 53 (Martin).

e.  If the SSD is used, by removing the deck of the ship that is now perpendicular to the water, cars can be removed deck by deck after surgically removing sideshell/bulkheads and decks themselves. This method uses the hull as primary containment barrier, keeping the cars on the vessel until they are safely removed. This system would be used until all cars are removed. That would leave the remainder of the hull at water level to remove, minimizing the debris field to clean. Dkt. 26-1, p. 13, ¶13(b)(ii).

f.  Using the SSD would prevent severing the fuel lines thought to be holding upwards of 44,000 gallons of the ship's fuel, because with the method described above, these structures can be accessed from a deck, without exposing the environment to that trapped fuel. Dkt. 26-1, p. 14, ¶13(a)(x).

g.  Because the SSD method would remove the cars and all else above the water line before cutting into the hull below the water line, the possible release of debris or cars into the ocean is substantially minimized. *Id.* at ¶13(b)(iii).

81

h.  In its salvage plan, DJS suggested it would do some of the removal above the water line while the EPB required was being constructed. *Id.* at ¶13(b)(iv).

i.  When the SSD method is used, the sections cut from the ship are considerably smaller than those cut using the LSD method.  The SSD sections are of a size well-suited for the material barges available and can be transported more securely and are thereby more stable. *Id.* at ¶13(a)(viii); 13(b)(v).

j.  A failure using the SSD would just lengthen the time to complete the salvage by requiring smaller pieces and sections be removed at a time. *Id.* at ¶13(b)(v).

k.  Car carriers are unique vessels. Only SMIT, a partner in DJS, has attempted wreck removals of these difficult car carrier projects. T. 126-127 (Williamson); Dkt. 26-1, p. 21, ¶ 14(d). On the occasions when the LSD removal has been attempted on vessels similar to this one, the LSD has failed.  Dkt. 26-1, ¶ 18.  The only car carrier salvage that successfully removed cars without spilling them into the ocean was performed by SMIT using DJS's proposed SSD methodology. *Id.* A repeat of the structural failures of the types experienced by the BALTIC ACE or the TRICOLOR would be catastrophic in the St. Simons Sound. *Id.*

l.  The interior of a car carrier is virtually wide-open, essentially a car garage, with decks.  Because the vessel is on its side, if a car drops from its lashings, it falls to the portside bottom.  T. 22-24 (Martin).

m. The environmental impact during both TRICOLOR and BALTIC ACE wreck removals was significant due to the failure of the large mid-sections that are weakened once the hull structure is compromised.  Once cut there was a large area where cars where falling from the cut sections once lifted.  This is due to the fact

82

that the sideshell breaks away remaining on the sea floor, which leaves the car decks literally open, so cars easily fall out of the collapsed or partly intact sections.   The same risk is present at the GOLDEN RAY wreck removal.  Dkt. 20-1, ¶ 18.

304.   <u>T&T PLAN</u>

a.   As of the date of Commander Witt's deposition, T&T still does not have a final salvage removal plan.  T.WITT:127:17-18.  <u>Commander Witt testified that there are "stages" but that there is still no final approved salvage plan</u>.  T:WITT:127:19-25.

b.   The approved T&T salvage plan (LSD) calls for cutting the GOLDEN RAY into eight, ultra large sections and the potential and known difficulties encountered in this plan are discussed in DJS's salvage plan. Hearing Exh.18.; Dkt. 26-1, p. 13, ¶ 13(i).

c.   To perform the LSD, the hull is sliced by cutting through the hull and the interior, as if cutting a loaf of bread, starting at both ends and progressing toward the center. As the cut-away ends are lifted away to a waiting barge, they and the ship's contents will spread (including cars) into the ocean, some of which may end up on the seabed.  Dkt. 26-1, ¶ 13(a).

d.   There is no current final, approved salvage plan for T&T as of the date of Commander Witt's deposition.   However, he testified that the T&T plan has changed in that they are now proposing to "start at one end and progress to the other for the reason that the … structural strength predominantly lies in the bow and stern."  T.WITT:307:16-21.   He testified that there remains the possibility of structural degradation.  T:307:23-25.

83

e.  Moreover, as the ends of the vessel are removed, the remaining hull loses strength and stability and collapses in on itself, creating a more complex and larger debris field on the seabed. T.37-38 (Martin)  All of the interior contents are exposed to the elements from both open ends, including the constant 5 knot twice daily tides and the strong currents running through the St. Simons Sound. T. 36, 41 (Martin).

f.  Another concern with LSD is that there is presently a crushed fuel pipe tunnel and the fuel piping which is thought to contain some/all of the missing 44,000 gallons of fuel. These will be severed if the LSD is used, uncontrollably releasing this fuel into the water. Dkt. 26-1, p. 14, ¶ 13a(x).

g.  In order to properly utilize the LSD, the Versabar VB 10000 must be used. T-41. It need not be used if the SSD is the chosen method. *Id.*

h.  Commander Witt was not aware that the Versabar crane has never been used in a wreck removal.  T.WITT:275:14-18.

i.  When there is a hull collapse, a rigging failure or if a significant number of cars were to fall from the vessel while the VB 10000 is over it, the VB 10000 could, itself, be seriously damaged, creating a shipwreck within a ship wreck. Dkt. 26-1, p. 14, ¶ 13a(x).

j.  If, as anticipated, the hull collapses after the bow and aft ends are removed, a large number of cars and debris will enter the St. Simons Sound and it is unlikely that the EPB that is being erected can contain the debris and the dropped cars, given the high velocity swirling currents. In that event, there is a significant likelihood that the cars and debris will migrate into the navigation channel, and elsewhere, while

simultaneously spreading fuel and other pollutants now trapped in the cars into the St. Simons Sound, the beaches and estuary. *Id.* at ¶13a(xi).

k.  A representative of T&T stated publicly in Glynn County recently that T&T expects to lose 100 cars overboard with each cut (and its Plan envisions seven cuts). *Id.* at ¶14(c).

l.  The sizeable impact of such an occurrence on the St. Simons Sound, the estuary and the beach would include more than merely the spread of debris and cars because each vehicle contains about 5 gallons of fuel, lubricating oils, steering and transmission fluids, antifreeze, refrigerants, and synthetic, several of which are water soluble. According, any vehicle allowed to enter the St. Simons Sound can release multiple waste streams that neither the net nor the boom can contain. *Id.* at ¶13(a)(xii).

m.  The size of T & T's approved EPB – 31 acres – being erected now - is a risk to navigation in the channel. This enormous size of this EPB is necessary because the LSD was selected, which in turn required the use of VB 10000. *Id.* at ¶ 13a(xiv), T. 41 (Martin).  Even at this size, if cars and debris fall into the ocean, it is unlikely that the EPB will be able to contain them all.  *Id.*

n.  After the LSD cutting process starts, the vessel is completely open to the elements and the twice-daily 5 knot average tidal action.  Indeed, the day-to-day risk during salvage using the LSD method is greater than that from a potential hurricane. *Id.* at ¶ 13(a)(vi), 13(a)(ix).  The certainty that the remaining hull will collapse after the ends are removed is a greater risk than that of a potential hurricane. *Id.* In contrast, if the SSD method is used, three sides of the hull remain intact at all times until all

the contents are removed.  Dkt. 26-1, ¶ 13(b)(ii).   Another significant concern relating to the use of LSD is the actual movement of the severed large sections of the ship to the material barges, and then their safety and security during transport to their final location in Louisiana.  Given the huge size and weight of the sections moved in this fashion, there is the risk that the section itself will be lost at sea or further break apart in transit, affecting an even greater area of the environment. *Id. at* ¶ 14(q).  The sizes to the sections that will be removed in this manner are actually larger than the barges they will be loaded on, creating separate risk that more debris, cars and pollutants will be accidentally dropped into the ocean while in transit. This methodology is also dangerous for the people involved. T. 45-46 (Martin).

o.  There is also the danger under the LSD that the EPB and/or the removal flotilla will have impacts in the channel.  In fact, the greatest risk is after the large sections are loaded on the material barges and are maneuvering out of the EPB. The relative height and weight of the removed sections in contrast to the barge sizes exacerbate the risk.  *Id.* at ¶13(a)(ix); T. 45-46 (Martin).

p.  The impact to the St. Simons Sound, its estuary and near shore environments is greater than just debris and chunks of steel. Each vehicle has at least one battery, contains about 5-gallons of gasoline, lubricating oils, steering/transmission fluids, antifreeze, refrigerants, and a host of synthetics, and some are water soluble. Any vehicle entering the St. Simons Sound has the potential of releasing multiple waste streams that would not be contained by either a net or a boom.  Dkt. 26-1, p. 15, ¶ 13(a)(xii).

q.  T&T has no experience with wreck removal at this scale. *Id.* at ¶ 13(a)(iii).  SMIT, a DJS partner, is the only organization that has performed LSD of a car carrier.  T. 126:2-3 (Williamson).  No LSD of a similarly sized ship, much less a car carrier, has been successful because the ship collapses on itself after end slices are made through the hull. T.115-116 (Jagt); Dkt. 26-1, p. 27, ¶18(b).  The collapse drops the remainder of the ship and its contents to the seabed, which further complicates salvage time, and requires adjusting to an SSD method.  *Id.* at ¶18(d). When SMIT salvaged the TRICOLOR, and the LSD was attempted (the same methodology T&T is using), this collapse is exactly what occurred.  The resulting debris field on the seabed was larger than the ship and a an SSD was used. *Id.*; T. 115-116 (Jagt).

r.  Commander Witt was not aware that T&T had no experience with salvage and wreck removal of a car carrier.  T.WITT:71:24-25, 72:1-3.  Likewise, Commander Witt was not aware that DJS was the only company with experience with salvage and wreck removal of a car carrier like the GOLDEN RAY.  T.WITT:72:4-7.

s.  No LSD salvage operations of large vessels like the GOLDEN RAY have prevented the collapse of the hull after the ends of the vessel are removed.  T. 36; 37:9-25 (Martin).  It was with this experience that DJS recommended that the SSD be used in with the GOLDREN RAY and advised against the LSD method in its Plan and discussions. T. 38:1-5 (Martin).

t.  T&T is already currently two months behind the schedule outlined in T&T's plan. T.124:12-56 (Williamson); T.WITT:131:1-3.

u.  The cost associated with the T&T plan is nearly double the cost of the DJS plan. Dkt. 26-1, p. 20, ¶14(a).

87

v.  T&T has never accomplished a wreck removal of this size or complexity, and certainly has no history with car carriers like the GOLDEN RAY.  Dkt. 26-1, p. 13, ¶ 13(iii).

305.     Large Section Demolition is not a "more expeditious or effective response to the spill or mitigation of its environmental effects" than a Small Section Demolition. Dkt. 26-1, p. 13 ¶ 13(v-xii).

306.     The plan put forth by T&T Salvage does *not* provide for a more expeditious or effective response to the spill or mitigation of its environmental effects.  Dkt. 26-1, p.17, ¶ 13(a)(xix).   In fact, the T&T plan increases the risk of environmental damages, moves the completion date forward by only one month under a very questionable schedule, and costs significantly more than DJS's plan.  Dkt. 26-1, p.20, ¶ 14.a.

