# In the United States District Court for the Southern District of Georgia Brunswick Division

DONJON-SMIT, LLC,

    Plaintiff,

    v.

ADMIRAL KARL L. SCHULTZ,
CAPTAIN JOHN W. REED, COMMANDER
MATTHEW J. BAER, and COMMANDER
NORM C. WITT, in their
individual capacity, and in
their official capacity as
Officers of the UNITED STATES
COAST GUARD,

    Defendants.

No. 2:20-CV-011

## ORDER

Before the Court is Plaintiff Donjon-SMIT, LLC's ("DJ-S") Verified Motion for Injunctive Relief. Dkt. No. 6. In its Amended Complaint, Plaintiff seeks entry of a temporary restraining order (TRO), preliminary injunction, and permanent injunction. Dkt. No. 56 ¶¶ 29-32. The Court denied Plaintiff's TRO on February 18, 2020. See Hearing Tr. 6:17-18; Dkt. No. 12. This Order addresses Plaintiff's motion insofar as it requests a preliminary injunction enjoining Commander Witt's approval of GL NV24 Shipping, Inc.'s (the "Owner")[1] request for a deviation from its Non-Tank Vessel

---

[1] The registered owner of the M/V GOLDEN RAY is GL NV24 Shipping, Inc. (the "Owner"). Admin. R. at 1, 30. It "barebone charter[s]" the vessel to Hyundai Glovis Co, Ltd., ("Glovis") who in turn appointed G-Marine Service Co., Ltd.

Response Plan ("NTVRP") for the purpose of adding T&T Salvage, LLC ("T&T") as a salvage and marine firefighting ("SMFF") resource provider. Dkt. No. 20-1 at 63.

Plaintiff's motion for injunctive relief—in so far as it requests a preliminary injunction—is ripe for review. After reading the parties' respective pleadings, motions, briefs, and holding an evidentiary hearing on February 25, 2020, listening to Plaintiff's witnesses, watching Commander Witt's deposition, ordering additional limited discovery, and reviewing the entirety of the administrative record, Plaintiff's request for a preliminary injunction is **DENIED**.

It is important to understand the Court's role in ruling on this motion. "The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." <u>Sierra Club v. Van Antwerp</u>, 526 F.3d 1353, 1360 (11th Cir. 2008) (internal quotation marks omitted).

## I.   Procedural Background

On February 13, 2020, Plaintiff filed its Original Complaint. Dkt. No. 1. Contemporaneously, Plaintiff filed its Motion for

---

("G-Marine") as the vessel's technical and crew managers. <u>Id.</u> at 30. The Owner's Qualified Individual ("QI"), i.e. its representative within the OPA 90 required Unified Command for the M/V GOLDEN RAY response is G-Marine Services, Co., Ltd. ("G-Marine"). <u>Id.</u> Finally, the Owner has hired consultants to help develop its removal methodology. <u>Id.</u> They are Global Salvage Consultancy ("GSC"). <u>Id.</u> That said, Glovis has been the point of contact "[f]or and on behalf of GL NV24" throughout the wreck response efforts. <u>See, e.g.</u>, <u>id.</u> at 2.

Injunctive Relief. Dkt. No. 6. That motion has been fully briefed by the parties. Dkt. No. 20 (Defendants' Response); Dkt. No. 28 (Plaintiff's Reply). Plaintiff amended the Complaint on March 10, 2020. Dkt. No. 56.

The Court scheduled a hearing on Plaintiff's motion for injunctive relief for February 19, 2020. Dkt. No. 9. Plaintiff moved the Court to continue that hearing. Dkt. No. 11. The Court granted that motion and continued the hearing until February 25, 2020. Dkt. No. 12. Given the time-sensitive nature of injunctive relief, the Court issued an Order on February 21, 2020, directing each party to answer forty-five initial questions posed by the Court in writing by February 24, 2020. Dkt. No. 19. The Court specifically ordered the parties to indicate what witnesses or documents supported each of their responses. Id. The parties filed timely responses containing their respective answers. Dkt. No. 22 (Defendants' Responses); Dkt. No. 26 (Plaintiff's responses).

On February 25, 2020, the Court held a hearing that lasted more than five hours. Dkt. No. 32. During that hearing, Plaintiff called four sworn witnesses: Douglas Martin, the President and General Manager of SMIT Salvage Americas, Inc. ("SMIT"); Christiaan van der Jagt, an Operations Director for SMIT; Timothy Williamson, the General Manager of Donjon-SMIT, LLC; and Paul Hankins, the Vice President of Donjon Marine Co., Inc. ("DJ-M"). Id. Plaintiff also introduced exhibits for the Court to consider.

Id. Neither party proffered expert testimony regarding the alleged environmental danger associated with a Large Section Demolition ("LSD") methodology. Id.

On February 26, 2020, Plaintiff filed a motion regarding discovery, asking the Court to order Defendants to produce the full Administrative Record. Dkt. No. 31. The following day, the Court ordered Defendants to produce the whole administrative record by March 3, 2020. Dkt. No. 33. On that date, Defendants produced the administrative record. Dkt. No. 46. On February 28, 2020, both parties timely filed their respective proposed findings of fact and conclusions of law. Dkt. No. 36 (for Defendants); Dkt. Nos. 37-39 (for Plaintiff). On March 2, 2020, Plaintiff submitted a stipulation to some of the facts contained in Defendants' findings of fact and conclusions of law. Dkt. No. 40.

Also on March 2, 2020, the Court held a telephonic status conference with the parties. Dkt. No. 45. During that conference, the Court ordered that Commander Witt be deposed on or before March 9, 2020. Dkt. No. 44. The Court also ordered that the parties file any additional proposed findings of fact and conclusions of law by March 11, 2020. Id. On March 4, 2020, Plaintiff moved this Court to order Commander Witt to produce certain records for Plaintiff's use at his deposition. Dkt. No. 47. On March 6, 2020, the Court denied that motion. Dkt. No. 53. Commander Witt was deposed as

scheduled on March 9, 2020. See Dkt. No. 55. Commander Witt gave almost eight hours of sworn testimony. Dkt. Nos. 55-1, 58.

On March 11, 2020, both parties submitted additional proposed findings of fact and conclusions of law. Dkt. No. 60 (for Plaintiff); Dkt. No. 61 (for Defendants). It should also be noted that Defendants file weekly status updates on salvage of the M/V GOLDEN RAY. Dkt. Nos. 43, 59, 79.

## II. Findings of Fact

### A. The Incident

In the early morning hours of September 8, 2019, the M/V GOLDEN RAY capsized in the St. Simons Sound in between Saint Simons Island and Jekyll Island, off the Coast of Georgia. Admin. R. at 716 (Invitation to Tender). Currently, the 200-meter-long M/V GOLDEN RAY is listing at 110 degrees to its portside on a northern sandbar just beyond the only navigable shipping channel to the Port of Brunswick—the second largest Roll-On Roll-Off ("RoRo") Port by tonnage in the United States of America. Id. at 716-18. Approximately half of its 35.4 meter beam is above the water. See id. at 716. It is the largest cargo shipwreck in U.S. coastal waters since Exxon Valdez. Dkt. No. 56 ¶ 10. At the time of the incident, the M/V GOLDEN RAY carried twenty-three crew members, one harbor pilot, approximately 4,200 automobiles, and an estimated 380,000 gallons of oil. Plaintiff's Hearing Exhibit ("Pl. Ex.") 24 (Documents sent to Commander Witt by Plaintiff).

The M/V GOLDENRAY is grounded in an environmentally sensitive area that includes prime shrimping grounds and Bird Island—a significant roosting area for migratory birds. Admin. R. at 129 (Decision Memo). The longer the vessel remains in its grounded position in the Saint Simons Sound, the more time the environment (including the marine aquatic life specified) is exposed to the risks the wreck presents. Indeed, the longer the M/V GOLDEN RAY is exposed to the sound's tidal influences the more oil and other contaminants could be released from the vessel. See Hearing Tr. 79:19-22 (Martin Testimony).

**B.    The Oil Pollution Act of 1990 imposes certain requirements on the M/V GOLDEN RAY's Owner.**

Given the size of the M/V GOLDEN RAY and the amount of oil onboard, the United States Coast Guard determined that "there may be an imminent and substantial threat to the public health or welfare or the environment because of an actual or substantial discharge/release of oil or designated hazardous substance from the vessel." Admin. R. at 94 (Administrative Order: 01-19). As such, the incident triggered the statutory and regulatory demands of the Oil Pollution Act of 1990. Id.