307.     The  T&T  recommended  approach,  LSD,  compared  to  the  DJS's  preferred methodology (SSD), is determinedly not more expeditious or effective for the following reasons:

a.  The T&T LSD has failed to remove all the large sections on two previous occasions, when tried on similar casualties. Dkt. 26-1, ¶ 18(a) .  The T&T plan calls for cutting the GOLDEN RAY into eight, ultra large sections.  Hearing Exh. 8.  The discussion of why ultra large sections will not work was addressed in DJS's salvage plan. Dkt. 26-1, p. 13a.(i).   The only car carrier (of three similar casualties) successfully removed without spilling cargo used DJS's proposed methodology (i.e., SDS).  *Id.*, ¶ 18.  No explanation has been given as to why large section cuts would possibly work this time, in the middle of the St. Simons Sound.    DJS fully expects the

wreck and her sections to break up and spill cargo should this method be utilized. Dkt. 26-1, p. 18, ¶ 14(b).

b.  Further, the T&T plan made sweeping inaccurate generalizations on the wreck condition (Dkt. 26-1, p. 13, ¶ 13a(ii)) and they are, essentially, planning for failure. In fact, technical deficiencies of T&T's plan were noted in an email exchange between FOSC and SERT.  Dkt. 20-1, pp. 57-58.

c.  A repeat of the structural failures of the types that were experienced by the BALTIC ACE and TRICOLOR would be catastrophic in the St. Simons Sound, especially when it is a known likely outcome.  Dkt. 26-1 at ¶ 18.c.  Commander Witt was not aware at the time of the deviation request or his decision that there had been two other car carrier vessel incidents where large section demolition had been used. T.WITT:71:24-25, 72:1-3.

d.  It is unclear whether T&T's timeline contemplates the additional time it will take to recover the roughly 700 cars that will end up in the St. Simons Sound, as a result of the LSD proposed by T&T.  Dkt. 26-1 ¶ 14(c).

e.  The DJS recommended plan proposed removing the cars prior to cutting the hull structure so release of debris and cargo into the Sound substantially minimized. The risk of large-scale collapse of the hull structure is significantly less than the large section removal due to the controlled removal of the structure commensurate with reduction in hull strength.  Id., ¶ 13iii.

**HURRICANE SEASON**:

308.     There is no dispute that the hurricane season is one factor but by no means the only

factor.   Seemingly the risk to the environment posed by a potential collapse of the vessel

into the St. Simons Sound is an equal or greater risk.  Dkt. 26-1, p. 13, ¶ 13(a).(vi).  The

hurricane season risk is also mitigated by a small section removal by keeping the hull intact

(acting as a primary containment barrier). *Id.*  When DJS offered that it could compress the

timeline by cutting above water line steel that would not put cargo at risk as the barrier was

built, it was criticized for minimizing concern for the environment, which was the complete

opposite of the intent of the suggestion.  *Id.*, ¶ 13(b)(iv).

309.     But given the time it has taken to get the T&T plan and contract in place, it is

unlikely T&T's would be able to complete its plan prior to the hurricane season either.

Moreover, the risk to the environment by having a ship that has been opened up to the

elements experience during a hurricane is far greater that the risk of a hurricane passing

over the ship with the hull still intact and cars much more safely protected inside that hull.

Id. at ¶ 15(b).

**GREATEST RISK TO ENVIRONMENT:**

310.     LSD has a greater risk to the environment.  Dkt. 26-1, p. 13, ¶ 13(a)(vii).  The

significant additional risk is collapse or loss of an unstable section after lifting onto a

material barge after commencement of transit potentially spilling cars and / or wreck

sections outside the environmental barrier into presently unaffected areas.   The small

section demolition does not have the risk of transporting unstable sections that may

collapse or lost overboard.  *Id.* at ¶13a.(viii).

90

311.     During the TRICOLOR salvage some sections required the heavy lift sheerlegs to remain connected holding the wreck section during transit to the scrapping location. During the TRICOLOR and BALTIC ACE cases only the fore and aft sections could be lifted. *Id. at* ¶18(d).

312.     The remaining sections--similar to those proposed in GOLDEN RAY LSD-- structurally collapsed and had to be recovered by grabbing and wrecking.  The resultant wrecking is messy, more difficult, and more time consuming than the proposed SSD.  The only times LSD in a car carrier was attempted was by SMIT, and both times resulted in the majority of the mid-sections of the wreck collapsing. *Id.* at ¶18(f).

## GREATEST RISK TO NAVIGATION:

313.     The large section removal presents the greatest danger to the navigation channel for two reasons.   *Id*. at ¶ 13(ix).  The first is the high risk for debris, vehicles and/or hull structure falling into the channel.  While the nets are supposed to catch that debris, with 5 kts of current that net is not infallible.  *Id.*   Secondly, with such a large barrier and removal flotilla there will be equipment impacts on the channel. *Id*.   The largest risk to the navigation channel exists after a complete large section is lifted and landed onto a material barge.  *Id.* The sections can be unstable and subject to collapse after maneuvering out of the environmental barrier.  *Id.*  The relative height and width of the sections compared to the barge sizes available further exasperate the risk. *Id.*

314.     In the case of the TRICOLOR and BALTIC ACE, "Giant Barges" not available in the USA were utilized.  Even with the Giant Barges the sheerlegs heavy lift asset(s) were required after some lifts to secure the sections during transit.  *Id*.

**RISK ASSESSMENT:**

315.     In developing its salvage plan, DJS used SMIT's internal risk analysis software that uses common algorithms to assess risks associated with a variety of tasks in a given methodology.  That analysis in part was what convinced DJS not to recommend the Large Section Removal.  A third-party company CL Risk was engaged to develop Risk Registries on plans submitted through the ITT. Although the algorithms used in the risk assessment are similar to what SMIT used in its internal risk process, the results were wildly different (nearly 3-month risk penalty in schedule alone).  When these differences were questioned, DJS was not allowed to ask for reconsideration or provided explanation. *Id.* at ¶. 14.e.

316.     An after the fact analysis of the results found additional discrepancies as outlined in the GOLDEN RAY Comments to Risk Analysis of CL Risk.  Dkt. 26-2, pp. 2-8.

317.     DJS informed the P&I Club at several instances that the P&I Club was using the wrong planning and wrong risk register for the risk delay calculation. Please note that DJSs software did not use the uncertainties as introduced by the P&I Club's CL Risk software, only the risks were applied.  DJS did not see the need for adding uncertainties as this safety factor was already applied directly to the tons/hr. production, meaning, the duration of the removal tasks is already conservative, including the uncertainties. It should also be noted that the planning as originally introduced by CL Risk prior to November 5, 2019 suggested using this conservative production of 7.5mt per hour, while DJS foresaw a production of 15mt/hr based on prior experience and which was shown to the Defendants.  Dkt. 26-1, p. 23, ¶14(l-m).

**CHANCES OF SUCCESS:**

318.     DJS's plan has a very high chance of success as planned and there is 100% certainty

that DJS will complete the operation, having successfully used this methodology multiple

times over the last 40 years.  The plan is to remove in sections that will not compromise

hull integrity, maximizing chances of success.  *Id.* at ¶ 14(p).

319.     For the LSD, if the hull holds together long enough there is moderate chance of

lifting the bow and stern sections intact.  But once these rigid pieces are removed, DJS

estimates a low chance of getting anything else in large pieces.  There is an extremely low

chance that all of the sections can be lifted intact and if so the risk of collapse or loss from

the transport barge outside of the environmental barrier is high.  *Id.* at ¶14.q.

320.     SSD method on large vessels has a high probability of success completion.  There

is much more control on possible environmental issues.   While all salvage methodologies

impart risk, the key to selecting the best option is a robust risk analysis of all methods.  The

reasons an SSD is preferred is that the risks imparted should a cut fail or a piece dropped

is much less than that risk imparted on a large section failure or drop.  Most importantly is

the relative environmental risk.  The SSD removal might risk as many as a few cars at a

time as compared to a large section removal failure risk of hundreds of cars.  It is clearly a

different magnitude of risk.  SSD that have failed are generally due to environmental

conditions not allowing for crane work.  Saint Simon Sound is well protected and crane

work has been successfully ongoing.  Inability to use cranes on location would be the

reason for an SSD from not working.  That is not a significant risk at this location.  Dkt.

26-1, ¶ 13(b)(i).

321.     If LSD fails, what is the worst-case scenario:

93

a.  A significant quantity of ship's fuel is thought to be entrapped within the crushed Pipe Tunnel (Pipe Duct) and Fuel Piping on the portside of the GOLDEN RAY. The Large Section cutting will open the Pipe Tunnel and Piping to the St. Simons Sound. *Id*. at ¶. 13a.(x).

b.  If there is a rigging failure, hull section collapse, or release of a significant number of vehicles, through either the known damage to the hull or at a cut line, while the VB 10000 is in position over the GOLDEN RAY; any such failure could result in the VB 10000 being severely damaged.  Basically, resulting in a ship wreck within a ship wreck. *Id.* at ¶ 13a(x).

c.  Even if the VB 10000 is not directly affected, a GOLDEN RAY hull collapse will spill large quantities of vehicles and debris into the St. Simons Sound.  Even with the net barrier, with the high velocity swirling currents, there is significant chance the debris will migrate into the channel and spread the waste pollution streams about the St. Simons Sound and Estuary. *Id. at* ¶13(a)(xi).

d.  The impact to the St. Simons Sound, estuary and near shore environments is not just debris and chunks of steel.  Each vehicle has at least one battery, about 5-gallons of gasoline, lubricating oils, steering/transmission fluids, antifreeze, refrigerants, and a host of synthetics; several of these fluids/items are water soluble. Many vehicles have already been damaged by the energy of the vessel capsizing as well as the fires that occurred onboard.  Any vehicle allowed to enter the St. Simons Sound has the potential to release multiple waste streams that would not be contained by either a net or a boom.  These streams would enter one of the most productive environments on the East Coast. *Id*.

e.  The number of vehicles unaccounted for will not be ascertained until the completion of section disposal months after a section is harvested. Id. at ¶ 13(a)(iii).

f.  Even Commander Witt acknowledged that the DJS plan had a reduced risk of car displacement.  T.WITT:135:20-136:5.

322.   If SSD fails, what is the worst-case scenario:

a.  A failure would essentially be limited to an increased time to complete the removal and sections may need to be lifted in smaller than planned sections.   Securing and movement of the wreck from site will be much safer than that of the large section removal.  Dkt. 26-1, p. 19, ¶13(v).

b.  While all salvage methodologies impart risk, the key to selecting the best option is a robust risk analysis of all methods.  The reasons a small section methodology is preferred is that the risks imparted should a cut fail or a piece dropped is much less than that risk imparted on a large section failure or drop.  Most importantly is the relative environmental risk.  The small section removal might risk as many as a few cars at a time as compared to a large section removal failure risk of hundreds of cars.  It is clearly a different magnitude of risk.  Small section demolitions that have failed are generally due to environmental conditions not allowing for crane work.  Saint Simon Sound is well protected and crane work has been successfully ongoing.  Inability to use cranes on location would be the reason for a small section demolition from not working.  That is not a significant risk at this location.  *Id.*, ¶ 13(b)(i).

c.  Major hurricanes and storm risks still exist.  Under any approved salvage plan, the salvor would have to give that consideration.

95

Case 2:20-cv-00011-LGW-BWC   Document 60   Filed 03/11/20   Page 96 of 142

**DELAY IN FILING LAWSUIT**

323.     DJS learned of the Decision Letter on December 22, 2019.  T.61:21-25 (Martin).

324.     DJS did not receive a copy of the FOSC decision letter or Decision Memo until this litigation (February 21, 2019) and, therefore, had no basis to understand the reasoning behind the decision made by FOSC.  T.140:11-16 (Hankins).

325.     DJS sent FOIA requests (dated December 26, 2019 and January 13, 2020) to USCG requesting information pertaining to FOSC decisions regarding the deviation request, as well as emails and other documents from the date of incident to the January 13, 2020. T.121:18-25 (Williamson); Hearing Exh. 26.   USCG received both FOIA requests. Without justification, USCG has failed and refused to provide documents properly requested under FOIA.  *Id.*  USCG responded on March 6, 2020 and produced only six pages of documents (including the Owner's letter requesting deviation and the Deviation Letter, but not the Decision Memo).  USCG has not produced any documents in response to the January 13, 2020 FOIA request.

326.     DJS reasonably anticipated receipt of records from its FOIA request and that the USCG would have provided documents responsive to the requests within the time period required under law.  T.121.18-25; 140:11-16 (Williamson).

327.     DJS received its first and only response to its FOIA request on March 6, 2020, when it received from USCG a letter ("USCG FOIA Letter") along with only six (6) pages of documents, including the Owner's letter dated December 19, 2019, and the FOSC's decision letter, dated December 21, 2019.

96

328.        Frustrated that it had not received the information showing justification for the decision to allow a deviation from NTVRP, and allow another SMFF resource provider, DJS filed this action.  *See* generally, Verified Complaint, Dkt. 1.

329.        It was not until filing this lawsuit that DJS received a copy of Decision Letter and the reasons set forth therein.