The Oil Pollution Act of 1990 ("OPA 90"), 33 U.S.C. § 2701-2762, was enacted in response to the 1989 *Exxon Valdez* oil spill in Alaska's Prince William Sound. Specifically, OPA 90 amended Section 311 of the Clean Water Act, 33 U.S.C. § 1321, to "provide

a framework for preventing and responding to potential oil spills."

Alaska Wilderness League v. Jewell, 788 F.3d 1212, 1215 (9th Cir.

2015) (citing 33 U.S.C. § 1321(b)); see also Water Quality Ins.

Syndicate v. United States, 225 F. Supp. 3d 41, 48 (D.D.C. 2016)

("The OPA [90] was designed to streamline federal law so as to

provide quick and efficient cleanup of oil spills, compensate

victims of such spills, and internalize the costs of spills within

the petroleum industry.") (internal quotation marks omitted); 2

Admiralty & Mar. Law § 18:3 (6th ed.) (same).

Under OPA 90, the President (acting through the Coast Guard)

is charged with preparing and publishing a National Contingency

Plan ("NCP"). 33 U.S.C. § 1321(d). The NCP establishes "efficient,

coordinated, and effective action to minimize damage from oil and

hazardous substance discharges." Jewell, 788 F.3d at 1215. The NCP

designates a federal officer to be the Federal On-Scene Coordinator

("FOSC") for each area of the country that requires an Area

Contingency Plan ("ACP") to be created and implemented. 33 U.S.C.

§ 1321(d)(2)(K), (j). The FOSC, a Coast Guard official, directs

spill removal and clean-up efforts and coordinates the efforts of

federal, state, and local response teams. 33 U.S.C. §

1321(j)(4)(B)(ii). He has the authority to increase the speed and

effectiveness of the response and may take additional steps to

mitigate the environmental effects of the spill. 33 U.S.C. 1321

(c)(3)(B); 33 C.F.R. § 155.4032(a). If necessary, he can federalize the response. See, e.g., Witt Depo. 62:13-15.

Regulations promulgated by the Coast Guard to enforce OPA 90 require each owner of a non-tank vessel carrying oil to have a Non-Tank Vessel Response Plan ("NTVRP") in place in the event of a "worst case discharge or substantial threat of discharge." 33 C.F.R. § 155.5010. NTVRP regulations require owners to pre-contract with prevention and clean-up providers so that discharge responders react quickly and "without the need for contract negotiations during an actual emergency." Salvage and Marine Firefighting Requirements; Vessel Response Plans for Oil, 73 FR 80618-01, 80635 (Dec. 31, 2008); see also 33 U.S.C. § 1321(j)(5)(D) (providing for response plan requirements).

Once the Coast Guard determines that OPA 90 and its regulations apply to an incident, the non-tank vessel owner must act in accordance with the NCP, the ACP, and the NTVRP. An owner cannot deviate from these plans unless the President of the United States or the FOSC "determines that deviation from the response plan would provide for a more expeditious or effective response to the spill or mitigation of its environmental effects." 33 U.S.C. § 1321(c)(3)(B).

The FOSC is "the principal authority" responsible for responding to threats of potential oil discharges. The FOSC's authority is "normally delegated to [the Captain of the Port]."

Pl. Ex. 33 at App'x. C-4 (Coast Guard Contingency Preparedness Manual, Vol. 4).[2] The FOSC for the M/V GOLDEN RAY response is Defendant Commander Norman C. Witt, USCG. Currently, Commander Witt is the Commanding Officer, Marine Safety Unit Savannah and the Captain of the Port of Savannah. Dkt. No. 22-9 (Commander Witt Biography); 33 C.F.R. § 300.120(b); 33 C.F.R. § 3.35-15(b).

## C. Plaintiff's NTVRP Contract with the Owner (through G-Marine).

The Plaintiff is Donjon-SMIT, LLC ("DJ-S"). DJ-S is a U.S. based joint-venture maritime salvage, firefighting, and lightering ("SMFF") company. Dkt. No. 56 ¶ 2. On September 20, 2017 DJ-S and G-Marine entered into a contract agreeing that DJ-S would provide SMFF for G-Marine's vessels while in U.S. waters, including the M/V GOLDEN RAY, should an event involving the vessel trigger OPA 90's statutory and regulatory requirements. Dkt. No. 22-5 ("NTVRP Contract").[3]

Under the NTVRP Contract, DJ-S agreed to provide and maintain the capability to provide SMFF services to the Owner in accordance with 33 C.F.R. § 155.4030(a)-(h) in consideration of predetermined

---

[2] According to the Coast Guard's Contingency Preparedness Planning Manual, Vol. 4, Commander Witt-upon assuming his statutory role as Captain of the Savannah Port-was granted an interim Type 3 IC certification to be the incident commander for the M/V GOLDEN RAY response, i.e., the FOSC. Witt Depo. at 7-10; Pl. Ex. 33 at 105 ¶ D.4.

[3] To be clear, the registered owner of the M/V GOLDEN RAY is GL NV24 Shipping, Inc. (the "Owner"). Admin. R. at 1, 30. It "barebone charter[s]" the vessel to Hyundai Glovis Co, Ltd., ("Glovis") who in turn appointed G-Marine Service Co., Ltd. ("G-Marine") as its technical and crew managers. Id. at 30. In this instance, G-Marine signed the NTVRP as an "Owner" of the M/V GOLDEN RAY. Id. at 699.

compensation. Dkt. No. 22-5 at Art. 6. Regarding the exclusivity of DJ-S services, the NTVRP Contract states, "the parties agree that the use of [DJ-S] as the Owner's named salvor and marine firefighter is required under the regulatory language of [33 C.F.R. § 155] within [American Waters]. If more than one primary provider is allowed, the parties agree that any of Owner's listed primary providers within a [Captain of the Port ("COPT")] zone may be utilized by the Owner." Dkt. No. 22-5 at Art. 10(b); see 33 C.F.R. § 155.4025 (defining "COTP").

**D. Plaintiff's Response to the Wreck**

In response to the wreck, DJ-S mobilized and arrived on-scene within two hours. Dkt. No. 26-1 ¶ 7(b). As part of its initial response, DJ-S led the team responsible for rescuing all twenty-three of the M/V GOLDEN RAY's crewmembers, along with its harbor pilot. Id.; Hearing Tr. 18:12-15. DJ-S' response also included the rescuing of four crew members trapped within the vessel over a thirty-six hour period. Dkt. No. 26-1 ¶ 7(b). In the days immediately following the wreck, DJ-S put out numerous fires onboard the M/V GOLDEN RAY. See Dkt. No. 56 ¶ 17.

On September 15, 2019, the FOSC directed the Owner of the M/V GOLDEN RAY to remove all oil and hazardous materials from the wreck. Id. at 94. DJ-S was placed in charge of this operation. The lightering of the vessel's fuel reserves lasted until December 19, 2019. Pl. Ex. 24 (ICS-209 Incident Summary). In total, DJ-S removed

330,000 gallons of fuel and other harmful substances from the vessel. Id.

In addition, DJ-S "sanitized" the M/V GOLDEN RAY in preparation for its demolition after it was declared a constructive loss on October 12, 2019. Dkt. No. 61-2; Pl. Ex. 16 at 2 (Decision Memo). This took several weeks.

## E. Plaintiff's Letter of Intent Agreement with Owner's P&I Club.

On October 16, 2019, the Owner's "P&I Club," the North of England Protection & Indemnity Association Limited, entered into a Letter of Intent ("LOI") with DJ-S. Admin. R. at 701-703. The LOI provided that "[f]ollowing our recent discussions regarding the salvage of the 'GOLDEN RAY' . . . we hereby agree to enter into exclusive negotiations with you [for 21 days]. . . to conclude suitable contracting principles for the . . . removal of the Vessel and cargo . . . to the satisfaction of the competent authorities." Id. at 701 ¶¶ 1, 2. During this time, the P&I Club and DJ-S agreed to work towards agreeing on the "general terms" governing the removal of the M/V GOLDEN RAY: Contracting Principles and Methodology. Id. ¶ 2.