330.        Even as of this date DJS does not have a complete copy of the Administrative Record.

331.        DJS has attempted to mediate with Owner, but those efforts have failed leaving only the option of Arbitration under the NTVRP Contract.

## ADMINISTRATIVE RECORD INCOMPLETE

332.        The Court ordered Defendants to produce the entire Administrative Record and the Court is persuaded that Defendants did not do that, and improperly withheld weekly summaries, emails and other documents that are not subject to any legitimate privilege. T.WITT:220:16-20, 221:10-14.  The weekly summaries, more operational updates, were prepared by "senior Coast Guard folks" and finalize by Commander Witt  and were designed to make sure that District 7 had an understanding of the events of the prior week related to finalizing a salvage plan and ultimately concluding to allow a deviation. T.WITT:224:17-225:3.  The weekly summaries were documents that identified the facts and circumstances and events that occurred during that week and were considered operational summaries.  T.WITT:224:22-225:3.

**PLAINTIFF DONJON-SMIT, LLC'S FIRST AMENDED**
**PROPOSED CONCLUSIONS OF LAW**

Plaintiff DonJon-SMIT, LLC ("DJS") submits the following First Amended Proposed Conclusions of Law in connection with DJS's Motion for Preliminary Injunction and First Amended Complaint against Defendants Admiral Karl L. Schultz, Captain John W. Reed, Commander Norm C. Witt, and Commander Matthew J. Baer (collectively, "Defendants").

**PROCEDURAL**

**A.    JURISDICTION.**

This Court has jurisdiction pursuant to (1) 28 U.S.C. § 1331, given that this matter involves matters related to the Constitution, and the laws, or treaties of the United States; (2) 28 U.S.C. § 1346, given that DJS's claims against the United States are founded upon the Constitution, Act(s) of Congress and the regulations of an executive department, including but not limited to OPA 90 *et. seq*; and (3) 33 U.S.C. § 1321(e)(2) of the Clean Water Act, and given that the relief sought is in the public interest and is required by the balance of the equities.  Additionally, pursuant to 5 U.S.C. §702 this Court has jurisdiction to review an agency's action.

**B.    STANDING.**

DJS has standing to pursue its claims.  DJS has a "personal stake in the outcome of the controversy" given its status as a SMFF resource provider under the GOLDEN RAY NTVRP. *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663 (1962).  DJS has also shown "(1) an injury in fact that is concrete, particularized, and either actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will redress the injury."  *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768

F.3d 1135, 1145 (11th Cir. 2014); *See Ga. State Conference of NAACP Branches v. Cox,* 183 F.3d 1259, 1262 (11th Cir. 1999).

First, DJS has demonstrated both "injury in fact" and "irreparable harm" (monetary and reputation), caused by the Federal On-Scene Coordinator's ("FOSC") displacement of DJS as the SMFF resource provider in violation of the OPA 90 and Chafee Amendment. *Vt. Agency of Natural Res.*, 529 U.S. at 772, 120 S. Ct. at 1862 ("The interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right.").  Second, given that DJS's displacement, despite its SMFF designation, was the result of the FOSC Commander Witt's actions and decisions, DJS's alleged injury is "fairly traceable to the challenged action of [D]efendant[s]." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  In other words, "but for" the FOSC's failure to comply with the law and, and then, his improper deviation approval, DJS would not have suffered injury or harm.  Finally, DJS's injury is redressable, "as opposed to merely speculative,"[11] given that the Court's order will:

    a.    Restore DJS's property rights, which were improperly taken by virtue of the FOSC's deviation decision which violated DJS's due process rights and

    b.    Repair DJS's reputation and will allow DJS to resume its role as the proper SMFF provider, given that the FOSC's deviation was violative of OPA 90 and the Chafee Amendment.

Similarly, a writ compelling the FOSC to retract the subject deviation will repair DJS's reputation and will allow DJS to resume its role as the proper SMFF provider.  Having concluded DJS has standing to pursue its claims, the Court now turns to the substance and merits of DJS's claims.

---

[11] *Lujan*, 504 U.S. at 561.

## APPLICABLE LAW

### A.   STANDARD OF REVIEW.

The standard of review applicable to DJS's Fifth Amendment due process claim and APA claim under 5 U.S.C. § 706(2)(B) for actions contrary to its constitutional rights is *de novo*. *Chronos Shipping v. U.S. Coast Guard,* 957 F. Supp. 667, 670 (E.D. Pa. 1997) (stating that, under § 706(2)(B), a court "may review the constitutionality of the [defendant] Coast Guard's actions" under a "de novo" standard); *Darden v. Peters*, 488 F.3d 277, 283-84 (4th Cir. 2007) ("[C]onstitutional questions that arise during APA review fall expressly within the domain of the courts . . . [t]hus, judicial review of a claim that the agency's actions violated a claimant's constitutional rights is conducted de novo."); *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205, Will County, Illinois*, 391 U.S. 563, 580, 88 S. Ct. 1731, 1740, 20 L. Ed. 2d 811 (1968) ("This Court has regularly held that where constitutional rights are in issue an independent examination of the record will be made in order that the controlling legal principles may be applied to the actual facts of the case.").

In assessing these constitutional claims, this Court is not required to afford any deference to Defendants' findings or rulings. Instead, this Court will make an independent assessment of the constitutional validity of Defendants' actions. *See Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979) (reversing the lower court's rejection of the plaintiff's first amendment claim and stating that, when assessing whether an agency violated a constitutional right under § 706(2)(B), a court may not "rel[y] on agency findings or def[er] to agency rulings in making its decision" and instead must make an "independent assessment of a citizen's claim of a constitutional right[.]"); *Rydeen v. Quigg*, 748 F. Supp. 900, 906 (D.D.C. 1990), aff'd, 937 F.2d 623 (Fed. Cir. 1991) (stating that

courts "need not accord deference to the agency's decisions in regard to plaintiff's constitutional challenges because the courts, not agencies, are experts on constitutional issues."). Accordingly, this Court may look beyond the administrative record to determine whether Defendants' actions were constitutional. *Grill v. Quinn*, 2:10-CV-0757 GEB GGH, 2013 WL 3146803, at *6 (E.D. Cal. June 18, 2013) ("A direct constitutional challenge is reviewed independent of the APA. As such [a] court is entitled to look beyond the administrative record in regard to this claim.") (citations omitted).

Additionally, in assessing DJS's other APA claims under 5 U.S.C. § 706(2)(A), (C), and (D), this Court will make an independent assessment and is not required to afford any deference to Defendants' findings or rulings. While the APA standard of review is generally narrow and presumes the agency action is valid, *Sierra Club v. Hankinson*, 939 F. Supp. 865, 869 (N.D. Ga. 1996), courts are "not required to stand aside and rubber stamp their affirmance of administrative decisions that are deemed inconsistent with a statutory mandate or that frustrate congressional policy underlying a statute." *Parkway Med. Ctr. v. Heckler*, 614 F. Supp. 564, 566 (S.D. Fla. 1984), aff'd and remanded sub nom. *Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435 (11th Cir. 1987) (citing *National Labor Relations Board v. Brown*, 380 U.S. 278, 85 S.Ct. 980)). Instead, an agency's interpretation is afforded no deference under the APA when it is clearly contrary to congressional intent based on the statute's plain language. *See Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, 424 F. Supp. 2d 37, 47 (D.D.C. 2006) (granting summary judgment against the Coast Guard under the APA for its illegal application of the Oil Pollution Act and stating that "[w]here the Court can easily discern congressional intent from the statutes' plain language, the Court's APA review terminates at step one of the *Chevron* review and the Agency's construction is owed no deference."). This Court finds that Defendants' interpretation

101

of exceptional circumstances as applying in every situation where environmental damage is likely is clearly contrary to congressional intent under OPA 90 that deviations should be rarely granted. Therefore, this Court will review DJS's Fifth Amendment due process claim and APA claims under 5 U.S.C. § 706(2)(A), (B), (C), and (D) de novo and without affording any deference to Defendants' judgment.

## B.    SOVEREIGN IMMUNITY.

Sovereign immunity does not apply to the causes of action in this suit.  Under the *Larson-Dugan* exception, "suits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity.[12]  Here, DJS's causes of action seek specific and equitable relief from Defendants acting beyond their (1) statutory authority under 33 C.F.R. § 155.4032(a) and 33 U.S.C. § 1321(c)(3)(B), and (2) constitutional authority under the Fifth Amendment.  Injunctive relief, declaratory judgment, and writ of mandamus are forms of specific and equitable relief.[13]  Accordingly, sovereign immunity does not bar Plaintiff's causes of actions.  Additionally, the Administrative Procedure Act provides that a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review and such a claim cannot be dismissed on the ground that it is against the United States.[14]

---

[12]  *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 693 (1949); *see also Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).  *See* 5 U.S.C. 701 et seq.

[13]  *See United States v. Mitchell*, 463 U.S. 206, 207, 103 S. Ct. 2961, 2963, 77 L. Ed. 2d 580 (1983); *Bowen v. Massachusetts*, 487 U.S. 879, 893, 108 S. Ct. 2722, 2731, 101 L. Ed. 2d 749 (1988).

[14]  5 U.S.C. §702.

C.      **CLEAN WATER ACT AND OPA 90.**

The Federal Water Pollution Control Act (FWCP or Clean Water Act), as amended by OPA 90, is focused on the prevention of and response to oil spills.  *See* Section 311 of the Clean Water Act Section (33 U.S.C. § 1321); OPA amendment, 33 U.S.C. §§ 2701-2762.  OPA 90 "provides a framework for preventing and responding to potential oil spills" and "mandates oil spill contingency planning at four levels:  (1) the national, (2) regional, and (3) area level, and lastly, at (4) the level of individual owners and operators of offshore oil facilities."  *Alaska Wilderness League v. Jewell*, 788 F.3d 1212, 1215 (9th Cir. 2015) (citing 33 U.S.C. § 1321(b)); *see also Walter Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 48 (D.D.C. 2016) ("The OPA was designed to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry.")

D.      **VESSEL RESPONSE PLANS (VRP) AND NON-TANK VESSEL RESPONSE PLAN (NTVRP).**

By virtue of the Clean Water Act, and OPA 90, owners and operators[15] of certain vessels and facilities must have detailed contingency spill response plans covering "worst-case" spill scenarios.  33 U.S.C. §1321(j)(5)(D).  These mandated plans are called Vessel Response Plans (VRP). 33 CFR Part 155, Subpart I, Sections 155.4010-155.4055.  Since 2013, owners and operators of "non-tank vessels"[16] must have VRPs – called Non-Tank Vessel Response Plans (NTVRPs) - for response services that might be necessary in the case of an oil spill into the waters

---

[15]   Vessel owners and operators are referred to as Responsible Party (RP) and/or "Planholders."

[16]   Vessels carrying petroleum oil only as a secondary cargo with a capacity of 2,500 barrels (105,000 gallons) or more of petroleum oil as fuel (bunkers).  *See also* 33 C.F.R. § Subsection 155.5050(i)(1).

of the United States.  *See* 33 CFR Part 155, Subpart J, Sections 155.155.5010-155.5075.
Planholders (as part of their NTVRPs) must identify service providers for salvage and marine
firefighting (SMFFs) and have in place pre-negotiated and pre-approved contracts with SMFFs.
*Id*.  S*ee also* 33 C.F.R. § 155.5050(d), (e), (f) (a planholder, "by contract or other approved means,
[must have in place] response resources necessary to respond to a [oil] discharge.").  The NTVRP
requirement and SMFF designations exist "to ensure that an incident be responded to quickly and
without the need for contract negotiations during an actual emergency."  Salvage and Marine
Firefighting Requirements; Vessel Response Plans for Oil, 73 FR 80618-01.

> Additionally, NTVRPs must include a "funding agreement."  A "funding agreement" is
>
> a written agreement between a resource provider and a planholder that identifies *agreed upon rates for specific equipment and services* to be made available by the resource provider under the agreement. The funding agreement is to ensure that salvage and marine firefighting responses are not delayed due to funding negotiations.  This agreement must be part of the contract or other approved means and must be submitted for review along with the VRP."

33 C.F.R. § 155.4025 (emphasis added).  Because actual SMFF needs are unknown beforehand, a
fixed lump-sum pricing is not appropriate or even possible.