If DJ-S and the P&I Club could agree on the Contracting Principles—including a fee structure—then they would begin developing a methodology to remove the M/V GOLDEN RAY from the Saint Simons Sound (the "Methodology"). Here, the LOI states:

It is already agreed that full parbuckling is not feasible. We have discussed smaller sections after a partial cut down, as well as building a cofferdam around the Vessel to assist with removal operations. As part of the Methodology, the Contractor will provide a broad indication of the likely overall duration and costs (with breakdown) of the removal Methodology.

Id. at 702 ¶ 4. Should the P&I Club and DJ-S agree to the Contracting Principles and Methodology, then the P&I Club would arrange a meeting with the Unified Command,[4] where the Club and DJ-S would jointly present the Methodology. Id. ¶ 5.

On October 28, 2019, the P&I Club sent a "Reminder Letter" via email to DJ-S' leadership regarding the LOI provisions. Admin. R. at 119-121; Hearing Tr. 32:14-18. In that email, the P&I Club stated, inter alia, that "in order to manage expectations" it would "reiterate" certain points it expected DJ-S' plan to address, including "preferably a minimum of three high level dismantling scenarios," the use of a cofferdam or "any other solution" that would protect the liability and exposure of the Owner and the P&I Club. Id. The Reminder Letter concluded by stating that DJ-S also needed to focus on the "non-technical issues," like their fee structures. Id. at 120-21.

---

[4] The Unified Command is established by the NCP. See 40 C.F.R. § 300. It is comprised of a federal representative—the Federal Officer in Charge ("FOSC"), a state representative—the State Officer in Charge ("SOSC")—and the owner's representative, also known as the Qualified Individual ("QI"). Witt Depo. 42:25-43:14. In the present case, Defendant Commander Norman C. Witt is the FOSC, the state representative is the Georgia DNR, and the Owner's representative, the QI, is G-Marine. Id.; Id. at 14:8-10.

DJ-S submitted their plan—developed under the instructions of the LOI and meetings with the Owner and its representatives—on November 5, 2019. <u>See</u> Admin. R. at 247-77 (DJS' Plan). The P&I Club ultimately rejected this plan. <u>See, e.g.,</u> <u>id.</u> at 109. Dkt. No. 20-1 at 50.

**F.  Owner Engages Third Parties**

From November 13, 2019 to approximately February 3, 2020, the Owners engaged in contract negotiations with third-party contractors not listed on the NTVRP for the demolition and removal of the M/V GOLDEN RAY.

**1.  Expression of Interest**

As the Owner explains to Commander Witt via letter, "Once it was clear that Contracting Principles could not be agreed under the LOI," the Owner was "left with little alternative but to issue an Expression of Interest ('EOI') to 13 potential contractors," including DJ-S and the two companies who form it: DJ-M and SMIT. Dkt. No. 61-4 (Owner's Letter to C. Witt); <u>see</u> Admin. R. at 749-53. The Owner sent the EOI to the potential contractors on November 13, 2019. Dkt. No. 61-4.

The EOI provided the thirteen potential contractors with background information and information regarding what services the Owner expected the contractors to perform should their bid be accepted. As part of those instructions, the Owner stated that LSD

was preferred and that it expected such an operation to remove the M/V GOLDEN RAY "prior to the 2020-2021 winter season." Id.

Of note, the EOI stated that "[i]t is anticipated that an environmental protection barrier will be placed around the wreck," that the Owner and the P&I Club hoped "to have the barrier installed by the end of February 2020," and that "wreck removal will commence after installation of the barrier." Id. The Owner further clarified, "[f]or the avoidance of doubt, the installation of this barrier will not form part of the wreck removal contract." Id.

### 2.    Invitation to Tender Offer

On November 18, 2019, the Owner (via their consultants, Global Salvage Consultancy ("GSC")) sent an Invitation to Tender ("ITT") to the nine contractors who responded to the EOI, including DJ-S and DJ-M. Dkt. No. 64-1; Admin. R. at 715-28. In relevant part, the ITT stated:

> It is anticipated that the removal of the wreck can be achieved through the utilization of large section demolition as opposed to small section demolition. Large section demolition is the preferred option and will be given high priority in the selection of the contractor.

Admin. R. at 721.

GSC followed up with the potential contractors on November 25, 2019 with a "Q&A sheet." Admin. R. at 746-48. In that document, GSC defined LSD and Small Section Demolition ("SSD") in tonnage:

"**SSD** = Small Section Demolition is piecemealing; **LSD** = Large Section Demolition are pieces larger than 150 MT." Id. at 747.

### G.   The Removal Plans

#### 1.   DJ-S' November 5, 2019 LOI Plan (the "DJ-S Plan")

DJ-S submitted a plan to the Owner (through the P&I Club) on November 5, 2019. Attached to the plan were a series of references and appendixes. See Admin. R. at 247-77. Commander Witt subsequently received it.

The DJ-S Plan begins with an assessment of three options for removing the M/V GOLDEN RAY: Parbuckling, LSD, and SSD. Id. at 255. DJ-S stated that parbuckling was "not feasible" given the poor structural integrity and stability of the vessel. Id. Next, the DJ-S Plan "discarded" removing the wreck in the "largest sections possible" for various reasons, including the M/V GOLDEN RAY's lack of structural integrity, particularly its upper decks. Id. That said, the DJ-S Plan went on to suggest that while it could "heavy lift" parts of the M/V GOLDEN RAY, the upper decks would need to be removed using an SSD methodology. Id.

Then, DJ-S explained that its "preferred option" is to remove the entire wreck in "smaller sections using available assets and proven wreck removal techniques." Id. Specifically, DJ-S proposed removing the upper decks in a "piecemeal fashion" after which the lower decks could be removed in large sections between 600 and 1,500 MT. Id.

DJ-S proposed that the salvage efforts be done in stages. Phase One called for asset mobilization and site preparation. Id. at 261. Phase Two called for removal of the M/V GOLDEN RAY down to the waterline using SSD. Phase Three called for removing it down the seabed in either 600MT or 1,500 MT sections. Id. at 264. During this phase, DJ-S would remove the M/V GOLDEN RAY's several oil tanks fully intact. Id. at 271. Phase Four involved removing debris, the cofferdam, scour protection, and finally demobilization of DJ-S' assets. Id. at 267. Although "cutting and grabbing operations" would be limited to daylight operations only, DJ-S' plan recommended that removing scrap, installing the cofferdam, completing surveys, and maintaining their various resources could continue for 24 hours a day, seven days a week. Id. at 275.

Plaintiff's Plan proposes that "a cofferdam [be] installed around the wreck," but notes that the plan "does not materially change if there is, or is not, a cofferdam." Id. at 261. It goes on to say that if the Owner decides to use the cofferdam, "[t]he cofferdam and wreck removal can be executed sequentially," but that doing so would take a longer time. Id. at 268. Alternatively, the cofferdam could be constructed "in parallel with" Phase 2 of the removal operation, which would speed up the timeline for removal. Id. The DJ-S Plan notes that a "pile driven cofferdam"

that surrounds the vessel would take "5-6 months" to install. Id. at 270.

### 2. T&T's ITT Plan ("T&T's Plan")

The Owner sent T&T's plan to the Unified Command on December 18, 2019. See Admin. R. at 2490-2545. The T&T plan calls for the M/V GOLDEN RAY to be "mechanically cut into eight (8) large sections and lifted onto barges for disposal using the US-flagged VB-10,000 floating crane." Id. at 2491. T&T states that its plan is "[t]he most time-effective approach," id. at 2493, and has a "minimal environmental impact" because the M/V GOLDEN RAY will be cut into fewer sections which "reduces the amount of debris" that may fall into the water, and because the loudest portion of the operation (the chain cutting of the vessel) is "only needed for 7 days and spaced out 5 days at a time." Id. at 2495. Of note, the T&T Plan also states that the operation is "likely to finish before hurricane season." Id.