NTVRPs and the funding agreement requirements exist to ensure that salvage and marine
firefighting responses are not delayed by funding negotiations which would otherwise slow down
and frustrate the stated purpose of the OPA 90, as amended. 33 U.S.C. § 1321(c)(3)(B).
Accordingly, when a discharge occurs or may be imminent, a non-tank vessel owner or operator
must act in accordance with its NTVRP.  33 U.S.C. 2701 (32), 33 U.S.C. § 1321(c)(3)(B).  For the
GOLDEN RAY, the Owner, by way of the vessel's NTVRP, identified and contracted with DJS

as the sole, primary[17] resource provider for all nineteen (19) SMFF services under the GOLDEN

RAY NTVRP.

**E.     THE     NATIONAL     OIL     AND     HAZARDOUS     SUBSTANCES     SPILL**
**CONTINGENCY PLAN ("NCP") AND UNITED STATES COAST GUARD.**

The NCP is the centerpiece of U.S. preparation to deal with (1) spill prevention; (2)

emergency situations; and (3) spill response.  *See* 2 Admiralty & Mar. Law § 18:3 (6th ed.).  The

purpose of the NCP "is to provide the organizational structure and procedures for preparing for

and responding to discharges of oil and releases of hazardous substances, pollutants, and

contaminants."  40 C.F.R. § 300.1.  The Unites States Coast Guard (USCG) "is the lead agency

for federal pollution response in the coastal zone."  Dkt. 28-6, p. 289 (The United States Coast

Guard Incident Management Handbook, hereinafter "IMH").  The NCP specifies that a Federal

On-Scene Coordinator (FOSC) is the federal official with responsibility to direct the spill removal

and clean-up efforts.  *33 U.S.C. § 1321(c)(1)(A)*.  For incident management, the FOSC must use

the National Incident Management System (NIMS) and its Incident Command System (ICS) for

incident management.  *See* Nat'l Incident Management System, 3rd Ed, October 2017, p. 78

(hereinafter "NIMS 3rd Ed").  Dkt. 28-6, p. 4 – IMH.

"The NIMS ICS is a standardized all hazard – all risk approach to managing crisis response

operations as well as non-crisis events with principles that can be applied to all types of incidents."

*Id.*  "ICS specifies an organizational structure for incident management that integrates and

---

[17]  "The primary resource provider will be the point of contact for the placeholder when multiple resource providers
are listed in the same service . . . ."  33 C.F.R. 155.4025, and 33 C.F.R. 155. 4030 (a).  "The primary resource provider
means a resource provider listed in the vessel response plan as the principal entity contracted for providing specific
salvage and/or marine firefighting services…."  *Id.*

coordinates a combination of procedures, personnel, equipment, facilities, and communications." *See* NIMS 3rd Ed, p. 24; Dkt. 28-6, p. 4 - IMH.  This includes the use of a  National Response Team (NRT) (established as a part of the NCP) to provide technical assistance, resources and coordination. 40 C.F.R. §§ 300.110-300.115.   Effective use of the ICS includes use of an operational planning cycle, more commonly referred to as a "Planning P."

A qualified[18] FOSC is responsible to "coordinate and direct responses to hazardous substances releases or potential releases."   Dkt. 28-6, p. 289 - IMH. The FOCS's "primary objective is to protect public health and safety, and the environment…."  *Id.* A FOSC is to "use[] legislative and regulatory authorities to ensure that pollution response is carried out expeditiously and aggressively."[19]   A SMFF (in this case, DJS) is supposed to be "the point of contact for the planholder, the [FOSC] and the [UC], in matters related to specific resource and services as required in § 155.4030(a)."  Dkt. 28-6, p. 323 - IMH.

## F.  THE CHAFEE AMENDMENT.

The Chafee Amendment[20] to OPA 90 provides:

An owner or operator participating in efforts under this subsection shall act in accordance with the National Contingency Plan and the applicable response plan required under subsection (j), or as directed by the President, except that the owner or operator may deviate from the applicable response plan if the President or the *Federal On-Scene Coordinator determines that deviation from the response plan would provide for a more expeditious or effective response to the spill or mitigation of its environmental effects.*

---

[18]  U.S. Coast Guard, Contingency Preparedness Planning Manual Vol. 4: Incident Management and Crisis Response at 10-5 (2016), available at https://media.defense.gov/2017/Mar/28/2001722998/-1/-1/0/CIM_3010_24.PDF.

[19]  *Id.* at C-4.

[20]  Section 1144 of the Coast Guard Authorization Act of 1996

33 U.S. Code § 1321 (C) (3) (B).   The related administrative law to the Chaffee Amendment, however, provides as follows:

> Use of resource providers not listed in the VRP. If another resource provider, not listed in the approved plan for the specific service required, is to be contracted for a specific response, justification for the selection of that resource provider needs to be provided to, and approved by, the FOSC.  *Only under exceptional circumstances will the FOSC authorize deviation from the resource provider listed in the approved vessel response plan in instances where that would best affect a more successful response.*  (emphasis added).

33 C.F.R. § 155.4032(a) (emphasis added).

## FINDINGS/DECISIONS

### A.   DJS IS ENTITLED TO INJUNCTIVE RELIEF.

The purpose of preliminary injunctive relief is to preserve the status quo until the district court renders a decision on the merits.  *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 (11th Cir.1999).  Therefore, in assessing the appropriateness of injunctive relief, a court must consider "the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (*en banc*).  Here, DJS has shown preliminarily that:

(1)   There is a substantial likelihood of success on the merits;

(2)   Irreparable injury will be suffered if the relief is not granted;

(3)   The threatened injury outweighs the harm the relief will  inflict on the non-movant; and

(4)   Entry of the relief will serve the public interest.

107

*Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir.2005); *see also Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034 (11th Cir. 2001).

1.    **A SUBSTANTIAL LIKELIHOOD OF DJS'S SUCCESS EXISTS.**

(a)    **THERE IS A SUBSTANTIAL LIKELIHOOD THE FOSC VIOLATED THE OPA 90, THE CHAFEE AMENDMENT, AND RELATED REGULATIONS.**

As discussed below, the Court finds that none of the three (3) circumstances upon which the FOSC based his deviation, are "exceptional."  Additionally, the Court finds that the FOSC failed to substantiate the alleged basis for finding "exceptional circumstances" and failed to follow NIMS ICS and guiding regulations by improperly allowing competitive bidding and approving T&T despite the lack of a funding agreement with the Owner.

(i)    **NO EXCEPTIONAL CIRCUMSTANCES TO WARRANT DEVIATION.**

A pre-contracted SMFF provider under a USCG approved NTVRP should **not** be replaced absent exceptional circumstances.   The FOSC Commander Witt identified the following circumstances as "exceptional," justifying his deviation order:

(1)    The vessel is large and close to a navigable channel;

(2)    The vessel grounded in an environmentally sensitive area; and

(3)    The vessel is in close proximity of tourist destinations.

None of these conditions, however, are "exceptional circumstances" given that each circumstance existed as of the date of GOLDEN RAYs capsize.  To accept Defendants' arguments would require the Court to go beyond the intended meaning of the phrase "exceptional circumstances" as expressed by the examples found in the Chafee Amendment regulation.  The Salvage and

108

Marine Firefighting Requirements; Vessel Response Plans for Oil, 73 FR 80618-01, states that "exceptional circumstances" exist when:  "a resource provider [unable] to perform their required services. . . [or] … [] a resource provider [who] is … non-responsive or deficient[.]"  *Id*. at 80637.

Neither circumstance existed with respect to DJS as GOLDEN RAY'S SMFF resource provider.  It is undisputed that, DJS's representatives were on site within two (2) hours, and assisted in the successful rescue of four (4) trapped crewmen, stabilized the worksite by laying down a blanket of rock surrounding the ship, and  successfully removed approximately 300,000 gallons of bunker fuel from the GOLDEN RAY's twenty-four (24) fuel tanks."[21]  It is undisputed that DJS was ready to commence salvage operations of the GOLDEN RAY beginning November 6, 2019 – approximately four (4) months ago and was diligently pursuing the approval of a salvage plan deemed feasible by SERT.  Significantly, DJS was willing to consider other methodologies, even though not its recommendation, so long as other methodologies were properly considered and approved by Unified Command.

The examples set forth in 73 FR 80618-01 illustrate the constraints to a finding of "exceptional circumstances."  An extrapolation of those examples, as suggested by Defendants, would be in contravention of the principle of *ejusdem generis*.  *See City of Delray Beach v. Agricultural Ins. Co.*, 85 F.3d 1527, 1534 (11th Cir. 1996) (applying the doctrine of *ejusdem*

---

[21]  DJS offered documents and the testimony of Messrs.  Paul Hankins, Doug Martin, Thijs van der Jagt, and Tim Williamson who were directly involved in DJS's immediate response to GOLDEN RAY's distress call, and who were actively engaged in fulfilling DJS's responsibilities under OPA-90 as the pre-approved SMFF under GOLDEN RAY's NTVRP.  DJS also presented the Affidavit of Tim Williamson.  Defendants did not contest the content of Mr. Williamson's affidavit.  Defendants did not offer any testimony until they were compelled to make FOSC Commander Witt available for deposition on March 9, 2020.

*generis* that "when an enumeration of specific things is followed by some more general word or phrase then the general word or phrase will usually be construed to refer to things of the same kind or species as those specifically enumerated").

To accept the FOSC's explanation would be contrary to, and ascribe a broader meaning to the phrase (and permit wider latitude) than, that expressed (a) by legal definition (and the word "exceptional" in common parlance),[22] and (b) by courts interpreting the phrase when used in other federal rules and regulations. For example, under 8 U.S.C. § 1229a(e)(1) of the Immigration and Nationality Act, "exceptional circumstances" was interpreted to mean: "…a high bar that 'will be met in only rare cases.'" *Jimenez-Castro v. Sessions*, 750 F. App'x 406, 408–09 (6th Cir. 2018) (quoting *Kaweesa v. Gonzales*, 450 F.3d 62, 68 (1st Cir. 2006)); *see also Herbert v. Ashcroft*, 325 F.3d 68, 72 (1st Cir. 2003). Similarly, under 18 U.S.C.A. § 3145(c) of the Criminal Procedure Act, "exceptional circumstances" was interpreted to mean: "…circumstances which are clearly out of the ordinary, uncommon, or rare." *United States v. McGillivray*, No. 2:11 CR 22-7, 2012 WL 137409, at *2 (quotations omitted) (W.D.N.C. Jan. 18, 2012), and "'a unique combination of circumstances giving rise to situations that are out of the ordinary.'" *United States v. Lea*, 360 F.3d 401, 403 (2d Cir.2004) (quoting *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir.1991)). This is consistent with the United States Supreme Court's interpretation of the term "exceptional"

---

[22] Black's Law Dictionary defines "exceptional circumstances" as "[c]onditions which are out of the ordinary course of events; the unusual or extraordinary circumstances." Black's Law Dictionary (10th ed. 2014). Focusing merely on the word "exceptional," common use dictionaries define the word to mean "rare." *E.g.* "exceptional" *Merriam-Webster.com.* 2020. https://www.merriam-webster.com (8 March 2020). Synonyms for "exceptional" bear out the extremes something must be to be considered "exceptional" for such including: aberrant, aberrated, abnormal, anomalous, atypical, especial, exceeding, extraordinaire, extraordinary, freak, odd, peculiar, phenomenal, preternatural, rare, singular, uncommon, uncustomary, unique, unusual, unwonted. *Id.*

by way of its very rare discretionary grant of "extraordinary writs" under U.S. Sup. Ct. R. 20. Such occasions are almost non-existent.[23]

In addition, Commander Witt's testimony demonstrated that he did not have a good understanding of how OPA 90 and the regulations work in the salvage and wreck removal context. (T.WITT:231:25-232:6).   It is quite apparent that his casual views of the OPA 90 and Chafee Amendment, i.e., believing it is "entirely reasonable for the owner to explore other options", is the very reason for this litigation.   The Owner and P&I Club interjected competitive bidding into the salvage and wreck removal of the GOLDEN RAY and Commander Witt allowed it, because it is his view that it is "entirely reasonable for the owner to explore other options" and all the while Commander Witt is not focused on whether the financial or commercial terms have caused a delay in the salvage and wreck removal process.