In terms of specifics, the plan "involves cutting the GOLDEN RAY into eight (8) sections weighing between 2,700[MT] to 4,100[MT]. The sections will then be lifted by the DP3 twin-hull VB-10,000." Id. at 2494. "Once cut, the individual sections will be loaded onto prepared deck barges which will be outfitted with a spill containment barrier and support structures for sea fastening." Id. Prior to the lifting and cutting, "[e]ngineered lifting frames for each section" will be fabricated and then

delivered on-site to be attached to the vessel. Id. at 2497. The lifting frames "spread the lifting force" and "assist in maintaining the structural integrity of the sections as they are separated." Id. Doing this should prevent the M/V GOLDEN RAY from collapsing on itself. Id. The risk of collapse is most significant at "midship." Id. at 2520. As such, lifting these sections will "likely" require additional structural support. Id. To identify and remove any debris that fell off the vessel and into the water during the salvage, "T&T will deploy its Hydrographic survey team." Id. at 2513. T&T's Plan proposes that "many," but not all, of its operations can "be performed on a 24/7 basis." Id. at 2540.

The T&T Plan states, "An environmental barrier will be constructed according to the approved [Unified Command] plans." Id. at 2500. T&T proposes that this barrier be constructed "in tandem" with "other wreck removal preparations," including creating the lifting frames onshore and removing "large appendages" from the M/V GOLDEN RAY. Id. at 2497. When the M/V GOLDEN RAY has been completely removed, T&T will do another hydrographic survey to "ensure the bottom is free from debris." Id. at 2514. Afterwards, T&T will remove the EPB. Id.

Regarding pollution control, T&T's Plan considers the noise and vibration of its operation ("which will require mitigation") as well as the light pollution caused by T&T's welding efforts. Id. at 2536, 2541. T&T also considered the use of a "bubble

barrier" to reduce underwater noise. Id. at 2542. In addition to
the Owner's proposed EPB, the plan itself offers some environmental
protection thanks to the "limited number of cuts," all of which
avoid accidentally nicking one of the M/V GOLDEN RAY's numerous
bunker oil tanks. Id. at 2536. The plan does not call for the cargo
to be removed individually, but in tandem with the vessel itself.
Id. at 2548. Therefore, the Plan calls for netting or fencing to
be installed on the now-open sections of the vessel to prevent its
cargo from entering the Saint Simons Sound. Id. at 2536. Of import,
"the timeline proposed will lessen the exposure of the wreck to
the physical environmental conditions thus reducing the pollution
potential associated with continued deterioration." Id. Because
the M/V GOLDEN RAY is structurally compromised, T&T's plan also
contains a contingency plan: SSD as necessary either above or below
the waterline. Id. at 2514-15.

### 3. DJ-S' December 8, 2019 ITT Plan

In response to the Owner's ITT, Plaintiff submitted a second
plan-this time to the Owner's consultants (GSC)—on December 8,
2019. See Dkt. No. 70-3. The email included DJ-S' revised plan
along with its appendices, dkt. no. 70-3 at 61-175, a risk
registry, dkt. no. 70-4, and "a video showing the sectional removal
of the wreck," dkt. no. 70-5. DJ-S forwarded the email and
attachments to Defendant Captain Reed, the following day. Dkt. No.
70-2.

Plaintiff filed its ITT Plan with the Court on March 16, 2020. Dkt. No. 70-3. In general, DJ-S' ITT Plan proposes the same methodology as it did in its LOI plan, but with some changes. Dkt. No. 70-3. First, DJ-S' ITT Plan states that its proposed methodology includes the use of a coffer dam or other EPB, and that DJ-S would be "open to changes in methodology" including LSD using the same VB 10,000 in T&T's plan. Id. at 12, 20, 21-23, 42-46, 53, 132-135. DJ-S proposes that its preferred method would take 211 days plus EBP construction time (to be completed prior to any demolition). Id. at 57.

Finally, DJ-S' ITT plan states that its proposal is conditioned upon successful contract negotiations. Id. at 60. DJ-S desired to reinstate the original provisions of Wreckhire #1 but added "cofferdam or EPB construction" and "complete removal of Vessel" to Box 7 of that agreement. Id. DJ-S also desired reinstating some previously removed provisions, including "Disposal and Redelivery" to ¶ 9 and "Extra Costs for disposal" to ¶ 14. Id. Plaintiff also asked that the "Transitional Agreement from WH1 to WH2" be considered "null and void." Id.

### H.  Owner's Deviation Requests

On November 8, 2019, the Owner, DJ-S, and DJ-M executed a "Transitional Agreement" whereby the parties attempted to transfer control of the M/V GOLDEN RAY salvage operation from DJ-S to DJ-M beginning on November 9, 2019. Dkt. No. 20-1 at 20-21.

### 1. Coast Guard Administrative Order 01-19 Amendment 1 ("Amendment 1")

On November 8, 2019, the Coast Guard issued Coast Guard Administrative Order 01-19 Amendment 1 ("Amendment 1"). Admin. R. at 8-9. Amendment 1 sought to "clarify expectations." Id. at 1. On November 12, 2019, the Owner replied to Amendment 1 with its requested information. Id. at 10-23 (Owner's First Reply). The Owner replied two more times that month: November 20, 2019, id. at 54-64 (Owner's Second Reply), and November 25, 2019, id. at 122-125 (Owner's Third Reply); see also id. at 135-433 (supporting documents). Through these responses, it became clear to the Coast Guard that the Owner changed the terms of its Wreckhire agreement with Plaintiff, transitioned the work occurring on the M/V GOLDEN RAY to DJ-M, and sent the EOI and ITT to third-party contractors. Id. at 11-12, 57.

### 2. Coast Guard Administrative Order 01-19 Amendment 2 ("Amendment 2")

On November 22, 2019, the Coast Guard issued Administrative Order 01-19 Amendment 2. Id. at 26-28. Amendment 2 sought to address "possible deviations" from the M/V GOLDEN RAY's approved NTVRP (i.e. the Transitional Agreement). Id. at 26-27. Accordingly, Commander Witt asked the Owner to explain why the Transitional Agreement was enacted and, if necessary, to provide a deviation request pursuant to 33 C.F.R. § 155.4032 by November

26, 2019. Commander Witt specifically asked for DJ-S' input on these issues. Id. at 27. Comm.

Commander Witt also expressed his concern that the Owner's rejection of DJ-S' proposed plan "may delay the overall response efforts" and requested a copy of the LOI letter to DJ-S, DJ-S' entire removal plan, a "detailed explanation for rejecting the plan," and "any additional response or explanatory information provided by DJ-S to explain why they felt their proposal met the Owner's requirements." Id. Finally, Commander Witt requested the Owner provide him with the ITT and told the Owner that if it intended to use a contractor not provided for on the NTVRP, it would have to request a deviation. Id.

On November 25, 2019, the Owner replied to the Amended Order with the information the FOSC requested regarding "Conditions" 3 and 4. Id. at 29-48. In a separate document dated November 25, 2019, the Owner replied to the Amended Order with the information that the FOSC requested regarding "Conditions" 1 and 2. Id. at 109-21; see also id. at 444-695 (supporting documents). Regarding Condition 1 (the Transitional Agreement), the Owner submitted a deviation request. Id. at 109. Regarding Condition 2 (Rejecting DJ-S' Plan), the Owner provided DJ-S' plan and stated that it rejected the plan because DJ-S used a SSD methodology, would not end until the winter of 2020/2021, did not commit to building the

EPB prior to the start of demolition, and lacked clarity regarding around-the-clock work. Id. at 112.

On November 26, 2019, Plaintiff replied to the Amended Order with the information that the FOSC requested. Id. at 49-50; see also id. at 696-1670 (supporting documents). DJ-S stated that it considered the Transitional Agreement to be a deviation). Id. at 49.

On December 1, 2019, Commander Witt determined that the transition from Wreckhire #1 to Wreckhire #2 constituted a deviation and denied that deviation. Id. The FOSC found that the change in resource providers (from DJ-S to DJ-M) had "little to no impact" on the continuity of the operations, and thus would not "make the response more expeditious, effective, or environmentally safer." Id. at 52.

### 3. The Owner's Second Deviation Request

On December 19, 2019, the Owner made its second request to deviate from the NTVRP. Id. at 86-93. In the request, the Owner explained that the deviation will result in a "more expeditious, efficient, and more effective" removal operation that will also mitigate the environmental impacts of the removal and would thus "best affect a more successful response." Id. at 86. The Owner stated that the use of T&T's plan is favored because it calls for the completion of a flexible EPB prior to the start of the cutting operation and because it recommends the use of LSD. The Owner

further stated that T&T's method is expected to result in the wreck being removed much earlier in the approaching hurricane season. Id. at 88. Finally, the deviation notes that although there is potential for the wreck's hull to collapse, T&T will be able to shift to SSD, if needed. Id.