From the evidence before the court, it appears the FOSC used what would be described, at best, as an "any circumstance" standard in evaluating the Owner's deviation request combined with a misunderstanding of how OPA 90 should function.   If an "exceptional circumstance" becomes "any circumstance," then a NTVRP, much like 33 C.F.R. § 155.4032, would become meaningless.   Accordingly, owners and their insurers would be able to circumvent the Chafee Amendment and the Coast Guard's stated purpose for NTVRPs, to prevent contract negotiations during an emergency, thus slowing down and frustrating the stated purpose of the law.   33 U.S.C. § 1321(c)(3)(B).

---

[23]  Thousands of such petitions have been filed, but the Court has not granted an extraordinary writ of habeas corpus since 1925.  *See Ex parte Grossman*, 267 U.S. 87 (1925), or a writ of mandamus since 1962. *See Fong Foo v. United States*, 369 U.S. 141 (1962).

(ii)   **FOSC FAILED TO SUBSTANTIATE ASSERTED EXCEPTIONAL CIRCUMSTANCES AND FOLLOW NIMS ICS.**

The FOSC failed to adequately explain the bases for his decision.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("The process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.").  An agency "order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."  *Id.*  A discretionary agency decision must be supported by substantial evidence.  *Alabama-Tombigbee Rivers Coal v. Kempthorne*, 477 F.3d 1250, 1262 (11th Cir. 2007).  This is consistent with Defendants own authoritative regulation, which provides:

> Before the FOSC authorizes a deviation, the FOSC must clearly document why the deviation is necessary in the MISLE activity and/or other relevant incident response documentation, such as an Incident Action Plan (IAP).

U.S. Coast Guard, Marine Environmental Response and Preparedness Manual, Chapter 5: Industry Response Plans at 5-7 (2018), available at https://media.defense.gov/201 8/Oct/01/20020 46527/-1/-1/0/CIM_16000_14A.PDF.

The Court finds that the FOSC's December 21, 2019 Decision Memo, itself, does not "adequately explain" a legitimate rationale for his decision.  Instead, it merely mimics the demands and commentary of the Owner and P&I Club, including the Owner and P&I Clubs' misstated facts and conclusions.  The FOSC's Decision Memo fails to reflect any independent analysis.  Compare Ex. 12, Dkt. 20-1, p. 43-47 (Owner's December 12, 2019 deviation request) and Dkt. Ex. 16, Dkt. 20-1, p. 49 – 55).  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (an agency's "action cannot be upheld merely because findings might have been made and considerations disclosed which

112

would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding. (citations omitted).").

There is no evidence that the FOSC made any attempts to communicate with DJS after he received the Owner's December 19, 2019 Deviation Demand and before he granted the deviation two (2) days later.  The FOSC did the exact opposite – he affirmatively avoided having any such communications.  There is no reasonable basis for the FOSC not to have engaged directly with DJS.  The FOSC should have engaged with DJS to assure he had an accurate and unbiased understanding of the situation, particularly given the extraordinary decision he was about to make.  Additionally, the Chafee Amendment (33 C.F.R. § 155.4032) speaks of replacing a provider for **a** service, not all 19 SMFF duties.  The uncontradicted testimony to date is that there has not been a circumstance where a deviation from an NTVRP was granted when based upon exceptional circumstances, even more-so for all 19 SMFF services.

### (iii)    THE FOSC IMPROPERLY APPROVED T&T.

NTVRP SMFFs must be under a contract and have in place a funding agreement.  33 C.F.R. § 155.4025.  The FOSC failed to understand this and the NTVRP regulations as they relate to the provision of SMFF services.  This fundamental misunderstanding caused the FOSC to violate the law by not requiring a funding agreement between the Owner and T&T.  The requirement for provision of written contracts and funding agreements for SMFF services is also addressed in the definition of "Contract or other approved means" in 33 C.F.R. § 155.5020 of the NTVRP regulations.  There the regulation allows in subsection (5) that a letter of consent (as opposed to a written contract and funding agreement) for SMFF services <u>only</u> for nontank vessels with a fuel oil capacity of less than 2,500 barrels.  Further, 33 C.F.R. § 155.4045(a) provides that the vessel

owner "may only list resource providers in [the] plan that have been arranged by contract or other approved means." Commander Witt has not seen the specifics of any type of funding agreement. T.WITT:242:12-16. He is aware that the Owner and T&T have signed a "Wreckhire" agreement. T.WITT:242:16-17. He has been provided a copy of the "Wreckhire", but that document does not include any of the commercial terms. T.WITT:234:17-18. Commander Witt emphasized that even though the financial terms were redacted out of the Wreckhire agreement, he was not focused on the financial aspects. T.WITT:235:22-23. Regardless, Commander Witt has not seen a final executed contract between the Owner and T&T, and he does not know the status of the contract. T.WITT:242:18-243:8. He has only seen the Wreckhire contract, but the commercial information has been redacted out. T.WITT:243:7-13; T.WITT:243:18-20. Despite this, he still granted the deviation prior to evening seeing the receiving Wreckhire agreement.

The evidence and record before the Court shows that as of the date of the Deviation Letter, Owner and T&T had not provided proper funding agreements and, therefore, in any event T&T was not property certified or authorized as a resource provider under the GOLDEN RAY NTVRP. FOSC should not have approved the deviation request in the first instance, but also should not have approved T&T without the proper funding agreements.

### (iv)   THE FOSC FAILED TO FOLLOW REQUIRED RULES, REGULATIONS, AND PROTOCOLS.

The FOSC failed to follow the Coast Guards own rules, regulations and protocols as follows:

(1)   The FOSC failed to follow ICS and establish planning and management functions for DJS and failed to properly coordinate a systematic approach.

(2)    The FOSC failed to coordinate with DJS to finalize as salvage and wreck removal plan.

(3)    The FOSC failed to utilize Planning P or other planning protocols with respect to DJS's salvage and wreck removal plan to develop an Incident Action Plan to make it possible for DJS's to have a clear understanding of the methodology and requirements of the salvage and wreck removal that was required or mandated by UC.

(4)    The FOSC and UC failed to properly communicate with DJS.

(5)    The FOSC failed to engage in "stakeholder outreach" with DJS, Dkt. 28-6, p. 44 (IMH, Chap. 4, p. 4-2).

(6)    The FOSC failed to keep DJS, as a stakeholder, and others, informed "of [incident] response activities." Dkt. 28-6, p.50 (IMH, Chap. 4, p. 4-8, Management ¶ E).

(7)    The FOSC failed to "[e]stablish an information transfer process to facilitate communications with stakeholders and organizations."  Dkt. 28-6, p. 51 (IMH, Chap. 4, p. 4-9 - Management, ¶ R).

(8)     The FOSC failed to define and follow Critical Information Requirements (CIRs) which are "critical to facilitate timely decision making."  Dkt. 28-6, p..51 (IMH, Chap. 4, p.  4-9; Dkt. 28-6, p. 171 (IMH, Chap. 12, p. 12-6).[24]

(9)     The FOSC failed to (i) develop an action plan to ensure communication and coordination with appropriate stakeholders whereby draft plans would be submitted to IC/UC for review and approval, (ii) keep IC/UC informed of any adverse stakeholder concerns, feelings and/or relationships that may develop, (iii) keep external entities, such as EOCs, informed of IC/UC direction, and (iv) keep IC/UC appraised of political and/or stakeholder sensitivities.  Dkt. 28-6, pp. 52 – 53 (IMH, Chap. 4, §§ 4-10 – 4-11); *See also* Dkt. 28-6, p.66 (IMH, Chap. 6, § 6-5).

(10)    The FOSC failed to follow "Best Response" guidelines by (i) not keeping "stakeholders well informed," (ii) not "efficiently us[ing] response resources" , and (iii) not properly assessing whether "progress being made toward achieving objectives and completing tasks", whether "response organization working together effectively" or whether "response organization [were] communicating effectively."  Dkt. 28-6, pp. 55-56 (IMH, Chap. 4, pp. 4-13 – 4-14).[25]

---

[24]  CIRs are developed to "ensure the most accurate and appropriate data is gathered by both operational assets and other IMT members." Dkt. 28-6, pp. 167 - 168 (IMH, Chap. 12, pp. 12-2 - 12-3).  Stakeholder  interest and concerns are one of those enumerated.  Dkt. 28-6, p. 52 (IMH, Chap. 4, p. 4-10, CIR, ¶ V).

[25]  The IMH includes a checklist to assist the UC and the FOSC in assessing their own actions.  Dkt. 28-6, p. 57 (IMH, Chap. 4, p. 4-15).

The Court finds that by the failures of the FOSC and UC to follow and implement the NIMS process, including its refusal to communicate with DJS, the FOSC and UC (1) willingly allowed the Owner and P&I Club to unlawfully and improperly interject competitive bidding into the salvage and wreck removal process, (2) impeded DJS from securing a final, approved salvage and wreck removal plan, and (3) violated the governing law and regulations by granting a deviation approving a salvor who was not a party to the pre-approved NTVRP and who was without a funding agreement.

### (b) THERE IS A SUBSTANTIAL LIKELIHOOD THE FOSC's ACTIONS WERE UNLAWFUL UNDER THE ADMINISTRATIVE PROCEDURE ACT CLAIM.

By virtue of the Administrative Procedure Act (APA), a district court may "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . [or] (D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2).  The APA directs reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed" and to "hold unlawful and set aside agency action, findings, and conclusions" that violate the law or are otherwise "arbitrary, capricious, or an abuse of discretion."  5 U.S.C. § 706(1) and (2).

In reviewing an agency's decision under the Administrative Procedure Act (APA), it is the Court's duty to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *McElmurrary v. USDA*, 535 F. Supp. 2d 1318, 1324 (S.D. Ga 2008).  A "clear error of judgment" can be defined as a decision that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law

Case 2:20-cv-00011-LGW-BWC   Document 60   Filed 03/11/20   Page 118 of 142

or unless it is unsupported by substantial evidence. *Id*.; *see Alabama-Tombigbee Rivers Coal v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007). Given that an agency is duty bound to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," a court can overturn an agency decision which is unsupported by substantial evidence. *McElmurrary,* 535 F. Supp. 2d at 1324. *See Assoc. of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Res. Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion..." *McElmurray*, 535 F. Supp. 2d at 1324 (internal citations omitted).

The Court finds FOSC's deviation decision was arbitrary and capricious for the following reasons:

1.   The FOSC's decision memo shows that he believes that his authority to "deviate" from NTVRP occurs the moment there is large capsized "vessel … and in very close proximity to a navigable channel that is the sole access route to the one of the busiest ports in the United States – the Port of Brunswick. . . [t]he vessel is grounded in an environmentally sensitive area that includes prime shrimping grounds and a significant roosting area for migratory birds[,]. . . [and] [t]he vessel is aground in close proximity to the major tourist destinations of St. Simons and Jekyll Islands. Dkt. 20:13; *see also* Dkt. 20-1:51-67. A FOSC does not have authority to expand his powers the moment there is a substantial discharge threat. Under 33 CFR § 155.5010, NTVRPs are to be implemented anytime the FOSC determines there is a

"substantial threat of discharge."  Under Defendants' interpretation of "exceptional circumstances", every time an NTVRP is triggered by a substantial threat, that same threat would also justify immediate deviation from the NTVRP under 33 CFR § 155.4032(a), rendering NTVRPs pointless.  Every NTVRP implementation cannot also constitute an "exceptional circumstance."  If the Court were to sanction and approve FOSC's definition, then such an approach is beyond the scope and authority expressly granted under 33 CFR § 155.5010.

2.   Defendants declined to give DJS a single meeting despite the fact it was the single designated . NTVRP SMFF.  Defendants instead arbitrarily and capriciously took whatever they were told by the Owner at face value and did not follow their statutory mandate to work with the NTVRP SMFF to produce a plan acceptable to the UC. Considering the potential environmental disaster at issue, it was arbitrary and capricious to completely ignore DJS's repeated attempts to gain an audience.