Comparatively, the Owner stated at the onset of its deviation request that "DJS was provided two opportunities to propose its approach to this wreck removal project." Id. Both times, however, "DJS submitted a wreck removal plan that did not include complete Large Section Demolition." Id. Instead, "DJS proposed to perform Small Section Demolition and for Owners to separately contract for the erection of an EPB with a third-party." Id. The Owner also states that DJ-S' plan has a "P-90 date of 7 October 2020," meaning the wreck would remain only partially demolished in the Saint Simons Sound until the end of hurricane season. Id. Next, the Owner wrote, "Simply stated, the DJS proposal fails to satisfy the concerns of the wreck removal experts and would result in a noisy, prolonged, inefficient, and less environmentally reasonable wreck removal operation." Id. In closing, the Owner states that the deviation is warranted because the "expedited timeline for completion" coupled with the "erection of an EPB prior to the commencement of cutting operations" makes T&T's methodology the "more expeditious *and* effective response *and* mitigates the environmental effects." Id. at 89 (emphasis in original).

### 4. Commander Witt's Deviation Approval

On December 21, 2020, Commander Witt approved the Owner's deviation request, id. at 85, and wrote a "Decision Memo" explaining his decision. Id. at 126-32. The Decision Memo provides details of the analysis he, as FOSC, undertook. In his analysis, Commander Witt determined that the Owner's request was justified because the deviation was for a specific purpose, under exceptional circumstances, and would best affect a more successful response. Id. at 128.

Of particular importance, Commander Witt discussed four "exceptional circumstances" warranting the deviation: the size of the M/V GOLDEN RAY (a 656-foot RoRo listing at 100 degrees to its portside), its proximity to the only navigable channel to the Brunswick Port, the environmental sensitivities of the surrounding area, and the proximity of the M/V GOLDEN RAY to tourist areas. Id. at 128-29. Next, Commander Witt explained that his review of the Owner's justification "supports a finding that a deviation would provide for a more successful response, including one that is more expeditious or effective and mitigates the [wreck]'s environmental effects." Id. at 129. As he explained:

> The Owner has requested to use T&T on the basis that the resource provider is able and willing to conduct Large Scale Demolition (LSD) with the use of an EPB. The Owner's expert engineering and salvage advisors have found LSD to be the most expeditious, effective and environmentally safe means of removing the vessel.

Id.

Second, Commander Witt determined that T&T's Plan—including installing the EPB—was four months faster than DJ-S' Plan. Id. at 129-30. Rather than relying on the Owner or solely on his own calculations, Commander Witt documents that SUPSALV and SERT were also consulted. This timeframe was confirmed as "reasonable" by SUPSALV and SERT's preliminary review of T&T's Plan. Id. SUPSALV and SERT also deemed T&T's plan to be "technically feasible." Id. at 129. Accordingly, the FOSC found that the Owner's claim that LSD is the more expedient methodology "well-founded." Id.

The FOSC then explained that the accelerated timeline "provides for a more successful response" because it reduces the likelihood that the salvage operations will extend as long into the 2020 hurricane season or another season of winter storms. Id. at 130. Thus, according to Commander Witt, the deviation would provide not only an "expeditious response," but also a more successful one. Id.

Next, Commander Witt considered whether the deviation would mitigate the environmental impacts of the wreck and its removal. He concluded that it does. First, Commander Witt points out that the Owner asserts the use of an EPB provides the best containment of the remaining pollutants and "mitigates the effects of a potential discharge," particularly when constructed prior to demolition. Id. Then, Commander Witt reasons that T&T's proposed

timeline reduces the amount of time the environment remains at risk of a potential discharge from the M/V GOLDEN RAY. Third, Commander Witt states that since LSD uses fewer cuts, the oil tanks within the M/V GOLDEN RAY can be removed intact; thus, the likelihood of the salvors nicking an oil line is greatly reduced. Id. Taken together, these limited cuts reduce the overall threat of an accidental oil discharge from the M/V GOLDEN RAY during demolition. Id. In his final point regarding mitigation of environmental impact, Commander Witt states that the quickened pace of removal would also reduce the duration of inevitable light pollution, noise pollution, and acoustic disturbances to the marine environment caused by the demolition. Id.

Next, Commander Witt further supports his conclusion that the deviation would best affect a more successful response by arguing that the Owner has "maintained the position that LSD after the construction of an EPB" has been its "preferred methodology" since it "began considering salvage operations." Id. He continues:

> Throughout contractual negotiations and technical discussions, DJS maintained a position that SSD was preferred. DJS submitted two proposals to the Owner: an initial proposal after an exclusive negotiating period submitted on 5 November 2019 and a secondary proposal submitted during the Invitation to Tender process, which closed on 8 December 2019. Both of DJS' plans focused on the use of SSD, despite the Owner articulating a preference for LSD and an EPB in their Invitation to Tender and technical discussions. Neither of DJS' plans satisfy the concerns of the Owner and their salvage experts as they do not commit to LSD or use of an EPB before starting operations . . .

> It is unclear why DJS has been unwilling or unable to
> acquiesce to the Owner's reasonable request for LSD and
> an EPB. However, DJS' lack of ability in meeting the
> Owner's demands supports a determination that DJS and
> the Owner have philosophical disagreements as to the
> preferred methodology for salvage operations.

Id. at 130-31. On top of all of the reasons heretofore discussed,
Commander Witt cites the deteriorating working relationship
between DJ-S and the Owner compared to T&T's ability to maintain
a working relationship with the Owner as further evidence that the
deviation would best affect a more successful response. Id. at
131-32.

## III. Conclusions of Law

A preliminary injunction is an "extraordinary and drastic"
remedy. Siegel v. LePore, 234 F.3d 1163, 1176-77 (11th Cir. 2000).
Indeed, "[w]hen a court employs the extraordinary remedy of
injunction it directs the conduct of a party, and does so with the
backing of its full coercive powers." Nken v. Holder, 556 U.S.
418, 428 (2009) (internal quotations and citations omitted). A
court should only exercise this power in the rarest of
circumstances. For the court to grant such extraordinary relief,
a movant must establish four essential elements: (1) a likelihood
of success on the merits of the overall case; (2) irreparable
injury; (3) the threatened injury outweighs the harm the
preliminary injunction would cause the other litigants; and (4)
the preliminary injunction would not be averse to the public

interest. See Chavez v. Fla. SP Warden, 742 F.3d 1267, 1271 (11th Cir. 2014). Injunctions that do more than preserve the status quo are particularly disfavored. Powers v. Sec'y, Fla. Dep't of Corr., 691 F. App'x 581, 583 (11th Cir. 2017) (internal quotations and citation omitted).

### A. Plaintiff has a possible, but not likely, chance of success on the merits.

To determine whether Plaintiff has a likelihood of success on the merits, the Court must first determine whether it has jurisdiction over Plaintiff's claims, and if so, whether Plaintiff has standing to bring each claim.

The Court has jurisdiction to hear Plaintiff's Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, claim for judicial review, including Plaintiff's request for a declaratory judgment. Indeed, the APA provides the Court with subject matter jurisdiction over these claims in conjunction with 28 U.S.C. § 1331. 5 U.S.C. § 704; see also Media Gen. Operations, Inc. v. Herman, 152 F. Supp. 2d 1368, 1371 (S.D. Ga. 2001).

Such jurisdictional confidence is lacking regarding most of Plaintiff's remaining claims. First, although the Court has original jurisdiction over "any action in the nature of mandamus to compel an officer . . . of the United States or any agency thereof" to perform a duty owed to the plaintiff," 28 U.S.C. 1361, a writ of mandamus is only appropriate where the "duty owed to the

plaintiff" is mandatory. It is well established that "a writ of mandamus cannot compel a discretionary action." Einhorn v. DeWitt, 618 F.2d 347, 349 (5th Cir. 1980). As discussed above, the FOSC has discretionary authority to grant an owner's request to deviate from a NTVRP. See 33 U.S.C. § 1321(c)(3)(B). Accordingly, there are doubts regarding whether the Court has jurisdiction to consider Plaintiff's request for a writ of mandamus under 28 U.S.C. § 1361.