3.   The FOSC's review of Owner's NTVRP deviation request was arbitrary and capricious because it lasted approximately twenty-four hours.  Commander Witt received the Owner's deviation request on December 20 and approved the deviation on December 21, seemingly taking all of the information that Owner provided at face value without seeking verification or consultation from DJS or any other third-party expert.  At the very least Defendants should have solicited technical data from DJS, who had already been working on the GOLDEN RAY for months.

4.   The FOSC decision memorandum fails to mention or consider the differences between the DJS's and the ITT proposal, and the differing economic implications and risks.  Further, the FOSC failed to engage in any degree of due diligence to

determine why there was a failure to agree to a salvage plan, and whether the deviation request from Owner was pretext for the Owner attempting to use the deviation request as a means to secure competitive bidding.

5.   The FOSC decision memorandum fails to recognized that DJS was willing to pursue other methodologies as approved by UC but instead wrongly suggests that "DJS has been unwilling or unable to acquiesce to the Owner's reasonable requests for LSD and an EPB" and that DJS showed a "lack of adaptability in meeting the owner's demand" and that "philosophical disagreements as to the preferred methodology for salvage operations" should justify a deviation from NTVRP.  *See* Memorandum from N.C. Witt, CDR to File, dated 21 Dec. 2019, Page 6, attached as Exhibit 8 to Docket #20.  What the FOSC failed to recognize is that the preferred methodology was not at the heart of the dispute.   If there was a philosophical difference, it was based upon the Owner and Owner's Insurer changing the economic and risk parameters, trying to force DJS into a fixed price contract and assuming the risk of a riskier LSD methodology.

6.   The FOSC decision memorandum also shows that Commander Witt relied upon the following factors that were not true:

a.   Commander Witt's memorandum states that the "T&T's plan using LSD is faster than DJS's plan using SSD by approximately four months,"  This is not the accurate timetable.  T. 67:14-17.  FOSC assumed that DJS's plan would push until 2021, which was not accurate.  DJS's plan would have

been completed approximately one month later than the plan proposed by T&T.

b.      FOSC wrongly assumed the failure of the P&I Club and DJS to finalize a salvage plan was due to P&I Club waiting for the plan to be developed by DJS.  This is not true as the DJS plan was provided to Owner and P&I Club in a timely manner, on November 5, 2019.  The P&I Club was insisting on renegotiating the pre-approved contract and pricing terms as set forth in the NTVRP Contract, in direct violation of OPA 90.  DJS provided to the P&I Club a detailed salvage plan that contemplated possible salvage and wreck removal options that could be utilized, but also made it clear to the P&I Club that it was not renegotiating the financial terms of the NTVRP Contract.  Dkt. 26-1, ¶3(d).

c.      FOSC's statement that DJS's "lack of adaptability in meeting the owner's demands" is not accurate.  DJS's plan shows the options available and merely shows the recommended option.  DJS's was willing to pursue other methodologies, but not willing to meet the P&I Club's demands to negotiate new financial terms.  *Id.* at ¶ 3(e); T. 67:22-68:2; T. 68:3-6; T. 124:17-21. DJS would have been willing[26] to utilize LSD if Unified Command would have approved that methodology, after full planning review, but DJS would not have been willing to do that with the lump sum pricing terms demanded by P&I Club and Owner and assuming the risk.  T. 70:7-15; 19-24.

---

[26]  See footnote 9.

d.  Commander Witt writes that "This approval of a deviation from your NTVRP fulfills the requirements of 33 CFR Part 155 and meets the demands of my order.  Please provide me, no later than December 29, 2019, an executed Letter of Consent between you and T&T Salvage.  Also, at your earliest convenience, please provide me an executed contract."  *See* Hearing Exh. 15; Dkt. 20-1 at 63.  This does not meet the requirements of 33 CFR Part 155.  First, a letter of consent is not an acceptable contract or other approved means for a vessel of this size, and second, according to 155.4025 definitions, "(a) As part of the contract or other approved means you must develop and sign, with your resource provider, a written funding agreement. This funding agreement is to ensure that salvage and marine firefighting responses are not delayed due to funding negotiations.  "Funding agreement is a written agreement between a resource provider and a planholder that identifies agreed upon rates for specific equipment and services to be made available by the resource provider under the agreement.  The funding agreement is to ensure that salvage and firefighting responses are not delayed due to funding negotiations.  This agreement must be part of the contract or other approved means and must be submitted for review along with the VRP." (Emphasis added) Witt abrogated the regulatory requirement, itself, along with the listed regulatory procedures by not requiring a contract to be submitted as part of his approval process.

(c)     THERE IS A SUBSTANTIAL LIKELIHOOD THE FOSC'S
        ACTIONS VIOLATED OF PROCEDURAL AND SUBSTANTIVE
        DUE PROCESS CLAIM.

The Eleventh Circuit Court of Appeals has stated that "§ 1983 has been applied to federal

actors under *Bivens*." *Sibley v. U.S. Supreme Court*, 136 Fed. Appx. 252, 254 (11th Cir. 2005);

*See Holloman v. Watt*, 708 F.2d 1399, 1401–02 (9th Cir.1983), cert. denied, 466 U.S. 958, 104

S.Ct. 2168, 80 L.Ed.2d 552 (1984) (stating that a *Bivens* action only applies against federal officials

in their individual capacities, while the United States and its officers in their official capacities

remain protected by sovereign immunity); *see also Hampton v. United States*, 575 F.Supp. 1180,

1183 (W.D.Ark.1983) citing *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846

(1979).  This Court finds persuasive the Eleventh Circuit authority allowing injunctive relief based

on a *Bivens* claim.  *See Bolin v. Story,* 225 F.3d 1234 (11th Cir. 2000); *Vieux v. Fed. Bureau of

Prisons,* 2016 WL 4070138, at *2 (N.D. Ala. July 29, 2016) ("the Eleventh Circuit Court of

Appeals has implicitly recognized [in *Bolin*] that a *Bivens* plaintiff may pursue a claim for

prospective injunctive relief").; *see also Perez v. Watts*, 2:15-CV-76, 2015 WL 9592536, at *6

(S.D. Ga. Dec. 31, 2015), report and recommendation adopted, 2:15-CV-76, 2016 WL 693542

(S.D. Ga. Feb. 19, 2016) (stating that the plaintiff's *Bivens* claims for injunctive relief against the

defendant federal officials in both their individual and official capacities may proceed).

In the instant case, the evidence shows that DJS invested substantial resources to fulfill the

pre-contracted SMFF services, to enable Owner to travel into U.S. waters and remain OPA 90

compliant.   Defendants, whether by ignorance or otherwise, failed to coordinate with and

recognize DJS as the primary and sole SMFF resource provider during the critical time periods

where DJS diligently attempted to finalize a salvage and wreck removal plan for approval of

Unified Command.  There is no question that the Owner and P&I Club inappropriately interjected

123

competitive bidding into the process of finalizing a salvage and wreck removal plan, and it is also clear to this Court that FOSC and Unified Command not only did nothing to prevent the delays occasioned by the competitive bidding, but in fact encouraged Owner and P&I Club by refusing to meet with and coordinate with DJS, who at all critical times was the sole, primary resource provider for SMFF services.  DJS, the pre-contracted SMFF service provider, was deprived of its contract rights by virtue of the conduct of Defendants, and such conduct gives rise to protected rights under Section 1983.

### (d)     DJS HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS DECLARATORY JUDGMENT CLAIM.

Section 2201, known as the Declaratory Judgment Act, provides that "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a); *Mailplanet.com, Inc. v. Lo Monaco Hogar, S.L.*, 291 Fed. Appx. 229, 230, FN 3 (11th Cir. 2008).  Declaratory judgment is a remedy committed to judicial discretion.  *A. L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324 (1961).  Policy favors rendering of declaratory judgment when judgment will serve a useful purpose in clarifying and settling legal relations in issue and when it will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to proceeding.  *Mine Safety Appliance Co. v. Energetics Science, Inc.*, 416 F. Supp. 530 (S.D.N.Y. 1976).  "The purpose behind  the Declaratory Judgment Act is to afford a[ ] form of relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1230 (S.D. Fla. 2009).

DJS seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and Fed R. Civ. P. 57, and as provided for by the Administrative Procedure Act under 5

U.S.C. § 704.  As set out above, the Court finds that Defendants' actions with respect to their approval of the deviation from the NTVRP were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; Defendants' actions with respect to their approval of the deviation from the NTVRP were contrary to DJS's constitutional rights and Defendants' constitutional powers or privileges; Defendants' actions with respect to their approval of the deviation from the NTVRP were in excess of their statutory jurisdiction, authority, and/or limitations; and Defendants' actions with respect to their approval of the deviation from the NTVRP were without observation or procedure as required by law.

### (e)   DJS HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ON ITS MANDAMUS CLAIM.

The Mandamus and Venue Act, 28 U.S.C. § 1361, provides "original jurisdiction" over a mandamus action "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." [27]  Mandamus relief is appropriate when "(1) the plaintiff has a clear right to the relief requested; (2) the defendant has a clear duty to act; and (3) no other adequate remedy [is] available." *Cash v. Barnhart*, 327 F.3d 1252, 1258 (11th Cir. 2003); *Saadi Nizar Orabi v. Chertoff,* 562 F. Supp. 2d 1377, 1382 (N.D. Ga. 2007).  Though issuance of a writ of mandamus is a "legal remedy, it is largely controlled by equitable principles and its issuance is a matter of judicial discretion." *Id*. (citing *Carter v. Seamans*, 411 F.2d 767, 773 (5th Cir.1969)).

---

[27]  The same standards that apply to DJS's APA claims would also apply to its mandamus claim.  *See Nelson v. United States*, 107 F. App'x 469, 471 (6th Cir.2004) ("When a petitioner seeks both mandamus relief and relief under the APA, courts apply the same principles and standards both to determine jurisdiction and to assess the merits."); *Qadir v. Gonzales*, No. 07-3741(FLW), 2008 WL 2625314, at *3 (D.N.J. June 27, 2008) (quoting *Han Cao v. Upchurch*, 496 F. Supp. 2d 569, 575 (E.D. Pa. 2007)) ("for purposes of compelling agency action that has been unreasonably delayed, the mandamus statute and the APA are co-extensive."); *Hernandez–Avalos v. INS*, 50 F.3d 842, 844 (10th Cir.1995) (describing the APA and the Mandamus Act as "merely different means of compelling an agency to take action which by law it is required to take.").

Accordingly, if no adequate remedy is available to DJS under the APA, this Court could still provide mandamus relief for Defendants' plain violations of 33 U.S.C. § 1321 (3)(B) and 33 C.F.R. § 155.4032 and violation of DJS's Fifth Amendment due process rights.[28]

DJS's claim satisfies all factors.  DJS has a clear right to overturn the FOSC's deviation approval because it was illegal and caused and is continuing to cause harm to DJS.  The FOSC had a clear duty to take control of the GOLDEN RAY response effort and failed to do so.  In his failure, the FOSC allowed the Owner to secure a competitive bidding environment, which ultimate led to the Coast Guard's "final decision" approving the deviation from the NTVRP, removing DJS from the salvage and replacing it with a contractor willing to accept a lump sum contract.  There is no other adequate remedy because the relief offered under the APA is sufficiently distinguishable, in that DJS's APA significantly limits the evidence the Court can consider to the Coast Guard's unilaterally created "Administrative Record."

### (f)   DJS HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS ON ITS SECTION 1983 CLAIM BECAUSE THE FOSC VIOLATED DJS'S DUE PROCESS RIGHTS.

The FOSC's deviation approval effectively gutted DJS's NTVRP contract with the Owner, a contract on which DJS expended significant time, money, and resources to procure.  Because the Coast Guard has improperly interfered with DJS's contract, its Fifth Amendment rights to due process of law have been violated.  Under the Fifth Amendment of the U.S. Constitution, no person shall "be deprived of life, liberty, or property, without due process of law[.]"  Indeed, the "root

---

[28]  Because such mandamus relief would be based upon Defendants' constitutional violations, this Court could look outside of the administrative record in reviewing Donjon-SMIT's claims.  *See Grill v. Quinn*, 2:10-CV-0757 GEB GGH, 2013 WL 3146803, at *6 (E.D. Cal. June 18, 2013) ("A direct constitutional challenge is reviewed independent of the APA.  As such [a] court is entitled to look beyond the administrative record in regard to this claim.") (citations omitted); *Puerto Rico Pub. Hous. Admin, v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 328 (D.P.R. 1999) (authorizing discovery on constitutional claims brought alongside APA claims).

requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *see also Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971).   In this instance, OPA 90 requires vessels to have pre-approved NTVRP contracts and funding agreements in place, DJS was the SMFF service provider under a pre-approved and pre-negotiated contract, and the decision of FOSC completely upset that contract and prevented DJS from enjoying the benefits of that contract.