Next, Plaintiff brings a constitutional claim alleging a violation of procedural and substantive due process under the Fifth Amendment of the United States Constitution. The Fifth Amendment ensures that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Court has little doubt that it has jurisdiction over this constitutional claim. See Bell v. Hood, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."); see also 5 U.S.C. § 706(2)(B).

The merit of Plaintiff's constitutional claim, however, is quite another matter. Plaintiff alleges that "Defendants, acting in their official and individual capacity, wrongfully approved the Owner's deviation request and nullified Donjon-SMIT's contract without affording Donjon-SMIT any opportunity to be heard." Dkt. No. 56 ¶ 42. Accordingly, Plaintiff claims that "Defendants thereby

violated Donjon-SMIT's Fifth Amendment rights by depriving Donjon-SMIT of its property without due process of law." Id. Of course, federal courts have long held that a contract is a property interest protected by the Constitution from a government taking. See, e.g., Lynch v. United States, 292 U. S. 571, 579 (1934); Long Island Water-Supply Co. v. City of Brooklyn, 166 U.S. 685, 690 (1897). However, the Court must take several analytical steps before it can even reach Plaintiff's constitutional challenge. First, it is not apparent that Plaintiff's NTVRP Contract is "secured by statute." Plaintiff has offered no evidence or law that its NTVRP contract was "secured by statute." Second, even if the NTVRP Contract is "secured by statute," it has not been shown that the Coast Guard's approval of the Owner's deviation deprived Plaintiff of its contract.

The facts as set forth thus far call into question whether there was even a taking. Primarily, the deviation approval simply adds T&T as a resource provider under the NTVRP. It does not remove Plaintiff as a resource provider. On paper, Plaintiff is still a resource provider under the NTVRP. Practically speaking, however, it is true that the FOSC's approval of the Owner's deviation stripped Plaintiff of its pre-contracted position of being the sole and primary provider under the NTVRP and whatever the contractual benefits that position may have entailed. Plaintiff has yet to make an argument as to why, under these facts, the Coast

Guard's actions constitute an improper government taking under the Fifth Amendment.

Second, the question of whether Plaintiff has a constitutional claim in this case is further complicated by the "Transitional Agreement" between the Owner, DJ-S, and DJ-M. The Coast Guard determined that the agreement was a deviation from the NTVRP because the agreement removed DJ-S as the SMFF provider and replaced it with DJ-M. It is unclear what the legal ramifications of the Coast Guard's denial of the Owner's first deviation request has on the enforceability of the Transitional Agreement, let alone the underlying contracts it modified, namely Wreckhire #1 between the Owner and DJ-S and Wreckhire #2 between the Owner and DJ-M. This already complicated legal question is exacerbated even further because these three contracts, along with the NTVRP, purport to be governed by the laws of England, not the United States.

Given the novelty of the question presented, the complexity of the facts involved, and the lack of legal argument supporting this claim, the Court cannot say at present that Plaintiff's constitutional claim has a likelihood of success on the merits. Accordingly, the Court focuses on the Plaintiff's APA claims:

judicial review of the Coast Guard's administrative decision and a declaratory judgment regarding the same.[5]

### 1. Plaintiff's Substantive Claims Under the APA

Plaintiff argues that Defendants "have subverted the very purpose of OPA 90 and effectively delegated their decision-making authority back to those responsible for the disaster at issue." Dkt. No. 56 ¶ 34. They disagree with the FOSC's analysis and decision. In Plaintiff's view, Defendants are "willfully failing" to abide by OPA 90 and the regulations promulgated under it because the FOSC approved a deviation when there were no exceptional circumstances or "guarantees" of a more successful response. Id. ¶ 36 (citing 33 C.F.R. § 155.4032). Plaintiff's opinion is that the deviation does not provide for a "more expeditious or effective response to the spill or mitigation of its environmental effects." 33 U.S.C. § 1321(c)(3)(B); Dkt. No. 56 ¶ 37. Therefore, Plaintiff urges the Court to find that Defendants' approval of the Owner's deviation request to add T&T as an SMFF provider under the NTVRP was "arbitrar[y] and capricious[], in [violation] of Donjon-SMIT's due process rights under the Fifth Amendment, in excess of their statutory authority, and without observance of procedure required by law." Id. ¶ 38; see also 5 U.S.C. § 706(2)(A)-(D). Accordingly,

---

[5] At the February 25, 2020 hearing, Defendants' counsel argued that DJ-S lacks standing to bring its claims under the APA because, at base, its injury "is the loss of their contract," and the Coast Guard is not responsible for that loss. Hearing Tr. 159:14-20. That is debatable. For the purposes of this Order, the Court finds that DJ-S has standing.

Plaintiff requests that this Court "hold unlawful and set aside Defendants' approval of Owner's deviation from the NTVRP." Id. ¶ 39. Plaintiff also requests a declaratory judgment under the APA stating the same. Id. ¶ 46.

## 2. The Standard of Review under the Administrative Procedure Act

Both parties agree that the approval of a request to deviate from the NTVRP is a final agency action subject to judicial review under the APA. In reviewing a final agency action, the district court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] without observance of procedure required by law." See Van Antwerp, 526 F.3d at 1360 (alteration in original) (citing 5 U.S.C. § 706(2)). The Eleventh Circuit has instructed that this standard of review is "exceedingly deferential" and that the Court's only role is to "ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." Id. at 1359–60 (internal punctuation omitted; citations omitted). "[T]he focal point for judicial inquiry of an administrative agency's action should be the administrative record." Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246

(11th Cir. 1996) (citing <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973)).

That said:

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand [the decision back] to the agency for additional investigation or explanation.

<u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985).

### 3. The FOSC has discretion when deciding whether a deviation from the NTVRP is warranted.

Under OPA 90, the FOSC is "the principal authority for responding to oil and hazardous substance spills or releases, including threats of discharges and releases." Pl. Ex. 33 at App'x. C-4 (Coast guard Contingency Preparedness Manual, Vol. 4). "The FOSC uses legislative and regulatory authorities to ensure that pollution response is carried out expeditiously and aggressively." <u>Id.</u> For the FOSC to grant a non-tank vessel owner's request for a deviation from the NTVRP to use an unlisted resource provider, the owner must submit a request containing a sufficient justification for it. 33 C.F.R. § 155.4032(a). The owner's request is justified if the FOSC finds the facts contained therein—coupled with his own understanding of the facts concerning the overall response effort—constitute "exceptional circumstances" and finds that the deviation would "best affect a more successful response." <u>Id.</u>; <u>see</u>

<u>also</u> "Coast Guard Marine Environmental Response and Preparedness Manual," COMDTINST M16000.14A (Sept. 2018), 5.C.5.b.(4).[6]

The FOSC's limited authority allows him to take actions that would effectuate a quicker, safer response. He cannot exceed that authority. Therefore, a "more successful response" demands a "clear" showing of either effectiveness, speed, or mitigation of the environmental damages. 33 U.S.C. § 1321 (c)(3)(B); 33 C.F.R. § 155.4032(a); <u>see also</u> Coast Guard Marine Environmental Response and Preparedness Manual at 5.C.5.b.(4) ("FOSCs possess the regulatory authority to approve a deviation from an approved VRP under exceptional circumstances and if the proposed alternative actions would clearly enable a more effective response"). Accordingly, when an owner requests a deviation from the NTVRP to add a provider not listed on the NTVRP to provide a specific service as part of the response, the determination that the facts of the response constitute "exceptional circumstances" is left to the FOSC.

### 4. Application

In its Amended Complaint, Plaintiff alleges that Defendants wrongfully approved the M/V GOLDEN RAY Owner's deviation request because the deviation did not "provide for a more expeditious or effective response to the spill or mitigation of its environmental

---

[6]    Available    at    <u>https://media.defense.gov/2018/Oct/01/2002046527/-1/-1/0/CIM_16000_14A.PDF</u> (last viewed Feb. 23, 2020).

effects." 33 U.S.C. 1321(c)(3)(B); Dkt. No. 56 ¶ 37. Plaintiff further alleges that Defendants' grant of the Owner's deviation request is contrary to law because the response to the wreck lacked "exceptional circumstances" warranting a deviation. 33 C.F.R. § 155.4032; Dkt. No. 56 ¶ 36. Accordingly, Plaintiff alleges that Defendants' approval was (1) arbitrary and capricious, (2) contrary to Plaintiff's constitutional rights, (3) in excess of Defendants' authority, and (4) without observance of procedure required by law, and therefore reviewable by this Court under the APA. Id. ¶¶ 38, 39; see also 5 U.S.C. § 706(2)(A)-(D).