Protected property interests include valid contracts.  *See Lynch v. United States*, 292 U. S. 571, 579 (1933) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States.").  Se*e also Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1003 (1984) (the range of "intangible interests" include contracts, that are "property for purposes of the Fifth Amendment's Takings Clause"); *Long Island Water-Supply Co. v. City of Brooklyn*, 166 U.S. 685, 690, 17 S. Ct. 718, 720, 41 L. Ed. 1165 (1897) ("A contract is property, and like any other property, may be taken...subject to rule of just compensation[.]"); *United States v. Petty Motor Co*., 327 U.S. 372, 381, 66 S.Ct. 596, 90 L.Ed. 729 (1946) (holding that plaintiff was entitled to just compensation for the *government's taking* of an option to renew a lease); *United States Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").

Here, because the FOSC's deviation approval deprived DJS of "a significant property interest" worth millions of dollars, DJS was entitled to "an opportunity for a hearing" before the

taking of its rights and position as the pre-contractor salvor for all 19 SMFF services under the GOLDEN RAY NTVRP. *See Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L. Ed. 2d 113 (1971). Since no "extraordinary situation" existed to justify Defendants' refusal to afford DJS even a single meeting to defend its property right before the government's "taking," Defendants violated DJS's Fifth Amendment right to due process of law.

## 2. DJS HAS BEEN HARMED AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY WILL BE SUFFERED IF RELIEF IS NOT GRANTED.

As a direct and proximate cause of Defendants' conduct as described above, DJS has and will continue to suffer significant and irreparable harm.

### (a) DEFENDANT'S ACTIONS HAVE IRREPARABLY INJURED DJS BY THE LOSS OF GOLDEN RAY WORK.

DJS has lost the value of its NTVRP Contract, under which it was the sole and primary provider of SMFF services, a contract that was supposed to be secured by statute absent exceptional circumstances. Several courts, including this Court, have found that loss of a contract award is sufficient to show irreparable injury. *See Georgia by & through Georgia Vocational Rehab. Agency v. United States by & through Shanahan*, 398 F. Supp. 3d 1330, 1344 (S.D. Ga. 2019); *Cardinal Maint. Serv., Inc. v. United States,* 63 Fed. Cl. 98, 110 (2004); *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 747 (2004) (stating that "[i]rreparable injury can be shown in the form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.") (citations omitted).

This Court in *Georgia v. United States* found irreparable injury where a government vendor was improperly cut out of a bidding process at the Kings Bay Naval Base. *Georgia*, 398 F. Supp.

3d at 1340.  Therein, the U.S. Navy put its dining services out for bid and the incumbent dining services vendor notified the Navy that it intended to bid for a renewal.  However, the Navy informed the incumbent bidder that it would not be considered for a variety of reasons and the vendor sued for a temporary injunction to prevent the Navy from contracting with another vendor.  This Court agreed with the vendor and granted an injunction.  In finding irreparable harm, this Court stated, "Plaintiff will experience irreparable harm in the loss of the contract (if they were supposed to be awarded it as they allege), the loss of employees, the economic loss involved in bidding for another contract, and the loss of not being able to bid for the contract."  *Id*. at 1344.  The Court went on to favorably cite *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders.  Irreparable injury includes, but is not limited to, lost profits which would flow from the contract."), and *SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 741 (2004) ("Irreparable injury can be shown in the 'form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.'"").

Here, Defendants argue that DJS's reliance on *Georgia* is "wholly misplaced" for two reasons, (1) DJS can still compete for MV GOLDEN RAY contracts because it is still a resource provider for SMFF services under the NTVRP, and (2) DJS can seek damages from the Owners.  As already discussed, the first argument is a distinction without a difference.  While DJS may technically still be on the Owner's SMFF resource provider list, it has been shut out of the salvage and wreck removal process since all SMFF services have been contracted to T&T just as Commander Witt confirmed in his deposition.  T.WITT:17-23.  Without the Court's intervention, this will continue.  DJS was the pre-contracted service provider for all 19 salvage services relevant

to the MV GOLDEN RAY. But by virtue of the FOSC's unsubstantiated December 21, 2019 deviation approval, the FOSC effectively removed DJS from *all nineteen SMFF* services. Much like the Navy in *Georgia*, the FOSC created an unequal playing field. The FOSC and other members of the U.S. Government refused to meet with DJS, all the while granting T&T Salvage meetings. DJS was prohibited from presenting its plan to Unified Command. T&T Salvage did. If the FOSC's deviation is allowed to stand, DJS will continue to experience irreparable harm in the loss of the contract, the loss of employees, the economic loss of its expected profit, the economic cost involved in bidding for another contract, and the inability to competitively bid for *this* contract. DJS will also lose the significant resources it expended both in negotiating to become the SMFF provider and in preparing its wreck removal proposal.

### (b)    DEFENDANT'S ACTIONS HAVE IRREPARABLY INJURED DJS'S REPUTATION WHICH HARM IS CONTINUING.

An injury is irreparable if it cannot be undone through monetary remedies. *Hanna v. Plumer*, 380 U.S 460, 85 S.Ct. 1189 (1965). The loss of customers and goodwill is an "irreparable" injury. *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir., 1981); *McDonalds Corp. v. Robertson*, 147 F.3d 1301, 13010 (11th Cir. 1998). "[G]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. Appx. 180, 190 (11th Cir. 2005). "Irreparable injury can also be based upon the possibility of confusion." *Ferrellgas,* 143 Fed. Appx. at 190. DJS's reputation in the industry will be damaged by its highly-publicized removal as the SMFF provider, impacting future negotiations with other vessel owners. Defendants' actions have established the dangerous precedent that SMFF provider contracts can easily be terminated without justification. This not only undermines the very purpose of OPA 90, but also impacts thousands of SMFF contracts that DJS currently has with other vessel

owners. In its recent public forum, the Coast Guard provided a history of the MV GOLDEN RAY disaster response to date – a disaster response that until recently was indisputably handled entirely by DJS. However, nowhere in the government's published history of this event is DJS mentioned. Instead, T&T Salvage is given implicit credit for DJS's work. *See* Dkt. 28-5. A quick review of recent news articles makes it clear that DJS's important, early work on the project has already been forgotten. *See* Dkt. 28-1 – 28.5.

The Coast Guard is indirectly damaging DJS's reputation, as well. DJS is currently the largest OPA-90 salvor provider in the world, with over 7000 vessel OPA 90 contracts. Obviously, DJS's very strong reputation helped it achieve this position, and it relies on that reputation to sustain its business. GOLDEN RAY is currently the second largest marine casualty event in recorded history. This is precisely the type of work DJS should be involved in because it is the most experienced. But the federal government tarnished DJS's reputation when it improperly veered from the statutorily required course of action without justification, given the absence of evidence to support the claimed existence of "exceptional circumstances." Allowing this deviation to stand until a full hearing on the merits of the underlying claim will forever tarnish DJS's record and reputation. By its indifference, the federal government has essentially blackballed DJS from this project, which will effectively damage DJS's reputation with its core business, cause a loss of its well-justified reputation, and, will undoubtedly cause a loss of goodwill with its current and prospective clients.

### 3. THE THREATENED INJURY TO DJS OUTWEIGHS THE HARM THE RELIEF WOULD INFLICT ON DEFENDANTS.

The threatened injury to DJS outweighs any harm Defendants may suffer if the preliminary injunction is granted. Temporarily delaying the approval of Owner's deviation request would not

harm the Defendant government officials in any perceptible way.    *See S. Wine & Spirits of Am., Inc. v. Heineman*, No. 4:07CV3244, 2007 WL 3051405, at *1 (D. Neb. Oct. 16, 2007) (granting a temporary restraining order halting the implementation of a new Nebraska liquor license law inter alia because the defendant government officials "would not be harmed in any way by [the TRO]" when compared to the potential violation of the plaintiffs' Equal Protection and Commerce Clause rights); *Husteel Co. v. United States*, 34 F. Supp. 3d 1355, 1363 (Ct. Int'l Trade 2014) (granting a preliminary injunction stopping the Department of Commerce from liquidating certain merchandise in part because "the government will not be harmed in any meaningful way" if made to wait for judicial review of the agency's determination).

The construction of the thirty-one acre barrier has already begun, but it will be months before the remaining salvage work will be performed.  The records shows that DJS is ready, willing and able to perform all 19 SMFF services under the NTVRP, that DJS is able to mobilize and have equipment and workers ready to start work within two weeks, and that DJS will be able to complete the salvage work on or before August 14, 2020.  Additionally, Commander Witt has not seen a final executed contract between the Owner and T&T, and he does not know the status of the contract.  T.WITT:242:18-243:8.  He has only seen the Wreckhire contract, but the commercial information has been redacted out.  T.WITT:243:7-13; T.WITT:243:18-20.  Having been displaced as the sole SMFF service provider, DJS has already lost out on some of the work, but substantial work remains.  DJS' status as sole and primary SMFF provider was secured by both contract and statute absent exceptional circumstances.  Therefore, the balance of potential harms substantially favors enjoining Defendants until this Court can determine if DJS's rights were violated and if the violations of OPA 90 pose greater risk to the environment.

132

4.    THAT ENTRY OF THE RELIEF WOULD SERVE THE PUBLIC
        INTEREST.

Enjoining Defendants' approval of Owner's NTVRP deviation will best serve the public

interest.   If environmental harm is likely, the public interest favors the issuance of injunctive relief

to protect the environment.  *See Amoco Prod. Co. v. Vill. of Gambell*, AK, 480 U.S. 531, 545,

107 S. Ct. 1396, 1404, 94 L. Ed. 2d 542 (1987) (stating that environmental injury, if shown to be

"sufficiently likely[,]" will usually favor the issuance of an injunction because "by its nature,

[environmental injury] can seldom be adequately remedied by money damages[.]").  Indeed, citing

public interest, courts have frequently granted injunctive relief halting behavior which could have

caused irreparable damage to the environment.  *See Wroncy v. Bureau of Land Mgmt.*, 777 F. Supp.

1546, 1549 (D. Or. 1991) (granting a temporary restraining order stopping the Bureau of Land

Management from continuing to fertilize certain forest lands in part because of the potential

environmental impact to public lands); *Sierra Club v. Lujan*, 716 F. Supp. 1289, 1293 (D. Ariz.

1989) (granting a preliminary injunction inter alia because it was "obvious" the public interest

would be served by stopping construction which could irreparably damage a national park);

*Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) (quotations omitted)

(granting a preliminary injunction halting the construction of a water diversion project partly

because "preserving nature and avoiding irreparable environmental injury is in the public

interest.").

Defendants' current course of action will likely cause significant environmental harm.

The salve and wreck removal plan currently pursued by T&T's is a plan that may result in the

collapse of the of the vessel, and some of the 4,000 vehicles containing batteries, refrigerant,

gasoline, antifreeze, engine oil, brake, transmission, and power steering fluid, mercury switches,

and lead battery connectors could end up St. Simons Sound.  When compared to DJS's proposal, the T&T plan poses a much greater risk to the environment:

| GOLDEN RAY Wreck Removal Plan Comparison | |
|---|---|
| **T&T Plan** | **DJS plan** |
| o Establish large, thirty-one-acre perimeter which would interfere with the navigation channel | o Establish small, 4.6-acre perimeter which avoids main navigation channel |
| o Cut vessel into eight large, 4,000-ton sections, increasing risk of hull collapse/discharge of vehicles into surrounding waters | o Cut vessel into small, 600-ton sections, minimizing risk of hull collapse/discharge of vehicles |
| o Sections would be too large to completely fit onto transport barge, posing additional discharge risk | o Smaller sections would fit securely on transport barge |
| o More expensive | o Less expensive |
| o Approach led to further pollution when implemented on the TRICOLOR and BALTIC ACE wreck removals | o Approach successfully employed during REIJIN wreck removal |

While normally the Coast Guard could correctly argue that its interests are merged with those of the public, the evidence shows that not to be the case here.  The facts are that the Coast Guard has yielded to the desires of the Owner and P&I Club, at the expense of the public.  It is DJS's interests, not the Coast Guard's, which merge with the public's interest.