Plaintiff cites four grounds for review. First, Plaintiff alleges that the FOSC provided no "public justification" for his deviation. Dkt. No. 28 at 7. They argue that the FOSC's decision memorandum, dated December 21, 2019, was not shared with Plaintiff until Defendants provided it during the present litigation. Id. This is true, but it is also inconsequential. Defendants are correct in asserting that neither 33 U.S.C. § 1321(c)(3)(B) nor 33 C.F.R. § 155.4032(a) requires the FOSC to provide a "public justification" for his decision to approve the deviation. Dkt. No. 20. Although Plaintiff maintains that a "public justification" is warranted, no statute nor regulation contemplates such. At most, Plaintiff has shown that Commander Witt may not have also filed his Decision Memo "in the [Marine Information for Safety and Law Enforcement ("MISLE")] activity and/or other relevant incident

response documentation, as required by a Coast Guard Manual. COMDTINST M16000.14A (Sept. 2018). If such documentation deviation from the manual did occur, it is not likely to amount to a finding that the deviation decision was "without observance of procedure as required by law."

Second, Plaintiff disagrees with Commander Witt and argues that the "exceptional circumstances" stated by the FOSC are not, in fact, exceptional. Dkt. No. 28 at 9. The FOSC provides four circumstances that, when taken together, make the "GOLDEN RAY [wreck] and salvage operations . . . an exceptional circumstance" under 33 C.F.R. § 155.4032. Dkt. No. 20-1 at 51-52 (Decision Memo). Specifically, the FOSC cites the size of the M/V GOLDEN RAY, its proximity to the only navigable channel to the Brunswick Port, the environmental sensitivities of the Saint Simons Sound and surrounding coastlines, and the wreck's proximity to major tourist destinations as "exceptional circumstances" warranting a deviation. Id.

Plaintiff argues that these are not "exceptional circumstances," because by definition all vessels requiring an NTVRP are large, all environmental areas are sensitive to oil and hazardous material spills, and, as Plaintiff would have the Court find, there is nothing "exceptional" about the proximity of tourist locations close to the wreck. Dkt. No. 28 at 10-12.

The phrase "exceptional circumstances" as used in 33 C.F.R. § 155.4032 has not been interpreted by Courts. Plaintiff posits that an exceptional circumstance occurs *only* when a resource provider is unable to perform their required task or when their services are "non-responsive or deficient." In support, Plaintiff points to Salvage and Marine Firefighting Requirements; Vessel Response Plans for Oil, 73 FR 80618-01, 80637 (Dec. 31, 2008). However, Plaintiff's reliance on that Federal Register guidance is misplaced. There, the Coast Guard uses the above language in response to a specific question from a commenter who claimed that OPA 90 imposed "no requirements related directly to the adequacy of the resource provider." Id. at 80636. Therefore, the Coast Guard's response in no way indicates those examples of exceptional circumstances are an exclusive list. To the contrary, that language was employed to address one specific question posed.

Comparatively, Defendants argue that determining what circumstances are classified as "exceptional" is a case-specific and fact-based question to be decided by the FOSC. Dkt. No. 20 at 15. The statute in question, 33 U.S.C. § 1321(c)(3)(B), does not contain the phrase "exceptional circumstances." Instead, the statute states, "[T]he owner or operator may deviate from the applicable response plan if [the FOSC] determines that deviation . . . would provide for a more expeditious or effective response to the spill or mitigation of its environmental effects." Id.

However, the phrase "exceptional circumstances" is used in the Coast Guard's regulations promulgated under 33 U.S.C. § 1321, namely 33 C.F.R. § 155.4032. That Regulation requires "[o]nly under exceptional circumstances will the FOSC authorize deviation from the resource provider listed in the approved vessel response plan in instances where that would best affect a more successful response." Id. The well-accepted definition of "exceptional" serves as a guide. The Oxford English Dictionary defines "exceptional" as "unusual, not typical." *Exceptional*, THE OXFORD ENGLISH DICTIONARY (2nd ed. 2010).

Here, Plaintiff has not met its difficult burden of showing that it is likely to prevail on its claim that Commander Witt was incorrect in his determination that exceptional circumstances exist. Plaintiff fails to account for the combination of circumstances noted by the FOSC. Far from determining, as Plaintiff sees it, that the M/V GOLDEN RAY is a big boat with oil near a shipping channel, Commander Witt considered the, well, exceptional details of the size, location, position, and environment. In fact, Plaintiff's chosen representative testified as to the unusual, atypical nature of the M/V GOLDEN RAY wreck. Tellingly, Mr. Martin, when asked about the M/V GOLDEN RAY wreck, testified, "The GOLDEN RAY is one that people will speak about for time . . . There's cars. There's a pollution event, and it's a big job and . . . it's in front of everyone. So, yeah. You know, these kind of cases occur

40

occasionally around the world . . . so to have it in one location . . . is unique as mentioned . . . it's not that common." Hearing Tr. 63:13-64:3 (full exchange).

So, no, it cannot be said that the M/V GOLDEN RAY's wreck presents an ordinary circumstance. It couldn't even be said by the Plaintiff's witness under oath. As a result, the Court cannot say that Plaintiff is likely to prevail in its contention in that regard.

Third, Plaintiff argues that the FOSC's Decision Memo does not "adequately explain" its rationale for approving the Owner's deviation but instead shows that the FOSC "merely mimics the demands and commentary of the Owner," instead of presenting an "independent analysis" of the facts. Dkt. No. 28 at 12. Specifically, Plaintiff argues that the FOSC's decision was "arbitrary and capricious" because the FOSC "relied on factors Congress did not intend [for him] to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Jewell, 788 F.3d at 1217.

Plaintiff notes broadly that "[t]he facts set forth [in its Reply Brief] evidence the FOSC's failure to comply with the law." Dkt. No. 28 at 12. Plaintiff further contends that the FOSC should

have "noted" Plaintiff and the Owner's methodological differences in October 2019, "conducted his own investigation" into those, and ultimately settled that dispute so Plaintiff could have begun removing the M/V GOLDEN RAY in November using whatever method the FOSC chose. Id. at 12. Plaintiff concludes that because the FOSC did not take those steps in October, despite his knowledge of Plaintiff's willingness to do an LSD removal, he had to then fabricate "contrived and unsupportable explanations" for approving the Owner's deviation request. Id.

Certainly, Plaintiff as a scorned salvager disagrees with Commander Witt's decision. The question before the Court is not whether Commander Witt made the best decision. The question is whether it was arbitrary and capricious. The record thus far supports a finding that it was neither arbitrary nor capricious.

Fourth and finally, Plaintiff speculates about the motives of the Owner in making a deviation request: to allegedly circumvent the liability provisions of OPA 90 by requiring salvors submitting bids under the ITT to propose "fixed price" contract in addition to their methodology. Dkt. No. 28 at 14; see 33 U.S.C. § 2710(b) (providing that a responsible party cannot convey liability imposed under OPA 90 to any other person). Plaintiff contends that the "acceptance of a fixed price contact, because it shifts [the] risk to the salvor" is also a violation of OPA 90 susceptible to

judicial review under the APA.[7] Suffice it to say that such a theory remains as such for now.  It may be that Plaintiff someday brings forth sufficient evidence to support that theory.  That day has not yet arrived.  Accordingly, the Court cannot say it is likely that Plaintiff will prevail on it.

Although it may be possible for Plaintiff to prevail someday on some of its contentions and theories, the record at present cannot support a finding that Plaintiff is likely to prevail.

**B.   Plaintiff will likely suffer an irreparable harm.**

Next, Plaintiff must show "that the preliminary injunction is necessary to prevent irreparable injury." Chavez, 742 F.3d at 1271. "A showing of irreparable harm is the *sine qua non* of injunctive relief." Ne. Fla. Chapter of Ass'n of Gen Contractors of Am. V. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (internal quotations omitted; citations omitted). The irreparable harm must be "neither remote nor speculative, but actual and imminent." Id. In other words, it must be "not merely possible, but likely." United States v. Jenkins, 714 F. Supp. 2d 1213, 1221 (S.D. Ga. 2008).