The Coast Guard's entire argument regarding the "balance of the equities" can be summarized as a "time is of the essence" argument.  Essentially, the government argues that the longer that work cannot commence, the greater the risk to all stakeholders, except DJS.  If time was truly of the essence, then the FSOC and the Coast Guard would not have let four (4) months lapse to acquiesce to the Owner's and P&I Club's demands when a feasible plan was presented by the contracted SMFF in early November 2019.  The FOSC has allowed  the situation to devolve, despite having a viable, feasible, executable plan available from DJS, a recognized expert in the

134

field.  The FOSC allowed the Owner to commandeer the methodology of salvage and demand a fixed priced contract, in violation of OPA 90.  This decision to deviate, without appropriate rationale, failed to take into consideration the public's interest and is beyond extraordinary. Indeed, if timing were truly the FOSC's concern, DJS's work would have begun in November and would have been concluded within approximately six (6)  months, prior to the hurricane season.

It is significant to note that the Coast Guard has not produced any analytical comparison of the DJS and T&T's plans.  By acquiescing to the Owner's demands, the FOSC has failed to provide any thoughtful reasoning supporting the efficacy of LSD over SSD.  This alone is definitive evidence that the FOSC failed in his duties to protect the public and assure compliance with U.S. laws.  While the harm to DJS has been thoroughly briefed above, and is similar to the harm alleged in *Georgia*, this Court must determine whether (1) "the harm to [DJS] of losing out on the contract and the sunk costs and profits involved in losing incumbent status without having any remedy to pursue damages against the United States," and (2) the harm to DJS's reputation outweighs the harm to the government.  *Georgia*, 398 F. Supp. 3d 1330, 1356.  Considering that the public's and DJS's interests are aligned and considering the irreparable harm DJS will suffer without an injunction, the equities tip in favor of DJS and grant a preliminary injunction.

**G.     OTHER LEGAL CONSIDERATIONS.**

**1.     DJS DID NOT UNREASONABLY DELAY SEEKING INJUNCTIVE RELIEF.**

A party's reasonable delay in filing for injunctive relief caused by its efforts to investigate or resolve the matter does not prejudice whether relief should be granted. *See Georgia by & through Georgia Vocational Rehab. Agency v. United States by & through Shanahan*, 398 F. Supp. 3d 1330, 1347 (S.D. Ga. 2019) (granting preliminary injunction and stating that the plaintiff's two-

and-a-half month delay in filing was "a reasonable time for [the plaintiffs] to consider their options . . . and decide to prepare for and pursue injunctive relief while their arbitration was pending."); *Cybermedia, Inc. v. Symantec Corp.*, 19 F.Supp.2d 1070, 1078 (N.D.Cal.1998) ("[A] reasonable delay caused by a plaintiff's good faith efforts to investigate an infringement claim will not rebut the presumption [of irreparable harm] in a copyright infringement case."); *Fid. Brokerage Servs. LLC v. McNamara*, No. 11 CV 1092 MMA RBB, 2011 WL 2117546, at *5 (S.D. Cal. May 27, 2011) (granting a temporary restraining order despite a three-month delay in seeking injunctive relief because, during that time, the plaintiffs were endeavoring to informally resolve its concerns with defendants); *Steinway & Sons v. Demars & Friends*, No 80–04404, 1981 U.S. Dist. LEXIS 15169, at *39 (C.D.Cal. Jan. 28, 1981) ("Plaintiff cannot be charged with delay attributable to efforts, such as those here, to resolve the dispute without the court's intervention.").

DJS reasonably believed that Owner and P&I Club would not unlawfully and inappropriately interject competitive bidding into the process of finalizing a salvage and wreck removal plan.  Further, DJS reasonably believed that FOSC and Unified Command would not allow Owner and P&I Club to violate OPA 90 and the Chaffee Amendment and engage in competitive bidding and delay the salvage and wreck removal process.  DJS did not learn that FOSC allowed the deviation request until December 22, 2019.  From and after that date, DJS diligently pursued information in an attempt to understand the facts and circumstances the FOSC relied upon to allow the deviation including the following:

December 23, 2019:   Commander Witt informs DJS that he has approved Owner's deviation request and will 'defer' to Owner regarding DJS's request for a meeting.  DJS then requests another meeting with Real Admiral Fears regarding the deviation approval.

December 24, 2019:   Commander Witt sends letter to DJS stating that he approved deviation and opining that a meeting would be fruitless unless Owner also attended. DJS emails the U.S. Navy Supervisor of Salvage and Diving requesting their opinion on the deviation approval.

December 26, 2019:  DJS files a Freedom of Information Act request with Coast Guard for information regarding Commander Witt's deviation approval.  The Coast Guard did not produce any documents in response to this request until March 6, 2020.

January 7, 2020:  Rear Admiral Fears responds to DJS's multiple meeting requests, asks DJS to set up conference call.  DJS also learns that T&T wreck removal, the entity that replaced DJS as the SMFF provider, had not yet reached an agreement with Owner.

January 13, 2020:   DJS files a second Freedom of Information Act request with Coast Guard for information regarding Commander Witt's deviation approval.  The Coast Guard has yet to respond to this request.

January 14, 2020:  DJS emails Rear Admiral Fears again requesting a meeting.

January 17-24 2020:  DJS continues to attempt to schedule an in-person meeting with Rear Admiral Fears, to no avail.

February 3, 2020:  T&T finally signs contract with Owner's insurers to become the new SMFF provider.

February 6, 2020:  Coast Guard issues press release stating that construction of T&T's "environmental protection barrier[,]" the first phase of its wreck removal plan, will begin "in approximately two weeks."

February 13, 2020:  DJS files its Verified Complaint and Motion for Injunctive Relief and Brief in Support.

March 9, 2020:  Commander Witt testifies at his deposition that he has not seen a final executed contract between the Owner and T&T, and he does not know the status of the contract. T.WITT:242:18-243:8.  He has only seen the Wreckhire contract, but the commercial information has been redacted out.  T.WITT:243:7-13; T.WITT:243:18-20.

DJS did not unreasonably delay in filing for injunctive relief.

### 2.     ENTRY OF TRANSITIONAL AGREEMENT IS IRRELEVANT.

Defendants contend that DJS's entry into a Transitional Agreement with the Owner (Dkt. 20-1, p. 20) prevents DJS from now asserting rights as the designated and certified SMFF under the NTVRP.  The Court finds this contention unsupported by the facts and law, and irrelevant to the controversy before the Court particularly to any analysis of the FOSC's failure to comply and act in accordance with the APA.

As an initial matter, any deviation from NTVRP required approval of the FOSC. 33 U.S.C.A. § 1321(c)(3)(B), 33 C.F.R. § 155.4032.  As such, the Transitional Agreement was merely anticipatory given that it was ineffective without FOSC approval.  When the FOSC rejected the Owner's request for a deviation, the Transitional Agreement became void.  The Owner's recognition that DJS remained the registered and approved SMFF and , when it applied for a

138

second deviation on December 19, 2019.  Hearing Exh. 12.  In fact, the FOSC recognized DJS as the SMFF under MV GOLDEN RAY's NTVRP when (1) it rejected the Owner's first Deviation (Dkt. 20-1, p. 23), and (2) accepted Owner's second deviation request.  Dkt. 20-1, p. 63.  Further, the FOSC makes no reference to DJS in his December 21, 2019 "Decision Memo." Dkt. 20-1, p. 49 – 55.

### 3.    THE COURT IS ENTITLED TO CONSIDER EVIDENCE BEYOND THE ADMINISTRATIVE RECORD.

While typically the Court should only consider evidence within the Administrative Record, the Court can consider outside evidence where there is a "strong showing of bad faith or improper behavior by the agency." *Alabama -Tombigbee Rivers Coal v. Kempthorne,* 477 F.3d 1250, 1262 (11th Cir. 2007).  Given Defendants failure to submit the entire "Administrative Record," or offer any testimony regarding the Administrative Record, the Court will consider evidence beyond the Administrative Record.  Because there is at least a question of improper behavior by the FOSC in carrying out his duties of oversight and decision making, it is within the Court's discretion to consider any pro-offered evidence beyond the Administrative Record.

### 4.    APPLICATION OF THE MISSING WITNESS AND DOCUMENT DOCTRINE TO THE COURT'S CONSIDERATION.

DJS's lawsuit has been pending since February 13, 2020, and the Court noticed the injunctive hearing on February 18, 2020.  Dkt. 1 and 12.  Despite having notice of the hearing, and a pre-hearing opportunity to submit substantive records (Dkt. 19), Defendants chose not to produce all the records upon which they seek to rely and, then, opted not to present any testimony at the preliminary injunction hearing.  The person who made the decision about which DJS complains did not provide any testimony until compelled to do so by the Court.  Given these circumstances,

and the issues before the Court, the Court evaluates the evidence before it with the presumption that the remainder of the Administrative Record would have been unfavorable to Defendants. *Graves v. US*, 150 U.S. 118, 121, 14 S. Ct. 40, 37 L. Ed. 1021 (1893) (if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable); *Jones v. Otis Elevator Co.*, 861 F.2d 655 (11th Circ. 1988) (Georgia).

## CONCLUSION

Based on the foregoing, DJS asks the Court to enter the preliminary injunction and award DJS any relief to which it may be entitled.

This __11th__ day of __March__ 2020.

Respectfully submitted,

**TAYLOR, ODACHOWSKI, SCHMIDT & CROSSLAND, LLC**

___/s/ Joseph R. Odachowski_____
**Joseph R. Odachowski**
Georgia State Bar No. 549470
**Peter H. Schmidt, II**
Georgia State Bar No.  629512
300 Oak Street, Suite 200
St. Simons Island, GA 31522
(912) 634-0955 – Telephone
(912) 638-9739 – Facsimile
jodachowski@tosclaw.com

**ATTORNEYS FOR PLAINTIFF DONJON-SMIT, LLC**

[signature page on following page]

140

**OF COUNSEL:**
**CLARK HILL PLC**

/s/ Garney Griggs
**Garney Griggs**
Texas State Bar No. 08491000
**Clifford Bowie Husted**
Texas State Bar No. 00796803
909 Fannin, Suite 2300
Houston, TX  77010
(713) 951-5600 – Telephone
(713) 951-5660 – Facsimile
ggriggs@clarkhill.com
hustedc@clarkhill.com

**ATTORNEYS FOR PLAINTIFF**
**DONJON-SMIT, LLC**

## CERTIFICATE OF SERVICE

This hereby certifies that on this day, I electronically filed the ***Plaintiff DonJon-SMIT, LLC' Amended and Revised Proposed Findings of Fact and Conclusion of Law*** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

| | |
|---|---|
| Martha C. Mann, Esq.<br>Sydney A. Menees, Esq.<br>UNITED STATES DEPARTMENT OF JUSTICE<br>Environmental & Natural Resources Division<br>Post Office Box 7611<br>Washington, DC  20044<br>Martha.mann@usdoj.gov<br>Sydney.menees@usdoj.gov | Bradford C. Patrick, Esq<br>ASSISTANT UNITED STATES ATTORNEY<br>Post Office Box 8970<br>Savannah, Georgia   31412<br>Bradford.patrick@usdoj.gov |

This   11th   day of   March   2020.

**TAYLOR, ODACHOWSKI, SCHMIDT &
CROSSLAND, LLC**

 /s/ Joseph R. Odachowski
**Joseph R. Odachowski**
Georgia State Bar No:          549470
**Peter H. Schmidt, II**
Georgia State Bar No. 629512

300 Oak Street, Suite 200
St. Simons Island, GA 31522
(912) 634-0955 – Telephone
(912) 638-9739 – Facsimile
jodachowski@tosclaw.com