This factor weighs in favor of Plaintiff.  Here, Plaintiff argues that as the direct and proximate result of the Coast Guard's approval of a deviation request, Plaintiff has lost a contract.

---

[7] At present, there is no evidence to support this claim, and even if there were, it is unclear that Plaintiff would have standing to pursue it.

Dkt. No. 6 at 14. Although the Court questions whether the contract is "secured by statute," the reality is that the M/V GOLDEN RAY can only be salvaged once. It also remains true that until the Coast Guard approved the Owner's deviation request, DJ-S—as the sole and primary NTVRP SMFF provider—was the only entity who could perform that salvage. See Amin. R. at 2633, Art. 10(b) ("[T]he parties agree that the use of DONJON-SMIT as the OWNER's named salvor and marine firefighter is required under [33 C.F.R. § 155].")。 Plaintiff argues that the deviation also harmed its reputation in the industry and that the deviation "undermines the very purpose of OPA 90" which "devastatingly impacts the hundreds of SMFF contracts that Donjon-SMIT currently has with other vessel owners." Dkt. No. 6 ¶ 31.

Plaintiff primarily alleged that time is of the essence because once T&T began construction of the EPB, it became "nearly impossible to restore Donjon-SMIT as the SMFF provider." Id. ¶ 32. Since filing its motion for injunctive relief, Plaintiff has walked back these allegations in word and deed. First, this Court scheduled a hearing regarding Plaintiff's request for a TRO and preliminary injunction for February 19, 2020, the day the construction of the EPB was to begin. In response, Plaintiff's counsel asked for a continuance. Dkt. No. 11. At Plaintiff's request, the Court granted Plaintiff's Motion to Continue and rescheduled the hearing for February 25, 2020. Dkt. No. 12.

Construction of the EPB began on February 19, 2020. During the February 25, 2020 hearing, the Court asked one of Plaintiff's witnesses, "Do you agree that it is now nearly impossible for [DJ-S] to be restored [as the SMFF provider]?" to which Plaintiff's witness responded, "It's more difficult. I think 'nearly impossible' is probably . . . not correct." Hearing Tr. 106:1-2.

Defendants argue that Plaintiff's delay in filing this case fifty-three days after learning about the deviation is "a sufficient basis alone," dkt. no. 8 ¶ 2, for this Court to conclude that Plaintiff is not facing an irreparable harm. Plaintiff's delay, though long, is not enough to change the fact that Plaintiff is facing an irreparable harm.

The M/V GOLDEN RAY will only be salvaged once. Unless Plaintiff prevails in its injunction, it will lose an amount of the salvage work, irreparably.

**C. The balancing of the harms may weigh in favor of granting Plaintiff's request for injunctive relief.**

Next, Plaintiff must show that its threatened injury "outweighs the harm" the preliminary injunction would cause the Coast Guard. Chavez, 742 F.3d at 1271. Here, the injunctive relief Plaintiff seeks is an order staying the Coast Guard's decision to approve the Owner's deviation request until this action is fully litigated. Since the Coast Guard has already approved the deviation, the Court would essentially enjoin the effectiveness of

the FOSC's decision on salvage operations. In effect, the Court's preliminary injunction would indefinitely halt all or most SMFF activity currently taking place on and around the M/V GOLDEN RAY (unless the Owner contracted for SMFF services with Plaintiff). This drastic equitable remedy is the only one available to Plaintiff that would completely prevent Plaintiff's irreparable harm. By the time this case reaches a final judgment on the merits, it is very possible that T&T's salvage of the M/V GOLDEN RAY will be complete and Plaintiff will have lost all opportunity to remedy its harm, regardless of whether it is successful on its underlying claims.

Comparatively, the Coast Guard argues that the preliminary injunction would harm it because it would have to maintain the safety and the security of the area around the M/V GOLDEN RAY (including monitoring the environment and maintaining channel integrity) while the injunction halted salvage activity on and around the vessel. Dkt. No. 20 at 22. Defendants further argue that when the federal government is the party against whom the injunctive relief is requested, the third and fourth injunction factors "merge" together. Nken v. Holder, 556 U.S. 418, 435 (2009). To the extent this factor is weighed independently of the fourth factor, it tips ever so slightly in favor of Plaintiff. To the extent it overlaps or merges with the fourth, Defendant has the winning position for this third factor.

### D. Public Interest

This factor, in this case, is crucial. Regardless of whether the Coast Guard could show that the harm caused to it because of the preliminary injunction would also harm the community, granting this preliminary injunction would be averse to the public interest. An injunction to enjoin the effectiveness of the FOSC's decision would necessarily add delay. It would inevitably push salvage efforts further into the 2020 hurricane season and quite likely into 2021.[8]

During that time, the environmental protection barrier would go unfinished (unless the Owner contracted with Plaintiff to complete it). At the same time the M/V GOLDEN RAY would continue to deteriorate. All parties agree that as it deteriorates, the risk of an oil spill becomes greater. Indeed, both parties have acknowledged that the biggest threat to the environment is the M/V GOLDEN RAY itself. As long as it remains in the Saint Simons Sound, this community's waterways, coastline, and various important forms of marine life face an imminent environmental threat. Time compounds that threat.

---

[8] The 2020 hurricane season and following winter storm months will only magnify the extent to which any delay to the salvage of the M/V GOLDEN RAY would harm the public. As the head of the Coast Guard Office of Marine Environmental Response Policy, Captain Ricardo Alonso stated in his affidavit, "[c]onducting salvage operations during hurricane season (or winter storm months) presents additional safety risks and reduces [the] ability to effect[ively conduct] salvage and removal [operations]. Hurricanes . . . bring many dramatic changes to the marine environment—including high winds, storm surges, and shifting of the ocean floor, all of which increase chances of the vessel becoming destabilized or splitting apart." Dkt. No. 20-2 ¶ 8.

This case began on a very different foot than it finds itself today. When injunctive relief was first requested by Plaintiff, it was to prevent what Plaintiff, at the time, contended was an "almost certain environmental disaster" in the St. Simons Sound if T&T's LSD approach is used. Dkt. No. 6 at 1. This, too, was walked back by Plaintiff at the hearing. As Plaintiff's witness explained, DJ-S would and could salvage the M/V GOLDEN RAY using an LSD plan. Hearing Tr. 105:3-6 (Martin Testimony). Despite the language Plaintiff used in the Complaint, Plaintiff is actually not opposed to the LSD approach, Plaintiff just wants to be the company doing it.

Without any evidence of a public benefit to delaying the salvage of the M/V GOLDEN RAY, Plaintiff cannot meet its burden of showing that its request for a preliminary injunction is in the public interest.[9]

## IV. Conclusion

The wreck of the M/V GOLDEN RAY is so significant and so fraught with challenges, the Court has concerns that no method—

---

[9] As this decision issues, the United States of America is well into a worldwide Coronavirus (COVID-19) pandemic. Situation Summary, CENTERS FOR DISEASE CONTROL AND PREVENTION (March 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html. International travel is restricted on a scale heretofore unseen. Id. The Court has not even factored in the unusual conditions our country faces in arriving at the Court's decision today. If it were factored in, it would strengthen the conclusion that further delay and disruption are not in the public interest. Suffice it to say that at a time when some ordinary groceries are difficult to find and air travel is rare, any decision upending an operation as involved and important as the salvage of the M/V GOLDEN RAY would add time and consequentially threat to unique and important environmental resources. That is in no one's interest.

whether it be by large sections or small sections—and no salvage company—whether it be Plaintiff or T&T—can prevent further environmental complications and/or partial collapse of the vessel itself.

To be clear, this Order does not and, by law, must not conclude that Commander Witt's decision is the one the Court would have made. The Court's only role is to "ensure that [Commander Witt] came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for [Commander Witt's] decision." Van Antwerp, 526 F.3d at 1360. Here, the evidence brought forth shows that Commander Witt's decision was rational. It was not arbitrary or capricious. The decision was well documented and within his discretion as the FOSC. Crucially, the relief requested by Plaintiff would further delay the removal process, and that delay would harm the people, waterways, coastline, and marine life of the Golden Isles. Accordingly, Plaintiff's request for a preliminary injunction is **DENIED**. The Court reserves its power to issue a decision regarding Plaintiff's permanent injunction for a more appropriate time.

**SO ORDERED**, this __24th__ day of March, 2020.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA